**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

BRENT WILLIS, FRED COOPER, TIM HAAS, REGINALD KAPTEYN, ALICIA SYRETT, GREGORY GOULD, CHUCK ENCE, CARL AURE, KEVIN MANION, ED BRENNAN, AMY KUZDOWICZ, GREG FEA, and CRAIG THIBODEAU,

Defendants.

---

**PLAINTIFF'S CLASS ACTION COMPLAINT**
**FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

---

Plaintiff Dennis Clifton ("Plaintiff") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through their attorneys, which included, among other things, a review of defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NewAge, Inc. (collectively "NewAge" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased the securities of NewAge for the time period January 18, 2018 through and including October 18, 2022 (the "Class Period"), seeking to recover damages caused by Defendants' violations of federal securities laws and pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Relevant non-party party NewAge purports to produce and sell various beverages and other health products. NewAge wholly owns subsidiaries that sell products under a variety of brand names.

3.      During the Class Period, NewAge's Chief Executive Officer ("CEO") and various Chief Financial Officer's ("CFO") misrepresented to investors the Company's business relationships, product development, business prospects, adequacy of internal controls, and concealed an internal investigation and subsequent disclosure to the Department of Justice and the SEC.

4.      As a result of this adverse information, Plaintiffs and the class were damaged.

**JURISDICTION AND VENUE**

5.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

7.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C.  § 78aa and 28 U.S.C. § 1391(b), as a substantial part of the conduct complained of herein occurred in this District.

8.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND RELEVANT NON-PARTY

9.     Plaintiff Dennis Clifton as set forth in the accompanying certification, incorporated by reference herein, purchased NewAge securities at artificially inflated prices during the Class Period and have been damaged thereby.

10.     Defendant Brent Willis ("Willis") served as NewAge's CEO and a Director from March 24, 2016 through January 10, 2022.

11.     Defendant Gregory Gould ("Gould") served as NewAge's CFO from October 12, 2018 through July 2, 2021.

12.     Defendant Kevin Manion ("Manion") served as NewAge's CFO from July 21, 2021 through July 1, 2022

13.     Defendant Chuck Ence ("Ence") served as NewAge's CFO from October 17, 2016 through August 15, 2018, when he became the Company's Comptroller.

14.     Defendant Carl Aure ("Aure") served as NewAge's Chief Accounting Officer and Senior Vice President from December 2018 through October 2021.

15.     Defendant Ed Brennan ("Brennan") served as a member of NewAge's Board of Directors (the "Board") since 2017 and as Chairman since January 2022. Defendant Brennan has served as the Company's interim CEO since March 2022.

16.     Defendant Fred Cooper ("Cooper") has served on NewAge's Board since November 16, 2020.

17.     Defendant Greg Fea ("Fea") has served on the Board since 2017 and previously served as Chairman from 2018 to 2022.

18.     Defendant Tim Haas ("Haas") served on the Board from 2017 until January 2022.

19.     Defendant Reginald "Reggie" Kapteyn ("Kapteyn") served on the Board from 2017 until November 2020.

20.     Defendant Amy Kuzdowicz ("Kuzdowicz") has served on the Board since February 25, 2019 and serves as the Audit Committee Chair.

21.     Defendant Alicia Syrett ("Syrett") served on the Board from January 6, 2020 until January 31, 2022.

22.     Defendant Craig Thibodeau serves as NewAge's Vice President of Key Accounts and as President of International and Global Head of Private Label.

23.     The individuals in paragraphs 10-22 are collectively referred to hereinafter as the "Defendants."

24.     The Defendants are collectively referred to herein as "Defendants."

25.     Relevant non-party NewAge is a Delaware Corporation with its principal executive offices located at 7158 S. FLSmidth Dr. Suite 250, Midvale, Utah 84047. It was previously incorporated in Washington State and its principal place of business was in Denver, Colorado. At all relevant times herein, NewAge's common stock was listed on the NASDAQ Stock Exchange

or on the OTC market. The Company was known as New Age Beverages Corporation until July 29, 2020 and from then on as NewAge, Inc. Its common stock was listed on the NASDAQ exchange under ticker NBEV until September 14, 2022, and since then on the OTC market under the ticker NBEVQ.

26.    NewAge purports to be an "organic and healthy products company intending to become the world's leading social selling and distribution company."

