**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-JPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,
GREG FEA, and
CRAIG THIBODEAU,

JURY TRIAL DEMANDED

Defendants.

---

**AMENDED CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**


PRELIMINARY STATEMENT .......... 1

NATURE AND SUMMARY OF THE ACTION .......... 2

JURISDICTION AND VENUE .......... 8

PARTIES AND RELEVANT NON-PARTY .......... 9

SUBSTANTIVE ALLEGATIONS .......... 10

I. FACTUAL BACKGROUND .......... 10

A. Company Background .......... 10

B. The Distribution Agreements And CBD Portfolio Scheme .......... 11

1. The U.S. Military .......... 12

2. Sobeys, Loblaws, and Safeway .......... 13

3. South Korean Distribution .......... 14

4. The CBD Portfolio .......... 14

5. Walmart .......... 15

C. NewAge and Defendants Seize The Opportunities Afforded By The Company's Artificially Inflated Share Price .......... 15

D. The Ariix Merger .......... 17

E. The SEC's Investigation Into The Purported Distribution Agreements And CBD Portfolio .......... 20

II. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD .......... 22

A. Statements Regarding NewAge's Relationship With The U.S. Military .......... 22

B. Statements Regarding NewAge's Relationship With Loblaws and Sobeys .......... 25

C. Statements Regarding South Korean Distribution .......... 27

D. Statements Regarding NewAge's CBD Beverage .......... 28

E. Statements Regarding NewAge's Relationship With Walmart .......... 38

F. Statements About NewAge's Internal Controls .......... 40

III. THE TRUTH BEGINS TO EMERGE .......... 46

IV. OTHER POST-CLASS PERIOD DEVELOPMENTS .................................................. 48

V. ADDITIONAL SCIENTER ALLEGATIONS ........................................................... 48

A. Defendants Knew Or Had Access To The Fact That The Distribution Relationships Did Not Exist Or Were Less Expansive Than Stated .................... 48

B. Defendants Knew Or Had Access To The Fact That Statements Regarding NewAge's CBD Portfolio Were False And Misleading ..................................... 53

C. The Chief Restructuring Officer's Declaration Supports Willis's Scienter.......... 57

D. Willis's Concealment Of The Truth About Certain Agreements From The Board ............................................................................................................ 58

E. Defendants' Positions And The Types Of Misrepresentations Support Scienter ........................................................................................................ 59

F. Audit Committee Members' Scienter ................................................................ 61

G. NewAge and Certain Defendants' Financial Motive.......................................... 62

1. Willis..................................................................................................... 65

2. Gould..................................................................................................... 66

3. Kapetyn, Brennan, Fea, and Haas ........................................................ 66

4. Stock-Based Compensation Accounted For A Substantial Amount Of Defendants' Compensation................................................................ 67

H. The Ariix Acquisition Scheme Supports Scienter ............................................... 68

I. Resignations........................................................................................................ 71

J. SOX Certifications............................................................................................... 72

VI. LOSS CAUSATION................................................................................................ 74

VII. CLASS ACTION ALLEGATIONS ........................................................................ 78

VIII. CONTROL PERSON LIABILITY.......................................................................... 79

IX. APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE........................ 80

X. THE AFFILIATED UTE PRESUMPTION .............................................................. 81

XI. NO SAFE HARBOR ................................................................................................ 82

XII. CLAIMS FOR RELIEF ........................................................................................... 83

COUNT I ...................................................................................................................... 83

COUNT II ..................................................................................................................... 85

PRAYER FOR RELIEF ........................................................................................................... 87

JURY TRIAL DEMAND ..................................................................................................... 87

## PRELIMINARY STATEMENT

This is a federal securities class action on behalf of a class consisting of all persons who purchased the securities of NewAge from January 18, 2018 through and including October 18, 2022 (the "Class Period"), seeking to recover damages caused by Defendants' (defined below) violations of the federal securities laws and to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). At all times during the Class Period, NewAge was a publicly traded stock and the Company was subject to the reporting requirements of the Exchange Act.

Lead Plaintiffs Damian Betebenner and Cigdem Betebenner ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters alleged herein. Plaintiffs' information and belief is based upon the substantial investigation by Plaintiffs' counsel into the facts and circumstances alleged herein, including the following: (i) review and analysis of public filings referenced herein made by non-defendant NewAge, Inc. ("NewAge" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of public statements made by Defendants Brent Willis ("Willis"), Gregory Gould ("Gould"), Kevin Manion ("Manion"), Chuck Ence ("Ence"), Carl Aure ("Aure"), Ed Brennan ("Brennan"), Fred Cooper ("Cooper"), Greg Fea ("Fea"), Tim Haas ("Haas"), Reginald Kapteyn ("Kapteyn"), Amy Kuzdowicz ("Kuzdowicz"), Alicia Syrett ("Syrett"), and Craig Thibodeau ("Thibodeau") in press release, conference calls, SEC filings, and media outlets; (iii) review and analysis of analyst reports, news articles, and other publications referenced herein; (iv) review and analysis of filings in the SEC's action against defendant Willis captioned *SEC v. Willis*, No. 1:22-cv-02744-SKC (D.Colo.); (v) review and analysis of filings in the SEC's Order Instituting Cease-and-Desist Proceedings [ . . .] and Imposing A Cease-and-Desist Order against NewAge,

Administrative Proceeding File No. 3-21212 ("Cease and Desist Order"); (vi) review and analysis of filings in the NAI Liquidation Trust's action against Defendants captioned *In re: NewAge, Inc. et al.*, No. 22-10819 (LSS) (D. Del. Bankr.) ("Adversary Action") and NewAge's bankruptcy docket; and (vii) review and analysis of other documents referenced herein. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE AND SUMMARY OF THE ACTION**

1. This case concerns straightforward and blatant efforts by Defendants to intentionally mislead the market that NewAge's business operations were rapidly expanding when in fact they were failing. Defendants repeatedly and falsely told the market that the Company was entering into lucrative distribution agreements for its products, when in fact, no such distributions agreements existed or the agreements were substantially more limited than represented. Further, the Company had insufficient inventory to fulfill such agreements in the first place. The charade was widespread, egregious and ultimately led to the bankruptcy of the Company. It also spawned an SEC case and an Adversary Action against many of the same Defendants.

2. Prior to and during the Class Period, NewAge was a developer and seller of "organic and healthy products," including beverage product lines such as XingTea, Marley, AspenPure, Búcha Live Kombucha, and Coco-Libre.

3. As NewAge's Chief Executive Officer ("CEO") Willis explained, only two metrics really matter in the beverage industry: "points of distribution" and "sales for point of distribution." Q3 2017 Earnings Call (Nov. 14, 2017). NewAge had been struggling on both fronts for some time. By the end of 2017, the Company was in dire straits, with a net loss of approximately $3.5 million and only approximately $285,000 in cash.

4. Frustrated with NewAge's deteriorating fortunes and declining share price, Willis, Gould, and Thibodeau concocted a scheme to falsely mislead the market by announcing that NewAge had distribution and/or partnership agreements to distribute its beverages that they knew the Company did not actually have, or that were much smaller than they claimed.

5. For example, on the first day of the Class Period, January 18, 2018, NewAge issued a press release announcing that NewAge had a "new distribution agreement" with the U.S. military which was a "[n]ew U.S. [m]ilitary initiative in partnership with NewAge" whereby 21 NewAge stock keeping units—*i.e.*, products that NewAge sells—across five product lines were purportedly "shipping out now and throughout the 1st quarter to all commissary locations worldwide[.]" The press release described the scope of the distribution agreement as including 240 military commissaries and 3,100 exchanges in more than 30 countries, and claimed that the "new distribution agreement is expected to have a material impact on the financial results of NewAge." Similar statements were made in May and August 2018. These false and misleading statements sent NewAge stock soaring.

6. These statements were nothing more than bald-faced lies. Unbeknownst to investors, no such agreement existed. NewAge never entered into a "distribution agreement" or "initiative in partnership" with the U.S. military, never had plans to sell its products at all commissaries and exchanges worldwide and never had an adequate inventory to fulfill this purported agreement. In reality, the only new distribution agreements that NewAge had at this time was to sell NewAge products at two stores in Virginia and Florida for a 4-week trial period, a far cry from the "worldwide" distribution agreements that were expected to have a "material impact" on the Company's financial results.

7. On February 1, 2018, NewAge issued a press release announcing that the Company "has begun shipments of its Coco-Libre and Búcha Live Kombucha brands in expanded distribution throughout Loblaws and Sobeys, the largest grocery retailers across Canada[,]" and "is now expanding to all banners within Loblaws and expanding throughout both Sobeys and [its subsidiary] Safeway." Similar statements were made that month, causing NewAge's stock price to rise and prompting an equity analyst to maintain a "buy" rating for NewAge based, in part, on this purported distribution expansion.

8. The statements in the February 1 press release also were lies - unbeknownst to investors, no such expansion had occurred when these statements were made.

9. On February 13, 2018, NewAge issued a press release falsely stating that NewAge expanded its Búcha product to all major retailers throughout Canada and announced that NewAge "has signed a major distribution agreement for expansion of its Búcha Live Kombucha brand with the largest food and beverage distributor in South Korea to expand to all major retail outlets throughout the country effective immediately."

10. NewAge's stock once again soared on this announcement, but it was also false. Indeed, the South Korean distributor did not place its first order of Búcha until December 2018 and only about 1,500 bottles were ever sold before the relationship ended in October 2019.

11. Later in 2018, NewAge decided to take advantage of the buzz over cannabidiol ("CBD"), a prevalent ingredient in marijuana, and announced that it had been testing and developing a CBD-infused beverage portfolio. NewAge told the market on September 19, 2018 that it planned to unveil its CBD beverage portfolio at the National Association of Convenience Stores ("NACS") trade show in Las Vegas in October 2018. The Company touted that

NewAge's Health Sciences Division ("Health Sciences") was "overseeing and carefully controlling production, quality, and its supply chain and sales channel partners[.]"

12. An October 2018 press release quoted its Chief Medical Officer as attesting to NewAge's "scientifically and medically grounded" approach to its CBD portfolio.

13. Unbeknownst to investors, however, these were blatant falsehoods. In fact, NewAge: (1) had merely been distributing a CBD-infused water that was developed and controlled by a third-party supplier; (2) had only taken preliminary steps towards the development of any CBD-infused beverage of its own shortly before its September 2018 announcement; (3) the "NewAge Health Sciences Division" was comprised of just two part-time employees who had no role in the development of the CBD portfolio at that time and whose participation was minimal, at best, in the process thereafter; (4) NewAge's purported debut at NACS—held in an off-site hotel room due to NACS' prohibition on CBD—consisted only of samples of existing NewAge products to which drops of CBD purchased from a local store had been added onsite before the event; and (5) NewAge's Chief Medical Officer never provided the quote attributed to him in the October press release.

14. NewAge, Willis, and Gould kept up the ruse, making additional statements about the Company's purported CBD portfolio through January 2019, telling investors that NewAge completed its portfolio, that it secured substantial retail and distribution pre-orders and commitments to sell its CBD products, and was even selling it in retail stores.

15. Defendants capitalized and profited from the soaring NewAge stock price that they had ginned up with their lies. All of the foregoing false and misleading statements boosted NewAge's share price, increasing its stock's liquidity and enabling the Company to improve its finances. For example, immediately after telling the market about its CBD portfolio in

September 2018, NewAge put in place an at-the-market ("ATM") securities offering that generated about $38 million in net proceeds. In November 2018, NewAge again took advantage of its artificially inflated stock price to conduct a second ATM offering that garnered it an additional $52 million, providing it with a cash balance of more than $80 million and significantly improving the Company's balance sheet.

16. With the ATM offering proceeds, the Company was able to purchase global beverage company Morinda Holdings ("Morinda") in December 2018, which was projected to grow NewAge's annual revenue from $50 million to over $300 million in 2019.

17. A number of the Defendants benefited personally from the artificial inflation that drove NewAge's changed fortunes. Effective January 2019, the Board doubled Willis's annual salary from $312,500 to $650,000. Willis also made over $2 million off his sales of 425,000 NewAge shares between April and October 2019. Other Defendants also received increased salaries and stock awards. For example, Gould's annual salary was increased nearly 87%, increasing from $67,000 to $500,000 a year.

18. In early 2020, NewAge began to contemplate acquiring another multi-level-marketing company, Ariix. The Ariix merger would prove disastrous. First, NewAge's audited financials provided post-closing revealed that Ariix's targeted working capital was not the $11 million it had represented to NewAge, but was in fact negative $18 million—a $29 million shortfall. Second, immediately after the merger closed, Ariix received an order from Japan's Consumer Affairs Agency suspending Ariix from recruiting new brand partners due to fraudulent practices likely in violation of the Foreign Corrupt Practices Act ("FCPA"). This caused NewAge to conduct a lengthy and expensive investigation into Ariix's business practices, while

continuing to falsely and misleadingly tell the market that NewAge had no internal control weaknesses.

19. As with most houses of cards, the one built by NewAge eventually came tumbling down as the truth was gradually revealed to the market.

20. On January 10, 2022, NewAge shocked the market by announcing that the Board and Willis agreed he would resign, effective immediately. On this news, the Company's stock dropped 6% on January 11 and January 12, 2022.

21. Then, on May 17, 2022, the Company announced that it received a late notice from Nasdaq regarding the filing of its Form 10-Q, causing its stock to fall 8% the next day.

22. Less than a month later, on June 8, 2022, NewAge announced that it was undertaking a review of "strategic alternatives," including "available financing alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction." NewAge's share price fell 12%, 11%, and 7%, respectively, on the three days following this news.

23. On August 30, 2022, New Age announced that it was filing for Chapter 11 bankruptcy relief. The next day, *The Wall Street Journal* released an article titled, "New Age Says Cost of Internal Probe Contributed to Bankruptcy," which highlighted the fact that in its Chapter 11 disclosure, New Age admitted that it had conducted an expensive internal investigation into Ariix for suspected violations of the FCPA. The stock dropped 39% the next day, and further plummeted 26% on September 2, 2022.

24. After market close on September 2, 2022, NewAge announced that Nasdaq would be delisting its stock beginning on September 8, 2022 due to the Company's Chapter 11 filing. On this news, NewAge shares closed down 9% on September 6, 2022, the next trading day.

25. Finally, the SEC announced on October 18, 2022 that it was taking legal action against Willis for having engaged in a "multi-year fraud by disseminating numerous false and misleading press releases and making false public statements concerning NewAge's business dealings, and aided and abetted NewAge's disclosure of material information in violation of Regulation FD," and was charging him under Section 10(b) and Rule 10b-5 of the Exchange Act, Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and with aiding and abetting NewAge's violations of Section 13(a) of the Exchange Act and Regulation FD.[1]

26. On October 19, 2022, the SEC's Cease and Desist Order was announced, enjoining NewAge from further violations of the Securities and Exchange Acts, and the rules and the rules and regulations promulgated thereunder.[2] In anticipation of these proceedings, NewAge submitted and the SEC accepted a settlement offer. The following day, NewAge stock plummeted 99%.

**JURISDICTION AND VENUE**

27. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

28. This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1331.

29. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred in this District.

---

1 The SEC's Complaint is filed herewith as Exhibit A.

2 The Cease and Desist Order is filed herewith as Exhibit B.

30. In connection with the acts, conduct, or other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES AND RELEVANT NON-PARTY

31. Plaintiffs, as set forth in the certifications filed at ECF No. 20-2, incorporated by reference herein, purchased NewAge securities at artificially inflated prices during the Class Period and have been damaged thereby.

32. Defendant Willis served as NewAge's CEO and a Director from March 24, 2016 through January 10, 2022.

33. Defendant Gould served as NewAge's CFO from October 12, 2018 through July 2, 2021.

34. Defendant Manion served as NewAge's CFO from July 19, 2021 through July 1, 2022.

35. Defendant Ence served as NewAge's CFO from September 15, 2016 through August 15, 2018, when he became the Company's Controller.

36. Defendant Aure served as NewAge's Chief Accounting Officer and Senior Vice President from December 2018 through October 2021.

37. Defendant Brennan served as a member of NewAge's Board of Directors ("Board") since 2017 and as Chairman of the Board of Directors since January 1, 2022. Defendant Brennan has served as the Company's interim CEO since March 2022.

38. Defendant Cooper has served on NewAge's Board since November 13, 2020.

39. Defendant Fea has served on the Board since 2017 and previously served as Non-Executive Chairman of the Board from 2018 to January 1, 2022.

