**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-JPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

     v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,
GREG FEA, and
CRAIG THIBODEAU,

Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT BRENT WILLIS'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 3

I.     PLAINTIFFS HAVE STANDING.......................................................................... 5

II.    PLAINTIFFS ADEQUATELY PLEAD FALSITY .............................................. 6

       A.     The AC Properly Attributes Statements to Willis..................................... 7

       B.     Willis's Statements Were False And Misleading ...................................... 7

              1.     Statements About The Military, Retail, And Distributor Relationships..... 7

              2.     Statements About Walmart ........................................................ 10

              3.     Statements About The CBD Portfolio ....................................... 11

              4.     Statements About Internal and Disclosure Controls................ 13

       C.     Willis's Statements Are Not Protected By The Safe Harbor ................... 15

       D.     Willis's Statements Are Not Puffery ....................................................... 16

III.   PLAINTIFFS ADEQUATELY PLEAD SCIENTER ......................................... 17

       A.     Willis Knew The Truth About The Purported Agreements.................... 18

       B.     Willis Knew The Truth About The CBD Portfolio And Internal And
              Disclosure Controls................................................................................. 22

       C.     Motive Supports Scienter......................................................................... 23

       D.     Other Circumstantial Evidence Supports Scienter.................................. 25

IV.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ........................... 26

       A.     The Corrective Disclosure And Leakage Theories................................. 27

       B.     The Materialization Of The Risk Theory................................................ 31

       C.     Willis's Remaining Arguments Are Meritless......................................... 31

V.     PLAINTIFFS STATE §20(a) CLAIMS ............................................................... 33

CONCLUSION................................................................................................................... 33

# TABLE OF AUTHORITIES

**Cases**                                                                                                                      **Page(s)**

*In re Adaptive Broadband Sec. Litig.*,
  2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................................................................25

*In re Allergan Generic Drug Pricing Sec. Litig.*,
  2019 WL 3562134 (D.N.J. Aug. 6, 2019) ..........................................................................27, 32

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016) .......................................................................................18, 25

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
  505 F. Supp. 2d 662 (D. Colo. 2007).....................................................................................15

*In re Ashanti Goldfields Sec. Litig.*,
  184 F. Supp. 2d 247 (E.D.N.Y. 2002) ...................................................................................21

*In re Axis Cap. Holdings Ltd., Sec. Litig.*,
  456 F. Supp. 2d 576 (S.D.N.Y. 2006).....................................................................................24

*Better v. YRC Worldwide Inc.*,
  2012 WL 4433500 (D. Kan. Sept. 25, 2012) ....................................................................16, 21

*Billhofer v. Flamel Techs., S.A.*,
  2012 WL 3079186 (S.D.N.Y. July 30, 2012) .........................................................................11

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
  556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................................28

*Brown v. China Integrated Energy, Inc.*,
  875 F. Supp. 2d 1096 (C.D. Cal. 2012) ..................................................................................26

*Brumbaugh v. Wave Sys. Corp.*,
  416 F. Supp. 2d 239 (D. Mass. 2006) .....................................................................................11

*In re Career Education Corp. Sec. Litig.*,
  2006 WL 999988 (N.D. Ill. Mar. 28, 2006)............................................................................21

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012) .....................................................................................19

*Chapman v. Mueller Water Prods., Inc.*,
  466 F. Supp. 3d 382 (S.D.N.Y. 2020).....................................................................................24

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014)................................................................................................11

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ..........................................................................................10

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ......................................................................24

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)..............................................................................32, 33

*In re Crocs, Inc. Securities Litigation*,
774 F. Supp. 2d 1122 (D. Colo. 2011)..................................................................................10

*Croker v. Carrier Access Corp.*,
2006 WL 2035366 (D. Colo. July 18, 2006) ....................................................................25, 26

*In re Curaleaf Holdings, Inc. Securities Litigation*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) ....................................................................................13

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ......................................................................15

*Donley v. Live Nation Ent., Inc.*,
2024 WL 794641 (C.D. Cal. Feb. 23, 2024)..........................................................................8

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................3, 26

*Ellis v. Spectranetics Corp.*,
2018 WL 1583837 (D. Colo. Apr. 2, 2018)..........................................................................21

*Emps. Ret. Sys. of the State of R.I. v. Williams Cos, Inc.*,
889 F.3d 1153 (10th Cir. 2018) ............................................................................................9

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
2005 WL 3504860 (S.D. Tex. Dec. 22, 2005)......................................................................28

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013)..................................................................................16

*Farlow v. Peat, Marwick, Mitchell & Co.*,
956 F.2d 982 (10th Cir. 1992) ..............................................................................................6

*In re Firstenergy Corp. Sec. Litig.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022) ..............................................................................15

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010)........................................................................................30

*In re Gold Res. Corp. Sec. Litig.*,
  957 F. Supp. 2d 1284 (D. Colo. 2013).......................................................................................16

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997) .................................................................................................10

*Gruber v. Gilbertson*,
  628 F. Supp. 3d 472 (S.D.N.Y. 2022)........................................................................................27

*In re HEXO Corp. Securities Litigation*,
  524 F. Supp. 3d 283 (S.D.N.Y. 2021)........................................................................................13

*Higginbotham v. Baxter International Inc.*,
  495 F.3d 753 (7th Cir. 2007) .....................................................................................................15

*Hogan v. Pilgrim's Pride Corp.*,
  2023 WL 8896324 (D. Colo. Dec. 26, 2023).............................................................................26

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
  45 F.4th 1236 (10th Cir. 2022) ..........................................................................................9, 23, 24

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 9453468 (C.D. Cal. Dec. 31, 2008) ...........................................................................31

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)......................................................................................................................7

*Kessman v. Myriad Genetics, Inc.*,
  2019 WL 1330363 (D. Utah Mar. 25, 2019) .............................................................................26

*Kowal v. MCI Commcunications Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) .....................................................................................................8

*Latham v. Matthews*,
  662 F. Supp. 2d 441 (D.S.C. 2009)...............................................................................................8

*In re Level 3 Communications, Inc. Securities Litigation*,
  667 F.3d 1331 (10th Cir. 2012) .................................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)........................................................................................................................6

*Mauss v. NuVasive, Inc.*,
2016 WL 3681831 (S.D. Cal. July 12, 2016) ........................................................................28

*McDonald v. Kinder-Morgan, Inc.*,
287 F.3d 992 (10th Cir. 2002) .................................................................................................9

*Medina v. Clovis Oncology, Inc.*,
215 F. Supp. 3d 1094 (D. Colo. 2017).....................................................................................16

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*,
79 F.4th 1209 (10th Cir. 2023) ...............................................................................................21

*In re Merck & Co., Inc., Sec., Derivative & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) .................................................................................6

*In re MGP Ingredients, Inc. Securities Litigation*,
2021 WL 3885655 (D. Kan. Aug. 31, 2021) ..........................................................................25

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
761 F.3d 1109 (10th Cir. 2014) ..............................................................................................18

*Mishkin v. Zynex Inc.*,
2011 WL 1158715 (D. Colo. Mar. 30, 2011) ........................................................................20

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Sup. 3d 987, 1012 (D. Colo. 2016)..............................................................................26

*In re Molycorp, Inc. Sec. Litig.*,
2015 WL 1540523 (D. Colo. Mar. 31, 2015) ........................................................................24

*In re Myriad Genetics, Inc. Sec. Litig.*,
2021 WL 977770 (D. Utah Mar. 16, 2021) ...........................................................................25

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) ..........................................................................10, 17, 19, 31

*Nakkhumpun v. Taylor*,
2014 WL 321156 (D. Colo. Jan. 29, 2014)......................................................................30, 32

*In re Neustar Sec. Litig.*,
83 F. Supp. 3d 671 (E.D. Va. 2015) .......................................................................................16

iv

*In re New Century*,
 588 F. Supp. 2d 1206 (C.D. Cal. 2008) ......................................................................33

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
 80 F.4th 158 (2d Cir. 2023) .......................................................................................15

*Nicholas v. Poughkeepsie Sav. Bank/FSB*,
 1990 WL 145154 (S.D.N.Y. Sept. 27, 1990).............................................................6

*Patel v. Axesstel, Inc.*,
 2015 WL 631525 (S.D. Cal. Feb. 13, 2015) .......................................................18, 22

*Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*,
 372 F. Supp. 3d 1139 (D. Colo. 2019).........................................................................6

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
 769 F.3d 313 (5th Cir. 2014) ................................................................................29, 32

*Puddu v. 6D Glob. Techs., Inc.*,
 742 F. App'x 553 (2d Cir. 2018) ...............................................................................27

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017) .....................................................................................9