27.    On August 30, 2022, NewAge filed for Chapter 11 bankruptcy in Delaware. The bankruptcy plan submitted by NewAge has not been confirmed and all litigation against NewAge is subject to an automatic stay.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

28.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who purchased the securities of NewAge during the Class Period and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NewAge securities were actively traded on the NASDAQ stock exchange or later on the OTC market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by NewAge or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

30.    Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)  whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)  whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of NewAge; and

(c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

34.    The Class Period begins on January 18, 2018, when Defendants issued a false and misleading press release announcing that NewAge had a "new distribution agreement" with the

U.S. military which was a "new U.S. military initiative in partnership with NewAge". Under this agreement, 21 NewAge "SKUs" ("stock keeping unit," or distinct item for sale) across five product lines were purportedly "shipping out now and throughout the 1st quarter to all commissary locations worldwide," with the scope of the distribution agreement including 240 military commissaries and 3,100 exchanges in over 30 countries. The Company also claimed that "[t]he new distribution agreement is expected to have a material impact on the financial results of NewAge."

35.     During NewAge's May 15, 2018 earnings call, Defendant Willis made a statement which falsely referenced NewAge having "picked up the military business worldwide." In addition, on NewAge's August 14, 2018 earnings call, Defendant Willis false stated that NewAge was selling "21 core SKUs" of its brands in the "military channel" that was "as big as Walmart in total sales throughput."

36.     The statements in the January 18, 2018 press release and the May 15 and August 14, 2018 earnings calls were false and misleading when made because, as Defendant Willis was aware or was reckless in not being aware of at the time: (1) NewAge never entered into a "distribution agreement" or "initiative in partnership" with the military and never had plans to sell its products at all commissaries and exchanges around the world; (2) NewAge did not have adequate inventory of its products to fulfill this reported agreement; and (3) the only new distribution during this period was to sell NewAge products at two individual stores in Virginia and Florida for a trial period of four weeks.

37.     The false and misleading statements about NewAge's relationship with the U.S. military were material and caused NewAge's share price to spike. On January 19, 2018, the trading

day following the January 18, 2018 press release describing the purported agreement with the military, NewAge's stock price closed 21% higher than the previous day.

38.     Further, on February 1, 2018, Defendants issued a materially false and misleading press release announcing that NewAge had "begun shipments of its Coco-Libre and Bucha Live Kombucha brands in expanded distribution throughout Loblaws and Sobeys, the largest retailers across Canada" and "is now expanding to all banners within Loblaws and expanding throughout both Sobeys and Safeway."

39.     Defendants followed up on this press release with a February 13, 2018 press release stating that its Bucha Live Kombucha brand had "recently expanded to all major retailers throughout Canada . . ."

40.     The statements from the February 1 and 13, 2018 press releases on these beverages were false and misleading when made because: (1) there was no expansion of NewAge product lines Coco-Libre and Bucha Live Kombucha to all banners within Loblaws and throughout Sobeys (including Sobeys' subsidiary Safeway); (2) Sobeys never actually sold Coco-Libre brand beverages; (3) there was no expanded distribution of Coco-Libre brand beverages to Loblaws in 2018; and (4) NewAge did not expand distribution of its Bucha Live Kombucha brand to all major retailers throughout Canada.

41. The false and misleading statements about the purported expansions in Canada were material and caused NewAge's share price to go up. Following the February 1, 2018 announcement of the respective expansions with Loblaws and Sobeys, the share price closed up 5%. On March 5, 2018, an equity analyst maintained a "buy" rating for NewAge and a target price of $6 per share based, in part, on NewAge's reported expansions with Loblaws and Sobeys

42.     In the same press release containing the false statements concerning NewAge's purported expansion of its Bucha Live Kombucha drink to "all major retailers in Canada," Defendants made another materially false statement. Specifically, it was announced that NewAge "has signed a major distribution agreement for expansion of its Bucha Live Kombucha brand with the largest food and beverage distributor in South Korea to expand to all major retail outlets throughout the country immediately." The press release proceeded to identify 14 South Korean department stores, hypermarkets, and convenience and grocery outlets in which the brand would be sold starting by or before June 2018.

43.     In the same press release, Defendant Thibodeau stated, "[t]his is another major deal for NewAge [. . .]. NewAge no longer opportunistically distributes internationally. New, we build our brands in markets where we can have real scale, real broad-based market presence, and critical mass to enable the Company to invest in and sustainably build our brands. Bucha has rapidly expanded in both existing and new accounts in North America, and now is building on its success with a fantastic distribution partner in South Korea."

44.     This statement was false and misleading when made because: (1) the South Korean distributor merely received the right to distribute NewAge products within South Korea and did not guarantee that any retailers in South Korea would place orders for any NewAge products; (2) none of the 14 department stores, hypermarkets, and convenience and grocery outlets listed in this press release had made any commitment to purchase NewAge products. The distributor did not place any orders of Bucha Live Kombucha until December 2018, and even then, sales were minimal (1,500 bottles sold) before the relationship was terminated in October 2019.

45.     The false and misleading statements regarding the agreement with the South Korean distributor were material and caused NewAge's share price to go up. Following the

9

February 13, 2018 announcement of the agreement with the South Korean distributor, NewAge's stock went up by over 6% on the day, and an equity analyst even sent CEO Willis an email congratulating him on the "win [in South Korea."