40. Defendant Haas served on the Board from 2017 until January 30, 2022.

41. Defendant Kapteyn served on the Board from 2017 until November 2020.

42. Defendant Kuzdowicz has served on the Board since February 25, 2019 and serves as the Audit Committee Chair.

43. Defendant Syrett served on the Board from January 7, 2020 until January 31, 2022.

44. Defendant Thibodeau serves as NewAge's Vice President of Key Accounts and as President of International and Global Head of Private Label.

45. The individuals in ¶¶32-44 are collectively referred to herein as the "Defendants."

46. Relevant non-party NewAge is a Delaware corporation with its principal executive offices located at 7158 S. FL Smidth Dr., Suite 250, Midvale, Utah 84047. It was previously incorporated in Washington State and its principal place of business was in Denver, Colorado. At all relevant times herein, NewAge's common stock was listed on the NASDAQ Stock Exchange or on the OTC market. The Company was known as New Age Beverages Corporation until July 28, 2020, and from then on as NewAge, Inc. Its common stock was listed on the NASDAQ exchange under ticker NBEV until September 14, 2022, and since then on the OTC market under the ticker NBEVQ.

47. On August 30, 2022, NewAge filed for Chapter 11 bankruptcy in Delaware.

## SUBSTANTIVE ALLEGATIONS

## I. FACTUAL BACKGROUND

### A. Company Background

48. NewAge manufactured, marketed, and sold a portfolio of healthy beverage brands, including XingTea, Marley, AspenPure, Búcha Live Kombucha, and Coco-Libre. 2018 Form 10-K at 51. Its portfolio is distributed through NewAge's own direct store distribution

("DSD")[3] network and other routes to market throughout the U.S. and in 15 countries. *Id.* The brands are sold in all channels of distribution, including hypermarkets, supermarkets, pharmacies, convenience, gas, and other outlets. *Id.*

49. NewAge operated as New Age Beverages Corporation from June 2016 and became NewAge, Inc. in July 2020. *Id.;* 2021 Form 10-K at 1. As of December 31, 2017, the Company had 172 full time employees, which grew to 889 the following year. 2019 Form 10-K at 19.

50. Throughout 2017 and into 2018, NewAge was in dire financial straits: the Company ended 2017 with a net loss of approximately $3.5 million and only approximately $285,000 in cash. SEC Compl. ¶14. NewAge was unable to secure national accounts for its existing brands nor develop promising new products in 2017, causing the stock price to decline substantially. *Id.* Indeed, NewAge's share price dropped from about $7 per share in June 2017 to $2 per share in December 2017.

**B. The Distribution Agreements And CBD Portfolio Scheme**

51. As Willis explained to investors during the Company's Q3 2017 earnings call, the business is dependent on points of distribution and sales at points of distribution. Growing these points of distribution was, in Willis's view, the key to NewAge's success. It was also key to Willis's personal financial success, as he was frustrated with his compensation and was told by the Board in or around 2017 and early 2018 that once the Company was on better financial footing, it would revisit his compensation. SEC Compl. ¶16.

52. To that end, Willis concocted a "fake it till you make it" scheme whereby he and others would tell the market that NewAge was expanding its points of distribution by fabricating

---

[3] DSD means delivering products from a supplier directly to a store bypassing the retailer's distribution center.

or greatly exaggerating distribution agreements it made to sell its beverages and seizing on the CBD-craze to tout a nearly-nonexistent CBD beverage portfolio. Meanwhile, NewAge continued to affirm that it had adequate internal controls. These statements would serve to increase NewAge's stock price, and the increased price and liquidity would enable it to enter into stock offerings, raising cash that would enable it to raise Willis and other executives' and directors' salaries, and acquire companies to grow the business.

**1. The U.S. Military**

53. On January 18, 2018, the first day of the Class Period, NewAge issued a press release titled, "New Age Beverages Expands Distribution of Their Entire Healthy Portfolio Worldwide With the US Military." The press release claimed that NewAge was "***expanding distribution of its portfolio of healthy beverages into all of the Military Commissaries worldwide***."[4] Military Commissaries are operated by the Defense Commissary Agency ("DeCA"), which provide groceries to U.S. military personnel, retirees and their families. *See* https://corp.commissaries.com/our-agency/about-deca.

54. The press release explained how significant a deal this was, stating that "New Age will be providing healthy alternatives across all their brands to active duty military personnel, retirees, and their families spanning a population of almost 25 million people across more than 30 countries. The new distribution agreement is expected to have a material impact on the financial results of New Age." Willis's own military service, discussed by him in the press release, lent credence to this blockbuster announcement. On this news, NewAge stock soared 21%.

[4] Unless otherwise noted, all emphasis is added and all citations and internal quotation marks are omitted.

55. Analysts enthusiastically reported on the news. For example, Aegis Capital Corp. stated, "New Age Beverages announced this morning a new distribution agreement whereby the company will sell its healthy beverages into all U.S. military commissaries worldwide. The agreement spans over 3,300 outlets in 30 countries around the world, thus expanding the company's distribution platform not only in the U.S., but overseas as well. Including U.S. military personnel, retirees, and their families, the targeted market this new distribution channel can reach spans a population of nearly 25 million people."

**2. Sobeys, Loblaws, and Safeway**

56. A month later, in February 2018, Defendants also claimed to have expanded distribution with Canadian retailers Sobeys, Loblaws, and Safeway, as described in further detail in Section II.B, *infra*.

57. Sobeys Inc. is a Canadian grocery retailer with approximately 1,600 stores in all 10 Canadian provinces under retail banners that include Sobeys, Safeway, and others. https://corporate.sobeys.com/our-purpose.

58. Loblaws is a Canadian supermarket chain with more than 2,400 stores across Canada. https://www.loblaw.ca/en/who-we-are/. It is Canada's largest food retailer.

59. This announcement and subsequent discussions of the purported deals were met with stock price increases for NewAge that month, and enthusiasm from analysts. For example, Aegis Capital reported on March 5, 2018 that it maintained a "buy" rating for NewAge based in part on this news:

> In recent weeks, New Age Beverages has continued to make a flurry of announcements in rapid order outlining additional new distribution opportunities for the company's growing portfolio of beverage brands and products. Buoyed also by recent acquisitions, the company appears well positioned to generate impressive revenue and earnings growth this year, which we believe can act as a significant fundamental positive catalyst for the stock.

* * *

> **Expansion in Canada**. The company also recently announced it will begin shipping Coco-Libre, along with its Bucha Live Kombucha brand, into Loblaws and Sobeys, two of the largest chain [sic] of grocery retailers in Canada. Loblaw encompasses more than 2,000 supermarkets throughout Canada, while Sobeys is the second largest food retailer in Canada with over 1,500 stores in all ten provinces. Naturally, Canada represents another important geographic opportunity for expansion for New Age Beverages, and we would expect to see meaningful contribution from this region in 2018 and beyond.

*See also* Northland Capital Markets (Sept. 4, 2018) (initiating coverage of NewAge and stating "NBEV's offerings have been signed up by Loblaws and Sobeys/Safeway in Canada for a total of 3,500 stores, . . . 21 SKUs at U.S. military commissaries worldwide").

**3. South Korean Distribution**

60. That same month, February 2018, NewAge issued a press release announcing that NewAge "has signed a major distribution agreement for expansion of its Búcha Live Kombucha brand with the largest food and beverage distributor in South Korea to expand to all major retail outlets throughout the country effective immediately."

61. This statement was followed by a 6% increase in NewAge's share price.

**4. The CBD Portfolio**

62. Beginning on September 5, 2018, Willis announced that NewAge had been testing a CBD beverage over the previous six months, and that it had tested and developed a portfolio of CBD-infused beverages that it planned to unveil at the NACS trade show in Las Vegas. The rest of the year and early 2019 was dotted with similar falsehoods, with Willis and NewAge conveying that the Company had a completed CBD beverage portfolio, had secured substantial retail and distribution pre-orders and commitments to sell its CBD products, and was even selling it at Japan's FamilyMart.

63. The statements about NewAge's CBD beverage portfolio caused significant hikes in NewAge's share price. For example, NewAge's share price increased a whopping 26% following the September 5, 2018 announcement.

### 5. Walmart

64. NewAge and Willis also told the market on April 8, 2019 that the Company expanded its distribution with Walmart, the world's largest retailer. Specifically, they announced (1) the "first national distribution" of its products via an expanded distribution of its Marley beverage line with Walmart; (2) that NewAge had "now begun shipments to Walmart distribution centers across the United States"; and (3) that each of NewAge's three Marley Mate flavors would be available at Walmart stores in the beginning of April 2019.

65. As SeekingAlpha reported, this development "proved to be a shock for investors, sending shares roaring to close up 38.6% on April 8 . . ." Daniel Jones, A Grand Slam For New Age Beverages Corporation, Seeking Alpha (Apr. 11, 2019). The article continued, "[i]n its latest press release, the management team at New Age announced that in just a few short weeks, its products will be in some of the first Walmart stores and through the retail giant's almost incomparable distribution network, consumers across the country will be able to enjoy its Marley brands." *Id.*

## C. NewAge and Defendants Seize The Opportunities Afforded By The Company's Artificially Inflated Share Price

66. Although the distribution and CBD portfolio announcements described above would eventually be revealed to be false and misleading, they served to artificially inflate NewAge's stock price. Using this increased share price, NewAge was able to raise money and increase liquidity by conducting four equity offerings, which allowed it to raise over $105 million in gross proceeds in 2018 alone:

| Offering | Number of Shares | Gross Proceeds |
|---|---|---|
| April 2018 Offering | 2,560,000 | $4,480,000 |
| August 2018 Offering | 9,200,000 | $11,776,000 |
| ATM Offering – September 2018 | 8,089,000 | $37,533,000 |
| November 2018 Offering | 14,835,000 | $51,922,000 |
| **Total** | **34,684,000** | **$105,711,000** |

NewAge, Annual Report (Form 10-K), 65 (filed Mar. 16, 2020).

67. With the additional capital and increased value of its shares, NewAge was able to shift its focus to strategic acquisitions, further promoting a false sense of growth and financial prosperity.

68. Using the proceeds from its equity raises, NewAge completed its acquisition of Utah-based healthy beverage and lifestyle company, Morinda Holdings, Inc. ("Acquisition Agreement") in December 2018. Pursuant to the Acquisition Agreement, NewAge agreed to pay the following consideration to Morinda's equity holders and phantom stockholder: (i) $75 million in cash; (ii) 2,016,480 shares of the Company's common stock; and (iii) 43,804 shares of Series D Preferred Stock providing for the potential payment of up to $15 million contingent upon Morinda achieving certain post-closing milestones. NewAge, Current Report (Form 8-K), 2 (filed Dec. 21, 2018).

69. In an M&A Call prior to the Morinda acquisition, Defendant Willis stated: "[s]o clearly ***Morinda brings the attractive financial implication***, organizational underpinning and strengthening, but ***they also bring the market access*** with more than 160,000 distributors worldwide." Morinda Holdings, Inc., M&A Call (Dec. 4, 2018).

70. By window dressing the state of NewAge's finances and business prospects, Defendants opened the door to new opportunities therefore keeping the share price consistently high and liquid heading into the 2019 fiscal year.

71. Recognizing the Company's apparently improved prospects, the Board agreed to increase Willis's base salary from $312,500 per year to $650,000 per year beginning in January 2019. Also at this time, Gould's base salary soared to $500,000 from around $67,000 annually. NewAge, Proxy Statement (Schedule 14A), 14-15, (Apr. 5, 2019).

72. Willis also managed to pocket over $2 million by selling 425,000 shares between April and October 2019. *See* Section V.D.1, *infra*.

73. The other Defendants profited as well, garnering larger salaries and stock awards from 2019 onward, as described in greater detail below. *See id.*

74. NewAge also capitalized on its artificially inflated share price by entering into an ATM offering agreement with Roth Capital Partners, LLC on April 30, 2019 to sell up to $100 million worth of shares of the Company's stock. NewAge, Annual Report (Form 10-K), 65 (filed Mar. 16, 2020).

75. NewAge was also able to complete yet another acquisition in 2019—this time with Brands Within Reach ("BWR") on July 12, 2019. Consideration for the acquisition included $2.5 million which was utilized to eliminate 100% of BWR's debt, a $500,000 payment to the sellers and issuance of up to 700,000 in restricted shares of NewAge common stock. NewAge, Current Report (Form 8-K), Ex. 99.1, (filed Jul. 12, 2019)

**D. The Ariix Merger**

76. NewAge's merger spree, made possible by its artificially inflated stock, continued with the ill-fated reverse merger of e-commerce company Ariix, another MLM.

77. The reverse merger was contemplated in or around early 2020. Adversary Action, Complaint ("Liquidation Trust's Complaint" or "Liq. Compl.")[5] at ¶159. Founded in 2011, Ariix

---

5 The Liquidation Trust's Complaint is filed herewith as Exhibit 3.

sold consumer packaged products under several brand names, through a multilevel marketing direct selling model. *See* Bevnet, NewAge Agrees to Merger With Direct Selling Co. ARIIX, Four Others, Brad Avery, (Jul. 24, 2020), https://www.bevnet.com/news/2020/new-age-agrees-to-merger-with-direct-selling-co-ariix-four-others, (last visited May 31, 2024). Ariix was led, in part, by its founder and CEO, Fred Cooper and its founder and President, Mark Wilson. *See* LinkedIn, *Fred Cooper*, https://www.linkedin.com/in/fred-cooper-173a0b43; LinkedIn, *Mark Wilson*, https://www.linkedin.com/in/mark-wilson-99889963; Nasdaq, Press Release, *NewAge Agrees to Combine with Ariix and Four Additional E-Commerce/Direct Selling Companies to Create >$500 Million Global Enterprise* (Jul. 20, 2020).

78. The concept behind the NewAge-Ariix reverse merger was born out of the Company's claimed desire to "diversify its omnichannel strategy [and] plac[e] an increased emphasis on direct selling business models through its subsidiaries." *Id.* As NewAge's President for North America, Oliver Sonnois, put it: "[w]ith the world evolving in a direction toward healthier products, healthier beverages, and also the Covid situation - which has accelerated the shift away from traditional retail - [the merger represents] a real opportunity for broadening the direct-to-consumer base of our omnichannel strategy[.]" *Id.*

79. Merger negotiations began in March 2020 and on July 20, 2020, NewAge announced that it had entered into an Agreement and Plan of Merger with Ariix ("Merger Agreement"). Under the terms of the Merger Agreement, NewAge was required to pay Ariix's members (including Cooper and Wilson): (i) $25 million in cash; (ii) the issuance of 18 million shares of the Company's common stock, par value $0.001 per share; (iii) a convertible promissory note in the aggregate amount of $10 million, maturing six months from the closing date, to certain members of Ariix and other designated employees; and (iv) a convertible

promissory note in the aggregate amount of $141.25 million, maturing 24 months from the closing date, to certain members of Ariix and other designated employees. NewAge, Current Report (Form 10-K), 7-80 (filed Jul. 20, 2020).

80. The terms of the Merger Agreement were amended twice before it ultimately closed. Significantly, when it became clear that Ariix was not cooperating with its obligation to provide NewAge with the financial records and information it requested as a condition precedent to closing, unbeknownst to the market, the Company waived critical closing conditions enabling Ariix to provide, among other things, audited and interim financial statements ***after closing***. Liq. Compl. ¶¶175, 177.

81. Ultimately, on November 16, 2020, a letter agreement was entered into, with the amended terms, and the merger closed without Ariix's audited financials ("Amended Merger Agreement"). NewAge, Current Report (Form 8-K), Ex. 10.1, (filed Nov. 13, 2021). On this date, Defendant Cooper became a director of NewAge and Wilson became an officer of NewAge. Liq. Compl. ¶178. Defendant Willis continued his role as the CEO and as a director of NewAge.

82. In short order, NewAge's decision not to review Ariix's audited financials before the close proved disastrous, as the Company would come to find out that Ariix's financial condition and business practices were anything but what it represented to them pre-closing.

83. First, per the balance sheet that Ariix provided NewAge on closing, Ariix had negative $18M in working capital, representing a ***$29M shortfall*** from what was initially represented. *Id.* at ¶183.