*In re QuantumScape Sec. Class Action Litig.*,
 580 F. Supp. 3d 714 (N.D. Cal. 2022) .......................................................................11

*In re Qwest Commc'ns Int'l, Inc.*,
 396 F. Supp. 2d 1178 (D. Colo. 2004).......................................................................24

*Rabkin v. Lion Biotechnologies, Inc.*,
 2018 WL 905862 (N.D. Cal. Feb. 15, 2018) .............................................................28

*In re Rhythms Sec. Litig.*,
 300 F. Supp. 2d 1081 (D. Colo. 2004).........................................................................3

*In re Ribozyme Pharms., Inc. Sec. Litig.*,
 119 F. Supp. 2d 1156 (D. Colo. 2000).......................................................................11

*Richfield v. PolarityTE, Inc.*,
 2023 WL 3010208 (D. Utah Apr. 19, 2023).................................................................9

*Roberts v. Zuora, Inc.*,
 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ...........................................................21

*In re Rocket Fuel, Inc. Sec. Litig.*,
   2015 WL 9311921 (N.D. Cal. Dec. 23, 2015) ..........................................................................33

*Roots P'ship v. Lands' End, Inc.*,
   965 F.2d 1411 (7th Cir. 1992) ...............................................................................................6

*Sapssov v. Health Management Associates, Inc.*,
   608 F. App'x 855 (11th Cir. 2015) ......................................................................................28

*Sawant v. Ramsey*,
   570 F. Supp. 2d 336 (D. Conn. 2008) ....................................................................................11

*SEC v. GenAudio Inc.*,
   32 F.4th 902 (10th Cir. 2022) ...............................................................................................16

*SEC v. Goldstone*,
   233 F. Supp. 3d 1169 (D.N.M. 2017) .......................................................................................7

*In re SemGroup Energy Partners, L.P.*,
   729 F. Supp. 2d 1276 (N.D. Okla. 2010)...............................................................................15

*Shafer v. Lightning eMotors, Inc.*,
   2024 WL 691458 (D. Colo. Feb. 20, 2024) ...........................................................................21

*Smallen v. The W. Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) .....................................................................................18, 24

*Sorkin, LLC v. Fischer Imaging Corp.*,
   2005 WL 1459735 (D. Colo. June 21, 2005)...........................................................................24

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)...............................................................................19

*Spitzberg v. Hous. Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ..............................................................................................18

*SS Richmond LLC v. Harrison*,
   640 F. Supp. 3d 453 (E.D. Va. 2022) ...................................................................................17

*Steiner v. Medquist, Inc.*,
   2006 WL 2827740 (D.N.J. Sept. 26, 2006) ...........................................................................30

*Stevens v. GlobeTel Commc'ns Corp.*,
   2007 WL 9701197 (S.D. Fla. Apr. 4, 2007) ...........................................................................20

vi

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)........................................................................................................17, 23

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
    2022 WL 18859055 (E.D.N.Y. 2022).........................................................................................9

*Thomas v. Magnachip Semiconductor Corp.*,
    167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...................................................................................31

*In re Thornburg Mortg., Inc. Sec. Litig.*,
    695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................................................23

*In re Thornburg Mortgage, Inc. Securities Litigation*,
    683 F. Supp. 2d 1236 (D.N.M. 2010) ......................................................................................12

*Trs. of Welfare & Pension Funds of Loc. 464A v. Medtronic PLC*,
    2024 WL 1332262 (D. Minn. Mar. 28, 2024) ..........................................................................22

*UA Loc. 13 Pension Fund v. Sealed Air Corp.*,
    2021 WL 2209921 (S.D.N.Y. June 1, 2021) ............................................................................14

*United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake
    Energy Corp.*,
    774 F.3d 1229 (10th Cir. 2014) .................................................................................................9

*In re UTStarcom, Inc. Sec. Litig.*,
    617 F. Supp. 2d 964 (N.D. Cal. 2009) .....................................................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
    242 F.R.D. 76 (S.D.N.Y. 2007) .................................................................................................6

*Voulgaris v. Array Biopharma Inc.*,
    2020 WL 8367829 (D. Colo. Nov. 24, 2020) ..........................................................................22

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ....................................................................................26, 29, 30

*Winslow v. BancorpSouth, Inc.*,
    2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).......................................................................29

*In re Zagg Securities Litigation*,
    2014 WL 505152 (D. Utah Feb. 7, 2014) .................................................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................................22

**Statutes**

15 U.S.C. §78u-5(c)(1) ............................................................................................................15

**Other Authorities**

17 C.F.R. §229.308(a)(3)..........................................................................................................13

17 C.F.R. §240.13a–15(e)..........................................................................................................13

17 C.F.R. §240.13a–15(f) ..........................................................................................................13

Fed. R. Civ. P. 15(a)(2)..............................................................................................................33

Plaintiffs respectfully submit this memorandum of law in opposition to Brent Willis's

("Willis") Motion to Dismiss ("Motion" or "MTD") (Doc. 93).[1,2]

## INTRODUCTION

This is a classic case of securities fraud.  It involves a fraudulent scheme by Defendants

to intentionally mislead the market through assurances that NewAge's business had finally

transitioned from years of losses to a new period of rapid expansion.  Defendants falsely assured

the market that the Company was entering into multiple lucrative distribution agreements for its

beverages - including a prized contract with the U.S. military.  The fact was there were no such

contracts, or they were significantly more limited than represented.  Defendants told the market

that NewAge was creating a new "scientifically and medically grounded" cannabidiol ("CBD")

infused beverage portfolio, when no such effort was actually happening.  Defendants' lies had

the intended impact, as NewAge's stock price soared during the Class Period.  Defendants

profited and capitalized on the inflated stock prices.  For example, Willis dumped 1,220,541

shares (54% of his holdings) during the Class Period, reaping over $3.2 million from the sales,

and his annual salary doubled.  Defendants also used the artificially inflated stock price to raise

over $100 million through additional stock offerings, which was used in part to fund

acquisitions.  The acquisition of Ariix – part of NewAge's supposed effort to expand into the

---

[1]    All "¶ --" references are to the Amended Class Action Complaint ("AC").  Doc. 82.
Unless otherwise noted, all capitalized terms mean the same as in the AC, all emphasis is added
and all citations, internal quotation marks and footnotes are omitted.
[2]    Plaintiffs adopt and incorporate the arguments in their oppositions to the other
defendants' motions to dismiss and motion to strike filed herewith, to the extent those arguments
also pertain to Willis.

1

multi-level-marketing ("MLM") beverage space - was the product of egregious self-dealing by Willis and others.

The truth about Willis's and the other Defendants' lies came out gradually over time in a series of partial disclosures, including NewAge's bankruptcy, caused in part by the costly internal investigation into Ariix's violations of the Foreign Corrupt Practices Act ("FCPA"), and the SEC's Cease-and-Desist ("C&D") Order against NewAge and its complaint ("SEC Complaint") against Willis that revealed the full truth about the purported agreements and CBD portfolio.  As a result of the disclosures of Defendants' fraud, NewAge's stock price plummeted and investors lost over 90% of the value of their investment.

In his Motion, Willis argues that Plaintiffs are trying to create a securities fraud case out of his "good-faith belief" in his strategies that ultimately "missed its mark."  He blamed unforeseen challenges and the fact that the much-hyped agreements and CBD portfolio fell short of investors' expectations.  This argument is completely baseless.  As alleged in Plaintiffs' AC (and the complaints by the SEC and the bankruptcy trustee), the ventures that Willis touted were not just less profitable than anticipated *- they did not exist as represented in the first place and he clearly knew it*.

Willis claims that NewAge was clear that the agreements were merely indefinite and immaterial "authorizations" that created no long-term obligations, but this claim is also false and is *directly contradicted by his statements to the market*.  For example, Willis and others falsely touted a "new distribution agreement" with the U.S. Military, whereby NewAge was currently shipping 21 types of its products to "all…military commissaries worldwide," and was "expected to have a material impact" on NewAge's "financial results[.]"  Similarly definitive statements

2

were made about distribution agreements with the largest Canadian grocery retailers, the largest food and beverage distributor in South Korea, and Walmart.  As detailed below, these, and many other statements contained highly specific yet false material details.

Willis's arguments to dismiss fraud claims arising from such false and misleading statements have already been denied in the SEC case.  *See SEC v. Willis*, No. 22-cv-02744-GPG-SKC, Doc. 42 ("*Willis* Order") (D. Colo. Sept. 29, 2023).[3]  Willis does not, and cannot, provide any basis for this Court to rule differently in this case.