47.     In addition, in September, 2018, Defendant Willis made multiple false and misleading public statements announcing that NewAge had been testing and developing a slew of CBD-infused beverages.

48.     During a September 5, 2018 investor presentation, Defendant Willis made the false and misleading claim that NewAge had been testing a CBD beverage over the previous six months. In fact, NewAge had only been distributing a CBD-infused water that was developed and controlled by a third-party supplier, not developing a proprietary beverage.

49.     On September 19, 2018, Defendants issued a false and misleading press release stating that it had tested and developed a portfolio of CBD-infused beverages that it planned to unveil at the National Association of Convenience Stores ("NACS") trade show in Las Vegas, Nevada in October 2018, and that its Health Sciences Division ("Health Sciences") was "overseeing and carefully controlling product production, quality, and its supply chain and sales channel partners."

50.     The statements from the September 5, 2018 investor presentation and September 19, 2018 press release were false and misleading at the time they were made because (1) NewAge had only begun development of its CBD portfolio shortly before its September 19, 2018 announcement and had, by that time, taken only preliminary steps towards developing any CBD-infused beverage; and (2) Health Sciences, which comprised of only two part-time employees, had no role in the development of CBD beverages as of September 19, 2018, and minimally participated in the process thereafter.

51.     On October 10, 2018, Defendants then issued a false and misleading press release regarding NewAge's purported debut of its portfolio of "full spectrum" CBD-infused beverages from "its Health Sciences Division" at the October 2018 NACS trade show in Las Vegas that included a quote attributed to its Chief Medical Officer attesting to NewAge's "scientifically and medically grounded" approach to its CBD beverage portfolio.

52.     During an off-site meeting organized by Defendant Willis and attended by retailers, distributors, and investors during the October 2018 NACS trade show in Las Vegas, NewAge distributed sell sheets that were reviewed, edited, and authorized by Defendant Willis, and included the false and misleading statements that: (i) NewAge's full spectrum CBD products were manufactured via a "proprietary production process"; (ii) that the purported products were a "proprietary in-house formula developed by NewAge Health Sciences"; that "every batch" of the purported products is "third-party tested" and (iv) that the purported products benefited from a "full spectrum nano technology-amplified entourage effect."

53.     The statements from the October 10, 2018 press release and subsequent sell sheets were false and misleading at the time they were made because: (i) NewAge had, by that time, taken only preliminary steps towards the development of any CBD-infused beverage; (ii) the purported debut of the CBD-infused beverages at the off-site meeting in Las Vegas consisted only of samples of existing NewAge products to which drops of CBD purchased from a local shop had been added onsite just before the event; (iii) NewAge's Chief Medical Officer never supplied nor endorsed the quote attributed to him in the October 10, 2018 press release and he never attested to NewAge's "scientifically and medically grounded" approach in its CBD beverage portfolio given his lack of involvement in the development of the CBD beverage portfolio.

54.     Between October 16, 2018 and January 27, 2019, Defendant Willis and NewAge made even more false and misleading statements regarding NewAge's purported completion of a CBD beverage portfolio.

55.     On October 16, 2018, Defendants issued a press release in which the Company stated that its "portfolio of 9 CBD-infused products generated initial retail distribution commitments spanning more than 110,000 points of distribution" and in which Defendant Thibodeau stated that NewAge was privately engaged in "launch plans" for its CBD beverage portfolio with "some of the largest convenience and grocery retailers in North America totaling 115,400 new points of distribution [. . .]."

56.     Then, on November 14, 2018, Defendants issued a press release announcing that its CBD Portfolio was "in production for launch before Christmas." On the same day that this press release was issued, Defendant Willis claimed that NewAge "had commitments of over 125,000 points of distribution" for its CBD beverage portfolio, and that its CBD beverage portfolio was developed by Health Sciences.

57.     During a call with investors on December 4, 2018, Defendant Willis then falsely claimed that: (i) NewAge had gained 125,000 points of distribution of either preorders or commitments for its CBD products, (ii) had three CBD manufacturers in different parts of the U.S. "already lined up"; and (iii) NewAge would be launching its CBD-infused beverages by Christmas 2018.

58.     During a December 6, 2018 interview with TheStreet.com, Defendant Willis falsely claimed that the CBD portfolio was already in production and stated that he expected to have NewAge's CBD products in stores before Christmas 2018.