84. Second, NewAge developed concerns that Ariix had violated the FCPA. Once NewAge caught wind of Ariix's potential FCPA violations, the Company retained outside

auditors, counsel and accountants to perform an independent investigation into Ariix's international business practices, which required significant expenses to undertake. Liq. Compl. ¶187. Two months after the investigation concluded in June 2021, NewAge made a voluntary self-disclosure of suspected FCPA issues to the U.S. Department of Justice and the SEC. NewAge, Quarterly Report (Form 10-Q), 51 (filed Aug. 9, 2021).

85. All the while, Defendants touted the Ariix merger and affirmed that the Company's internal controls were adequate, or alternatively, disclosed weaknesses in internal controls that were unrelated to the false and misleading statements at issue, as explained in further detail below.

86. To make matters worse, according to the Liquidation Trust's Complaint filed in the bankruptcy action after the Class Period, Defendants Willis and Cooper engaged in a "fraudulent scheme wherein they: (1) cloned and transferred Ariix's proprietary ICONN software to Kwikclick, an entity they owned and controlled, which was a material asset NewAge was to acquire sole and exclusive rights to as part of the[ir] [m]erger [with Ariix.]" Liq. Compl. ¶391.

### E. The SEC's Investigation Into The Purported Distribution Agreements And CBD Portfolio

87. According to filings in NewAge's bankruptcy docket (*see* ECF No. 731 in No. 22-10819 (LSS) (D. Del. Bankr.)), the SEC began to investigate NewAge in or around February 2019 related to possible violations of the Securities Act and Exchange Act. The investigation included activity from at least June 2016 through February 2019.

88. Just two months after Willis resigned on January 10, 2022, he received a subpoena associated with the SEC investigation on March 25, 2022, pursuant to which he was

required to produce relevant documents and testify before the SEC. On June 10 and July 14, 2022, Willis testified in the SEC investigation. ECF No. 731.

89. On October 18, 2022, the SEC filed a civil complaint against Willis for violations of the securities laws because he made many of the false and misleading statements alleged herein.

90. On October 19, 2022, the SEC issued its Cease and Desist Order against NewAge.

91. Cease and desist proceedings are governed by 15 U.S.C. §78u-3, which provides that if, after notice and opportunity for hearing, the SEC finds that ***any person is violating or has violated any rule or regulation thereunder***, the Commission may publish its findings and enter an order requiring such person, ***due to an act or omission the person knew or should have known would contribute to such violation***, to cease and desist from committing or causing such violation and any future violation of the same provision, rule, or regulation. 15 U.S.C. § 78u-3.

92. The Cease and Desist Order provided, *inter alia*, that Willis was responsible for issuing false and misleading statements regarding the purported agreements with the U.S. Military, Canadian retailers, Walmart, the South Korean distributor, and FamilyMart, as well as the statements regarding the CBD portfolio. NewAge settled the Cease and Desist proceedings, which means that it avoided an adjudication in federal court about whether NewAge had or was about to commit a violation of securities law. John H. Sturc et al., *SEC Investigations and Enforcement Actions, in Securities Litigation: A Practitioner's Guide* 15-20.

93. Had NewAge refused to settle the cease-and-desist proceedings, fact intensive (and costly) proceedings would ensue and a formal determination as to NewAge's violation of the applicable securities laws/regulations would be made by the relevant authority.

## II. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD[6]

### A. Statements Regarding NewAge's Relationship With The U.S. Military

94. On January 18, 2018, the first day of the Class Period, NewAge and Willis intentionally issued a false and misleading press release announcing that NewAge had a "new distribution agreement" with the U.S. military, which was a "[n]ew U.S. [m]ilitary initiative in partnership with NewAge[.]" Under this agreement, 21 NewAge "SKUs" (stock keeping unit, or distinct item for sale) across five product lines were purportedly "shipping out now and throughout the 1st quarter to all commissary locations worldwide," with the scope of the distribution agreement including 240 military commissaries and 3,100 exchanges in over 30 countries. The Company also claimed that "[t]he new distribution agreement is expected to have a material impact on the financial results of New Age." Specifically, the press release states:

> New Age Beverages Corporation . . . today announced that ***it is expanding distribution of its portfolio of healthy beverages into all of the Military Commissaries worldwide. New Age will be providing healthy alternatives across all their brands to active duty military personnel, retirees, and their families spanning a population of almost 25 million people across more than 30 countries. The new distribution agreement is expected to have a material impact on the financial results of New Age.***
>
> Highlights:
>
> - ***21 total sku's across New Age's Coco-Libre, Marley, XingTea, Búcha Live Kombucha, and Aspen Pure Probiotic brands shipping out now and throughout the 1st quarter to all commissary locations worldwide***
> - ***New US Military initiative in partnership with New Age to provide healthier alternatives for active duty and retired servicemen and their families***
> - ***Scope of Military Commissaries (240) and Exchanges (3,100) spans over 3,300 outlets in more than 30 countries around the world***

[6] In this section, bold and italicized text indicates what statements are alleged to be false and/or misleading by way of omission. They are shown in context.

The Defense Commissary Agency (DeCA), which is headquartered at Fort Lee, VA, operates a worldwide chain of commissaries providing groceries to military personnel, retirees and their families in a safe, secure and better value shopping environment. A core military family support element, and a valued part of military pay and benefits, commissaries contribute to family readiness, enhance the quality of life for America's military and their families, and help recruit and retain the best and brightest men and women to serve their country.

***New Age's expanded distribution of its entire portfolio was accomplished in large part because of the Company's one-stop-shop portfolio model of healthy beverages.*** Major partners, distributors and retailers can work with one trusted company of scale to provide all their needs as consumers, and consequently retailers accelerate their shift to the purchase of healthier products. ***New Age will also be activating in store in all the outlets to drive awareness and trial with consumers. Not only will New Age's products be displayed in multiple locations in each commissary, but they will also have disruptive displays and other in-store activities and offers to connect with the consumers at the point of purchase.***

Brent Willis, a former US Military Officer and West Point graduate who is now the Chief Executive Officer of New Age Beverages, mentioned, "***We believe it is a great initiative for the military to make an active choice to provide healthier alternatives for their patrons.*** Anything we can do, we will do to support our country's finest. Our servicemen and their families make sacrifices for all Americans every day, and we are proud that we can support them."

95. During NewAge's May 15, 2018 earnings call, Willis introduced a NewAge employee to "give you the facts of what is happening in the market," which Willis knew were not the true facts about NewAge's business dealings with the U.S. military:

Brent Willis:

Chuck mentioned we still feel confident in outlook for the year, albeit at the lower end, and continue to hold our team accountable to our plan. The reason for the belief system is all in the revenue. And to discuss that, I thought it would be most valuable for our shareholders to hear from the two leaders managing the largest parts of our business: Mike Cunningham, who leads the US Division;, and Josh Hillegass, who manages our DSD Division. Let me pass it over to Mike, who can give you the facts of what is happening in the market. Mike?[7]

[7] https://seekingalpha.com/article/4175223-new-age-beverages-nbev-ceo-brent-willis-on-q1-2018-results-earnings-call-transcript.

96. Mike Cunningham, who Willis introduced, falsely referenced New Age having "***picked up the military business worldwide***[.]" Willis, who claimed to the market to have the purported military connections and was purportedly responsible for and the driving force in obtaining NewAge's military business, knew this statement was false and nevertheless made no effort to correct or clarify it at all.[8]

97. During an interview with Proactive Investors on YouTube on or around June 6, 2018, Willis continued to perpetrate these fraudulent statements about NewAge's business dealings with the U.S. military by stating in relevant part:

> [Willis]: "It also looks like very new channel expansion, e-commerce, which is very profitable, it's in a very significant way, ***military worldwide in a very significant way***. . . . All of these things were zero as part of the P&L when I started two years ago, even by the end of the year those those three or four new channels will probably be 17, 18 percent of total revenue by the end of the year. . . .
>
> * * *
>
> [Questioner]: "And you mention military, you're a former military member yourself and so that's important to you I think to be able to do that market as well?"
>
> [Willis]: "uhh I still have a lot of friends, I still have a lot of respect for all the military worldwide . . . . Anything we can do for the military or their families, uhh with healthy alternatives we want to do. . . .

New Age Beverages offers healthy beverages, including Bob Marley-branded product line, https://www.youtube.com/watch?v=6z_w5iFwMgM (last visited May 29, 2024) (starts at 3:44).

---

[8] The SEC and the Liquidation Trust attribute this statement to Willis. *See* SEC Compl. ¶51 and Liq. Compl. ¶117.

98. On NewAge's August 14, 2018 earnings call, Defendant Willis falsely stated that NewAge was selling "21 core SKUs" of its brands in the "military channel" that was "as big as Walmart in total sales throughput." Specifically, Willis stated:

> Well, just in the past 6 months, we have penetrated 40 of the top 50 retailers in North America, just a starting point, but still 40 of the top 50 retailers, including . . . CVS nationally across 3,000 stores with Xing, Food Lion on the East Coast and the Southeast with Xing ***and in the military channel with DEC and ACES, Coco-Libre, Marley, Búcha and overall 21 core SKUs in that account that they believe is as big as Walmart in total sales throughput***.

Defendant Ence was on the call as well.

99. The statements in ¶¶94-98 above were false and misleading when they were made because NewAge and Willis knowingly and/or recklessly omitted that: (1) NewAge never entered into a "distribution agreement" or "initiative in partnership" with the military and never had plans to sell its products at all commissaries and exchanges around the world; (2) NewAge did not have adequate inventory of its products to fulfill this purported agreement anyway; and (3) the only new distribution during the period was to sell NewAge products at two individual stores in Virginia and Florida for a trial period of four weeks.

100. The false and misleading statements about NewAge's relationship with the U.S. military were material and caused NewAge's share price to spike. On January 19, 2018, the trading day following the January 18, 2018 press release describing the purported agreement with the military, NewAge's stock price closed 21% higher than where it opened the previous day.

### B. Statements Regarding NewAge's Relationship With Loblaws and Sobeys

101. On February 1, 2018, NewAge and Willis issued a materially false and misleading press release announcing that NewAge had "***begun shipments of its Coco-Libre and Búcha Live Kombucha brands in expanded distribution throughout Loblaws and Sobeys, the largest***

***grocery retailers across Canada***" and "***is now expanding to all banners within Loblaws and expanding throughout both Sobeys and Safeway***." Defendant Thibodeau is quoted in the press release as stating:

> New Age is really on a roll in Canada, and the brands are gaining more and more *presence* with retailers, which is correlating to more and more *preference* with consumers, which is generating more and more *sales* for NewAge. We gained initial distribution in the first few hundred outlets with Loblaws and Sobeys in late 2017, and based on the success, ***are now expanding to all banners*** and our brands are gaining real critical mass.

102. Similar statements were made in a February 13, 2018 press release, with NewAge stating that its Búcha Live Kombucha "***has recently expanded to all major retailers throughout Canada*** . . . ", and Thibodeau stating, "***Búcha has rapidly expanded in both existing and new accounts in North America*** . . . ."

103. The statements in ¶¶101-02 above were false and misleading when made because NewAge, Thibodeau, and Willis knowingly and/or recklessly omitted that: (1) there was no expansion of NewAge product lines Coco-Libre and Bucha Live Kombucha to all banners within Loblaws and throughout Sobeys (including Sobeys' subsidiary Safeway); (2) Sobeys never actually sold Coco-Libre brand beverages; (3) there was no expanded distribution of Coco-Libre brand beverages to Loblaws in 2018; and (4) NewAge did not expand distribution of its Búcha Live Kombucha brand to all major retailers throughout Canada.

104. These statements about the purported expansions in Canada were material and caused NewAge's share price to go up. Following the February 1, 2018 announcement of the respective expansions within Loblaws and Sobeys, the share price closed up 5%. On March 5, 2018, an equity analyst maintained a "buy" rating for NewAge and a target price of $6 per share based, in part, on NewAge's reported expansions with Loblaws and Sobeys.

**C. Statements Regarding South Korean Distribution**

105. The February 13, 2018 press release also announced that NewAge "***has signed a major distribution agreement for expansion of its Búcha Live Kombucha brand with the largest food and beverage distributor in South Korea to expand to all major retail outlets throughout the country immediately***." The press release proceeded to identify 14 South Korean department stores, hypermarkets, and convenience and grocery outlets in which the brand would be sold starting by or before June 2018:

> ***With this expansion in South Korea, the Búcha brand portfolio will initially be sold in the top 5 department stores in the country including Lotte, Hyundai, Shinsegae, Galleria, and AK-Plaza. Thereafter in the second quarter, Búcha will be expanding into the hypermarkets including Lotte-mart, Home Plus, Costco, Megamart, and E-Mart, and the convenience and grocery outlets including GS25, CU, 7-Eleven, and Mini Stop***.

106. In the same press release, Defendant Thibodeau stated, "[t]his is another major deal for NewAge . . . . NewAge no longer opportunistically distributes internationally. Now, we build our brands in markets where we can have real scale, real broad-based market presence, and critical mass to enable the Company to invest in and sustainably build our brands. Búcha has rapidly expanded in both existing and new accounts in North America, ***and now is building on its success with a fantastic distribution partner in South Korea***."

107. The statements in ¶¶105-06 above were false and misleading when made because NewAge, Thibodeau, and Willis knowingly and/or recklessly omitted that: (1) the South Korean distributor merely received the right to distribute NewAge products within South Korea and it had not made any commitments to NewAge that any retailers in South Korea would place orders for any NewAge products; and (2) none of the 14 department stores, hypermarkets, and convenience and grocery outlets listed in this press release had made any commitment to purchase NewAge products. The distributor did not place any orders of Búcha Live Kombucha

until December 2018, and even then, sales were minimal (1,500 bottles sold) before the relationship was terminated in October 2019.

108. The statements regarding the agreement with the South Korean distributor and the relationship with Loblaws and Sobeys (*see* ¶102, *supra*) that appeared in the February 13 press release were material and caused NewAge's share price to go up. Following the February 13, 2018 announcement, NewAge's stock went up over 6% on the day, and according to the SEC and the Liquidation Trust, an equity analyst even sent CEO Willis an email congratulating him on the "win [in South Korea]."

**D. Statements Regarding NewAge's CBD Beverage**

109. According to the SEC, during a September 5, 2018 investor presentation, Defendant Willis made the false and misleading claim that NewAge had been testing a CBD beverage over the previous six months. In fact, NewAge had only been distributing a CBD-infused water that was developed and controlled by a third-party supplier, not developing a proprietary beverage. SEC Compl. ¶ 56.

110. On September 19, 2018, NewAge and Willis issued a false and misleading press release stating that NewAge had tested and developed a portfolio of CBD-infused beverages that it planned to unveil at the National Association of Convenience Stores ("NACS") trade show in Las Vegas in October 2018, and that its Health Sciences Division ("Health Sciences") was "overseeing and carefully controlling product production, quality, and its supply chain and sales channel partners." Specifically, the press release stated:

> New Age, . . . the Colorado-based organic and natural healthy functional beverage company intending to become the world's leading healthy beverage company, ***today announced that it intends to debut its portfolio of CBD infused beverages at the upcoming North American Convenience Store show (NACS) to be held at the Las Vegas Convention Center on October 7-10, 2018***.

> Given the growing awareness of the potential health benefits of CBD, the New Age Health Sciences Division evaluated the data and science supporting the emerging segment. ***As a result of that assessment, New Age began testing a CBD-infused beverage earlier this year in its home market in Colorado. Based on the learnings gained in the test market and the increased consumer acceptance of the segment, New Age has decided to expand its presence in the category***. ***The Company has taken the learnings it gained in product formulation and taste, efficacy and dosage, and consumer communication and has developed a portfolio of CBD-infused beverages***. Now, coupled with the increased interest from major retailers in North America, ***New Age intends to unveil its portfolio and category insights with select retail partners at the NACS show on October 8th.***
>
> According to the Brightfield Group, the Global market for CBD will top $22 Billion with the next 4 years. Non-psychotropic CBD is one of the most medicinal compounds in the cannabis plant, reportedly helping with everything from arthritis to epilepsy and cancer, and is seen by many as a natural remedy instead of a pharmaceutical or narcotic drug. The 2018 Farm Bill, which was recently passed by both the House and Senate, would likely legalize CBD for farmers across the country and allow it for sale nationally in all channels.
>
> New Age will be meeting with some of the major retailers in the country at NACS on October 8-10th ***and taking orders on a first come, first serve basis, given anticipated demand***. ***New Age's Health Sciences Division is overseeing and carefully controlling production, quality, and its supply chain and sales channel partners given the importance of efficacy and quality control in the end product***.
>
> Zach Ross, Marley Marketing Manager at New Age commented, "We believe we have developed unique consumer insights and ***accessed superior technology in CBD-infused beverages over the past year, and we are excited to share those insights with key retail partners. We believe we are in a position to bring national leadership to this emerging growth segment, and intend to launch the most efficacious and safe CBD-infused products for consumers, with the most responsible marketing and education to a segment that has potential to be transformative to healthy functional beverages***."