With respect to scienter, Willis's position—that he was just overly optimistic about NewAge's prospects—is not plausible.  There is a strong inference of scienter, supported by, *inter alia*, confidential witnesses ("CWs"), the SEC's Complaint and C&D Order, and a tremendous amount of solid evidence in NewAge's Liquidation Trust's ("Trust") complaint.

With respect to loss causation, which is subject to Fed. Rule Civ. P. 8's pleading standard, Plaintiffs need only provide "defendants with notice of what the relevant economic loss [or] the causal connection might be[.]"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Plaintiffs have done so, alleging a series of partial disclosures that culminate in the SEC's disclosures in October 2022 that sent NewAge's stock plunging **93%**.

### STATEMENT OF FACTS

Beginning in January 2018, Willis and NewAge made a series of announcements that misled the market that the Company's fortunes were improving.  ¶5.  They announced a "new distribution agreement" with the military, an expanded distribution with the largest grocery

---

[3]    The PSLRA did not change this Circuit's pleading standards for falsity in §10(b) cases, only scienter.  *In re Rhythms Sec. Litig.*, 300 F. Supp. 2d 1081, 1086, 1090 (D. Colo. 2004).  Thus, Plaintiffs are not subject to a higher pleading standard for falsity than the SEC.

retailers across Canada, "a major distribution agreement" with South Korea's "largest food and beverage distributor," and in early 2019, NewAge's "first national distribution" with Walmart. ¶¶94-97, 101-02, 105, 126.  They also told the market that NewAge had tested and developed a CBD-beverage portfolio, and announced massive retail commitments and near-term launches. ¶¶115-22.  Investors and analysts bought these lies as NewAge's stock price soared 21%, 5%, 6%, and 23% respectively, on these announcements.  ¶¶54, 104, 108, 129.

On NewAge's buoyed stock price and seemingly improved prospects, Willis convinced the Board to double his salary in early 2019 and thereafter pocketed millions selling his shares. ¶¶71-72.  Meanwhile, NewAge capitalized on its artificially inflated share price to raise over $100 million, allowing it to expand its business by acquiring multiple companies.  ¶¶197-206.

NewAge's acquisition spree would culminate in the ill-fated Ariix merger, announced in July 2020.  ¶79.  Ariix did not cooperate with its obligation to provide NewAge with certain information before closing, so NewAge *secretly waived* these conditions, allowing the merger to close without Ariix's audited financials and other critical information.  ¶80.  This would prove disastrous.  Immediately post-closing, NewAge discovered Ariix's targeted working capital was *negative $18 million*, and Japan suspended Ariix from recruiting new brand partners due to fraudulent practices that likely violated the FCPA.  ¶¶83-84.

Despite failing to ascertain this before the merger closed, and although Willis was able to repeatedly disseminate falsehoods concerning NewAge's business relationships and CBD portfolio, Defendants falsely assured investors regarding NewAge's internal and Disclosure Controls.  ¶¶132-44.  Meanwhile, Willis and Cooper misappropriated key assets NewAge acquired in the Ariix merger to fund a competing venture.  ¶¶216-27.

4

The SEC began to investigate NewAge around February 2019.  ¶87.  Two months before Willis received an SEC subpoena, he abruptly resigned, sending NewAge's stock down 6%.  ¶20.

With the immensely costly investigation into Ariix's FCPA violations ongoing, NewAge was unable to file its Form 10-Q on time, causing NASDAQ to send it a notice that it was not in compliance with listing rules.  ¶21.  On this news, NewAge's stock dropped 8%.  ¶21.  NewAge again shocked the market on June 8, 2022 by announcing that it was considering "strategic alternatives," leading its stock to plummet 12%, 11%, and 7% over three days.  ¶22.  Two months later, it filed for bankruptcy due partly to the enormous costs NewAge incurred while investigating Ariix.  ¶23.  On this news, NewAge stock dropped 39% the next day, and further plummeted 26% on September 2, 2022.  *Id*.  The bankruptcy led NASDAQ to delist NewAge, leading to another 9% drop.  ¶24.

Finally, on October 18, 2022, the SEC sued Willis for violating §10(b), among other statutes, for making many of the statements challenged herein.  ¶89.  The next day, the SEC issued its C&D Order against NewAge, setting forth the Company's and Willis's misconduct.  ¶90.  On this news, NewAge stock dropped *93%*.  ¶¶25-26.

The Liquidation Trust thereafter sued Defendants, making many of the same arguments as the SEC and casting additional light on the Ariix merger.

## I.    PLAINTIFFS HAVE STANDING

Willis' argument that Plaintiffs lack standing to pursue claims for false statements made after their last NewAge stock purchase on October 4, 2018, lacks merit.  MTD 8.  To hold otherwise would imply that "only someone who bought on the last day of [the] Class Period"

5

could bring an action.  *Nicholas v. Poughkeepsie Sav. Bank/FSB*, 1990 WL 145154, at \*6 (S.D.N.Y. Sept. 27, 1990).  That is not the law.  Numerous courts "apply a 'common course of conduct analysis' to standing questions," considering whether plaintiffs made a purchase after the defendant made ***any statements*** in furtherance of their "scheme of fraud."  *Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1150 (D. Colo. 2019) (disagreeing with *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992)).

Plaintiffs have standing not only because they purchased NewAge securities on October 1 and 4, 2018 (Doc. 20-2) following certain misstatements in furtherance of this "sustained course of conduct" (*In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007)), but because they decided to hold their NewAge stock throughout the Class Period.[4]

## II.      PLAINTIFFS ADEQUATELY PLEAD FALSITY

It is unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).  By speaking about NewAge's relationships, CBD portfolio and the effectiveness of its internal and Disclosure Controls, Defendants put these topics "in play," giving rise to a "duty to speak fully and truthfully" about them.  *In re Merck & Co., Inc., Sec., Derivative & ERISA Litig.*, 2011 WL 3444199 at \*9 (D.N.J. Aug. 8, 2011).

---

[4]      *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986-87 (10th Cir. 1992) (MTD 8) says nothing about standing and unlike here, lacked sufficient detail to determine what misrepresentations were made when or how they furthered the alleged scheme.

A.    **The AC Properly Attributes Statements to Willis**

The maker of a statement includes the person with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). It is undisputed that Willis was a maker of the statements in ¶¶94, 97-98, 115-18, 121-23, 127, 132-134, 136-39, 141, 143. Nothing in *Janus* precludes a single statement from having multiple makers. *SEC v. Goldstone*, 233 F. Supp. 3d 1169, 1204 (D.N.M. 2017).

Furthermore, the SEC concluded Willis had ultimate authority over the press releases, ¶130, and directed others to make misleading statements at conference calls, ¶¶95-96. *See also* AC Ex. A at ¶¶2-3, 75. The SEC's allegations are appropriately considered (*see* Motion to Strike ("MTS") Opposition, filed herewith), and therefore Willis is properly considered a "maker" of the remaining statements.

B.    **Willis's Statements Were False And Misleading**

1.    **Statements About The Military, Retail, And Distributor Relationships**

Willis stated that NewAge had a "***new distribution agreement***," ¶94, with the military "spann[ing] 3,300 outlets in over 30 countries" with some of its products "***shipping out now***…to all commissary locations worldwide," ¶¶5, 53, 94; NewAge "picked up the military business worldwide," ¶96, and "in a very significant way," ¶97; and that NewAge was selling "21 core" products "in the military channel" that was "as big as Walmart in total sales throughput[,]" ¶98.

Willis also told the market that: NewAge "beg[a]n shipments of [its] Coco-Libre and Búcha Live Kombucha brands…throughout Loblaws and Sobeys" and "is now expanding to all banners within Loblaws and expanding throughout Sobeys and Safeway," ¶101; Búcha "has

7

recently expanded to all major retailers throughout Canada," ¶102; and NewAge "*signed a major distribution agreement* for expansion of its Búcha Live Kombucha brand with the largest food and beverage distributor in South Korea to *expand to all major retail outlets throughout the country immediately*."  ¶105.

These statements gave the false and misleading impression that NewAge secured retail commitments, entered into several large-scale distribution agreements, and had begun shipping its products pursuant to these agreements.  ¶¶99, 103, 107.