59.     During the company's January 16, 2019 investor conference call, Defendant Willis directed the Company CFO and Marketing Director to make the following false statements: (i) NewAge had produced its portfolio of CBD-infused beverages prior to Christmas 2018; (ii) that this purported portfolio of beverages would be available in certain regional stores starting in March and April 2019; (iii) that every grocery retailer NewAge had met with at a recent trade show (the Winter Fancy Food Show) had placed an order for a CBD-infused beverage product from NewAge; and (iv) that NewAge would begin shipments of its CBD-infused beverage portfolio in the first quarter of 2019 and that this portfolio would have a material impact on NewAge's financial statements during the 2019 fiscal year.

60.     During the same January 16, 2019 call, Defendant Willis also falsely claimed that major Japanese retailer FamilyMart had placed an order with NewAge to sell NewAge's CBD beverage products in 15,000 of its outlets.

61.     Further, in a January 16, 2019 interview with Stuart Varney of Fox Business News, Defendant Willis claimed that NewAge's CBD beverages were available for purchase at FamilyMart.

62.     In a January 18, 2019 article in Forbes, Defendant Willis stated that FamilyMart stores would carry NewAge's CBD beverages, and that the product would start shipping in March 2019.

63.     At the January 27, 2019 Board meeting, Defendant Willis falsely told the Board that FamilyMart had placed an order for NewAge's line of CBD products.

64.     The statements from the October 16, 2018 press release, November 14, 2018 press release and earnings call, December 4 and 6 statements from Defendant Willis, and in the January 18, 2019 Forbes article were false and misleading at the time they were made because, as

Defendant Willis was aware, NewAge had not completed the development of a single CBD beverage product and never received orders or commitments from any retailer for CBD beverage products.

65.     The false and misleading statements regarding NewAge's fictitious CBD beverage portfolio were material and caused spikes in NewAge's share price at times from September 2018 to early 2019: (i) following the September 5, 2018 investor presentation announcing that NewAge had been testing a CBD beverage, NewAge stock closed up 7% on the day. Following the publication of the September 19, 2018 press release on the debut of the CBD beverage portfolio, NewAge's share price soared from a closing price of $2.82 on September 18, 2018 to $7.85 on September 20, 2018.

66.     On April 8, 2019, Defendants issued a false and misleading press release announcing (1) the "first national distribution" of its products via an expanded distribution of its Marley beverage line with Walmart; (2) that NewAge had "now begun shipments to Walmart distribution centers across the United States"; and (3) that each of NewAge's three Marley Mate flavors would be available at all Walmart stores in the beginning of April 2019.

67.     In addition, in the press release Defendant Thibodeau is quoted stating "[t]his is such a great accomplishment for New Age to gain its first national distribution, and to do so with the world's largest retailer in Walmart. This is just the first initiative that we expect to do with them on the Marley brand and other NewAge products on which we are in active discussions. We know Walmart is equally as committed as New Age to providing healthier products for their customers, and we expect to make the full portfolio of NewAge's better-for-you products available as we expand the relationship."

68.     The April 8, 2019 press release was false and misleading when it was made because (1) NewAge's agreement only covered some, but not all, of Walmart's distribution centers across the U.S.; (2) Walmart made no specific commitments regarding NewAge's Marley line and never agreed to make all Marley Mate flavors available at all Walmart stores in the beginning of April 2019; and (3) at their Walmart-sales peak, NewAge's Marley brand products were offered in less than 7% of Walmart stores across only 21 states.

69.     The false and misleading statements about the expanded distribution with Walmart were material and caused NewAge's share price to dramatically rise. Following the April 8, 2019 press release announcing the purported expanded distribution with Walmart, (1) NewAge's share price went up by over 23% on the day; and (2) a few hours after the release of the press release, an equity analyst sent Defendant Willis a congratulatory email.

70.     In December 2020, NewAge completed its acquisition of Ariix. It quickly developed concerns that Ariix had violated the Foreign Corrupt Practices Act ("FCPA"). In August 2021, it made a voluntary self-disclosure of suspected FCPA issues to the U.S. Department of Justice and the SEC.

71.      Throughout the class period, NewAge affirmed that it had adequate internal controls, or alternatively, disclosed weaknesses in internal controls that were wholly unrelated to the false statements at issue in this matter.

72.     On May 5, 2018, the Company filed its Q1 2018 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Ence pursuant to the Sarbanes-Oxley Acy of 2002—attesting to the accuracy and truthfulness of the information contained therein.

73.     The Q1 2018 10-Q did not reveal any internal control weaknesses. The Q1 2019

10-Q states in relevant part:

> "The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, **and that such information is accumulated and communicated to our management, including our chief executive officer and our chief financial officer to allow for timely decisions regarding required disclosure**. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.
>
> [. . .]
>
> There have been **no changes in our internal controls over financial reporting during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting**."

(Emphasis added.)

74.     On August 14, 2018, the Company filed its Q2 2018 results on Form 10-Q with the

SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Ence pursuant

to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information

contained therein.