111. The statements in ¶¶109-10 above were false and misleading when made because NewAge and Willis knowingly and/or recklessly made the statements while omitting that: (1) NewAge had only begun development of its CBD portfolio shortly before its September 19, 2018 announcement and had, by that time, taken only preliminary steps towards developing any supposed CBD-infused beverage; (2) NewAge was not developing a proprietary CBD product,

as conveyed in the above statements, but rather had merely been distributing a CBD-infused water that was developed and controlled by a third-party supplier; and (3) Health Sciences, which comprised of only two part-time employees, had no role in the development of CBD beverages as of September 19, 2018, and minimally participated, if at all, in the supposed process thereafter.

112. On October 10, 2018, NewAge and Willis issued a false and misleading press release titled "New Age Beverages Corporation Debuts Its Initial Portfolio of CBD-Infused Beverages." The press release discusses NewAge's purported debut of its portfolio of "full spectrum" CBD-infused beverages from "its Health Sciences Division" at the October 2018 NACS trade show in Las Vegas that included a quote attributed to its Chief Medical Officer attesting to NewAge's "scientifically and medically grounded" approach to its CBD beverage portfolio. Specifically, the press release stated in relevant part:

> New Age . . . today ***announced the debut of its portfolio of CBD-Infused beverages*** from its Health Sciences Division.
>
> KEY HIGHLIGHTS:
>
> - ***New Age debuted its portfolio of CBD-infused relaxation tea's*** [sic]***, CBD-infused sparkling waters, and CBD-infused shots, each with 25mg of full-spectrum CBD***.
> - Planned launch with major retailers and distributors nationally as soon as the Farm Bill is enacted, utilizing New Age's existing national distribution footprint and penetration in 40 of the top 50 retailers in North America.
> - ***CBD portfolio, other New Age brands, and store brand/private label offerings expected to round out New Age's portfolio*** and position the company as the authority in the emerging and high-growth healthy beverage category.
>
> ***New Age Health Sciences***, a wholly-owned subsidiary of New Age Beverages Corporation that houses all of New Age's patents, cooperative research studies, and human trial information***, debuted its portfolio of CBD-infused beverages in offsite meetings during the North American Convenience Store Show (NACS) held in Las Vegas on October 7th-10th, and held one-on-one meetings with major retailers and distribution partners on October 8th-10th***.

> Some of the country's largest distributors and retailers also attended New Age's CBD launch event where they tasted the company's range of CBD-infused sparkling waters and CBD-infused relaxation teas, and received brand and product overviews, pricing, and pre-order information.
>
> Michael Cunningham, senior vice president of sales for New Age commented, "The demand and interest for these products is unlike I have ever seen in my career. Customers loved the taste of New Age's CBD-infused products and many of them committed to bring in the products for sale.
>
> We invested the time and resources to get the taste and efficacy perfect on these CBD products. Retailer and distributor partner enthusiasm confirms that we got it right. Everyone knows about the full suite of New Age brands and their potential relevance in the CBD space. We intend to provide a full portfolio of offerings in this emerging growth segment, and expect the range of choices for retailers, distributors and consumers best position New Age to be the leader and authority in the sector."
>
> ***Dr. Gerry Haase, Chief Medical Officer for the New Age Health Sciences Division, was in attendance and provided a position paper and references on CBD, and was available for Q&A with retailers on the science and technology behind New Age's approach. Haase commented, "We are taking a very fact-based, scientifically and medically grounded, and responsible approach to our efforts with CBD. We believe our full spectrum CBD-infused beverages provide the most benefit for consumers, but it is clear from the questions from prospective partners that there is a significant amount of education needed on the types of CBD there are, the benefits, and how and what to communicate***."
>
> As part of its approach to the category, New Age is also initiating the creation of the 1st CBD industry association for consumer goods (CBD-CPG). New Age is inviting others to participate who share a common interest in defining industry standards for quality, dosage accuracy, and effectiveness, and who are open to a collaborative approach with regulatory bodies.

113. The statements in ¶112 above were false and misleading when made because NewAge and Willis knowingly and/or recklessly made the statements while omitting that: (i) NewAge had, by that time, taken only preliminary steps towards the supposed development of any CBD-infused beverage; (ii) the purported debut of the CBD-infused beverages at the off-site meeting in Las Vegas consisted only of samples of existing NewAge products to which drops of

CBD purchased from a local shop had been added onsite just before the event; and (iii) NewAge's Chief Medical Officer never supplied or endorsed the quote attributed to him in the October 10, 2018 press release and he never attested to NewAge's "scientifically and medically grounded" approach in its CBD beverage portfolio given his lack of involvement in the development of the CBD beverage portfolio, and (iv) NewAge was not developing a proprietary CBD product, as conveyed in the above statements, but rather had merely been distributing a CBD-infused water that was developed and controlled by a third-party supplier.

114. On October 16, 2018, NewAge and Willis issued a press release titled "New Age Beverages Corporation Receives Unprecedented Response At NACS To Its CBD-Infused Portfolio," in which the Company stated that its "***portfolio of 9 CBD-Infused products generated initial retail distribution commitments spanning more than 110,000 points of distribution***" and that:

> ***New Age Health Sciences debuted three new brands including, CBD WTRTM, a CBD-Infused Sparkling Water, CBD TEATM, a CBD-Infused Artisanal Craft-Brewed Tea, and CBD SHOTTM, a CBD-Infused Shot. Each of the products contain 25mg of full spectrum CBD***, non-psychotropic, THC-Free, and compliant with the known tenets of the Farm Bill. CBD WTRTM is an all-natural, clean, CBD-infused sparkling water in Strawberry Clementine, Raspberry Lime, Mango, and Grapefruit flavors. CBD TEATM is also all-natural, and is a craft-brewed and CBD-Infused tea with no added sugar in four flavors including Hibiscus Lemon, Lavender Mint, Japanese Mountain Green, and Grapefruit Thyme. CBD SHOTTM is a concentrated 2oz CBD-Infused green tea shot for on-the-go consumers. Zach Ross, Marketing Manager at New Age commented, "Not all consumers are looking to jack their heart rates up with 5 hours of caffeine. Some of us wouldn't mind just de-stressing a bit, the fundamental benefit of our CBD SHOTTM."
>
> Craig Thibodeau, President of International and Global Head of Private Label at New Age commented, "Publicly some of the major retailers are not talking about CBD and their intentions, ***but privately New Age is now engaged with some of the largest convenience and grocery retailers in North America working on launch plans for as soon as the Farm Bill is enacted***." Upon reviewing and tasting New Age's new CBD-Infused brand, retailers and distributors in North America totaling 115,400 new points of distribution, indicated authorizing and

> distributing the New Age CBD portfolio immediately following the approval of the Farm Bill. New Age intends to launch these products in all states and establishments that will legally allow the sale of CBD, on the condition that those retailers and distributors abide by the standards of responsible communication and education being established in the emerging category. ***New Age expects to launch with distributors and independent retailers in the end of the current quarter, and to expand with select national and regional retailers in the March/April 2019 resets with their initial CBD-Infused portfolio, and some of their other existing New Age brands in CBD-Infused variants***.

115. Then, on November 14, 2018, NewAge and Willis issued a new press release announcing its "***CBD and Health Sciences products in production for launch before Christmas***[.]" Willis was quoted in the press release as stating, in relevant part, "Now, with the distribution breadth of our core brands and our ability to fulfill demand, ***the impending launch of our CBD portfolio***, and next steps with strategic growth opportunities, we are confident in our ability to continue to drive excellent return for shareowners."

116. On the same day that this press release was issued, NewAge held an Earnings Call for Q3 2018. Once again, Willis introduced a NewAge employee to "give you some insight from the front line." The employee claimed that NewAge had "***overcommitments***" of "***well over 125,000 new points of distribution***" for its CBD beverage portfolio. Willis also stated that the CBD beverage portfolio was developed by "Health Sciences." Defendants Thibodeau and Gould were also on the call. https://seekingalpha.com/article/4222360-new-age-beverages-corp-nbev-ceo-brent-willis-on-q3-2018-results-earnings-call-transcript.[9]

117. During a call with investors on December 4, 2018, Defendant Willis then falsely and/or misleadingly claimed that: (i) NewAge had "gained about 125,000 points of distribution of either preorders or commitments" for its CBD products; (ii) has "3 manufacturers in different

---

[9] The SEC and the Liquidation Trust attribute this statement to Willis. *See* SEC Compl. ¶69 and Liq. Compl. ¶144.

parts of the United States already lined up" to make its CBD products; and (iii) NewAge would be launching its CBD-infused beverages by Christmas 2018. Specifically, Defendants Willis stated:

> ***So we've got 3 manufacturers in different parts of the United States already lined up, one of which is currently making our CBD water, our CBD shot and our CBD tea. So that is currently in production***. I'm not sure exactly when the products come in, ***but even though we made a commitment that we would be at least launching some of that by Christmas, so we're following through on that***. But we've got 2 other redundant manufacturing locations laid out. So the first one is in California, 2 other redundant manufacturing locations laid out. But the great thing about Morinda is, because they have production in Germany and Japan and Tahiti and China and the U.S., there is a real synergy there where things will be more in our direct circle of control, not just from a cost and cost management standpoint, but from a reducing any kind of bottleneck standpoint. ***So we could get deluged on this, Mike, with the demand on the CBD stuff.*** I just don't know when the timing is going to fully materialize, which is why we''re taking a very cautious business planning and financial approach to 2019 that we've got the capital and the working capital to be able to address the opportunity and that's why we're laying on the additional capacity and potential manufacturers if the worst in terms of a deluge happens or you can call it kind of the worst or the best, depending on your perspective, but we're trying to be prepared. But we're just not sure what's going to happen, which is why we're being careful from a modeling standpoint.

118. During a December 6, 2018 interview with TheStreet.com, Defendant Willis falsely and/or misleadingly claimed that the CBD portfolio was already in production and stated that he expected to have NewAge's CBD products in stores before Christmas 2018. Specifically, Willis stated: "[*W*]***e want to have our CBD, our cannabis-infused beverages portfolio launched in market before Christmas so we're in production now we're on track to be able to execute that***, . . . ."

*See* https://www.thestreet.com/video/new-age-beverage-co-ceo-discusses-cbd-infused-beverages-1480186014801860 (last visited May 29, 2024).

119. On December 12, 2018, NewAge and Willis issued a press release that stated, in relevant part:

> The Company, establishing itself as a [sic] the leading authority in the CBD-infused beverage space, is poised to aggressively expand its portfolio of CBD-infused beverages, addressing different key consumer need-states. ***The Company is completing initial production runs by Christmas for the full portfolio***, including sparkling water (CBD WTR™), green tea (CBD TEA™), and a shot offering (CBD SHOT™). It is prepared to distribute nationally as more clarity is brought to the regulatory landscape following passage of the Farm Bill.
>
> New Age's CBD-infused products contain 25mg of 'full spectrum' CBD, with zero THC, are non-psychotropic, and are third-party tested for safety, stability, efficacy, dosage accuracy, and are Farm Bill Compliant. In anticipation of a full national rollout***, the Company has already secured retailer and distributor commitments in key legal states including Colorado, California, Washington, and Oregon, and commitments spanning over 125 thousand points of distribution in the independent and DSD channels alone***.
>
> Michael Cunningham, SVP of Sales at New Age commented, "***In the past few months, New Age has confirmed major commitments with several leading retailers in anticipation of the President signing the Farm Bill. The Company expects to launch its CBD-infused products into national accounts as they come on board in conjunction with their April resets, and is prepared to penetrate the independent market and DSD distributors beginning in January***."

120. During the company's January 16, 2019 investor conference call, CFO Gould and NewAge's Marketing Director made the following false and/or misleading statements: (i) NewAge had produced its portfolio of CBD-infused beverages prior to Christmas 2018; (ii) that this purported portfolio of beverages would be available in certain regional stores starting in March and April 2019; (iii) that every grocery retailer NewAge had met with at a recent trade show (the Winter Fancy Food Show) had placed an order for a CBD-infused beverage product from NewAge; and (iv) that NewAge would begin shipments of its CBD-infused beverage portfolio in the first quarter of 2019 and that this portfolio would have a material impact on NewAge's financial statements during the 2019 fiscal year. Specifically, the following statements were made during the conference call:

> [Jay Barrow, Head of Brand]: ***We initially said we would produce our [CBD] portfolio in time for Christmas and we did.***

* * *

> So when will you see the product on the shelves and where will you see them? ***The answer is, in time for the major spring resets for key regional retail in the states that allow sales, which all really happened in March and April***. The regulatory landscape is changing so fast that more markets than these initial 4 or 5 will open up by then. The point I want to emphasize is***, that we'll be a*** [sic] ***position to act on these first. We built the supply chain and execution system so we can work with the retailers in these new markets to build what we believe is going to be the most consumer-relevant brand in the sector, period***.
>
> * * *
>
> I'll say, however, that ***every single grocery retailer that we met with at the show placed an order, every single one. 100%. This is unprecedented***. And the demand is not just at traditional retail. The approach is for major, pervasive, QSR operators, we're huge, with a number of commitments and preorders as the markets open up there. And the demand is not just in the U.S. We have previously mentioned that we believe the opportunity for CBD-infused beverages in Asia to be 100x that of North America. Well if the order from FamilyMart in Japan that has 15,000 outlets and was indifferent on price is any indication, that may play out to be true, and faster than we initially envisioned.
>
> [Gould]: . . . ***When I look at this opportunity, the biggest question that I see on the financial side is will the Marley and the other CBD infused beverage portfolio launches have a material impact on our financials in 2019? The answer to this is, yes***. And mind you, on our scale, is now $300-million-plus. So our materiality threshold is much more significant. . . .

According to the SEC, Willis directed Gould and Jay Barrow to make these statements. SEC Compl. ¶75.

121. During the same January 16, 2019 call, Defendant Willis also falsely claimed that major Japanese retailer FamilyMart had placed an order with NewAge to sell NewAge's CBD beverage products in 15,000 of its outlets. Specifically, Willis stated:

> [Analyst]: And FamilyMart in Japan, how big was that? Or have you said kind of a range?
>
> [Willis]: ***It's only 15,000 outlets***.
>
> [Analyst]: But their order? Their CBD order?
>
> [Willis]: ***We know but we're not in a position to communicate it yet***.

122. That same day, during an interview with Stuart Varney of Fox Business News, Defendant Willis claimed that NewAge's CBD beverages were available for purchase at FamilyMart. Specifically, he stated: "***If you want to go to Japan, you can pick it up at FamilyMart there now***." *See* Julia Limitone, *Marley cannabis-infused relaxation drink to hit store shelves soon*, https://www.foxbusiness.com/features/marley-cannabis-infused-relaxation-drink-to-hit-store-shelves-soon (relevant statements in video at 2:37).

123. In a January 18, 2019 article in Forbes, Defendant Willis stated that FamilyMart stores would carry NewAge's CBD beverages, and that the product would start shipping in March 2019. Specifically, the article states: "At last week's Winter Fancy Food Show in San Francisco, ***New Age Beverages received orders and pre-orders from grocery retailers across the U.S., regardless of location and including international orders. FamilyMart stores, based in Japan, will also carry the product, which will start shipping in March***, Willis said." He added, "It was unlike anything [I'd] ever seen."

124. The statements in ¶¶114-23 above were false and misleading when made because NewAge, Willis, and Gould knowingly and/or recklessly made them while omitting that: (1) NewAge had not completed the development of a single CBD beverage product; (2) NewAge was not developing a proprietary CBD product, as conveyed in the above statements, but rather had merely been distributing a CBD-infused water that was developed and controlled by a third-party supplier; and (3) NewAge never received orders or commitments from any retailer for CBD beverage products.

125. The false and misleading statements regarding NewAge's fictitious CBD beverage portfolio were material and caused spikes in NewAge's share price at times from September 2018 to early 2019: (i) following the September 5, 2018 investor presentation

announcing that NewAge had been testing a CBD beverage, NewAge stock closed up 7% on that day; and (ii) following the September 19, 2018 press release's publication on the debut of the CBD beverage portfolio, NewAge's share price soared from a closing price of $2.82 on September 18, 2018 to $7.85 on September 20, 2018.