Willis argues that the foregoing was not misleading because certain SEC filings warned that NewAge's relationships with "third parties" were merely "'authorizations' that were neither 'material [nor] definite' and did not create 'long-term obligations.'"  MTD 10.  This is belied by the challenged statements' plain language.  In any event, no facts support that "authorizations" existed then either.[5]  NewAge's purported warnings "do not…establish that reasonable investors would not have relied on [] Willis's specific representations about the scope and scale of distributors' purported commitments to NewAge…."  *Willis* Order 16.  Considering that NewAge did not have such agreements, was not then-shipping those products, and did not have adequate inventory to ship or expand as described, the challenged statements create an "impression of a state of affairs that differs in a material way from the one that actually exists." *Donley v. Live Nation Ent., Inc.*, 2024 WL 794641, at *8 (C.D. Cal. Feb. 23, 2024); *see Latham v. Matthews*, 662 F. Supp. 2d 441, 457 (D.S.C. 2009).  Analysts' descriptions of these relationships support Plaintiffs' interpretation of the challenged statements.  *See* ¶¶55, 59, 104,

---

[5]    Thus, *Kowal v. MCI Commcunications Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994) is inapposite.  MTD 9-10.

108; *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1244, 1251, 1264 (10th Cir. 2022)

(finding analysts' understanding of defendants' statements relevant to whether they misled

investors).[6]

Unlike in Willis's authorities, disclosing the truth in this case would have "alter[ed] the

meaning" of his statements.  *See Emps. Ret. Sys. of the State of R.I. v. Williams Cos, Inc.*, 889

F.3d 1153, 1163-64 (10th Cir. 2018); *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 996-98

(10th Cir. 2002).

And, because most of the challenged statements are statements of present/historical fact

(*e.g.*, "shipping out now," "effective immediately, "has signed a major distribution agreement")

"virtually no cautionary language short of an outright admission that [they] were materially false

or misleading would have been adequate."  *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130,

1148 (9th Cir. 2017).

The August 2018 disclosures regarding inventory issues do not insulate Willis's

statements either because the challenged statements were made in early 2018, while Willis

falsely conveyed to the market that large quantities were then-shipping out.  ¶¶94-108.

---

[6]    Willis's authorities are distinguishable.  *See United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1236-39 (10th Cir. 2014) (MTD 10) (no need to disclose alteration in application of hedging strategy where company disclosed that it makes frequent adjustments to it in response to market conditions and published historical use of hedging strategy demonstrating those adjustments); *Richfield v. PolarityTE, Inc*., 2023 WL 3010208, at \*10 (D. Utah Apr. 19, 2023) (MTD 11) (statements regarding product's regulatory pathway, FDA application, and salability not misleading where company disclosed FDA's concerns about product and no allegations defendants knew product could not be sold); *In re The Hain Celestial Grp. Inc. Sec. Litig*., 2022 WL 18859055, at \*22 (E.D.N.Y. 2022) (MTD 11) (that sales incentives and promotions proved unsustainable did not make statements about revenue sources misleading where company disclosed those practices).

Additionally, Plaintiffs allegations are not "fraud-by-hindsight" because NewAge eventually sold some products to some of these entities.  "[T]hese allegations are entirely consistent with statements that were false when made"—*i.e.*, it supports the allegation that the agreements, to the extent they existed, were smaller than represented.  *Willis* Order 10.[7]

### 2.    Statements About Walmart

In April 2019, Willis and NewAge announced: (1) the "first national distribution" of its Marley line with Walmart; (2) that NewAge had "now begun shipments to Walmart distribution centers across the [U.S.]"; and (3) that each of NewAge's three Marley flavors "will be available at Walmart stores in the beginning of April" 2019.  ¶¶126-27.

Willis argues that these statements are technically true because Marley products were *eventually* offered in Walmarts in 21 states.  However, literally true statements will support claims for securities fraud where they create a materially misleading impression.  *See e.g., Nakkhumpun v. Taylor* ("*Nakkhumpun II*"), 782 F.3d 1142, 1148-49 (10th Cir. 2015).  Willis's statements created the misleading impression that NewAge had specific commitments from Walmart and had begun to and would be shipping them to all, or at least *most* U.S. Walmart stores.  ¶¶126-28.  By "volunteering relevant, material information regarding the lucrative nature of [NewAge's] impending agreements, [Willis] assumed an obligation…[and failed] to convey

---

[7]    Defendants' authorities are distinguishable.  *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1253-60 (10th Cir. 2001) (MTD 10-11, 22) (finding failure to disclose specific lawsuit against company not misleading where company disclosed that it was subject to various lawsuits for substantial amounts whose outcomes were unknown, and defendants did not know this lawsuit was particularly material); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (MTD 7) (no contemporaneous facts showed statements misleading *when made*).  Unlike *In re Crocs, Inc. Securities Litigation*, 774 F. Supp. 2d 1122, 1146-47 (D. Colo. 2011) (MTD 10-11), Plaintiffs allege more than mere corporate mismanagement.

'the whole truth.'"  *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006);

*see Sawant v. Ramsey*, 570 F. Supp. 2d 336, 342 (D. Conn. 2008) (finding statements about

transaction with Walmart misleading where there was no written agreement between the

companies).[8]

### 3.    Statements About The CBD Portfolio

The statements about the CBD portfolio (¶¶109-10 and discussed above) were false

when made because NewAge had done no such testing as Defendants claimed, had taken only

preliminary steps to develop its portfolio despite claiming they would be taking orders, and the

Health Sciences division had no such role.  ¶111.

Willis argues that he did not represent NewAge had a "completed" product.  MTD 12.

But the press release specifically stated that NewAge "***has developed***" a portfolio of these

beverages, and would be taking orders in the following month.  ¶110.  These statements misled

investors by creating the impression that NewAge had created and tested a proprietary CBD

beverage portfolio that would soon be ready for distribution.  *See In re Ribozyme Pharms., Inc.*

*Sec. Litig.*, 119 F. Supp. 2d 1156, 1159-60 (D. Colo. 2000) (finding company misrepresented

status of product's development, in part through statements about product's testing);  *In re*

*QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 733-34 (N.D. Cal. 2022) (finding

---

[8]    Willis's authorities are inapposite.  *See City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014) (MTD 11) (no allegation defendants did not honestly believe or lacked a reasonable basis for their opinions regarding clinical trial data); *Billhofer v. Flamel Techs., S.A.*, 2012 WL 3079186, at *13 (S.D.N.Y. July 30, 2012) (defendants accurately conveyed positive clinical trial findings).

statements gave false impression that product was past conceptual stage and would soon be ready for commercialization).[9]

The same is true of Willis's statements thereafter, which touted the success of NewAge's debut of its "portfolio of CBD-infused beverages" at NACS, stating it held "meetings with major retailers and distribution partners" and falsely quoting NewAge's Health Sciences Division's Chief Medical Officer Haase about the "very fact-based, scientifically and medically grounded, and responsible approach" taken in developing NewAge's CBD portfolio. ¶¶112-13. Willis and others also claimed, *inter alia*, that NewAge had "retail distribution commitments" of over 100,000 "points of distribution," that its CBD products were "in production for launch before Christmas" 2018, and that the beverages were *presently available* in Japan at FamilyMart. ¶¶114-124.

These were lies: NewAge had not completed the development of any CBD beverage products and never received orders or commitments from any retailer for them. ¶124.

Willis claims these statements were not misleading because NewAge *did* debut a portfolio of "existing NewAge products infused with CBD." MTD 12. This claim does not pass the red face test. The "portfolio" to which he refers, however, consisted of adding other company's CBD drops to NewAge's existing non-CBD drinks on site. ¶¶113, 170. Even assuming, *arguendo*, that these bootleg concoctions met the literal definition of a portfolio debut, it was extremely misleading to describe them as such. The challenged statements convey an impression of beverages ready to be sold and shipped to consumers, "oversee[n] and carefully

---

[9]    *In re Thornburg Mortgage, Inc. Securities Litigation*, 683 F. Supp. 2d 1236, 1260 (D.N.M. 2010) (MTD 13) involved estimates that were appropriately qualified, not the assertions of fact involved here.

control[ed]" by its Health Sciences Division, not the amateur potion-making that was going on. *See* ¶¶109-25.

Furthermore, NewAge's "commitments," "agreements," and "launches" for the CBD portfolio did not fall through because of the regulatory hurdles NewAge purportedly warned about—***they did not exist in the first place***. ¶¶113, 124; *see also Willis* Order 7 n.4, 14 n.5, 14-15 (explaining that these warnings did not neutralize the CBD statements).[10]

### 4.    Statements About Internal and Disclosure Controls

Internal controls are intended "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles…." 17 C.F.R. §240.13a–15(f). Management cannot "conclude that the registrant's internal control over financial reporting is effective if there are…material weaknesses[.]" 17 C.F.R. §229.308(a)(3). Disclosure Controls "ensure that information required to be disclosed by the issuer in the reports [filed] under the [Exchange] Act…is recorded, processed, summarized and reported, within the [relevant] time periods[,]"and "accumulated and communicated to the issuer's management,…as appropriate to allow timely decisions regarding required disclosure." 17 C.F.R. §240.13a–15(e). Disclosure Controls can be rendered ineffective by material weaknesses in internal controls. ¶137.