75.     The Q2 2018 10-Q did not reveal any internal control weaknesses. The Q2 2018

10-Q states in relevant part:

> "**The Company's Principal Executive Officer and Principal Financial Officer have evaluated the effectiveness of our disclosure controls and procedures** as of the end of the period covered by this report pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, **the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective** in ensuring that information required to be disclosed in the reports that we file or submit under the Exchange Act is (1)

16

recorded, processed, summarized and reported within the periods specified in the Commission's rules and forms, and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."

(Emphasis added.)

76.     On August 17, 2018, the Company filed an amendment to its Q1 2018 10-Q. This amendment was signed and separately certified by Defendants Willis and Ence pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein. This amendment addressed NewAge's adoption of ASC 606 (a revenue recognition standard relating to accounting), and falsely affirmed that the company's internal controls had no weaknesses in light of the adoption of that standard. The Q1 2018 10-Q amendment states in relevant part:

> "***The Company's Principal Executive Officer and Principal Financial Officer have evaluated the effectiveness of our disclosure controls and procedures*** as of the end of the period covered by this report pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). ***Based on that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective*** in ensuring that information required to be disclosed in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the periods specified in the Commission's rules and forms, and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."

(Emphasis added.)

77.     On November 14, 2018, the Company filed its Q3 2018 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

78.     The Q3 2018 10-Q did not reveal any internal control weaknesses. The Q3 2018

10-Q states in relevant part:

> "***The Company's Principal Executive Officer and Principal Financial Officer
> have evaluated the effectiveness of our disclosure controls and procedures*** as of
> the end of the period covered by this report pursuant to Rule 13a-15(b) under the
> Securities Exchange Act of 1934 (the "Exchange Act"). ***Based on that evaluation,
> the Company's Principal Executive Officer and Principal Financial Officer have
> concluded that, as of the end of the period covered by this report, our disclosure
> controls and procedures are effective*** in ensuring that information required to be
> disclosed in the reports that we file or submit under the Exchange Act is (1)
> recorded, processed, summarized and reported within the periods specified in the
> Commission's rules and forms, and (2) accumulated and communicated to our
> management, including our Chief Executive Officer and Chief Financial Officer or
> persons performing similar functions, as appropriate to allow timely decisions
> regarding required disclosure."

(Emphasis added.)

79.     On April 1, 2019, the Company filed its results on Form 10-K with the SEC. The

Form 10-K was signed and separately certified by Defendants Willis and Gould pursuant to the

Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information

contained therein. In addition, the 2018 10-K was signed by Defendants Fea, Brennan, Haas,

Kapteyn, and Kuzdowicz.

80.     The 2018 10-K did not reveal any internal control weaknesses. It states in relevant

part:

> "***Our management is responsible for establishing and maintaining adequate
> internal control over financial reporting*** (as defined in Rules 13a-15(f) and 15d-
> 15(f) of the Exchange Act). In order to evaluate the effectiveness of internal control
> over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act of
> 2002, ***our management, with the participation of our principal executive officer
> and principal financial officer has conducted an assessment, including testing,
> using the criteria in Internal Control – Integrated Framework, issued by the
> Committee of Sponsoring Organizations of the Treadway Commission ("COSO")
> (2013)***. Our system of internal control over financial reporting is designed to
> provide reasonable assurance regarding the reliability of financial reporting and the
> preparation of financial statements for external purposes in accordance with
> generally accepted accounting principles. Because of its inherent limitations,

internal control over financial reporting may not prevent or detect misstatements. This assessment included review of the documentation of controls, evaluation of the design effectiveness of controls, testing of the operating effectiveness of controls and a conclusion on this evaluation.

***Based on this evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2018*.**"

(Emphasis added.)

81.    On May 9, 2019, the Company filed its Q1 2019 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

82.    The Q1 2019 10-Q did not reveal any internal control weaknesses. The Q1 2019 10-Q states in relevant part:

"In connection with the preparation of this Quarterly Report on Form 10-Q as of March 31, 2019, an evaluation of the effectiveness of the design and operation of our Disclosure Controls was performed. ***This evaluation was performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer. Based on this evaluation, we concluded that our disclosure controls and procedures were effective*.**"

(Emphasis added.)

83.    On August 19, 2019, the Company filed its Q2 2019 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002— attesting to the accuracy and truthfulness of the information contained therein.

84.    The Q2 2019 10-Q did not reveal any internal controls weaknesses. The Q2 2019 10-Q states in relevant part:

"In connection with the preparation of this Quarterly Report on Form 10-Q ***as of June 30, 2019, an evaluation of the effectiveness of the design and operation of our Disclosure Controls was performed. This evaluation was performed under the supervision and with the participation of our management, including our***

> ***Chief Executive Officer and Chief Financial Officer. Based on this evaluation,
> we concluded that our disclosure controls and procedures were effective*.**"

(Emphasis added.)