### E. Statements Regarding NewAge's Relationship With Walmart

126. On April 8, 2019, NewAge and Willis issued a false and misleading press release announcing: (1) the "first national distribution" of its products via an expanded distribution of its Marley beverage line with Walmart; (2) that NewAge had "now begun shipments to Walmart distribution centers across the United States"; and (3) that each of NewAge's three Marley Mate flavors "will be available at Walmart stores in the beginning of April" 2019. Specifically, the press release states in relevant part:

> New Age . . . today announced the distribution expansion of their Marley brand with Walmart, the world's largest retailer.
>
> KEY HIGHLIGHTS:
>
> - First national account penetration for New Age as consumers increasingly shift towards healthy food and beverages
> - Marley brand acquired in 2017, rearchitected and launched with organic mate and cold brew in 2018, now gaining national distribution
> - Marley Mate led its category growth in 2018. ***Has now begun shipments to Walmart distribution centers across the United States***
>
> Following a complete redevelopment of the Marley portfolio following the acquisition by New Age in mid-2017, which included the development and launch of Organic Marley Mate and Marley Cold Brew, the Marley brand was one of the New Age's leading brands in growth in 2018 with increased demand of more than 70%. Marley Mate led its segment and drove category growth, and the resurgence of the Marley Mellow Mood Relaxation Drinks following its remake has paved the way for the launch of Marley Mellow Mood + CBD, which is launching globally in 2019.
>
> Marley Mate, an organic yerba mate beverage, is grown in the subtropical rainforests of South America. It is a natural energy drink that has the taste of tea with the uplift of coffee without the crash. Marley (yerba) Mate, pronounced yer·

> ba ma·té, is consumed more than 6 to 1 over coffee in many South American countries, and according to Healthline "…is rich in antioxidants, xanthines, and polyphenols."
>
> Marley Mate comes in three flavors, Be Jammin' Berry, Ya Mon Mint, and Jamaican Me Mango. New Age's Marley Mate has the lowest-sugar, lowest-calorie, and lowest-carbohydrate yerba mate of all major competitors. The brand outsold all competitors per point of distribution in 2018, which contributed to the decision by Walmart to authorize the brand. ***Each of the flavors which*** [sic] ***will be available at Walmart stores in the beginning of April.***
>
> Craig Thibodeau, Vice President of Key Accounts for New Age stated, "This is such a great accomplishment for New Age ***to gain its first national distribution, and to do so with the world's largest retailer in Walmart***. This is just the first initiative that we expect to do with them on the Marley brand and other New Age products on which we are in active discussions. We know Walmart is equally as committed as New Age to providing healthier products for their customers, and we expect to make the full portfolio of New Age's better-for-you products available as we expand the relationship."
>
> New Age will be dedicating significant marketing efforts behind its Marley brand in 2019 to build on what it sees as a significant opportunity with consumers, utilizing a full suite of social and digital assets beginning in late April. Following initial shipment to distribution centers this month, stores are given two weeks to set the shelves. Across Walmart stores New Age will be running hyper-targeted GeoFraming campaigns to drive foot traffic at the store level, encouraging pull-through with digital couponing, awareness, and trial campaigns.

127. On NewAge's May 9, 2019 earnings call, Defendants Gould and Willis falsely referenced NewAge's "***national distribution***" with "***Walmart***."

128. The statements in ¶¶126-27 were false and misleading when made because NewAge, Gould, and Willis knowingly and/or recklessly made them while omitting that: (1) NewAge's agreement only covered some, but not all, of Walmart's distribution centers across the U.S.; (2) Walmart made no specific commitments regarding NewAge's Marley line and never agreed to make all Marley Mate flavors available at all Walmart stores in the beginning of April 2019; and (3) at their Walmart-sales peak, NewAge's Marley brand products were offered in less than 7% of Walmart stores across only 21 states (SEC Compl. ¶44).

129. The false and misleading statements about the expanded distribution with Walmart were material and caused NewAge's share price to dramatically rise. Following the April 8, 2019 press release announcing the purported expanded distribution with Walmart: (1) NewAge's share price went up by over 23% that day; and (2) a few hours about the release of the press release, an equity analyst sent Defendant Willis a congratulatory email.

130. According to the SEC, Willis made the sole and ultimate decision to issue certain press releases alleged herein to contain false and/or misleading statements. Willis also had final editorial control and ultimate authority over the content of the press releases, drafted the press releases, and authorized the issuance of the press releases. The press releases are quoted herein at ¶¶94, 101-02, 105-06, 110, 112, 114-15, 119, 126. *See* SEC Compl. ¶¶17, 33-34, 38, 43, 49, 58, 61, 66, 68, 76. With respect to the press releases at ¶¶94, 126, Willis also disseminated the press releases to the media directly by placing them on newswires. *See* SEC Compl. ¶¶17, 43, 49.

131. According to the Liquidation Trust, all of the Defendants were responsible for the statements made in ¶¶94, 101-02, 109-10, 114-15, 119, 126. *See* Liq. Compl. ¶¶107-09, 112-13, 116, 119, 124-25, 129-32, 134, 138-39, 141-43, 155, 158, 271, 275, 318, 426.

**F. Statements About NewAge's Internal Controls**

132. On May 15, 2018, NewAge filed its first quarter 2018 results on Form 10-Q with the SEC. It was signed and separately certified by Defendants Willis and Ence pursuant to the Sarbanes-Oxley Act of 2002—attesting to the accuracy and truthfulness of the information contained therein. In this filing, NewAge stated:

> The Company maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in our reports filed under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, ***and that such information is accumulated and communicated to our***

> ***management, including our chief executive officer and our chief financial officer to allow for timely decisions regarding required disclosure***. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.
>
> * * *
>
> There have been ***no changes in our internal controls over financial reporting during our most recent fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.***

133. In NewAge's second quarter 10-Q filing for 2018, the Company and Defendants Willis and Ence certified and signed false and misleading SEC filings attesting to the effectiveness and adequacy of NewAge's internal disclosure controls and procedures. In this filing the Company stated:

> ***The Company's Principal Executive Officer and Principal Financial Officer have evaluated the effectiveness of our disclosure controls and procedures*** as of the end of the period covered by this report pursuant to Rule 13a-15(b) under the Securities Exchange Act of 1934 (the "Exchange Act"). Based on that evaluation, ***the Company's Chief Executive Officer and Chief Financial Officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures are effective*** in ensuring that information required to be disclosed in the reports that we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the periods specified in the Commission's rules and forms, and (2) accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

NewAge, Quarterly Report (Form 10-Q), 28 (filed Aug. 14, 2018).

134. Substantially similar if not identical language appeared in the following documents:

a) NewAge's Form 10-Q filed with the SEC on November 14, 2018 signed and certified by Defendants Willis and Gould;

b) NewAge's Form 10-K filed with the SEC on April 1, 2019 certified by Defendants Willis and Gould and signed by Defendants Willis, Gould, Fea, Brennan, Haas, Kapteyn and Kuzdowicz;

c) NewAge's Form 10-Q filed with the SEC on May 9, 2019 certified by Defendants Willis and Gould;

d) NewAge's Form 10-Q filed with the SEC on August 19, 2019 certified by Defendants Willis and Gould;

e) NewAge's Form 10-K filed with the SEC on March 16, 2020 certified by Defendants Willis and Gould and signed by Defendants Willis, Gould, Fea, Brennan, Haas, Kapteyn, Kuzdowicz and Syrett;

f) NewAge's Form 10-Q filed with the SEC on May 11, 2020 certified by Defendants Willis and Gould;

g) NewAge's Form 10-Q filed with the SEC on August 10, 2020 certified by Defendants Willis and Gould; and

h) NewAge's Form 10-Q filed with the SEC on November 9, 2020 certified by Defendants Willis and Gould.

135. The statements in ¶¶132-34 above were false and misleading when made because NewAge, Willis, Gould, Ence, Fea, Brennan, Haas, Kapteyn, Kuzdowicz, and Syrett knowingly and/or recklessly made the statements while failing to disclose that NewAge's disclosure controls and procedures were not effective because: (1) Willis and others were falsely claiming that the Company had commitments from entities and were entering into agreements that did not exist or whose terms were significantly exaggerated and overstated; and (2) NewAge had been in the preliminary stages of the development of its portfolio of CBD-infused beverages when Willis

and others claimed that the Company had already developed and tested them from September 5, 2018 through January 2019.

136. On March 18, 2021, the Company filed its 2020 annual report on Form 10-K with the SEC ("2020 10-K"). The Form 10-K was signed and separately certified by Defendants Willis and Gould pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")—attesting to the accuracy and truthfulness of the information contained therein. The 2020 10-K was also signed by Defendants Fea, Brennan, Haas, Kuzdowicz, Syrett, and Cooper.

137. The 2020 10-K did not reveal any internal control weaknesses relating to the problems listed in ¶135, *supra*, but instead revealed unrelated internal control weaknesses:

> Our management, with the participation of our chief executive officer and chief financial officer, evaluated the effectiveness of our disclosure controls and procedures as of December 31, 2020 pursuant to Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. ***Based upon the evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2020 due to a material weakness in internal controls over financial reporting, described below***. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is accumulated and communicated to the company's management, including its principal executive and principal financial officers, as appropriate to allow timely decisions regarding required disclosure.

138. The 2020 Form 10-K then stated that as of December 31, 2020:

> [A] material weakness exists related to the Company's failure to design and implement monitoring activities over the acquisition of Ariix, LLC ("Ariix") resulting in the Company's inability to issue its financial statements for inclusion in its Form 10-K by the required due date. ***Specifically, due to the size and timing of the acquisition of Ariix, the Company did not have sufficient resources to***

> ***adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements*.**

139. Substantially similar if not identical language appeared in NewAge's Form 10-Q filed with the SEC on May 10, 2021 signed and certified by Defendants Willis and Aure.

140. The statements in ¶¶137-39 above were false and misleading when made because NewAge, Willis, Gould, Fea, Brennan, Haas, Kapteyn, Kuzdowicz, and Syrett knowingly and/or recklessly made the statements while failing to disclose that: (1) Willis and others were falsely claiming that the Company had commitments from entities and were entering into agreements that did not exist or whose terms were significantly exaggerated and overstated; (2) NewAge had been in the preliminary stages of the development of its portfolio of CBD-infused beverages when Willis and others claimed that the Company had already developed and tested them from September 5, 2018 through January 2019; and (3) it was conducting an internal investigation into Ariix for FCPA violations.

141. On August 9, 2021, NewAge filed its Form 10-Q ("Q2 2021 10-Q") signed and certified by Defendants Willis and Manion. The Q2 2021 10-Q contained substantially similar language with respect to the material weaknesses as those in ¶¶137-39.

142. The August 9, 2021 Form 10-Q also disclosed, for the first time, that in December 2020, the Company had engaged external counsel, accountants, and other advisors to conduct an independent investigation of Ariix's international business practices, which had identified "conduct that potentially" was in violation of the FCPA. Defendants misleadingly completely downplayed the true nature and consequences of the investigation. Specifically, the Company stated that it made a voluntary self-disclosure to the DOJ and the SEC about the investigation. NewAge also claimed that it "believes its investigation is substantially complete" and that it had initiated procedures to remediate the practices. Even though the Company claimed that it

believed that its investigation was "substantially complete" it failed to disclose that the investigation was so enormously materially costly that those costs posed a substantial risk that jeopardized the Company as a going concern. Furthermore, in the press release issued on August 9, 2021 with the Form 10-Q, Defendants made no mention of the internal investigation, the FCPA violations or the threat to the Company's finances that the cost outlay for the FCPA investigation represented to the Company's future.[10] Finally, during the earnings conference call to discuss the Company's results reflected in the Form 10-Q, during which Defendants Willis and Manion participate and spoke, no mention was made at all about an internal investigation, the FCPA violations or the threat to the Company's finances that the cost outlay for the FCPA investigation represented to the Company's future.

143. Substantially similar if not identical language as in ¶¶137-39 appeared in NewAge's Form 10-Q filed with the SEC on November 9, 2021 ("Q3 2021 10-Q") signed and certified by Defendants Willis and Manion.

144. The statements with respect to material weaknesses in ¶¶141, 143 above were false and misleading when made because NewAge, Willis, and Manion knowingly and/or recklessly made the statements while failing to disclose that: (1) Willis and others were falsely claiming that the Company had commitments from entities and were entering into agreements that did not exist or whose terms were significantly exaggerated and overstated; and (2) NewAge had been in the preliminary stages of the development of its portfolio of CBD-infused beverages when Willis and others claimed that the Company had already developed and tested them from September 5, 2018 through January 2019.

---

[10] www.sec.gov/ix?doc=/Archives/edgar/data/0001579823/000149315221019037/form8-k.htm

## III. THE TRUTH BEGINS TO EMERGE

145. On January 10, 2022, NewAge filed an 8-K announcing that the Board and Defendant Willis agreed that Willis would "resign as [CEO], Director, and employee of the Company, effective immediately. The Company and Mr. Willis will determine the terms of his departure at a future date. . . . Ed Brennan . . . will provide additional guidance and direction to the senior management team . . . ." In response, the stock went down 6% on each of the following trading days, from an opening price of $0.98 to a closing price of $0.9251 on January 11, 2022 and from an opening price of $0.935 to a closing price of $0.88 on January 12, 2022.

146. On May 17, 2022, the Company announced after trading hours had concluded that it had received a late notice from Nasdaq regarding the filing of its Form 10-Q. The next day, the stock went down by 8%, from an opening price of $0.391 per share to $0.3591 per share.

147. On June 8, 2022, after trading had concluded for the day, the Company announced that it was undertaking a review of "strategic alternatives," including available financing alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction." The next day, NewAge's share price went down 12%, from $0.42 per share to $0.3703. Following that, the Company's share price closed down 11% (the price per share dropped from $0.3605 to $0.3201 on the day), 7% (the price per share dropped from $0.3112 per share to $0.2902 on the day), and 3% (the price per share dropped from $0.298 per share to $0.29 on the day), respectively.

148. On August 30, 2022, NewAge announced that it was filing for Chapter 11 bankruptcy relief. Further, on August 31, 2022, *The Wall Street Journal* released an article called "NewAge Says Cost of Internal Probe Contributed to Bankruptcy." The market was astounded to learn for the first time from the Bankruptcy filing and the WSJ Article that the internal investigation into, and following consequences from, the FCPA violations was so costly

and massive as to have contributed to the need to seek bankruptcy protection. The next day, the stock closed down 39%, from an opening price of $0.2016 per share to $0.1222 per share. It further plummeted on September 2, 2022, closing down 26%, from an opening of $0.20 per share to $0.1482.

149. On September 2, 2022, after trading hours in the domestic markets had finished for the day, NewAge filed an 8-K announcing that it had received written notice from The Nasdaq Stock Market LLC ("Nasdaq") that, as a result of its filing for protection under Chapter 11, Nasdaq determined that NewAge's securities would be delisted from the Nasdaq stock exchange, beginning on September 8, 2022. In response to this news, NewAge stock closed down 9% on September 6, 2022, from an opening price of $0.1368 to a closing price of $0.125.

150. On October 18, 2022, the SEC announced that it was taking legal action against Defendant Willis. Specifically, he was alleged to have engaged in a "multi-year fraud by disseminating numerous false and misleading press releases and making false public statements concerning NewAge's business dealings, and aided and abetted NewAge's public disclosure of material information in violation of Regulation FD," and was accordingly charged under Section 10(b) and Rule 10b-5 promulgated thereunder, Section 17(a) of the Securities Act, and with aiding and abetting NewAge's violations of Section 13(a) of the Exchange Act and Regulation FD.

151. On October 19, 2022, the SEC announced that it had instituted cease-and-desist proceedings against NewAge pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, enjoining NewAge from further violations of the Securities and Exchange Acts, and rules and regulations promulgated under them. In anticipation of these proceedings,

NewAge submitted a settlement offer, which the SEC has accepted. The next day, NewAge stock plummeted from an opening price of $0.175 per share to $0.0013 per share, or 99%.