Willis certified that "[t]here have been no changes in our internal controls over financial reporting" that have "or are reasonably likely to materially affect, our internal controls over

---

[10]    *In re Curaleaf Holdings, Inc. Securities Litigation*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) (MTD 13) and *In re HEXO Corp. Securities Litigation*, 524 F. Supp. 3d 283, 310 (S.D.N.Y. 2021) (MTD 16) are therefore inapposite.

financial reporting." ¶132. He also certified that he "evaluated the effectiveness of our [Disclosure Controls]" and "[b]ased on that evaluation[,]" concluded that "our [Disclosure Controls] are effective[.]" ¶133. These statements were false and/or misleading when made.

The Disclosure Controls were not "effective" in ¶¶132-33 because Willis was able to issue written and oral public statements *on multiple occasions* about fake/exaggerated agreements and a CBD portfolio that he implied or outright stated were "expected to have a material impact on [NewAge's] financial results…." ¶94; *see also* ¶¶95-125. Plainly, NewAge had material weaknesses in its internal controls that rendered its Disclosure Controls ineffective. *See UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021) (sustaining claim that the Disclosure Controls were ineffective and/or inadequately designed where company was able to file reports that misstated and/or omitted material facts).

Willis and others also misled the market in later filings by attesting to their accuracy and truthfulness while stating that NewAge's Disclosure Controls were ineffective as of December 31, 2020 due to a material weakness in internal controls. Specifically, NewAge had "[in]sufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "sizing and timing." ¶¶137-39, 141, 143. These statements were misleading for omitting the real reasons why NewAge's Disclosure Controls were ineffective discussed above. ¶¶137-39, 141, 143. And with respect to the statement at ¶¶137-39, the Disclosure Controls were also ineffective because NewAge only discovered the FCPA issues *after* the Ariix merger closed. ¶¶18, 217. NewAge's failure to timely ascertain this (and other information) because they waived critical closing requirements (¶80)—necessitating a ruinously expensive internal

14

investigation—demonstrates that its internal controls were materially weak and therefore its

Disclosure Controls were ineffective too.  *See In re SemGroup Energy Partners, L.P.*, 729 F.

Supp. 2d 1276, 1289, 1311 (N.D. Okla. 2010) (failure to disclose ineffective internal controls

actionable).[11]

Willis argues that internal controls are inactionable "statements of opinion" based on *New

England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 176 (2d

Cir. 2023), but here, Willis certified the adequacy of otherwise inadequate disclosure controls

"***based on [his] evaluation***."  ¶¶133-34; ¶¶137-39, 141, 143 (similar).

However, these statements would be actionable even as opinions.  By making repeated

false and misleading statements about NewAge a "fundamental aspect of [its] business model[,]"

Willis's positive assessments of internal and Disclosure Controls "either were not honestly held

or were not based on the diligence a reasonable investor would expect [hi]m to convey."  *In re

Firstenergy Corp. Sec. Litig.*, 2022 WL 681320, at *10 (S.D. Ohio Mar. 7, 2022).[12]

### C.    Willis's Statements Are Not Protected By The Safe Harbor

The PSLRA's safe harbor does not protect Willis's forward-looking statements because

they are not accompanied by meaningful cautionary language and were made with actual

knowledge of their falsity.  15 U.S.C. §78u-5(c)(1).  Meaningful cautionary language must be

---

[11]    Willis's authorities are inapposite because there, plaintiffs insufficiently identified how defendants knew the statements were misleading.  *See Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683-84 (D. Colo. 2007) (MTD 14); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021).

[12]    In *Higginbotham v. Baxter International Inc.*, 495 F.3d 753, 761 (7th Cir. 2007) (MTD 14), defendant was unaware of a business partners' potentially unlawful conduct while here, ***Willis*** was engaging in it.

"substantive and tailored to the specific future projections, estimates or opinions…which the plaintiffs challenge."  *SEC v. GenAudio Inc*., 32 F.4th 902, 929 (10th Cir. 2022).

As explained in §§II.B.1, 3, the warnings regarding immaterial, indefinite "authorizations" and regulatory issues were not meaningfully cautionary because they did not warn investors of the true risks the purported agreements and CBD portfolio faced.  That is, that they were fictional or grossly exaggerated and therefore any positive predictions about them could not come true.  *See Willis* Order 16.[13]

The forward-looking statements are also not entitled to the safe harbor because Willis knew they were false or misleading when made (*see* §III).

### D.    Willis's Statements Are Not Puffery

Whether statements are puffery depends on the context in which they were made.  *See Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *6 (D. Kan. Sept. 25, 2012).

The statements Willis identifies were "capable of objective verification" and therefore not puffery.  *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1123 (D. Colo. 2017).  For example, the December 2018 statement that NewAge wants its CBD "beverages portfolio launched in market before Christmas so we're in production now" and "we're on track to be able to execute that," ¶118, were verifiable: either NewAge had completed the necessary steps such that it could get its portfolio on store shelves by Christmas, or it had not.  *Cf. In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 465 (S.D.N.Y. 2013) (statements about "on-

---

[13]    Willis's authorities are inapposite because the cautionary language adequately covered the risks that materialized.  *See In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1296-97 (D. Colo. 2013) (MTD 15); *In re Neustar Sec. Litig.*, 83 F. Supp. 3d 671, 682-84 (E.D. Va. 2015) (MTD 16).

time, on-target, and ready-to-launch technology" represented existing facts concerning NASDAQ's capability and reliability to execute orders and "were readily capable of verification.").

The other statements related to CBD that Willis challenges are also not puffery in context, as they are about objectively verifiable facts related to the development of NewAge's CBD products and its readiness for launch and commercialization.  ¶¶110, 112, 123.  For example, whether NewAge "accessed superior technology in CBD-infused beverages over the past-year," ¶110, as opposed to, say, putting others' CBD drops into existing beverages, is objectively verifiable.[14]

The same is true of the statement "military worldwide in a very significant way," ¶97, which was made in the context of discussing that channel's profitability and conveyed the verifiable fact that NewAge had a relationship with the military of meaningful scope.  *See SS Richmond LLC v. Harrison*, 640 F. Supp. 3d 453, 475-76 (E.D. Va. 2022) ("particularized and current representations" about a business' operations "constitute more than a 'rosy affirmation' or optimistic future projection….").

## III.    PLAINTIFFS ADEQUATELY PLEAD SCIENTER

A plaintiff may plead scienter by showing either an intent to deceive or that "defendant acted with a reckless disregard of a substantial likelihood of misleading investors."  *Nakkhumpun II*, 782 F.3d at 1150.  When considering scienter allegations, a court must "assess all the allegations holistically."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

---

[14]    The AC does not challenge the "unique consumer insights," ¶110, or "confident" statements, ¶¶95, 115.  None of Willis's authorities regarding puffery (MTD 16-17) involved a situation where the touted products did not exist.

When the parties present competing inferences, "a tie favors the plaintiff[.]" *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).  Willis argues that the most compelling inference is that he innocently attempted to improve NewAge through new endeavors but "misse[d] the mark."  MTD 18.  But Willis was not merely optimistic about how NewAge's business relationships and the CBD portfolio would shake out—he knowingly or recklessly misrepresented the extent to which they existed and profited off it.[15]  This is not based on Plaintiffs' opinion, but on facts properly taken from the SEC's years-long investigation, the Trust's complaint, the CRO affidavit, four CWs, a FOIA request, and other publicly available evidence.  *See* MTS Opposition.  Plaintiffs' allegations are more than sufficient to plead scienter.

### A.    Willis Knew The Truth About The Purported Agreements

Willis knew that the purported agreements with the military, Walmart, Canadian retailers, and the South Korean distributor did not exist or were smaller than represented because he spoke about them on multiple occasions.  ***He therefore knew that the company did not have agreements with those terms or was deliberately reckless in not knowing***.  ¶¶154-58, 162. Plaintiffs need not plead that Willis was involved in the agreements' formation or execution to show he acted with scienter.  Either he knew the agreements' actual terms, or he acted with deliberate recklessness by speaking about them without knowing their actual terms or confirming their existence.  *See Patel v. Axesstel, Inc.*, 2015 WL 631525, at *9 (S.D. Cal. Feb. 13, 2015)

---

15      Defendant's authorities are therefore inapposite.  *See, e.g., Smallen v. The W. Union Co*., 950 F.3d 1297, 1310 (10th Cir. 2020) (MTD 18, 21) (defendants may not have known about others' wrongdoing); *Anderson v. Spirit Aerosystems Holdings, Inc*., 827 F.3d 1229, 1246 (10th Cir. 2016) (certain defendants may not have known about underlying data used so could not know projections were unrealistic); *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P*., 761 F.3d 1109, 1118 (10th Cir. 2014) (defendants' opinion about future prospects supported by independent experts).