85.     On November 14, 2019, the Company filed its Q3 2019 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

86.     The Q3 2019 10-Q revealed internal controls weaknesses wholly unrelated to the materially false statements at issue in this matter. The Q3 2019 10-Q states in relevant part:

> "The Company's management, with the participation of the Company's Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of September 30, 2019.  Based upon that evaluation, ***our Chief Executive Officer and Chief Financial Officer concluded, as of the end of the period covered by this report, that the Company's disclosure controls and procedures were not effective due to the material weakness described below***."

(Emphasis added.)

87.     The 10-Q then discussed how NewAge's management identified a material weakness "in internal control over financial reporting as a result of inadequate controls over the preparation and review of our condensed consolidated statements of cash flows [. . .]." The disclosure did not address the numerous false statements addressed in paragraphs 74-89.

88.     On March 16, 2020, the Company filed its results on Form 10-K with the SEC. The Form 10-K was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein. In addition, the 2019 10-K was signed by Defendants Fea, Brennan, Haas, Kapteyn, Kuzdowicz, and Syrett.

89. The 2019 10-K did not reveal any internal control weaknesses. It states in relevant part:

> "*Under the supervision and with the participation of our management, including the Chief Executive Officer and Chief Financial Officer*, we have evaluated the effectiveness of our disclosure controls and procedures as required by Exchange Act Rule 13a-15(b) as of the end of the period covered by this report. *Based on that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures were effective*.

(Emphasis added.)

90. On May 11, 2020, the Company filed its Q1 2020 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

91. The Q1 2020 10-Q did not reveal any internal controls weaknesses. The Q1 2020 10-Q states in relevant part.

> "The Company's management, *with the participation of the Company's Chief Executive Officer and Chief Financial Officer*, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of March 31, 2020. Based on such evaluation, *the Chief Executive Officer and Chief Financial Officer concluded that, as of March 31, 2020, the Company's disclosure controls and procedures were effective* to ensure that information required to be disclosed in reports the Company files or submits under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) accumulated and communicated to management to allow timely decisions regarding required disclosure. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives."

(Emphasis added.)

92. On August 10, 2020, the Company filed its Q2 2020 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant

to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

93.    The Q2 2020 10-Q did not reveal any internal controls weaknesses. The Q2 2020 10-Q states in relevant part:

> "The Company's management, **with the participation of the Company's Chief Executive Officer and Chief Financial Officer**, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of June 30, 2020. **Based on such evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of June 30, 2020, the Company's disclosure controls and procedures were effective** to ensure that information required to be disclosed in reports the Company files or submits under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) accumulated and communicated to management to allow timely decisions regarding required disclosure. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In light of changes in business practices in response to the COVID-19 pandemic, management evaluated the Company's disclosure controls and procedures and determined that no changes in such disclosure controls and procedures were necessary."

(Emphasis added.)

94.    On November 9, 2020, the Company filed its Q3 2020 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

95.    The Q3 2020 10-Q did not reveal any internal controls weaknesses. The Q3 2020 10-Q states in relevant part:

> "The Company's management, **with the participation of the Company's Chief Executive Officer and Chief Financial Officer**, evaluated the effectiveness of the Company's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) as of September 30, 2020. **Based on such evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of September 30, 2020, the Company's disclosure controls and procedures were effective** to ensure that information required to be disclosed in

reports the Company files or submits under the Exchange Act is (i) recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and (ii) accumulated and communicated to management to allow timely decisions regarding required disclosure. Any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In light of changes in business practices in response to the COVID-19 pandemic, management evaluated the Company's disclosure controls and procedures and determined that no changes in such disclosure controls and procedures were necessary."

(Emphasis added.)

96.    On March 18, 2021, the Company filed its results on Form 10-K with the SEC. The

Form 10-K was signed and separately certified by Defendants Willis and Gould pursuant to the

Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information

contained therein. The 2020 10-K was also signed by Defendants Fea, Brennan, Haas, Kuzdowicz,

Syrett, and Cooper.

97.    The 2020 10-K did not reveal any internal control weaknesses relating to this

matter. The 2020 10-K states in relevant part:

"Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2020 pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based upon the evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2020 due to a material weakness in internal controls over financial reporting, described below. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure."

98.      The Company then stated that as of December 31, 2020, "a material weakness exists related to the Company's failure to design and implement monitoring activities over the acquisition of Ariix, LLC ("Ariix") resulting in the Company's inability to issue its financial statements for inclusion in its Form 10-K by the required due date. Specifically, due to the size and timing of the acquisition of Ariix, the Company did not have sufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements." It did not address any FCPA concerns that management may have had regarding Ariix's business, nor did it address the voluminous false statements that had been made regarding its business.