## IV. OTHER POST-CLASS PERIOD DEVELOPMENTS

152. On September 29, 2023, the Honorable Gordon P. Gallagher of this District found that the SEC adequately pleaded its claims against Defendant Willis under, *inter alia*, Section 10(b) of the Exchange Act. *See SEC v. Willis*, No. 1:22-cv-02744, slip op. (D. Colo. Sept. 29, 2023), ECF No. 42. Notably, Judge Gallagher found that many of the statements in Section II.A-E, *supra*, were false or misleading for the same reasons alleged herein.

## V. ADDITIONAL SCIENTER ALLEGATIONS

153. NewAge is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so. The scienter of Defendants and other Company officers, directors, employees, and agents is similarly imputed to NewAge under *respondeat superior* and agency principles.

### A. Defendants Knew Or Had Access To The Fact That The Distribution Relationships Did Not Exist Or Were Less Expansive Than Stated

154. Willis, Gould, and Thibodeau necessarily knew that the agreements with the military, Walmart, Sobeys, Safeway, Loblaws, and/or the South Korean distributor did not exist or were less expansive than represented because they spoke about them ***but did not have agreements with those terms***. *See* Section II.A.-C, E, *supra*.

155. The fact that those agreements do not exist is confirmed by the following facts:

a. The SEC's Cease and Desist Order against NewAge, which states that there was no factual basis for those statements;

b. The fact that Willis was sued by the SEC for making many of the same false and misleading statements regarding the distribution agreements alleged herein and submitted documents in support of his motion to dismiss, ***none of which included any of the agreements***;

c. The fact that all of the Defendants were sued by the Liquidation Trust[11] for making many of the same false and misleading statements regarding the distribution agreements alleged herein and submitted documents in support of their motions to dismiss, ***none of which included any of the agreements***;

d. The fact that Willis put in a Claim in NewAge's bankruptcy docket seeking an "amount not less than $2,963,961.37" against NewAge, which the Debtors opposed due to many of the false and misleading statements regarding NewAge's business relationships alleged herein, ECF No. 406, and Willis once again responded ***without including any of the agreements***; and

e. The fact that NewAge settled the SEC's Cease-and-Desist proceedings regarding false and misleading statements made about the purported business relationships suggests that the agreements did not exist in the form that was presented to the market.

156. Additionally, Plaintiffs' Counsel submitted a Freedom of Information Act ("FOIA") request to the Defense Commissary Agency, or DeCA, seeking any agreements

[11] Thibodeau was eventually voluntarily dismissed from the Adversary Action, without prejudice.

between NewAge and DeCA to determine what, if any, agreements regarding U.S. military commissaries existed. The DeCA was unable to locate any agreements with NewAge, Inc. or NewAge Beverages Corporation.

157. Lead Counsel also searched the website, Federal Procurement Data System (fpds.gov), a real-time database that contains contracts worth at least $10,000 that the federal government has entered into, and found no agreements between NewAge and any federal agency. *See https://www.fpds.gov/wiki/index.php/FPDS_FAQ*; https://obamawhitehouse.archives.gov/omb/procurement_pro_data_faq/.

158. That NewAge's relationship with Walmart was not nearly as expansive as stated in 2019 is further supported by the fact that, according to the SEC, at their Walmart-sales peak, NewAge's Marley brand products were offered in less than 7% of Walmart stores across only 21 states.

159. Thibodeau's knowledge with respect to the Company's purported relationship with Walmart is also supported by the fact that he stated on the November 14, 2018 earnings call that he "met with the largest overall retailer in the world" in "the past 2 weeks[.]" This retailer is presumably Walmart, and his statements suggest that Thibodeau was involved in any agreements the Company had with Walmart and therefore knew the statement he made on April 2019 regarding NewAge's purported expanded distribution with Walmart were false or misleading.

160. Thibodeau's knowledge with respect to the true scope of the Company's relationship with Canadian retailers Loblaws and Sobeys is also confirmed by Confidential Witness ("CW") 2, who served as an Operations Manager from May 2017 to 2018, a Director of Operations from August 2018 to January 2020, and as a Senior Director of Sales and Operations from January 2020 to March 2021. As Operations Manager, CW-2's role was in "warehousing

and logistics." According to CW-2, Thibodeau had been "lead" on the Canadian distribution agreements. CW-2 would see Thibodeau perhaps once a month in Denver and Thibodeau would talk about NewAge getting into the Canadian market. CW-2 believes that in early 2018, NewAge shipped six or seven containers of NewAge's Coco Sparkling beverage to Canada. Once shipped, the products would have been the responsibility of Thibodeau and whatever team Thibodeau had in Canada.

161. NewAge investors were never informed that even if NewAge had the claimed relationships with the military, Canadian retailers, the South Korean distributor, or Walmart, it did not have adequate inventory to fulfill them, according to the SEC and the Liquidation Trust. *See* SEC Compl.; Liquidator's Compl.

162. CW-2 explained that if NewAge had had a distribution agreement with the US military as extensive as what the Company and Willis purported, it would have "100%" affected CW-2, but nothing came about in that regard. Further, if there had been such large distribution agreements then CW-2 would have had to liaise with the Product Managers for those products because it would take four to six months to produce the products in the necessary quantities and to plan for how they would be distributed.

163. CW-3 served as NewAge's Vice President of Global Operations from December 2018 to January 2022. CW-3 handled virtually everything related to the supply chains for both NewAge and Morinda. According to CW-3, at no time during CW-3's tenure would there have been sufficient inventory to satisfy major retail orders from the U.S. military, Korean retailers and convenience stores, or Canadian retailers. Nor was there sufficient product being produced that would have satisfied such potential demand. For one thing, CW-3 said that the Kombucha drinks came in glass bottles that were procured from China and could take upwards of three to

four months to be fulfilled, so there would have had to have been "commitments" made by NewAge to the glass bottle producers, which there were apparently not. CW-3 added that it could take as long as a month-and-a-half just to ship glass bottles from China to the US. It would have also been necessary to make arrangements with producers regarding various flavor samples to be produced in small amounts. As CW-3 explained, when retailers (CW-3 used Walmart or Costco as examples) add a new item they usually do so regionally and then expand from there. So, while NewAge could have probably shipped "a couple containers," it would have otherwise taken "significant time to scale up" – upwards to six to nine months – to be able to ship in volume to such large, hypothetical customers. Further, CW-3 would have known if there were any such purchase commitments necessary to fulfill large retailer orders and CW-3 said that there had not been any beyond the normal amounts on order.

164. Willis, Gould, and Thibodeau knew or had access to the fact that NewAge had insufficient inventory to fulfill these agreements at all relevant times. This is supported by their own statements and/or information from confidential witnesses.

165. For example, Willis made statements during the Class Period evidencing his in-depth knowledge of NewAge's inventory status:

> And if I look at the receivables and the inventory, we're continually putting in, Kevin, new processes for better inventory management, and we simply do ABC analysis to look at the bottom 20% of those SKUs in terms of movement and total inventory and weeks on hand, and we're continually evolving the portfolio to basically cull the weakest performers, and frankly, which are all old brands that we've had in the system and cull those and focus and spend the money to keep in stock some of those best and fastest moving brands. So from an inventory management standpoint, we continue to do new things from a process standpoint and also from a receivables collection standpoint.

Q2 2018 Earnings Call at 9 (Aug. 14, 2018)

> Through the end of the year, the DSD Division is expected to achieve its 10th year of consecutive growth. And we have excellent visibility on growth in the

> fourth quarter now that the division is also fully replenished with inventory across both New Age and partner brands.

Q3 2018 Earnings Call at 6 (Nov. 14, 2018).

> 2018 was an extremely challenging [sic] as we spent almost the entire year recovering from inventory shortfalls due to working capital constraints. Those impacts completely distorted the underlying strength of the firm. Exiting the year however those issues are firmly behind us and we are a completely different company. We now have infrastructure, capabilities, and the human and financial resources across 60 countries to leverage our brands, intellectual property, and innovation to capture the full potential of what we believe are unparalleled opportunities worldwide.

Press Release, NewAge Beverages Corp. Announces 4th Quarter Revenue Growth of 24% and an Increase in Pro-Forma Revenue to Near $300 Million (Mar. 29, 2019).

166. Additionally, prior to the acquisition of Ariix, CW-3 reported to Willis and CW-3 communicated with Willis about supply chain matters by email. According to CW-3, Gould was involved in managing supply chain and was included on every purchase order that was cut to procure materials by which to supply customers. Thus, Willis and Gould were in a position to know whether such purchase orders actually existed and whether there was sufficient inventory to fulfill them.

167. Thibodeau was also in a position to know whether NewAge had sufficient inventory to supply the Canadian retailers as CW-2 notes, above.

### B. Defendants Knew Or Had Access To The Fact That Statements Regarding NewAge's CBD Portfolio Were False And Misleading

168. Defendants Willis, Gould, and Thibodeau necessarily knew whether or not NewAge was actually testing and developing a proprietary CBD product at the time the relevant statements were made.

169. This is established by their own statements regarding the CBD portfolio, *see* Section II.D, *supra*, and other facts set forth below.

170. For example, Willis was present at the NACS off-site debut at the Westgate Las Vegas Resort Casino. According to the SEC and the Liquidator, NewAge personnel were not serving the proprietary CBD beverages Willis and others touted, but rather NewAge's existing drinks with CBD oil added from a local shop beforehand. SEC Compl. ¶¶56, 63. Indeed, as shown in the image below, Willis himself was serving these beverages at the Westgate, pouring NewAge's supposed CBD-infused beverages from non-descript clear plastic bottles into red plastic cups, rather than in the type of branded bottle one would expect for a product that was touted to hit shelves by Christmas 2018 (*see* Section II.D, *supra*):


0:00 / 0:09



*See* Philaretos, *New Age Beverages Corporation: We've Seen This Movie Before, And It Ends Badly*, Seeking Alpha (Dec. 18, 2018) (providing link to pictures from the launch party). Based on Willis's statement in the video and the screenshot above, the label says "mango," and appears to be handwritten and taped to the bottle.

171. According to the SEC, Willis distributed sell sheets at NACS containing false and misleading statements, that (i) NewAge's "full spectrum" CBD products were manufactured via a "proprietary production process"; (ii) that the purported products were a "proprietary in-house formula developed by NewAge Health Sciences"; (iii) that "every batch" of the products were "third-party tested"; and (iv) that the purported products benefited from a "full spectrum nano technology-amplified entourage effect."

172. The Health Sciences Division had only two part-time employees at the relevant time. Indeed, by 2021, only three employees were listed on the website: Defendant Kapetyn, Chief Medical Officer Gerald M. Haase, and Dr. James Ehrlich. *See* https://web.archive.org/web/20210509130203/http://newagehealth.us/our-team/ .

173. Confidential witnesses also corroborate the fact that NewAge was not actually testing and developing a proprietary CBD product at the time the relevant statements were made.

174. CW-1 served as NewAge's Senior General Manager of Sales Operations & Customer Success – North America from December 2018 to July 2020. According to CW-1, NewAge's only CBD product during that time was a topical oil, not an ingestible product.

175. CW-2, who served in the roles described above and was in charge of storing NewAge's products and then shipping them to NewAge's customers, did not think that any CBD products were ever created.

176. The Company itself confirmed that the CBD beverage was not its own proprietary product in an SEC filing on March 18, 2022. That a proprietary, tested CBD beverage did not exist at the time of the relevant statements (Sept. 2018 - Jan. 2019), and Willis's knowledge thereof, is further supported by the fact that an Audit Committee investigation in 2022 found that Willis "was aware that the Company's Direct Store Distribution Division sold CBD-infused beverages in the U.S. from August 2019 through December 31, 2020" in violation of NewAge policy. *See* Form 8-K/A (Mar. 18, 2022). According to the Explanatory Note for the Form 8-K:

> As part of its year-end procedures, the Company discovered cannabidiol (CBD)-infused beverages in its inventory. Further investigation revealed that the Company distributed CBD-infused beverages **on behalf of third-party manufacturers without proper authorization**.

### C. The Chief Restructuring Officer's Declaration Supports Willis's Scienter

177. As noted above, Willis put in a Claim in the Bankruptcy docket seeking an "amount not less than $2,963,961.37" against NewAge, "on account of [NewAge's] advancement and indemnification obligations owed to [Willis] in relation to contractual severance obligation owed to [Willis] under his Employment Agreement, and the [sic] (i) the Securities and Exchange Commission ('SEC') Investigation . . ., (ii) NewAge Internal Investigation . . ., (iii) the SEC Action . . ., and (iv) any related proceedings[.]" ECF No. 406 at

¶22. The Debtors (who include NewAge, Morinda, and Ariix) opposed Willis's claims due to many of the actions alleged herein, ECF No. 406.

178. Specifically, the Debtors argued that Willis's claim is invalid as it is based on certain employment-related agreements that are potentially void due to Willis' fraudulent conduct, as alleged in the SEC Complaint, or in the alternative, his "conduct constituted 'cause' to end his employment without the obligation to pay severance including but not limited to Willis' conduct described, at last in part, related to the SEC Complaint." ECF No. 406 at ¶¶59-60.

179. The Debtors' opposition included the Declaration of Lawrence Perkins (Doc. 406-1), who serves as the Debtors' Chief Restructuring Officer ("CRO"). The declaration provides that "a high level of due diligence" existed before determining whether Willis's claim should be allowed, which included that the CRO or other Debtors' employees: "(i) reviewed (a) the Claims Register, by which we identified, among other things, claims that should be disallowed, and (b) the Debtors' Books and Records with respect to the claims described in the Objection, (ii) conferred with the Debtors' employees and outside counsel having knowledge relevant to understanding the validity of the claims, (iii) approved the inclusion of the claims in the Objection, and (iv) reviewed the Objection and the Proposed Order."

**D. Willis's Concealment Of The Truth About Certain Agreements From The Board**

180. According to the SEC's Complaint, Willis falsely stated to the Board in or around January 2018 that NewAge was negotiating the agreement with the military referenced in the January 18, 2018 press release and that it was likely to be finalized. SEC Compl. at ¶50.

181. According to the SEC's Complaint, on or around January 15, 2019, Willis falsely stated to a Board member that the Company had received approximately $40 million in orders (in annualized sales) for its CBD products at the Winter Fancy Food Show. SEC Compl. at ¶74.

182. According to the SEC's Complaint, Willis falsely stated to the Board at the January 27, 2019 Board meeting that FamilyMart placed an order for NewAge's CBD line of products. SEC Compl. at ¶80.

### E. Defendants' Positions And The Types Of Misrepresentations Support Scienter

183. The businesses with which Willis, Thibodeau, and Gould publicly stated the Company had relationships—the military, the world's largest retailer (Walmart), the largest Canadian retailers, the largest South Korean distributor—and the supposed proprietary CBD-portfolio—with were so substantial, and the scope of the purported agreements so large, that the other Defendants, as officers and directors of the Company, necessarily knew or were reckless in not knowing that those relationships did not exist in the form represented to the public.

184. For example, Defendant Ence, who served as NewAge's CFO until August 15, 2018, when he became the Company's Controller, was on the May and August 2018 earnings calls during which false and misleading statements were made about the vast scope of NewAge's relationship with the military. As CFO, Ence would necessarily have known whether a relationship of such scope existed: after all, the military agreement was "expected to have a material impact on the financial results of NewAge."

185. Additionally, numerous analysts and media outlets reported on NewAge's public statements regarding those relationships. Given Defendants' roles at the Company and the frequency of Board meetings, they necessarily knew or were reckless in not knowing that the

business relationships and details about the CBD-portfolio presented to the public were not accurate.

186. For example, according to NewAge's 2019 Proxy Statement, in 2018 the Board "held four in-person meetings, and each of the Audit Committee, Compensation Committee, and the Governance Committee met four times. The Board held five other meetings by telephone. No director attended fewer than 75% of the Board meetings or of the meetings of any committee such director served on." Form DEF14A (Apr. 16, 2019), at 9. At the time, Defendants Willis, Haas, Fea, Brennan, and Kapteyn served on the Board.

187. In 2019, Defendants Willis, Haas, Fea, Brennan, Kapteyn, and Kuzdowicz served on the Board. In 2019, the Board "held 12 meetings, the Audit Committee held 7 meetings, the Compensation Committee held 2 meetings, and the Governance Committee held 3 meetings. No director attended fewer than 75% of the Board meetings or of the meetings of any committee such director served on during 2019." Form DEF 14A at 9.