(though not required to review every detail, "it was deliberately and consciously reckless [of defendants] to fail to at least confirm that such contracts existed").

Willis argues that Plaintiffs put forth insufficient evidence to show that the purported agreement with the military did not exist. He argues that the agreement may exist, and that Plaintiffs were unable to find it because it might be on file with a contractor, not the government. This improperly disputes the facts, but even so, Willis surely would have submitted this and the other purported agreements by now in any of the three lawsuits alleging he fabricated them. *See* Exs. A, C; *Carlucci v. Han*, 907 F. Supp. 2d 709, 732 (E.D. Va. 2012) (denying motion to dismiss where "[d]efendants assert that the present nonexistence of such an agreement does not necessarily mean that it never existed[, but]…have no[t] offered any substantive facts or information that demonstrate their inference that any agreement such as the one represented existed at any point in the past[]").

And if the agreements he described were merely immaterial, indefinite "authorizations" §II.B.1, Willis "should have realized the obvious risk that existing and potential shareholders would [] be misled and that they might rely on the mischaracterization to their detriment." *Nakkhumpun II*, 782 F.3d at 1150.

Furthermore, Willis clearly knew that NewAge had insufficient inventory to fulfill the agreements even if they did exist. Willis's knowledge of or access to NewAge's inventory status at the time of his statements is confirmed by his own statements and corroborated by information from CWs. *See* ¶¶94-98, 164-66; *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009); (defendants' own statements "demonstrate[d] that [defendant] knew about [company's] systems capacities").

The CW allegations are entitled to significant weight because the AC "describes the bases of [their] knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *Mishkin v. Zynex Inc*., 2011 WL 1158715, at \*7 (D. Colo. Mar. 30, 2011); *see* ¶¶160-63, 166-67, 174-75, 232.

CW-2 was in sales and operations from 2017 to March 2021, "in charge of storing…and then shipping…NewAge's [products to their] customers." ¶¶160, 175. If NewAge had a distribution agreement with the military or Canadian retailers as extensive as Willis portrayed, "it would have '100%' affected CW-2" because he would have had to ensure "products [were produced] in the necessary quantities and…plan for how they would be distributed." ¶162. However, "nothing came about in that regard." *Id.* CW-2 also did not believe "CBD products were ever created." ¶175.

CW-2 met with Thibodeau monthly to "talk about NewAge getting into the Canadian market." ¶160. Thibodeau was "lead on [NewAge's] Canadian distribution agreements." ¶¶44, 160. Thus, given the magnitude of such "major retail orders," ¶163, with Canadian retailers, Willis was at least reckless for announcing it "without any efforts to verify" its scope with Thibodeau. *Stevens v. GlobeTel Commc'ns Corp.*, 2007 WL 9701197, at \*15 (S.D. Fla. Apr. 4, 2007).

As VP of Global Operations from December 2018 to January 2022,[16] CW-3 handled "virtually everything related to supply chains for both NewAge and Morinda" including

---

[16]    Despite Willis's claim that CW-3 cannot know anything about certain agreements announced before December 2018, Willis's own statements are to the contrary. (*i.e.*: "we would expect to see meaningful contribution from [Canada] *in 2018 and beyond*", ¶59; and NewAge had "'begun shipments to Walmart[s]…across the United States'…*beginning April 2019*." ¶64).

"mak[ing] arrangements with producers" to have beverage flavors produced and shipped to retailers. ¶163. CW-3 knew there was "[in]sufficient inventory to satisfy major retail orders from the U.S. military, Korean retailers … or Canadian retailers," *id.*, and he "communicated" with "Willis about supply chain matters by email." ¶166.[17]

Willis's attempts to discredit CW-2 and CW-3 are confounding: why would two employees involved in "warehousing and logistics" responsible for "everything related to supply chain[s]" (¶¶160, 163; MTD 21) have insufficient personal knowledge to opine on inventory status?

The fact that Willis was on emails about supply chain matters supports his knowledge of NewAge's inventory limitations and its implications for fulfilling the purported agreements. *See Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (CW allegations support inference of scienter because they establish that defendants "***had access to*** minutes, documents, and ***emails***" contradicting their statements); *In re Ashanti Goldfields Sec. Litig.*, 184 F. Supp. 2d 247, 270 (E.D.N.Y. 2002) (defendant's public statements regarding company's investments demonstrate personal knowledge of those investments).

The CWs also corroborate the AC's other allegations on this point. *See Better*, 2012 WL 4433500, at *10-11 (court found CW accounts corroborated other allegations establishing scienter).

---

[17]  Thus, *Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*, 79 F.4th 1209, 1219-20 (10th Cir. 2023) (MTD 21-22), *Shafer v. Lightning eMotors, Inc.*, 2024 WL 691458, at *11-12 (D. Colo. Feb. 20, 2024), *Ellis v. Spectranetics Corp.*, 2018 WL 1583837, at *8 (D. Colo. Apr. 2, 2018), and *In re Career Education Corp. Sec. Litig.*, 2006 WL 999988, at *5 (N.D. Ill. Mar. 28, 2006) are inapposite because here, Plaintiffs sufficiently identify the CWs, why they have the requisite personal knowledge, and why it would reach Willis.

**B.      Willis Knew The Truth About The CBD Portfolio And Internal And Disclosure Controls**

Willis knew when he made the CBD statements that the portfolio was (at best) in the very preliminary stages of development and the extensive testing described had not been performed. ¶¶109-10, 112, 114-23, 170-76.  His knowledge of the portfolio's status is apparent by the fact that he spoke about it frequently and in detail, and personally served the bootleg beverages at NACS.  ¶¶109-24, 170; *see Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829, at *21 (D. Colo. Nov. 24, 2020) ("It is unclear what further facts [P]laintiffs would need to plead to create a stronger inference that [Defendants] had access to information [they] discussed publicly."). Thus, he either knew the portfolio was not as far along as he told the market, or he failed to check the status before speaking.  Either way, he was deliberately reckless.  *See Axesstel*, 2015 WL 631525, at *9.

Willis argues that NewAge *did* develop a proprietary portfolio because NewAge later disclosed he knew about illegal sales of CBD-beverages from August 2019 through December 31, 2020.  But this was *after* the challenged CBD statements were made, and no facts show it was a "portfolio," or overseen by the Health Sciences Division.[18]

Willis's knowledge of the truth about the CBD portfolio, the distribution agreements (§III.A), and the FCPA investigation that he tried to frustrate, ¶231, also shows that he knew the internal and Disclosure Controls were ineffective for these reasons (§II.B.4).

---

[18]      Thus, the CWs's statements about the non-existent CBD portfolio contradict nothing and *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 999 (9th Cir. 2009) (MTD 22-23) is inapposite.  Willis's strawman argument about FDA approval is a feeble attempt to find favorable case law.  *See Trs. of Welfare & Pension Funds of Loc. 464A v. Medtronic PLC*, 2024 WL 1332262, at *27 (D. Minn. Mar. 28, 2024).

## C.    Motive Supports Scienter

Though not required, allegations of "personal financial gain may weigh heavily in favor of a scienter inference…." *Tellabs*, 551 U.S. at 325.  Willis and NewAge were motivated by the "prospect of ever-greater compensation" and "desire to raise capital" to avoid the "looming threat of bankruptcy[.]" *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010) (subsequent history omitted).

Specifically, Willis was motivated to artificially inflate NewAge's share price and make its prospects appear stronger to get the raise he sought from the Board—to whom he misrepresented certain information about the military agreement and CBD orders.[19]  ¶¶180-82, 194-95, 210, 214.  This worked: in early 2019, he got a 50% raise, and with stock awards and other compensation, he went from making $384,949 in 2018 to $2.1-$1.7 million in 2019 and 2020, respectively.  *Id.*

He also made suspicious stock sales.  Willis, who never sold shares before, sold 1,220,541 shares (54% of his holdings) during the Class Period for over $3.2 million (¶¶207-09), dwarfing the 130,000 shares he bought.  *Pluralsight*, 45 F.4th at 1267 (sales of 5% and 12% of holdings supported scienter).  150,000 shares were sold the day after the fictional Walmart agreement was announced, and 750,000 were sold a month after the Ariix merger was

---

[19]    *In re Level 3 Communications, Inc. Securities Litigation*, 667 F.3d 1331, 1346 (10th Cir. 2012) (MTD 25 n.12), by contrast, there was no evidence defendants lied to the board regarding company's progress.