99.      On May 10, 2021, the Company filed its Q1 2021 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Aure pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

100.     The Q1 2021 10-Q revealed internal controls weaknesses wholly unrelated to the false statements at issue in this matter. The Q1 2021 10-Q states in relevant part:

> Our management, **with the participation of our chief executive officer ("CEO") and acting chief financial officer** ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of March 31, 2021 pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act") [. . .] Based upon the evaluation completed as of March 31, 2021, **our CEO and acting CFO concluded that our disclosure controls and procedures were not effective since the material weakness in internal controls over financial reporting discussed below has not yet been remediated.**

(Emphasis added.)

101.     The Company then stated that a material weakness existed related to the Company's "failure to design and implement monitoring activities over the acquisition of Ariix that resulted in the inability to issue [financial statements for the 2020 Form 10-K] by the required due date."

The Company failed to mention its internal investigation into Ariix for FCPA violations, as well as the materially false statements made regarding its business relationships or CBD products.

102.    On August 9, 2021, the Company filed its Q2 2021 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Manion pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

103.    The Q2 2021 10-Q revealed internal controls weaknesses. The Q2 2021 10-Q states in relevant part:

> Our management, ***with the participation of our chief executive officer ("CEO") and chief financial officer ("CFO")***, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2021 pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). [. . .] Based upon the evaluation completed as of June 30, 2021, ***our CEO and CFO concluded that our disclosure controls and procedures were not effective since the material weakness in internal controls over financial reporting discussed below has not yet been remediated***.

(Emphasis added.)

104.    The Company then disclosed that as of June 30, 2021, a material weakness existed relating to the Company's "failure to design and implement monitoring activities over the acquisition of Ariix that resulted in the ability to issue our consolidated financial statements [. . .]." It did not mention that an investigation into Ariix for FCPA violations was taking place, nor that it had previously made materially false statements regarding its business.

105.    On November 9, 2021, the Company filed its Q3 2021 results on Form 10-Q with the SEC. The Form 10-Q was signed and separately certified by Defendants Willis and Manion pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein.

106.     The Q3 2021 10-Q revealed internal controls weaknesses. The Q3 2021 10-Q states in relevant part:

> Our management, with the participation of our chief executive officer ("CEO") and chief financial officer ("CFO"), evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2021 pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). [. . .] Based upon the evaluation completed as of September 30, 2021, our CEO and CFO concluded that our disclosure controls and procedures were not effective since the material weakness in internal controls over financial reporting discussed below has not yet been remediated.

107.     The material weakness at issue related "to the Company's failure to design and implement monitoring activities over the acquisition of Ariix that resulted in the inability to [issue financial statements in the 2020 Form 10-K by the required due date]." The Company did not disclose that in August 2021 it had made a voluntary self-disclosure to the U.S. Department of Justice and the Securities and Exchange Commission regarding suspected FCPA violations by Ariix.

108.     The statements referenced in ¶¶ 34-107 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company and Defendants had no relationship with the military or FamilyMart; (2) the Company and Defendants overstated the business agreements that they did have; (3) the Company and Defendants never produced or sold a proprietary CBD beverage; (4) the Company lacked adequate internal controls; (5) as a result the Company had a heightened risk of regularly scrutiny and ultimately subject to an SEC investigation and action; and (6) as a result of the foregoing, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

109.     Over time, despite NewAge's failure to disclose the extent of the fraud committed principally by Defendant Willis, the truth regarding the troubled state of the company has emerged publicly.

110.     On January 10, 2022, NewAge filed an 8-K announcing that the Board and Defendant Willis agreed that he would "resign as [CEO], Director, and employee of the Company, effective immediately. The Company and Mr. Willis will determine the terms of his departure at a future date. [. . .] Ed Brennan will provide additional guidance and direction to the senior management team [. . .]." In response, the stock went down 6% on each of the following trading days, from an opening price of $0.98 to a closing price of $0.9251 on January 11 and from an opening price of $0.935 to a closing price of $0.88 on January 12.

111.     On May 17, 2022, the Company announced after trading hours had concluded that it had received a late notice from Nasdaq regarding the filing of its Form 10-Q. The next day, the stock went down by 8%, from an opening price of $0.391 per share to $0.3591 per share.

112.     On June 8, 2022, after trading had concluded for the day, the Company announced that it was undertaking a review of "strategic alternatives," including "available financing alternatives, a potential financial restructuring, merger, sale or other strategic transaction." The next day, NewAge's share price went down 12%, from $0.42 per share to $0.3703. Following that, the Company's share price closed down 11% (the price per share dropped from $0.3605 to $0.3201 on the day), 5% (the price per share dropped from ($0.3112 per share to $0.2902 on the day), and 3% (the price per share dropped from $0.298 per share to $0.29 on the day), respectively.