188. In 2020, Defendants Willis, Haas, Fea, Brennan, Kapteyn, Kuzdowicz, and Syrett served on the Board. In 2021, Defendants Willis, Haas, Fea, Brennan, Kuzdowicz, Syrett, and Cooper served on the Board. In 2020, the Board "held 13 meetings, the Audit Committee held 9 meetings, the Compensation Committee held 4 meetings, and the Governance Committee held 1 meeting. No director attended fewer than 75% of the Board meetings or of the meetings of any committee such director served on during 2020." Form DEF 14A at 11 (Mar. 25, 2021).

189. In light of the frequency of the meetings, and the importance of the purported relationships and CBD-portfolio announced to the public, it is highly likely that these issues came to the Board's attention in a timely fashion.

### F. Audit Committee Members' Scienter

190. Defendant Kuzdowicz served as the Audit Committee Chair from 2019 through 2022. Fea served on the Audit Committee from 2018 to 2021. Kapetyn served on the Audit Committee from 2018 to 2020. Haas served on the Audit Committee from 2019 to 2021. Syrett served on the Audit Committee in 2020 to 2021. The Audit Committee Charter provides, in relevant part, that Audit Committee members are to:

- [K]eep the Company's independent auditors informed of the Committee's understanding of the Company's relationships and transactions with related parties that are significant to the Company; and to review and discuss with the Company's independent auditors the auditors' evaluation of the Company's identification of, accounting for, and disclosure of its relationships and transactions with related parties, including any significant matters arising from the audit regarding the Company's relationships and transactions with related parties; and

- [R]eview with management, the internal audit department and the Company's independent auditors the adequacy and effectiveness of the Company's internal controls, including any significant deficiencies or material weaknesses in the design or operation of, and any material changes in, the Company's internal controls and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such internal controls, and review and discuss with management and the Company's independent auditors disclosure relating to the Company's financial reporting processes, internal control over financial reporting and disclosure controls and procedures, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable[.]

191. The Audit Committee member Defendants had a duty to monitor for internal control weaknesses like those that existed in relation to the false and misleading statements regarding the distribution agreements, CBD portfolio, and the FCPA investigation following the Ariix merger.

192. Indeed, the Company's decision to retain outside auditors, counsel and accountants to perform an independent investigation into Ariix's international business practices, which required significant expenses to undertake, necessarily involved Defendants Kudzowicz, Haas, Fea, Kapetyn and Syrett in light of the Audit Committee's duties.

**G. NewAge and Certain Defendants' Financial Motive**

193. NewAge and certain Defendants financially benefited from the fraud alleged herein.

194. Around 2017 and into early 2018, Defendant Willis became dissatisfied with his compensation package and sought a raise from the Board. In response, the Board agreed to revisit Willis' compensation once the Company was in "better financial footing[.]" SEC Compl. ¶16.

195. Around the time Willis sought his raise, NewAge was in a dire financial situation with reported net losses of $3.5M for the 2017 fiscal year and reported net losses of $3.4M for the first six months of 2018. 2017 Form 10-K at 14 (filed Apr. 17, 2018); 2018 Form 10-Q at 14 (filed Aug. 14, 2018). Consequently, NewAge's share price dropped from as high as almost $7 per share in June 2017 to as low as $2 per share by December 2017. These struggles continued into the first half of 2018, where NewAge's stock sunk as low as $1.70 per share in June 2018.

196. In the midst of NewAge's financial woes, the Company initially sought to improve their capital position by obtaining approval of a $15M credit facility with PNC bank at an estimated annual interest of 3.5%. NewAge, Current Report (Form 8-K), 16, 37 (filed Mar. 12, 2018). This ultimately compounded NewAge's financial issues when the Company, reliant on the cash from credit's facility to fund its inventory needs in March 2018, failed to close its line of credit of with PNC. Q4 2018 Earnings Call (Mar. 29, 2019). As a result, NewAge spent the beginning of 2018 recovering from the "failed financing with PNC." *Id.*

197. Defendants' false and misleading statements helped NewAge's stock price recover, allowing it to reach new highs of nearly $9 per share in September 2018. This paved the way for the Company to hold its most significant ATM offering generating $38M in gross proceeds to date. *Id*.

198. Continuing to exploit the increased price and liquidity of its shares, NewAge conducted another offering in November 2018—yielding an additional $52 million in cash—increasing its cash balance to more than $80 million and significantly improving the Company's balance sheet. NewAge, Prospectus Supplement (Form 424B5), S-8-9, (filed Nov. 13, 2018).

199. In total, NewAge held four offerings in 2018, raising a total of over $105 million in gross proceeds:

| **Offering** | **Number of Shares** | **Gross Proceeds** |
|---|---|---|
| April 2018 Offering | 2,560,000 | $4,480,000 |
| August 2018 Offering | 9,200,000 | $11,776,000 |
| ATM Offering – September 2018 | 8,089,000 | $37,533,000 |
| November 2018 Offering | 14,835,000 | $51,922,000 |
| **Total** | **34,684,000** | **$105,711,000** |

NewAge, Annual Report (Form 10-K), 65 (filed Mar. 16, 2020).

200. With the additional capital and increased value of its shares, NewAge was able to shift its focus to strategic acquisitions.

201. Using the proceeds from its equity raises, NewAge completed its acquisition of Utah-based healthy beverage and lifestyle company, Morinda in December 2018. Pursuant to the Acquisition Agreement, NewAge agreed to pay the following consideration to Morinda's equity holders and phantom stockholder: (i) $75 million in cash; (ii) 2,016,480 shares of the Company's common stock; and (iii) 43,804 shares of Series D Preferred Stock providing for the

potential payment of up to $15 million contingent upon Morinda achieving certain post-closing milestones. NewAge, Current Report (Form 8-K), 2, (filed Dec. 21, 2018).

202. In an M&A Call prior to the Morinda acquisition, Defendant Willis stated: "[s]o clearly ***Morinda brings the attractive financial implication***, organizational underpinning and strengthening, but ***they also bring the market access*** with more than 160,000 distributors worldwide." Morinda Holdings, Inc., M&A Call (Dec. 4, 2018).

203. When the Morinda acquisition was announced on December 3, 2018, NewAge's share price reached its monthly high of $5.35.

204. Capitalizing again on the strength of its share price, NewAge entered into an ATM offering agreement with Roth Capital Partners, LLC to sell up to $100 million worth of shares of the Company's stock. NewAge, Annual Report (Form 10-K), 65 (filed Mar. 16, 2020).

205. With the influx of additional capital, NewAge completed yet another acquisition—this time with BWR on July 12, 2019. Consideration for the acquisition included $2.5 million which was utilized to eliminate 100% of BWR's debt, a $500,000 payment to the sellers and issuance of up to 700,000 in restricted shares of NewAge common stock. NewAge, Current Report (Form 8-K), Ex. 99.1, (filed Jul. 12, 2019)

206. Keeping with its trend of "growth" through acquisitions, NewAge acquired Ariix through an Amended Merger Agreement on November 16, 2020, for total consideration of $155.1 million, consisting of (i) the fair value of 19.7 million shares of common stock with a fair value of $54.2 million, (ii) the obligation to pay $10.0 million to the Sellers, and (iii) the fair value of the derivative liability of $90.9 million as of the Ariix closing date. NewAge, Quarterly Report (Form 10-Q), 46 (filed Aug. 9, 2021).

### 1. Willis

207. Beginning in April 2019, Willis sold his NewAge shares for the first time since he joined the Company in 2016. During the Class Period, Willis sold over 1 million NewAge shares for net proceeds of over $3 million, benefiting from NewAge's artificially inflated share price. Willis sold no shares before the Class Period. These sales were suspicious in timing and amount.

208. For example, the day after the April 8, 2019 announcement of the fictional expanded distribution agreement with Walmart, Willis sold 150,000 shares of NewAge stock for an average price of $5.97 per share, for net proceeds of $895,500.00 from the substantial share price increase driven by the news.

209. In total, during the Class Period, Willis made the following sales, totaling 54% of his holdings:

| Name | Transaction Date | Number of Securities Transacted | Total |
|---|---|---|---|
| Brent Willis | 4/5/2019 | 150,000 | $714,000.00 |
| | 4/9/2019 | 150,000 | $895,500.00 |
| | 6/17/2019 | 25,000 | $114,870.00 |
| | 7/15/2019 | 25,000 | $100,000.00 |
| | 8/15/2019 | 25,000 | $81,802.50 |
| | 9/16/2019 | 25,000 | $80,922.50 |
| | 10/15/2019 | 25,000 | $68,250.00 |
| | 7/6/2020 | 780,000 | $1,193,400.00 |
| | 12/10/2020 | 15,541 | $49,109.56 |

210. In addition to profiting from stock sales, Willis also profited by receiving a substantial increase in his salary. Willis repeatedly urged the Board to increase his salary, in part to pay personal tax liabilities. SEC Compl. ¶16. In or around 2017 and 2018, the Board told Willis that it would revisit his compensation package once the Company was in a better financial position. *Id.* Thus, in January 2019, following numerous misrepresentations that he and others

made about the Company's purported distribution deals with the military, the world's largest retailer (Walmart), the largest Canadian retailers, the largest South Korean distributor, and its CBD-portfolio, Willis's base salary doubled from $312,500 per year to $650,000 per year in 2019.

### 2. Gould

211. Like Willis, Gould's base salary skyrocketed in 2019 in light of the Company's buoying fortunes following the false and misleading statements discussed above, increasing from around $67,000 to $500,000 per year. His stock awards also increased from $0 to $1,845,500.

### 3. Kapetyn, Brennan, Fea, and Haas

212. Beginning in 2019, all then-director defendants received substantial raises and increased stock awards:

| Name | Year | Fees Earned or Paid in Cash | Stock Awards | Bonus | Other Comp. | Total |
|---|---|---|---|---|---|---|
| Ed Brennan | 2018 | $17,500 | $65,000 | n/a | $0 | $82,500 |
| | 2019 | $40,625 | $100,000 | n/a | $0 | $140,625 |
| | 2020 | $70,000 | $100,000 | n/a | $0 | $170,000 |
| Gregory Fea | 2018 | $42,500 | $65,000 | n/a | $0 | $107,500 |
| | 2019 | $151,875 | $100,000 | n/a | $0 | $251,875 |
| | 2020 | $187,500 | $100,000 | n/a | $0 | $287,500 |
| Reginald Kapteyn | 2018 | $17,500 | $65,000 | n/a | $0 | $82,500 |
| | 2019 | $55,625 | $100,000 | n/a | $0 | $155,625 |
| | 2020 | $59,063 | $100,000 | n/a | $8,437 | $167,500 |
| Timothy J Haas | 2018 | $17,500 | $65,000 | n/a | $0 | $82,500 |
| | 2019 | $58,125 | $100,000 | n/a | $0 | $158,152 |
| | 2020 | $70,000 | $100,000 | n/a | $0 | $170,000 |

213. Kapteyn also profited from suspiciously timed sales. On April 16, 2019, while NewAge's stock was still inflated from the April 8, 2019 press release announcing the Walmart agreement, Kapteyn sold 18,000 shares for $5.204 per share. In total, during the Class Period, Kapteyn made the following sales, totaling 40% of his holdings:

| Name | Transaction Date | Number of Securities Transacted | Total |
|---|---|---|---|
| Kapteyn | 4/16/2019 | 18,000 | $93,672.00 |
| | 1/24/2020 | 15,000 | $25,650.00 |

#### 4. Stock-Based Compensation Accounted For A Substantial Amount Of Defendants' Compensation

214. As set forth in the chart below, Defendants Willis, Gould, Syrett, Kuzdowicz, Brennan, Cooper, Fea, Kapetyn, and Haas derived a substantial portion of their yearly compensation from stock awards.

| Name | Year | Fees Earned or Paid in Cash | Stock Awards | Stock Options | Bonus | Other Comp. | Total |
|---|---|---|---|---|---|---|---|
| Brent Willis | 2018 | $312,500 | $0 | $0 | $50,000 | $22,449 | $384,949 |
| | 2019 | $650,000 | $297,375 | $796,220 | $312,845 | $56,852 | $2,113,292 |
| | 2020 | $650,000 | $0 | $0 | $1,000,000 | $115,528 | $1,765,528 |
| Gregory Gould | 2018 | $67,708 | $0 | $0 | $0 | $4,305 | $72,013 |
| | 2019 | $500,000 | $1,845,500 | $552,325 | $50,000 | $35,822 | $3,058,647 |
| | 2020 | $500,000 | $0 | $0 | $250,000 | $85,337 | $835,337 |
| Alicia Syrett | 2020 | $67,500 | $100,000 | $0 | n/a | $0 | $167,500 |
| Amy Kuzdowicz | 2019 | $60,938 | $100,000 | $0 | n/a | $0 | $160,938 |
| | 2020 | $77,500 | $100,000 | $0 | n/a | $0 | $177,500 |
| Ed Brennan | 2018 | $17,500 | $65,000 | $0 | n/a | $0 | $82,500 |
| | 2019 | $40,625 | $100,000 | $0 | n/a | $0 | $140,625 |
| | 2020 | $70,000 | $100,000 | $0 | n/a | $0 | $170,000 |
| Fred Cooper | 2020 | $6,250 | $33,048 | $0 | n/a | $0 | $39,298 |
| Gregory Fea | 2018 | $42,500 | $65,000 | $0 | n/a | $0 | $107,500 |
| | 2019 | $151,875 | $100,000 | $0 | n/a | $0 | $251,875 |
| | 2020 | $187,500 | $100,000 | $0 | n/a | $0 | $287,500 |
| Reginald Kapteyn | 2018 | $17,500 | $65,000 | $0 | n/a | $0 | $82,500 |
| | 2019 | $55,625 | $100,000 | $0 | n/a | $0 | $155,625 |
| | 2020 | $59,063 | $100,000 | $0 | n/a | $8,437 | $167,500 |
| Timothy J Haas | 2018 | $17,500 | $65,000 | $0 | n/a | $0 | $82,500 |
| | 2019 | $58,125 | $100,000 | $0 | n/a | $0 | $158,152 |
| | 2020 | $70,000 | $100,000 | $0 | n/a | $0 | $170,000 |

215. Thus, these defendants were motivated to artificially inflate the price of NewAge stock during the Class Period by misrepresenting the truth about NewAge's relationships with

distributors with whom they purportedly had agreements, its CBD portfolio, and its internal controls.

**H. The Ariix Acquisition Scheme Supports Scienter**

216. As noted above, the Ariix merger would prove to be disastrous, as Defendants would come to find out that Ariix's financial condition and business practices were anything but what it represented to them pre-closing.

217. In addition to the fact that Ariix had a ***$29M shortfall*** in working capital from what was initially represented to NewAge, Ariix had also received an order from Japan's Consumer Affairs Agency, suspending Ariix from recruiting new brand partners due to fraudulent practices likely in violation of the FCPA. *Id.* at ¶183.

218. Like the Audit Committee (Section V.F, *supra*), Gould and Aure were involved in the due diligence for the Ariix merger and therefore would have been aware of the FCPA violations revealed shortly after closing. *See* Liq. Compl. ¶¶173.

219. To make matters worse, it was later revealed in the Liquidation Trust's Complaint that several Defendants engaged in what was characterized as a "fraudulent scheme" to misappropriate key assets acquired by NewAge in the Ariix merger and fund Defendants Willis and Cooper's competing venture Kwikclick. *Id*. at ¶391.

220. Specifically, according to the Liquidation Trust, Defendants, Cooper and Willis, through their influence as apparent agents and officers of NewAge, set out to successfully operate their own multi-level marketing company, Kwikclick, (which Cooper and Willis owned a

majority stake in) by cloning Ariix's proprietary software[12], ICONN[13], to illegally gain access to its brand partnership data, transfer it to Kwikclick and compel NewAge to pay for a license to obtain the software. *See* generally *Id*.

221. The Liquidation Trustee's Complaint described the brand partner information, derived from ICONN, akin to "the single most important category of confidential information in a[n] MLM." The information housed within ICONN contained "troves of critical information about NewAge's Brand Partners" such as "their identities and those of their downlines, the relationship of each brand partner to a sales affiliate in their downline, the relationship of each brand partner to other brand partners, the compensation rules applicable to each brand partner, the sales volume generated by each brand partner, the compensation paid to each brand partner, the sales history of each brand partner, the purchasing patterns and practices of each brand partner, and the rewards and other non-cash compensation paid to each brand partner." *Id*. at ¶¶220, 251.