23

announced.  ¶¶208-09.  Defendant Kapteyn also sold 40% of his holdings.  ¶213.  *See Pluralsight*, 45 F.4th at 1264–65 (insider's profit considered in evaluating suspiciousness).[20]

Willis's arguments fail.  Although he did not buy at the Class Period high, he sold his shares for 207,000% more than their worth post-Class Period.[21]  *See Pluralsight*, 45 F.4th at 1267 (defendants' sales at prices roughly 75% higher than post-class period price suspicious, without reference to class period high).  His supposed 10b5-1 plan does not save him either.  *See Pluralsight*, 45 F.4th at 1266–67 (rejecting 10b5-1 defense at this stage because such "plans can be manipulated easily"); *see Willis* Order 21 n.10 (finding Willis's trading suspicious and noting the 10b5-1 plan was adopted ***after*** many of the challenged statements were made).

And even assuming that he sold to cover tax obligations, his trades would still "satisfy the 'motive' prong[.]"  *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013).[22]  Willis and NewAge were also motivated to use the artificially inflated stock to raise over $105 million and acquire multiple companies.  ¶¶197-99, 201-05; *see*

---

[20]    Defendant's authorities are distinct.  *See In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *23 (D. Colo. Mar. 31, 2015) (defendants unable to sell before class period due to lock out period) (MTD 24-25); *In re Axis Cap. Holdings Ltd., Sec. Litig.*, 456 F. Supp. 2d 576, 596 (S.D.N.Y. 2006) (timing of sale was six months prior to investigation); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (exercising options before expiration); *Smallen*, 950 F.3d at 1310 (exercising options before expiration and selling only 9,000 shares); *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *11 (D. Colo. June 21, 2005) (no information provided about the context of the stock sales).

[21]    Willis sold the shares for $3,297,854.56, which were worth $1,586.70 at the post-Class Period price of $0.0013.  ¶¶209, 245.

[22]    Willis's complaint that Plaintiffs have only plead his proceeds, not profits, does not negate scienter.  *See In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1195–96 (D. Colo. 2004) (stating that while "proceeds are not equal to profits," "the proceeds generated were substantial," and stating that "it is apparent that the stock sales of the individual defendants likely were, at minimum, significantly profitable for them").

*Croker v. Carrier Access Corp.*, 2006 WL 2035366, at \*9-10 (D. Colo. July 18, 2006) (finding

motive to acquire company with artificially inflated stock supports scienter).  Willis was also

motivated to use the Ariix acquisition to misappropriate key assets to fund his and Cooper's

competing venture.  ¶¶219-20, 225-26.

  As described above, Plaintiffs allege ample motive for why Willis and NewAge would

"falsify a beverage,"[23] (MTD 23) but even if NewAge was trying to develop the CBD beverages

it told the market it already had, seeking to "obtain additional time" for the portfolio's ***eventual***

development by misleading the market is a motive that can "strengthen[] the inference of

scienter."  *Anderson*, 827 F.3d at 1255.

  **D.**  **Other Circumstantial Evidence Supports Scienter**

  Resignations under suspicious circumstances, like Willis's, support scienter.  Willis

resigned during the SEC investigation (¶229), two months before receiving an SEC subpoena

and three months after the FCPA investigation that he was accused of frustrating began (*id.*,

¶¶231-32).  He was also denied severance (¶¶177-79).  *See*, *e.g.*, *In re UTStarcom, Inc. Sec.*

*Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (resignations contemporaneous with

investigations support scienter); *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at \*14

(N.D. Cal. Apr. 2, 2002) (discontinued severance payments "highly suspicious").  Willis's

resignation was also unusual because "it was effective immediately with no successor

identified[,]" *In re Myriad Genetics, Inc. Sec. Litig.*, 2021 WL 977770, at \*22 (D. Utah Mar. 16,

2021), ¶228, unlike in *In re Zagg Securities Litigation*, 2014 WL 505152, at \*6 (D. Utah Feb. 7,

---

[23]  *In re MGP Ingredients, Inc. Securities Litigation*, 2021 WL 3885655, at \*3, \*16 (D. Kan. Aug. 31, 2021) (MTD 23), by contrast, involved a whiskey product that existed but was not selling.

2014).  Thus, the more compelling inference is that Willis resigned for fraud-related reasons, and his authorities are therefore distinguishable.  *See* MTD 25.

Additionally, Willis's concealment of the truth regarding certain agreements and CBD orders from the Board, ¶¶180-82, is "strongly indicative of scienter[,]" *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012), as is his "execution of Sarbanes–Oxley certifications [¶¶233-34]," *Croker*, 2006 WL 2035366, at *10-11.

## IV.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

To plead loss causation, a plaintiff need only "allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is ***in some way*** connected with a drop in stock price."  *In re Molycorp, Inc. Sec. Litig.*, 157 F. Sup. 3d 987, 1012 (D. Colo. 2016).  Fed. R. Civ. P. 8 applies to loss causation allegations.  *Hogan v. Pilgrim's Pride Corp.*, 2023 WL 8896324, at *6-7 (D. Colo. Dec. 26, 2023).  Rule 8 is "not meant to impose a great burden upon a plaintiff," and in the context of loss causation, it requires only that Plaintiffs "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be…" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Loss causation can be alleged through (1) "a corrective disclosure" theory which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth . . . leak[s] out" over time; or (3) "a theory of materialization of a concealed risk[,]" where "defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized…." *Kessman v. Myriad Genetics, Inc*., 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019).  A "disclosure need not precisely mirror the earlier misrepresentations." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).  Rather, the truth can come out

"through events constructively disclosing the fraud[.]"  *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 (S.D.N.Y. 2022).

### A.    The Corrective Disclosure And Leakage Theories

Willis misled investors by speaking about distribution agreements, NewAge's CBD portfolio, and the effectiveness of NewAge's internal and Disclosure Controls while concealing that the agreements and CBD portfolio were non-existent or grossly exaggerated, and the Ariix FCPA investigation and its implications.  The truth was gradually revealed in a series of partial disclosures: (1) Willis's resignation; (2) the NASDAQ notice regarding the late Form 10-Q; (3) NewAge's announcement of "strategic alternatives"; (4) NewAge's bankruptcy filing, to which the costs of the Ariix investigation contributed; (5) the resulting delisting from the NASDAQ; and (6) the SEC's C&D Order and Complaint.  ¶¶235-46.  NewAge's stock plummeted in response to each of these disclosures.  *Id.*

Willis concedes that the final disclosures—the SEC Complaint and C&D Order—are factually related to the challenged misstatements, but argues that they do not qualify as corrective disclosures because they are "unproven allegations."  MTD 27.  Surely, all allegations are unproven, but in any event, it is well-established that the announcement of government charges adequately supports loss causation.  Here, Plaintiffs allege that the SEC Complaint and C&D Order "contain[] information that directly reveals the truth regarding the alleged false [and misleading] statements made by Defendants…, and because the SEC's disclosure caused a drop in stock price," it "can be the basis for a corrective disclosure[.]"  *In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at *13-14 (D.N.J. Aug. 6, 2019); *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 557 (2d Cir. 2018) (finding loss causation adequately pled where

SEC complaint and DOJ indictment were corrective disclosures); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at \*15 (N.D. Cal. Feb. 15, 2018) (C&D order part of "the totality of [] alleged partial disclosures [that] sufficiently plead[] loss causation").[24]

The earlier disclosures are also adequately connected to the challenged statements.

First, Willis's resignation on January 10, 2022 caused NewAge's stock to plummet 6%. ¶145. Willis argues that because the resignation announcement itself did not explain the reason for his departure, it was not linked to the challenged statements, citing *Nakkhumpun II*, 782 F.3d at 1149 for the proposition that "unrelated resignations are not corrective disclosures." MTD 26-27. But that case says nothing of the sort and Willis is wrong anyways. Subsequent events can confirm an earlier event revealed the truth about a fraud or a part thereof. Indeed, an officer's "resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to" the allegedly fraudulent conduct. *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at \*11 (S.D. Cal. July 12, 2016). The timing of Willis's resignation and his direct involvement in the wrongdoing alleged strongly suggests that his departure—and the accompanying stock drop—was causally related to the challenged statements. *See* §III.D; *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 136 (D. Conn. 2021) (finding resignations publicly "attributed to non-fraudulent motivations" served as loss causation events where resignees were directly involved in the alleged fraud and resigned shortly after investigation launched); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 2005 WL 3504860, at \*19 (S.D. Tex. Dec. 22,

---

[24]    Willis's authority, *Sapssov v. Health Management Associates, Inc.*, 608 F. App'x 855, 866 (11th Cir. 2015) (MTD 27), involved the announcement of a government investigation, not the charges announced here.