113.     On August 30, 2022, NewAge announced that it was filing for Chapter 11 bankruptcy relief. Further, On August 31, 2022, *The Wall Street Journal* released an article called "New Age Says Cost of Internal Probe Contributed to Bankruptcy," which highlighted the fact

that in its Chapter 11 disclosure, NewAge admitted that it had conducted an expensive internal investigation into Ariix for suspected violations of the FCPA. The next day, the stock closed down 39%, from an opening price of $0.2016 per share to $0.1222 per share. It further plummeted on September 2, 2022, closing down 27%, from an opening of $0.20 per share to $0.1482.

114.    On September 2, 2022, after trading hours in the domestic markets had finished for the day, NewAge filed an 8-K announcing that it had received writing notice from The Nasdaq Stock Market LLC ("Nasdaq") that, as a result of its filing for protection under Chapter 11 of the U.S. Bankruptcy Code, Nasdaq determined that NewAge's securities would be delisted from the Nasdaq stock exchange, beginning on September 8, 2022. In response to this news, NewAge stock closed down 9% on September 6, 2022, from an opening price of $0.1368 to a closing price of $0.125.

115.    On October 18, 2022, the SEC announced that it was taking legal action against Defendant Willis. Specifically, he was alleged to have engaged in a "multi-year fraud by disseminating numerous false and misleading press releases and making false public statements concerning NewAge's business dealings, and aided and abetted NewAge's disclosure of material information in violation of Regulation FD," and was accordingly charged under Section 10(b) and corresponding Rule 10b-5 of the Exchange Act, Section 17(a) of the Securities Act, and with aiding and abetting NewAge's violations of Section 13(a) of the Exchange Act and Regulation FD.

116.    On October 19, 2022, the SEC announced that it had instituted cease-and-desist proceedings against NewAge pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, enjoining NewAge from further violations of the Securities and Exchange Acts, and rules and regulations promulgated under them. In anticipation of these proceedings, NewAge

submitted a settlement offer, which the SEC has accepted. The next day, NewAge stock plummeted from an opening price of $0.175 per share to $0.0013 per share, or 93%.

117.     The facts constituting scienter were not known to any reasonable investor until announcements of these SEC proceedings in October 2022.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

118.     At all relevant times, the market for NewAge's common stock was an efficient market for the following reasons, among others:

(a)     NewAge's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market, for much of the class period;

(b)     During the class period, on average, several hundreds of thousands of shares of NewAge stock were traded on a weekly basis, demonstrating a very active and broad market for NewAge stock and permitting a *strong* presumption of an efficient market;

(c)     As a regulated issuer, NewAge filed with the SEC periodic public reports during the Class Period up until its delisting from the NASDAQ in September 2021;

(d)     NewAge regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     NewAge was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)     Numerous NASD/FINRA member firms were active market-makers in NewAge stock at all times during the Class Period (highlighted in case we need to fact check); and

(g)     Unexpected material news about NewAge was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

119.    As a result of the foregoing, the market for NewAge's common stock promptly digested current information regarding NewAge from all publicly available sources and reflected such information in NewAge's stock price. Under these circumstances, all purchasers of NewAge's common stock during the Class Period suffered similar injury through their purchase of NewAge's common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

120.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of NewAge who knew that those statements were false when made.

## FIRST CLAIM

### Violation of Section 10(b) Of
### The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

121.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

122.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other members of the Class to purchase and sell NewAge's securities at artificially inflated and distorted prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

123.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for NewAge's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

124.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of NewAge as specified herein.

125. These Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of NewAge's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about NewAge and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaging in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of NewAge's securities during the Class Period.

126. Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Defendants were high-level executives, directors, and/or agents at the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination to the investing public of information that they knew or recklessly disregarded to be materially false and misleading.

127. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public NewAge's operating condition and future business prospects and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

128.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of NewAge's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of NewAge's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired NewAge's securities during the Class Period at artificially high prices and were or will be damaged thereby.

129.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding NewAge's financial results, which were not disclosed by defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their NewAge securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

130.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

131.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

132.     This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

## SECOND CLAIM

### Violation of Section 20(a) Of
### The Exchange Act Against All Defendants

133.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

134.    The Defendants acted as controlling persons of NewAge within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have

been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

135.    In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

136.    As set forth above, the Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

137.    By virtue of their positions as controlling persons, the Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

138.    This action was filed within two years of discovery of the fraud and within five years of each plaintiffs' purchases of securities giving rise to the cause of action.

**WHEREFORE**, Plaintiffs prays for relief and judgment, as follows:

(a)  Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying them as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

(b)  Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)  Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)  Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: December 7, 2022                    Respectfully submitted,


**THE ROSEN LAW FIRM, P.A**.

/s/Phillip Kim
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827

Counsel for Plaintiffs