222. Moreover, Defendants expended NewAge's resources to train its brand partners on how to promote Kwikclick and encouraged them to finalize their sales through the Kwikclick platform, rather than through NewAge directly. *Id*. at ¶246.

---

[12] The information contained within the ICONN software was described by the Liquidation Trustee's Complaint as "the proverbial keys to the kingdom for launching a competing MLM business." *Id.* at ¶241.

[13] The ICONN software functioned as an intermediary where brand partners could send and receive links to a pre-populated shopping cart of products on the owner's ecommerce platform. *Id*. at ¶196. A code comparison study revealed a 95% match between the Kwikclick software and the existing ICONN software. *Id*. at ¶229. This level of similarity would ordinarily be impossible unless a large portion of Kwikclick's software is an ***exact copy*** of ICONN software. *Id*. at ¶89

223. Despite the fact that Defendants Willis and Cooper lacked actual authority to cause NewAge to enter into a license agreement with Kwikclick ("License Agreement"), they purported to do so anyway and repeatedly ignored requests from NewAge's board[14] to have the opportunity to review the sham Licensing Agreement, in turn impeding disinterested directors from having an opportunity review and vote on it. *Id.* at ¶¶86-87.

224. This was particularly troublesome because NewAge's Chief Information Officer, Blake Heringer ("Heringer"), expressed his concerns to Willis and Cooper and warned others of the possibility that, through the Licensing Agreement, there existed great risk that Kwikclick could misuse its access to NewAge brand partner data to unfairly compete with NewAge. *Id*. at 86. Cooper even admitted that this was the intention when Heringer confronted him about it. *Id*.

225. The terms of the License Agreement proved to be tremendously burdensome on NewAge and served only to benefit Kwikclick. For example, the License Agreement provided that NewAge would pay Kwikclick a licensing fee of $50,000.00 per month; Kwikclick would receive substantial commissions on sales of product by NewAge's brand partners through the Kwikclick platform and Kwikclick would jointly own the consumer information that would be gathered by the software during either the selling of NewAge's products to customers through the software or the selling of non-NewAge products to NewAge's brand partners and NewAge customers through the software. NewAge, Quarterly Report (Form 10-Q), Ex. 10.6 (filed Nov. 9, 2021).

---

[14] Per the Liquidation Trust's Complaint, Defendant Cooper met with NewAge's Chief Information Officer who accused Cooper of planning to use Kwikclick to "get NewAge's customers and build another [multi-level marketing company]" to which Cooper responded "now you're getting it." *Id*. at ¶81.

226. Not only did Defendants Cooper and Willis' actions violate significant non-compete provisions of the Merger Agreement, drive business away from NewAge and require them to expend significant capital on already owned assets but it also caused the Company to spend corporate resources and essential manpower on the development and promotion of Kwikclick software to its brand partners. Liq. Compl. ¶¶220, 246, 248, 344.

227. Defendants Cooper and Willis's behavior with respect to the Ariix merger further supports their scienter with respect to the false and misleading statements alleged herein.

**I. Resignations**

228. The timing and circumstances of Defendant Willis's January 10, 2022 resignation suggests he was aware of and/or had access to information showing that claims regarding the distribution agreements, the CBD portfolio, and the Ariix merger were false and/or misleading and omitted material information. The language of the Form 8-K announcing his departure suggested that the decision was sudden, stating: that the Board and Willis "agreed that Mr. Willis will resign as [CEO], Director, and employee of the Company, effective immediately. The Company and Mr. Willis will determine the terms of his departure at a future date." The 8-K noted that it did not yet have a new CEO lined up, but that it "intend[ed] to begin a search for a new [CEO] promptly."

229. The timing is also suspicious because it occurred during the SEC's investigation into many of the false and misleading statements relating to the purported distribution agreements and CBD portfolio alleged herein, which the SEC ultimately pinned on Willis in its federal civil action against him. Two months after his departure, Willis received a subpoena to produce documents and testify before the SEC. *See* Doc. 731.

230. The timing and circumstances of Gould's departure from NewAge, announced March 5, 2021, suggests that he was aware of and/or had access to information showing that

claims regarding the Ariix merger were false and/or misleading and omitted material information.

231. According to the Liquidation Trust's Complaint, Willis especially undertook efforts to frustrate the FCPA investigation into Ariix, which included terminating Gould's employment as NewAge's CFO. Liq. Compl. ¶188.

232. This is corroborated by the timing of his departure—just three months after NewAge's FCPA investigation began—and statements from CW-4. CW-4 served as a Director, Europe/USA Region Controller from February 2011 to April 2022 at Morinda and then NewAge after the Morinda acquisition, and as a Managing Director, Operations Controller from April 2022 to January 2023 at NewAge. According to CW-4, Gould was fired by Willis because Gould had told Willis to "walk away from Ariix." CW-4 believes that Gould told Willis this during the Ariix due diligence. CW 4 heard about Gould advising against Ariix from "people who knew him[.]" According to CW 4, although the reason for Gould's termination was "supposed to be very quiet," most of NewAge's management knew what happened.

**J. SOX Certifications**

233. Defendants Willis and Ence signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that they filed with the SEC in connection with the filing of NewAge's August 14, 2018 10-Q quarterly report for the quarterly period ending June 30, 2018. *See* NewAge's, Quarterly Report (Form 10-Q), Exs. 31.1, 31.2, 32.1, (filed Aug, 14, 2018). The certification states that the quarterly report "fully complies with the requirements of section 13(a) or 15(d) of the Securities and [sic] Exchange Act of 1934" and that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." *Id.* at Exh. 32.1. The certifications also state, in relevant part:

> 2) Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3) Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

*See id.* at Exs. 31.1 and 31.2.

234. Substantially similar certifications were included and certified by various Defendants in the following documents:

a) NewAge's Form 10-Q filed with the SEC on November 14, 2018, certified by Defendants Willis and Gould;

b) NewAge's Form 10-K filed with the SEC on April 1, 2019, certified by Defendants Willis and Gould;

c) NewAge's Form 10-Q filed with the SEC on May 9, 2019, certified by Defendants Willis and Gould;

d) NewAge's Form 10-Q filed with the SEC on August 19, 2019, certified by Defendants Willis and Gould;

e) NewAge's Form 10-K filed with the SEC on March 16, 2020, certified by Defendants Willis and Gould;

f) NewAge's Form 10-Q filed with the SEC on May 11, 2020, certified by Defendants Willis and Gould;

g) NewAge's Form 10-Q filed with the SEC on August 10, 2020, certified by Defendants Willis and Gould;

h) NewAge's Form 10-Q filed with the SEC on November 9, 2020, certified by Defendants Willis and Gould;

i) NewAge's Form 10-K filed with the SEC on March 18, 2021, certified by Defendants Willis and Gould;

j) NewAge's Form 10-Q filed with the SEC on May 10, 2021, certified by Defendants Willis and Aure;

k) NewAge's Form 10-Q filed with the SEC on August 9, 2021, certified by Defendants Willis and Mannion; and

l) NewAge's Form 10-Q filed with the SEC on November 9, 2021, certified by Defendants Willis and Mannion.

## VI. LOSS CAUSATION

235. Defendants' wrongful conduct, as alleged herein, directly and proximately caused Plaintiffs and the Class to suffer substantial damages.

236. During the Class Period, Plaintiffs and other Class members purchased NewAge securities at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those facts materialized. The price of NewAge securities declined significantly causing Plaintiffs and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

237. Defendants made false and misleading statements and material omissions regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger. On the strength of these false and misleading statements and material omissions, the

price of the Company's securities was artificially inflated to a Class Period high of $9.99 on September 21, 2018. Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's securities served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of NewAge's business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of NewAge securities declined.

238. The true facts regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger which were omitted and/or misrepresented by Defendants eventually caused the price of NewAge's securities to decline on six occasions, thereby causing harm to investors.

239. First, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger materialized on January 10, 2022, when NewAge announced that the Board and Defendant Willis agreed that he would "resign as [CEO], Director, and employee of the Company, effective immediately. The Company and Mr. Willis will determine the terms of his departure at a future date[.]" This caused investors to suffer losses as the price of NewAge securities dropped approximately 6% on each of the following trading days, from an opening of $0.98 per share to a closing price of $0.9251 per share on January 11, 2022 and from an opening price of $0.935 per share to a closing price of $0.88 on January 12, 2022.

240. Second, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger materialized on May 17, 2022, when the Company announced

after trading hours had concluded that it had received a late notice from Nasdaq regarding the filing of its Form 10-Q. This caused investors to suffer losses as the price of NewAge securities dropped approximately 8%, from an opening price of $0.391 per share to $0.3591 per share.

241. Third, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger materialized on June 8, 2022, after the market closed, when the Company announced that it was undertaking a review of "strategic alternatives," including "available financing alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transactions." This caused investors to suffer losses as the price of NewAge securities dropped approximately 12%, from $0.42 per share to $0.3703 per share. Following that, NewAge's share price closed down 11%, 7%, and 3%, respectively.

242. Fourth, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger materialized on August 30, 2022, when the Company announced that it was filing for Chapter 11 bankruptcy relief. On August 31, 2022, *The Wall Street Journal* released an article called "New Age Says Cost of Internal Probe Contributed to Bankruptcy," which highlighted the fact that in its Chapter 11 disclosure, New Age admitted that it had conducted an expensive internal investigation into Ariix for suspected violations of the FCPA. This caused investors to suffer losses as the price of NewAge securities dropped approximately 39%, from an opening price of $0.2016 per share to $0.1222 per share. It further plummeted on September 2, 2022, closing down 26% from an opening of $0.20 per share to $0.1482.

243. Fifth, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding NewAge's distribution agreements, CBD portfolio, internal

controls, and the Ariix merger materialized on September 2, 2022, after market close, when NewAge announced that it had received writing notice from the Nasdaq that, as a result of its filing for protection under Chapter 11, Nasdaq determined that NewAge's securities would be delisted from the Nasdaq stock exchange, beginning on September 8, 2022. This caused investors to suffer losses as the price of NewAge securities dropped approximately 9%, beginning on September 6, 2022, from an opening price of $0.1368 per share to a closing price of $0.125 per share.

244. Sixth, Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding distribution agreements, CBD portfolio, internal controls, and the Ariix merger materialized on October 18, 2022, when the SEC announced that it was taking legal action against Defendant Willis. Specifically, he was alleged to have engaged in a "multi-year fraud by disseminating numerous false and misleading press releases and making false public statements concerning NewAge's business dealings, and aided and abetted NewAge's disclosure of material information in violation of Regulation FD," and was accordingly charged under Section 10(b) of the Exchange Act and Rule 10b-5, Section 17(a) of the Securities Act, and with aiding and abetting NewAge's violations of Section 13(a) of the Exchange Act and Regulation FD.

245. The next day, on October 19, 2022, the SEC announced that it had instituted cease-and-desist proceedings against NewAge pursuant to Section 8A of the Securities and Exchange Acts, and rules and regulations promulgated under them. In anticipation of these proceedings, NewAge submitted a settlement offer, which the SEC accepted. These announcements caused investors to suffer losses as the price of NewAge securities dropped approximately 99%, from an opening price of $0.175 per share to $0.0013 per share.

246. Accordingly, as a result of their purchases of NewAge's securities during the Class Period, Plaintiffs and other Class members suffered economic losses and damages.

## VII. CLASS ACTION ALLEGATIONS

247. Plaintiffs bring this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all persons and entities that purchased or otherwise acquired NewAge securities during the Class Period and were damaged thereby.

248. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

249. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NewAge securities were actively traded on the NASDAQ stock exchange or later on the OTC market. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by NewAge or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

250. Plaintiffs' claims are typical of the claims of the other members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

251. Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests that are contrary to or in conflict with those of the Class.

252. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, *inter alia*:

a. Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of NewAge; and

c. To what extent the members of the Class have sustained damages and the proper measure of damages.

253. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VIII. CONTROL PERSON LIABILITY

254. Defendants are liable as direct participants with respect to the wrongs complained of herein. In addition, Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants were able to and did, directly and indirectly, control the conduct of NewAge's business.

255. Specifically, because of their positions within the Company, Defendants possessed the power and authority to control the contents of NewAge's SEC filings, annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein. Each Defendant, by reason of their respective management or board position, had the opportunity to review copies of the Company's SEC filings, reports, press releases, and other statements alleged herein to be false and/or misleading, prior to, or shortly after their issuance or to cause them to be corrected.

256. By virtue of their positions, Defendants had access to material non-public information. Each Defendant knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

## IX. APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

257. The false and/or misleading statements alleged herein were material and public and at all relevant times the market for NewAge's securities was an efficient market for the following reasons, among others:

a. NewAge's securities were listed on the NASDAQ, a highly efficient market;

b. NewAge's securities were listed on the OTC Markets, [add];

c. As a registered and regulated issuer of securities, NewAge filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

d. NewAge communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-

ranging public disclosures such as communications with the financial press and other similar reporting services;

e. The market reacted to public information disseminated by NewAge; and

f. At least 11 analysts followed NewAge's business and wrote reports which affected the marketplace.

258. As a result of the above, the market for NewAge securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices. The historical trading prices and volumes of NewAge common stock are incorporated herein by reference.

259. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue NewAge's securities. Without knowledge of the misrepresented or omitted facts, Plaintiffs and other Class members purchased NewAge securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of NewAge's securities were artificially inflated by Defendants' misrepresentations and omissions. Thus, a presumption of reliance applies.

## X. THE AFFILIATED UTE PRESUMPTION

260. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding NewAge's business operations and financial prospects—information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI. NO SAFE HARBOR

261. The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

262. First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current of historic fact, or are actionable in context because they omit then-existing material facts.

263. Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

264. Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

265. Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any beverage company, and misleadingly contained no factual disclosure of any of the specific details

concerning distribution agreements, CBD portfolio, internal controls, and the Ariix merger, or similar important factors that would give investors adequate notice of such risks.

266. Fifth, to the extent there were any such forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by a director and/or executive officer of NewAge who actually knew that each such statement was false or misleading when made.

## XII. CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants**

267. Plaintiffs reallege each allegation above as if fully set forth therein.

268. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5, against Defendants

269. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings, presentations, press releases, and analyst reports concerning distribution agreements, CBD portfolio, internal controls, and the Ariix merger reviewed by Defendants, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

270. During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to

defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiffs and other Class members in that Defendants concealed the truth about NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger.

271. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

272. Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

273. As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiffs and the Class members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

274. Plaintiffs and Class members purchased NewAge securities without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects. In so doing, Plaintiffs and Class members relied directly or indirectly on false and misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in

Defendants' public statements. Plaintiffs and Class members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

275. At the time of Defendants' false statements, misrepresentations and omissions, Plaintiffs and Class members were unaware of their falsity and believed them to be true. Plaintiffs and the Class would not otherwise have purchased NewAge securities had they known the truth about the matters discussed above.

276. Plaintiffs are filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiffs' claims, and within five years after the violations with respect to Plaintiffs' investments.

277. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

278. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in connection with their purchase of NewAge securities.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act Against Defendants

279. Plaintiffs reallege each allegation above as if fully set forth herein.

280. This claim is asserted against Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all Class members.

281. As set forth above, Defendants committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

282. Each Defendant, by reason of their status as senior executive officers and/or directors of NewAge, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the

Exchange Act. Defendants directly or indirectly controlled the content of the Company's SEC statements and press releases related to Plaintiff's and the Class's investments in NewAge securities within the meaning of Section 20(a) of the Exchange Act. Therefore, Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

283. Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases. Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

284. Defendants knew or recklessly disregarded the fact that NewAge's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Defendants did not act in good faith.

285. By virtue of their high-level positions and their participation in and awareness of NewAge's operations and public statements, Defendants were able to and did influence and control NewAge's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

286. Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, and as set forth more fully above.

287. As set forth above, Defendants committed a primary violation of Section 20(a) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by concealing the facts

regarding NewAge's distribution agreements, CBD portfolio, internal controls, and the Ariix merger.

288. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchase of NewAge securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Determining that Counts I through II of this action are a proper class action under Federal Rule of Civil Procedure 23, certifying Plaintiffs as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs' counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment interest, as allowed by law;

C. Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

D. Awarding Plaintiffs and the Class their costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

E. Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all triable claims.

Dated: May 31, 2024

Respectfully submitted,

By: s/ James M. Wilson, Jr.

James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Damian Betebenner and Cigdem Betebenner and Lead Counsel and Local Counsel for the Class*

**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on May 31, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.