2005) (officer's resignation, which only subsequent events suggested was linked to the alleged fraud, supported loss causation).

Even if Willis's resignation could not serve as a corrective disclosure on its own, it is properly considered a "portion of the totality" of the loss causation inquiry. *See Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc*., 769 F.3d 313, 322-23 (5th Cir. 2014).

The same is true for the remaining disclosures. On May 17, 2022, NewAge received a NASDAQ notice that it was not in compliance with listing rules because its Form 10-Q was late, leading to an 8% drop. ¶146. Then, NewAge announced that it was undertaking a review of "strategic alternatives," including "available financial alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction" on June 8, 2022, leading to a 12% drop the next day, followed by further drops the following three days. ¶147. Willis's complaint that neither disclosure is factually related to the challenged statements is merely an insistence on a "mirror image" rule that is uniformly rejected. *See Williams*, 558 F.3d at 1140 (a "disclosure need not precisely mirror the earlier misrepresentation[s]"). Events like these are appropriately considered part of the loss causation analysis, even if they are then-unexplained. *See Winslow v. BancorpSouth, Inc*., 2011 WL 7090820, at *12 (M.D. Tenn. Apr. 26, 2011) (finding press release announcing Form 10-K would be filed late need not "specifically detail[] the exact basis of the fraud").

The reasons behind the late filing and review of strategic alternatives became clear following NewAge's bankruptcy announcement and the SEC's revelations. On August 30, 2022, NewAge announced that it was filing for bankruptcy, largely due to the costs related to the Ariix investigation. ¶148. NewAge's stock dropped another 39% and 26% over the next two trading

29

days.  *Id.*  Then, NASDAQ announced that it would be delisting the stock due to NewAge's

bankruptcy filing, leading to a 9% drop.  ¶149.

Willis concedes that the "expensive internal investigation" into Ariix's suspected FCPA

violations contributed to the bankruptcy, but argues that it cannot be a "corrective disclosure"

because it does not reveal a "fraud[.]"  MTD 27.  However, the disclosure of the truth "required

under *Dura* ***is not that a fraud was committed per se***, but that the 'truth' about the company's

underlying condition, when revealed, causes the 'economic loss.'"  *Freudenberg v. E\*Trade Fin.

Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010).  Here, the bankruptcy filing revealed part of

the truth about NewAge's underlying condition.

Willis incorrectly cites *Williams*, 558 F.3d at 1139-40, for the proposition that a

bankruptcy cannot be a corrective disclosure.  *Williams*, however, found that the plaintiffs failed

to prove ***at summary judgment*** that the risks the challenged statements concealed, rather than

intervening causes in evidence, were responsible for the company's bankruptcy.  *Id.* at 1143.

Determining "whether an intervening event broke the chain of causation is a fact issue the Court

should not decide on a Rule 12(b)(6) motion[.]"  *Nakkhumpun v. Taylor ("Nakkhumpun I")*,

2014 WL 321156, at *5 (D. Colo. Jan. 29, 2014).

NewAge's stock fell again on NASDAQ's decision to delist it.  ¶149.  This disclosure is

related to the challenged statements because NASDAQ's decision was based on NewAge's

bankruptcy filing, which was caused partly by the Ariix FCPA investigation costs.  *See Steiner v.

Medquist, Inc.*, 2006 WL 2827740, at *20 (D.N.J. Sept. 26, 2006) (delisting linked to the fraud

where delisting decision caused by an investigation into company's billing practices).

30

**B.    The Materialization Of The Risk Theory**

A plaintiff can also "allege[] loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpum II*, 782 F.3d at 1154.  Plaintiffs allege that (1) the risk that materialized was within the zone of risk concealed by Defendants' false and misleading statements regarding the distribution agreements, CBD portfolio, and internal and Disclosure Controls (foreseeability), and that (2) the materialization of the risk negatively impacted NewAge stock's value (causal link). *Id*.

Specifically, the undisclosed risks of the invented/exaggerated distribution agreements, invented/exaggerated CBD portfolio, and ineffective internal and Disclosure Controls included regulatory scrutiny, costly internal investigations, and their foreseeable consequences, such as the CEO's ouster due to his role in this misconduct, violations of NASDAQ listing rules, bankruptcy, delisting, and SEC charges for such lies.  ¶¶235-46.  Thus, the decline in NewAge's stock price in response to these disclosures was a materialization of the risk concealed by Defendants' misrepresentations.  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045-46 (N.D. Cal. 2016) (finding materialization of the risk theory adequately pled where disclosures included a resignation, a retirement, and eventual restatement).

**C.    Willis's Remaining Arguments Are Meritless**

Willis further argues (citing no caselaw) that the length of time between certain statements and the disclosures meant that the disclosures could not have been corrective. However, no rule requires that a disclosure occur within a particular timespan.  *See In re Int'l Rectifier Corp. Sec. Litig*., 2008 WL 9453468, at *8-9 (C.D. Cal. Dec. 31, 2008) (2008

31

disclosure corrected statements from 2003); *Amedisys*, 769 F.3d at 317-18, 326 (2005 statements first corrected in 2008).

Willis also argues (again without caselaw) that NewAge's divestment of its retail brands in late 2020 meant that the stock could no longer have been artificially inflated when the SEC news came out. MTD 26. Whether this divestment intervened to dissipate all artificial inflation is a question of fact and not appropriately resolved at this stage. *See Nakkhumpun I*, 2014 WL 321156, at *5.

*Allergan* is instructive. There, Allergan argued that the sale of its generics business (Actavis) to Teva negated loss causation because the investigation revealing the anti-competitive conduct in the generics business could not have any effect on Allergan's shareholders. *Allergan*, 2019 WL 3562134, at *14. The court disagreed, explaining:

> [T]he sale of Actavis to Teva does not immunize Allergan shareholders from the losses suffered by the disclosure of the DOJ investigation any more than the sale releases Allergan from the investigation.…[I]t is more than plausible that the market was reacting to management's concealment of and engagement in wrongdoing, negative information which would have impacted Allergan's stock, not Teva's stock.

*Id.* The same logic applies here, and is further supported by the fact that NewAge's stock dropped *93%* following the SEC's news (¶151)—a drop for which Willis provides no alternate explanation.

Willis also argues that losses before the first corrective event, January 10, 2022, cannot be attributable to the fraud. MTD 26. This is irrelevant because Plaintiffs are not seeking losses suffered before the first disclosure. A stock price decline prior to a corrective disclosure does not doom loss causation or alter the fact that NewAge's share price dropped significantly in response to a series of partial disclosures. *See City of Sterling Heights Police & Fire Ret. Sys. v.*

*Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (finding loss causation although the "share price had been steadily declining throughout the Class Period and long before the [relevant] Announcement"); *In re New Century*, 588 F. Supp. 2d 1206, 1237 (C.D. Cal. 2008) (similar).

## V.       PLAINTIFFS STATE §20(a) CLAIMS

Although NewAge is not a defendant, NewAge was a maker of each challenged statement and was expressly identified as such.  *See* ¶¶94-144.  Thus, NewAge likewise committed a primary violation of §10(b).  *In re Rocket Fuel, Inc. Sec. Litig.*, 2015 WL 9311921, at *10 (N.D. Cal. Dec. 23, 2015).  Plaintiffs therefore state §20(a) claims against Willis.

## CONCLUSION

For the foregoing reasons, Willis's motion should be denied in its entirety.  However, if Willis's motion is granted, Plaintiffs respectfully request leave to amend, which should be given "freely...when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Since filing the AC, Plaintiffs have continued to pursue their own independent investigation and have developed additional evidence in support of their claims contained therein, including direct evidence about certain Defendants' knowledge of the truth behind the purported agreements, inventory issues, and CBD portfolio.

Date: September 30, 2024                                Respectfully submitted,


                                                By: *s/ James M. Wilson, Jr.*

                                                James M. Wilson, Jr.
                                                **FARUQI & FARUQI, LLP**
                                                685 Third Avenue, 26th Floor

New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: jwilson@faruqilaw.com

Robert W. Killorin
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
E-mail: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Damian
Betebenner and Cigdem Betebenner and
Lead Counsel for the Class*

34

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Lead Plaintiffs' Memorandum in Opposition to Defendant Brent Willis's Motion to Dismiss the Amended Class Action Complaint complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1), and modified by the Court's July 30, 2024 order, Doc. 91.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on September 30, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

1