**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-JPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

                  v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,
GREG FEA, and
CRAIG THIBODEAU,

Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS CARL AURE, ED BRENNAN, CHUCK ENCE, GREG FEA, GREGORY GOULD, TIM HAAS, REGINALD KAPTEYN, AMY KUZDOWICZ AND KEVIN MANION'S MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

ARGUMENT ............................................................................................................................ 6

I.     THE D&OS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS ..... 6

       A.     The AC Properly Attributes False and Misleading Statements To D&Os ............. 6

       B.     Gould's Statements About NewAge's Walmart Distribution ................................ 7

       C.     Gould's Statements About NewAge's CBD Beverage Portfolio ........................... 8

       D.     D&Os' Statements About NewAge's Internal and Disclosure Controls .............. 11

II.     THE AC SUFFICIENTLY PLEADS A STRONG INFERENCE OF SCIENTER ......... 15

       A.     Knowledge Of The Non-Existent/Grossly Exaggerated Agreements And CBD Portfolio ....................................................................................................... 15

       B.     Knowledge Related To Ariix ............................................................................... 21

       C.     Personal Financial Motives Bolsters Strong Inference of Scienter ...................... 23

       D.     Other Circumstantial Evidence Supports Scienter ............................................... 24

III.     PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ...................................... 26

       A.     The Corrective Disclosure And Leakage Theories ............................................... 27

       B.     The Materialization of the Risk Theory ............................................................... 29

       C.     Defendants' Remaining Arguments Are Meritless ............................................... 30

IV.     PLAINTIFFS STATE A CLAIM UNDER SECTION 20(A) ......................................... 31

CONCLUSION ....................................................................................................................... 34

# TABLE OF AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Adams v. Kinder-Morgan, Inc.*,
　340 F.3d 1083 (10th Cir. 2003) ...............................................................................................33

*In re Alstom SA Sec. Litig.*,
　406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................................33

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
　827 F.3d 1229 (10th Cir. 2016) ...............................................................................................21

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
　505 F. Supp. 2d 662 (D. Colo. 2007)................................................................................15, 20

*Basic Inc. v. Levinson*,
　485 U.S. 224 (1988).....................................................................................................................6

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
　763 F. Supp. 2d 423 (S.D.N.Y. 2011)...............................................................................12, 31

*Briggs v. Sterner*,
　529 F. Supp. 1155 (S.D. Iowa 1981) .......................................................................................32

*Brumbaugh v. Wave Systems Corp.*,
　416 F. Supp. 2d 239 (D. Mass. 2006) ........................................................................................8

*In re Century Aluminum Co. Sec. Litig.*,
　749 F. Supp. 2d 964 (N.D. Cal. 2010) .....................................................................................31

*City of Philadelphia v. Fleming Cos.*,
　264 F.3d 1245 (10th Cir. 2001) ...............................................................................................25

*Croker v. Carrier Access Corp.*,
　2006 WL 2035366 (D. Colo. July 18, 2006) ...........................................................................25

*Dura Pharms., Inc. v. Broudo*,
　544 U.S. 336 (2005).................................................................................................................3, 26

*In re Enron Corp. Sec, Derivative & ERISA Litig.*,
　2005 WL 3504860 (S.D. Tex. Dec. 22, 2005)..........................................................................27

*Evanston Police Pension Fund v. McKesson Corp.*,
　411 F. Supp. 3d 580 (N.D. Cal. 2019) .....................................................................................24

*In re Flower Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018) ............................................................25

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ........................................................................15

*In re Gold Res. Corp. Secs. Litig.*,
    957 F. Supp. 2d 1284 (D. Colo. 2013) .......................................................................10

*Gruber v. Gilbertson*,
    628 F. Supp. 3d 472 (S.D.N.Y. 2022) ........................................................................27

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
    2022 WL 889158 (E.D. Pa. Mar. 25, 2022) ..................................................................3

*In re Hamilton Bancorp, Inc. Sec. Litig.*,
    194 F. Supp. 2d 1353 (S.D. Fla. 2002) .......................................................................33

*In re Honeywell Int'l Inc. Sec. Litig.*,
    182 F. Supp. 2d 414 (D.N.J. 2002) ..............................................................................9

*In re HP Sec. Litig.*,
    2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) ...........................................................34

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ...................................................................................10

*In re Int'l Rectifier Corp. Sec. Litig.*,
    2008 WL 9453468 (C.D. Cal. Dec. 31, 2008) ............................................................30

*Jacobs v. Coopers & Lybrand*, *L.L.P.*,
    1999 WL 101772 (S.D.N.Y. Mar. 1, 1999) ...........................................................32, 33

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011) ....................................................................................................6, 7

*Kessman v. Myriad Genetics, Inc.*,
    2019 WL 1330363 (D. Utah Mar. 25, 2019) ..............................................................26

*In re Keyspan Sec. Litig.*,
    2003 WL 21981806 (E.D.N.Y. July 30, 2003) ...........................................................10

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) .......................................................................................30

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ...............................................................................24

*In re Livent, Inc. Sec. Litig.*,
148 F. Supp. 2d 331 (S.D.N.Y. 2001)........................................................................21

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ............................................................19

*Maher v. Durango Metals, Inc.*,
144 F.3d 1302 (10th Cir. 1998) ...............................................................................31

*Mart v. Tactile Sys. Tech., Inc.*,
595 F. Supp. 3d 788 (D. Minn. 2022)........................................................................19

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).....................................................................................................6

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystem Holdings, Inc.*,
79 F.4th 1209 (10th Cir. 2023) ...............................................................................26

*In re Merck & Co., Inc., Sec., Derivative & ERISA Litig.*,
2011 WL 3444199 (D.N.J. Aug. 8, 2011) ..................................................6, 7, 31, 32

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
761 F.3d 1109 (10th Cir. 2014) ...............................................................................26

*Mishkin v. Zynex Inc.*,
2011 WL 1158715 (D. Colo. Mar. 30, 2011) .........................................................16

*In re Molson Coors Beverage Co. Securities Litigation*,
2020 WL 13499995 (D. Colo. Dec. 2, 2020)...........................................................19

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016).........................................................20, 24, 26

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................10

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) ...................................................................... *passim*

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)......................................................................................17

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
   367 F. Supp. 3d 16 (S.D.N.Y. 2019)........................................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................................................14

*In re Parmalat Sec. Litig.*,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005)......................................................................................30

*Patel v. Axesstel*,
   2015 WL 631525 (S.D. Cal. Feb. 13, 2015) ............................................................................16

*In re PMA Cap. Corp. Sec. Litig.*,
   2005 WL 1806503 (E.D. Pa. July 27, 2005)............................................................................13

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ...................................................................................................30

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. 2022) .......................................................................................9

*In re Rent-Way Sec. Litig.*,
   209 F. Supp. 2d 493 (W.D. Pa. 2002)......................................................................................32

*Roofer's Pension Fund v. Papa*,
   2018 WL 3601229 (D.N.J. July 27, 2018)................................................................................15

*SEC v. Curshen*,
   372 F. App'x 872 (10th Cir. 2010) ..........................................................................................23

*SEC v. GenAudio Inc.*,
   32 F.4th 902 (10th Cir. 2022) ..................................................................................................14

*SEC v. Goldstone*,
   952 F. Supp. 2d 1060 (D.N.M. 2013) ........................................................................................8

*SEC v. Goldstone*,
   233 F. Supp. 3d 1169 (D.N.M. 2017) ........................................................................................7

*In re SemGroup Energy Partners, L.P.*,
   729 F. Supp. 2d 1276 (N.D. Okla. 2010)......................................................................13, 22, 31

*Singer v. Reali*,
   883 F.3d 425 (4th Cir. 2018) ...................................................................................................25

*Smallen v. W. Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) .......................................................................................26

*S. Ferry LP #2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)........................................................................17

*In re Sprint Corp. Sec. Litig.*,
   232 F. Supp. 2d 1193 (D. Kan. 2002)........................................................................6, 10, 11

*State of N.J. and Its Division of Inv. v. Sprint Corp.*,
   314 F. Supp. 2d 1119 (D. Kan. 2004)...............................................................................33

*Steiner v. Medquist, Inc.*,
   2006 WL 2827740 (D.N.J. Sept. 26, 2006) .....................................................................28

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)..............................................................................31

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
   690 F. Supp. 2d 959 (D. Ariz. 2010) ...........................................................................32, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................................15, 23

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...........................................................................19

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   695 F. Supp. 2d 1165 (D.N.M. 2010) ..............................................................................23

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   824 F. Supp. 2d 1214 (D.N.M. 2011) ..............................................................................32

*In re Tronox, Inc. Sec. Litig.*,
   2010 WL 2835545 (S.D.N.Y. June 28, 2010) ..................................................................30

*UA Local 13 Pension Fund v. Sealed Air Corp.*,
   2021 WL 2209921 (S.D.N.Y. June 1, 2021) ....................................................................12

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
   672 F. Supp. 2d 596 (S.D.N.Y. 2009)...............................................................................13

*Voulgaris v. Array Biopharma Inc.*,
   2020 WL 8367829 (D. Colo. Nov. 24, 2020) ...............................................................16, 17

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ........................................................................................27, 31

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003) ....................................................................11, 23, 32

*Winslow v. BancorpSouth, Inc.*,
    2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011) ....................................................................28

*Wolfe v. Aspenbio Pharma, Inc.*,
    587 F. App'x 493 (10th Cir. 2014) ........................................................................................21

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019) ................................................................................17, 20

*In re Zagg Securities Litigation*,
    797 F.3d 1194 (10th Cir. 2015) ............................................................................................24

**Statutes**

15 U.S.C. § 78u-5(c)(1) ...............................................................................................................10

**Other Authorities**

17 C.F.R. §229.308(a)(3) ..............................................................................................................11

17 C.F.R. §240.13a–15(e) .............................................................................................................11

17 C.F.R. §240.13a–15(f) ..............................................................................................................11

Fed. R. Civ. P. 15(a)(2) ...................................................................................................................2

Lead Plaintiffs Damian Betebenner and Cigdem Betebenner ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants Carl Aure, Ed Brennan, Chuck Ence, Greg Fea, Gregory Gould, Tim Haas, Reginald Kapteyn, Amy Kuzdowicz and Kevin Manion's (collectively, "D&Os") motion to dismiss ("Motion").[1, 2]

## INTRODUCTION

In the beverage industry, the two most important metrics are "points of distribution" and "sales for point of distribution."  Beverage company NewAge had been struggling on both fronts for a while, ending 2017 with a net loss of $3.5 million and only $285,000 in cash.

Desperate to turn around NewAge's deteriorating fortunes and declining share price— and increase their own compensation—Willis, Gould, and others concocted a scheme whereby they, *inter alia*, fabricated or grossly exaggerated agreements for NewAge's beverages with Walmart, the military, certain retailers, and distributors and touted a largely fictional proprietary CBD beverage portfolio, all while repeatedly reassuring the market that the Company had effective internal controls and disclosure controls and procedures ("Disclosure Controls").  These statements gave investors the false misimpression that NewAge was successful and its prospects promising, artificially increasing its stock price.

In light of NewAge's seemingly changed fortunes and artificially inflated stock price, Willis, Gould, and the then-Board members received large salary bumps and huge stock awards

---

[1]    All "¶ --" references are to the Amended Class Action Complaint ("AC").  Doc. 82. Unless otherwise noted, all capitalized terms mean the same as in the AC, all emphasis is added and all citations, internal quotation marks and footnotes are omitted.

[2]    Plaintiffs adopt and incorporate the arguments in their oppositions to the other defendants' motions to dismiss and motion to strike filed herewith, to the extent those arguments also pertain to the D&Os.

1

in early 2019, while Willis and Kapteyn also profited off of suspiciously timed insider sales. NewAge was also able to raise much-needed cash that allowed it to buy other companies and pivot into the multi-level-marketing ("MLM") beverage space, culminating in the Ariix merger that, unbeknownst to the market, was the product of egregious self-dealing by Willis and others, and only closed after NewAge agreed to waive certain critical closing obligations that would ultimately prove disastrous.

The truth came out in a series of partial disclosures, including NewAge's bankruptcy. That bankruptcy was caused in part by the undisclosed devastatingly enormous costs of the internal investigation NewAge had to perform into Ariix's violations of the Foreign Corrupt Practices Act ("FCPA"). This culminated with an SEC Cease-and-Desist ("C&D") Order against NewAge.

The D&Os argue that many of the misstatements Plaintiffs attribute to them were not actually "made" by them.[3]   But by speaking (for Gould) and signing documents (for all D&Os), they are considered "makers" of those statements for the purposes of §10(b). This is true even though Willis is also considered a "maker" of these statements.

The D&Os argue that their statements were not false or misleading, or made with scienter. At bottom, they rest on the argument that everything was Willis's fault, and none of it their own. To be sure, the evidence adduced to date shows that Willis was highly culpable. The SEC's decision to charge Willis and enter the C&D Order against NewAge, however, does not

---

[3]    The D&Os request that the AC as to the D&Os be dismissed with prejudice. MTD 29. As detailed herein, the entire Motion should be denied; however, should the Court determine that the AC should be dismissed in whole or in part, Plaintiffs respectfully request that the dismissal be without prejudice and that it be granted leave to amend, which should be given "freely...when justice so requires." Fed. R. Civ. P. 15(a)(2).

exclude the remaining defendants from liability under §10(b).  *See, e.g., Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at \*19 (E.D. Pa. Mar. 25, 2022) (where not all securities litigation defendants were charged in government action but securities suit survived against certain non-charged defendants).  Indeed, Plaintiffs' allegations are based not only on the SEC's Complaint against Willis and the SEC C&D Order against NewAge, but also on NewAge's Liquidation Trust's complaint ("Liquidation Trust's Complaint" or "Liq. Compl."),[4] NewAge's public filings, and information from four CWs.

Furthermore, Plaintiffs have sufficiently alleged loss causation under the governing standard, Rule 8, by providing "defendants with notice of what the relevant economic loss [or] the causal connection might be."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Even assuming, *arguendo*, that the D&O Defendants are not themselves found liable under §10(b), there is no doubt that they are control persons under §20(a) for NewAge's primary §10(b) violations.

## STATEMENT OF FACTS

In 2018, Willis and NewAge announced a "new distribution agreement" with the military, and thereafter claimed NewAge had "begun shipments" of certain brands "in expanded distribution throughout Loblaws and Sobeys, the largest grocery retailers across Canada;" "signed a major distribution agreement" with South Korea's "largest food and beverage distributor" "to expand to all major retail outlets throughout the country immediately;" and the "first national distribution" of its Marley products to Walmart.  ¶¶101-02, 105, 126.  They also

---

[4]    The Liquidation Trust's Complaint is properly considered, as explained in Plaintiffs' opposition to the motion to strike, filed herewith.

told the market that NewAge had tested and developed a CBD-beverage portfolio, for which the Company's Health Sciences Division was "overseeing and carefully controlling production, quality, and its supply chain and sales channel partners[,]" and announced massive retail commitments and near-term launches.  ¶¶110; 115-22.  NewAge's stock rose on these announcements.  ¶¶54-55, 104, 108, 129.

Although the foregoing was untrue, Gould nonetheless confirmed the development of NewAge's CBD beverage portfolio and its near-term launch by touting the "material impact" its "CBD infused beverage portfolio launches" would have on NewAge's financials in 2019.  ¶120. Shortly thereafter, Gould discussed NewAge's first "national distribution" with Walmart on a conference call.  ¶127.

At the same time Willis, Gould, and NewAge were repeatedly disseminating blatantly false and misleading information about the Company's agreements and CBD portfolio, they and, Ence, Aure, Fea, Brennan, Haas, Kapteyn, and Kuzdowicz were assuring investors that the Company had in place adequate Disclosure Controls to comply with all SEC requirements. ¶¶132-35.

Given NewAge's buoyed stock price and seemingly improved prospects, certain D&Os' fortunes vastly increased due to the steady stream of false statements, with stock awards accounting for a great deal of their compensation.  For instance, Gould's salary increased from $67,000 *to $500,000 per year* and he received $1,845,500 in stock awards.  ¶214.  Fea, Brennan, Kapteyn, and Kuzdowicz also received an additional $100,000 in stock awards.  *Id.*  Kapteyn sold 40% of his shares.  ¶213.

Meanwhile, NewAge capitalized on its artificially inflated share price to raise over $100 million, allowing it to pivot into the MLM beverage space by acquiring multiple companies. ¶¶197-206.  NewAge's acquisition spree would culminate in the ill-fated Ariix merger, announced in July 2020.  ¶79.  When Ariix did not fulfil its obligation to provide NewAge with audited financials and other critical information before closing, NewAge chose to secretly *waive* those conditions rather than disclose the material breach to investors.  ¶80.  This decision, made secretly, would prove disastrous to NewAge investors.  Immediately post-closing, NewAge discovered Ariix's targeted working capital was *negative $18 million*, and Japan suspended Ariix from recruiting new brand partners due to fraudulent practices that likely violated the FCPA.  ¶¶83-84.

Despite their failure to ascertain this before the merger closed, Willis, Gould, Fea, Brennan, Haas, Kuzdowicz, Aure, and Manion continued to mislead the market by disclosing a material weakness in internal controls unrelated to the real issues facing the Company.  ¶¶136-44.  Meanwhile, Willis and Cooper misappropriated key assets NewAge acquired in the Ariix merger to fund a competing venture.  ¶¶216-27.

The SEC began its investigation around February 2019.  ¶87.  Two months before Willis received a SEC subpoena, he abruptly resigned without explanation, sending NewAge's stock down 6%.  ¶145.  A series of partial disclosures thereafter, including NewAge's bankruptcy, gradually revealed the truth previously concealed by Defendants' fraud, culminating in the SEC's Complaint and C&D Order that detailed Willis's and NewAge's misconduct.  ¶¶145-51. NewAge stock plummeted on each revelation.  *Id.*

NewAge's Liquidation Trust ("Trust") thereafter sued Defendants, making many of the same arguments as the SEC and casting additional light on circumstances related to the Ariix merger.

ARGUMENT

### I.    THE D&OS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

It is unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011). By speaking about NewAge's relationships, CBD portfolio and the effectiveness of its internal and Disclosure Controls, the D&Os put these topics "in play," giving rise to a "duty to speak fully and truthfully" about them. *In re Merck & Co., Inc., Sec., Derivative & ERISA Litig.*, 2011 WL 3444199, at *9 (D.N.J. Aug. 8, 2011).

An omitted fact is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-232 (1988). "[M]ateriality is a mixed question of law and fact and ordinarily should be reserved for the trier of fact." *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002) ("*Sprint I*").

#### A.    The AC Properly Attributes False and Misleading Statements To D&Os

The maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

6

Ordinarily, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made…only by the party to whom it is attributed," *Id.* at 142-43.  Here, Gould made oral statements (¶¶120, 127) and all D&Os signed SEC filings (¶¶132-44) containing statements Plaintiffs alleged to be false or misleading.  This is sufficient to show that the D&Os were "makers" of those statements.  *See, e.g., Janus*, 564 U.S. at 143 ("the content [of a speech] is…within the control of the person who delivers it."); *Merck*, 2011 WL 3444199, at *25-26 (under *Janus*, corporate executive "made" statements in SEC filings he signed).  While the SEC concluded that Willis had ultimate authority over press releases and directed others to make statements during conference calls, ¶¶95-96, it did not allege that about the SEC filings and Gould's oral statements in ¶127.  *See* ¶130.  Even if it did, however, "nothing in *Janus* precludes a single statement from having multiple makers."  *SEC v. Goldstone*, 233 F. Supp. 3d 1169, 1204 (D.N.M. 2017).[5]

**B.    Gould's Statements About NewAge's Walmart Distribution**

On a May 9, 2019 earnings call, Gould maintained the lie first published by Willis and NewAge in April 2019 that NewAge had secured a "national distribution" with Walmart.  ¶127. Gould insists this statement was literally true because NewAge's CBD products were eventually offered in Walmarts in 21 states.  However, literally true statements will support claims for securities fraud where they create a materially misleading impression.  *See Nakkhumpun v. Taylor* ("*Nakkhumpun II")*, 782 F.3d 1142, 1148-49 (10th Cir. 2015).  Gould's statements gave the materially misleading impression that NewAge had specific commitments from Walmart—

---

[5]    To be clear, Plaintiffs only allege that the D&Os are makers of statements they signed or made orally and are not using "improper group pleading."

the world's largest retailer—and had begun to and would be shipping them to all, or at least *most* U.S. Walmart stores.  ¶¶127-28; *see Brumbaugh v. Wave Systems Corp.*, 416 F. Supp. 2d 239 (D. Mass. 2006) (by "volunteering relevant, material information regarding the lucrative nature of impending agreements, Defendants assumed an obligation…to convey the whole truth.").

Gould argues that the phrase "national distribution" was used when referring to both Walmart *and* 7-Eleven, suggesting that NewAge's agreements with both were, collectively, of national scale.  MTD 14.  This makes no sense, particularly considering the press release issued a month prior that explicitly announced NewAge's "first national distribution" with Walmart. ¶126.

Gould also suggests that his subsequent response to an analyst's question qualified his earlier statement about NewAge's "national distribution" to Walmart in the sense that the deal was "brand-new."  MTD 14.  This reasoning falls apart on closer scrutiny.  In response to the analyst's question about the agreement's scope, Gould did not correct himself and say that the agreement covered only some of Walmart's distribution centers, but instead made vague generalizations and reiterated the "national distribution" statement.  Not only did Gould fail to correct the misleading impression his prior statement made, he reinforced it.  *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1245 (D.N.M. 2013) ("[I]f a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement.").

### C.    Gould's Statements About NewAge's CBD Beverage Portfolio

On January 16, 2019, Gould stated: "[w]hen I look at this opportunity [CBD]…will the Marley and the other *CBD infused beverage portfolio launches have a material impact on our*

8

*financials* in 2019? The answer to this is, yes." ¶120.  By touting the material financial impact NewAge's CBD beverages would bring in *the upcoming year*, Gould gave investors the impression that the portfolio existed and was sufficiently developed such that it would soon be made available by retailers in the commercial market.  Gould's statement was false and misleading because, unbeknownst to investors, NewAge had not completed the development of a single CBD beverage product, did not have their own proprietary CBD product to launch and never received an order or commitment from any retailer for its CBD beverage products.  ¶124. Thus, the non-existent portfolio could have no "material impact."  *Id.*; *see In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 733 (N.D. Cal. 2022) (sustaining complaint where statements gave false impression that product was past conceptual stage and would soon be ready for commercialization).

Gould's subsequent statement that NewAge is not going to make any specific forecasts or predictions about the CBD beverages, and that "the regulatory landscape" would likely present obstacles does not make the statement in ¶120 any less misleading.  "By voluntarily choosing to speak about [NewAge's CBD beverage portfolio, Gould] was under a duty to be honest and forthright."  *Sprint I*, 232 F. Supp. 2d at 1219.  This duty encompassed revealing the real status of NewAge's CBD portfolio.  *See In re Honeywell Int'l Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 419, 425-26 (D.N.J. 2002) (statements actionable where "there were other undisclosed problems…that perpetrate[d] the illusion that new Honeywell was thriving").

Gould argues that his CBD statements were not material, but *he* characterized them as such when he made them ("material [financial] impact").  MTD 11-12.  They are also not puffery: "loosely optimistic statements that are so vague, so lacking in specificity…no

9

reasonable investor could find them important." *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.,* 45 F.4th 1236, 1249 (10th Cir. 2022). To determine whether a statement is puffery, context is key. What may seem to "be innocuous 'puffery' or [a] mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation." *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

Gould's statements about "the material impact" that "Marley and the other CBD infused beverage portfolio ***launches*** [will] have…on [NewAge's] financials ***in 2019***" (¶120) were not mere "vague statements of optimism" in context but specific statements about their impending launch and their likely impact on NewAge's bottom line. *In re Keyspan Sec. Litig.*, 2003 WL 21981806, at *17 (E.D.N.Y. July 30, 2003) (optimistic statements that defendants knew misrepresented existing facts found actionable).

Neither the PSLRA safe harbor nor the bespeaks caution doctrine protects Gould's material misstatements. The PSLRA's safe harbor provides that a forward-looking statement is not actionable if it is issued with "meaningful cautionary language," or was not knowingly false or misleading when made. 15 U.S.C. §78u-5(c)(1). The bespeaks caution doctrine provides that "[f]orward-looking representations are considered immaterial when sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect." *Sprint I*, 232 F. Supp. 2d at 1222.[6] The "safe

---

[6]    D&Os' authority is not to the contrary. *See In re Gold Res. Corp. Secs. Litig.*, 957 F. Supp. 2d 1284, 1293 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015) (MTD 17-18) (plaintiffs failed to plead that defendants' growth projections were unattainable). In other words, the risk had not materialized.

harbor" disclosure Gould cites identifies which statements are "forward-looking" (MTD 13) but contains no cautionary statement that are "substantive and tailored to the specific" statements that is required by the safe harbor and the bespeaks caution doctrine. *Sprint I*, 232 F. Supp. 2d at 1222. Indeed, Gould points to nothing warning investors of the risks that had already materialized with respect to NewAge's CBD beverage portfolio—that it was not yet developed and therefore had no chance of making the "material financial impact" Gould stated. *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1232 (N.D. Okla. 2003) (generic warnings of problems that can affect revenues are insufficient where the problems "had already manifested themselves.").

Additionally, the statements were made with actual knowledge of their falsity, as explained in §II.

## D.     D&Os' Statements About NewAge's Internal and Disclosure Controls

Internal controls are intended "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." 17 C.F.R. §240.13a–15(f). Management cannot "conclude that the registrant's internal control over financial reporting is effective if there are…material weaknesses[.]" 17 C.F.R. §229.308(a)(3). Disclosure Controls "ensure that information required to be disclosed by the issuer in the reports [filed] under the [Exchange] Act is recorded, processed, summarized and reported, within the" relevant "time periods[,]" and "accumulated and communicated to the issuer's management,…as appropriate to allow timely decisions regarding required disclosure." 17 C.F.R. §240.13a–15(e). Disclosure Controls can be rendered ineffective by material weaknesses in internal controls. ¶137. Internal

11

and Disclosure Controls are material to investors.  *See In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 470 (S.D.N.Y. 2011).

On May 15 and August 14, 2018, Willis and Ence certified and signed SEC filings that stated (1) "[t]here have been no changes in our internal controls over financial reporting" that have "or are reasonably likely to materially affect, our internal controls over financial reporting," and (2) that they "evaluated the effectiveness of our [Disclosure Controls]" and "[b]ased on that evaluation[,]" concluded that our [Disclosure Controls] are effective[.]"  ¶¶132-33.  Substantially similar statements appeared throughout NewAge's 2019 and 2020 Forms 10-Q and 10-K, based on the evaluation of Willis and CFO Gould, and signed by Willis and the following D&Os: Gould (¶¶134(a)-(h)); Fea, Brennan, Haas, Kapteyn, and Kuzdowicz (¶¶134(b), (e)).

These statements were false and/or misleading when made.  The Disclosure Controls were not "effective" in ¶¶132-34 because Willis, Gould, and others were able to issue written and oral public statements *on multiple occasions* about fake/exaggerated agreements and a CBD portfolio that implied or outright stated were "expected to have a material impact on [NewAge's] financial results."  ¶94; *see also* ¶¶95-129.  Either NewAge had Disclosure Controls in place to prevent the unilateral publication of blatant falsehoods regarding NewAge's finances and prospects that Willis and Gould continuously bypassed, or no such Disclosure Controls existed.  Alternatively, NewAge had material weaknesses in its internal controls that rendered its Disclosure Controls ineffective.  *See UA Local 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021) (sustaining claim that the Disclosure Controls were ineffective and/or inadequately designed where company was able to file reports that misstated and/or omitted material facts).

12

Willis and D&O Defendants Gould, Fea, Brennan, Haas, and Kuzdowicz also misled the market in the March 18, 2021 Form 10-K by attesting to the accuracy and truthfulness of the statements made therein (¶136) while stating that NewAge's Disclosure Controls were ineffective as of December 31, 2020 due to a material weakness in internal controls (¶¶137-38). Specifically, NewAge had "insufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "sizing and timing." *Id*. These statements were misleading for omitting the real reasons why NewAge's Disclosure Controls were ineffective as discussed above. ¶140. Substantially similar statements appeared in the August 9 and November 9, 2021 Form 10-Qs, signed by Willis and Manion, and were misleading for the same reasons. ¶¶141, 143-44.

With respect to the statements at ¶¶137-39, the Disclosure Controls were also ineffective for the additional reason that NewAge only discovered the FCPA issues *after* the Ariix merger closed. ¶¶18, 217. NewAge's failure to timely ascertain this (and other information) because they waived critical closing requirements (¶80)—necessitating a ruinously expensive internal investigation—demonstrates that its internal controls were materially weak and therefore its Disclosure Controls were ineffective too. *See In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1289-90 (N.D. Okla. 2010), *on reconsideration in part* (July 30, 2010) (failure to disclose ineffective internal controls actionable); *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at \*10 n.8 (E.D. Pa. July 27, 2005) ("it is a violation of securities laws to fail to disclose the true facts regarding the adequacy of your internal controls"); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (representations

actionable where facts concerning internal controls were "much more serious than the picture conveyed[]").

Assuming, *arguendo*, that the foregoing statements were opinions, they are still actionable. A statement of opinion is false if it contains an embedded statement of untrue fact or if the speaker does not hold the stated belief. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015). A statement of opinion is rendered misleading even if believed by the speaker, if it "omits material facts about the [speaker's] inquiry into or knowledge concerning [the opinion], and if those facts conflict with what a reasonable investor would take from the statement itself." *Id.*

The D&O Defendants' statements were false because they clearly did not believe their stated opinions about the internal and Disclosure Controls considering their knowledge (*see* §II) about the repeated dissemination of false information about NewAge's agreements and CBD portfolio (¶¶134, 136-37, 141-143),[7] and the FCPA investigation (¶¶137-39). Alternatively, these statements were misleading for omitting that NewAge failed to verify and prevent the spread of false and misleading information about its agreements and CBD portfolio, and failed to timely discover and disclose Ariix's FCPA issues, causing the Company to be embroiled in a costly investigation. *SEC v. GenAudio Inc.*, 32 F.4th 902, 925 (10th Cir. 2022) (finding an opinion to be misleading because it "omitted certain information that resulted in the statement being misleading to a reasonable investor"). Thus, the D&Os' statements about *why* their Disclosure Controls were ineffective were "misleading to a reasonable person" when read fairly

---

[7]    The August 9, 2021 Form 10-Q disclosed the FCPA investigation but downplayed its true nature and consequences—*i.e.*, that it was so costly it was threatening the Company's future. ¶142.

and in context. *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019).

The D&Os' arguments about what is required to be disclosed in SOX certifications misses the point. MTD 10-11. Once they spoke about NewAge's internal and Disclosure Controls, they put those controls "in play" and "cannot omit material facts related to that issue so as to make the disclosure misleading." *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *13 (D.N.J. July 27, 2018). Thus, this is not a case of mere mismanagement, as D&Os contend, but the failure "to disclose a specific material fact resulting from that mismanagement." *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010).[8]

## II. THE AC SUFFICIENTLY PLEADS A STRONG INFERENCE OF SCIENTER

A plaintiff may satisfy the scienter standard by showing either an intent to deceive or that "defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun II*, 782 F.3d at 1150. When considering scienter, a court must "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre or even the most plausible of competing inferences[.]" *Id.* at 324.

### A. Knowledge Of The Non-Existent/Grossly Exaggerated Agreements And CBD Portfolio

Gould made materially misleading statements about the Walmart agreement and CBD Portfolio. ¶¶120, 127. Gould knew that the purported agreement with Walmart was smaller than

---

[8]    *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683 (D. Colo. 2007) (MTD 10) is inapposite because unlike here, it was unexplained how the "disclosure procedures and internal reporting controls" were deficient.

represented because he spoke about it but did not have an agreement providing for "national distribution." ¶¶154-55. *See Patel v. Axesstel,* 2015 WL 631525, at *9 (S.D. Cal. Feb. 13, 2015) (though not required to review every detail of the contracts they spoke of, "it was deliberately and consciously reckless [of defendants] to fail to at least confirm that such contracts existed"). Gould's knowledge is also supported by the CWs' allegations, which unlike in the D&Os authorities, are entitled to significant weight because the AC "describes the bases of [their] knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *Mishkin v. Zynex Inc*., 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011); *see* ¶¶160-63, 166-67, 174-75, 232. CWs 1-3 corroborated the SEC's and Trust's complaint's allegations that there was no CBD beverage portfolio, no distribution agreements, and no inventory to fulfill them anyway. For example, CW-3, NewAge's VP of Global Operations from December 2018 to January 2022, who handled virtually everything related to supply chains, stated that Gould was involved in managing the supply chain and included on every purchase order that was cut to procure materials by which to supply customers. ¶¶163-66. If the agreements existed as described, Gould would necessarily have known NewAge did not have sufficient inventory to fulfill them.

Gould also knew that the CBD portfolio was nowhere near the stage of development such that it could be expected to have a "material impact on [NewAge's] financials" in 2019. ¶120. This is because NewAge had not completed the development of a single CBD beverage or received any orders or commitments for them at that point. ¶124. It is unbelievable that a CFO, and someone who decided to talk to the market about the Company's CBD beverages, would not have access to the portfolio's development status. *See Voulgaris v. Array Biopharma Inc*., 2020

16

WL 8367829, at *21 (D. Colo. Nov. 24, 2020) ("It is unclear what further facts [P]laintiff[ ] would need to plead to create a stronger inference that [Defendants] had access to information [they] discussed publicly."); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (defendants statements "demonstrate[d] that [he] knew about [company's] systems capacities").  Thus, he either knew before speaking that the portfolio had no chance of materially impacting NewAge's financials in 2019, or did not bother to check the status before speaking. Either way, he "should have realized the obvious risk that existing and potential shareholders would [] be misled and that they might rely on the mischaracterization…to their detriment." *Nakkhumpun II*, 782 F.3d at 1150.

Kuzdowicz, Fea, Haas, Kapteyn, and Brennan acted with scienter by either recklessly failing to monitor the information they had a duty to monitor or intentionally signing off on and failing to correct false statements.  They also knew and/or recklessly disregarded facts suggesting that NewAge's internal and Disclosure Controls were inadequate.  *See Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 875 (D. Kan. 2019) (finding defendants' failure to disclose information that they would have been closely monitoring to support inference of scienter); *see also Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (scienter can be alleged where "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud[]").

Specifically, they signed SEC filings on April 1, 2019, March 16, 2020, and March 18, 2021 that contained false or misleading statements about NewAge's internal and Disclosure Controls.  ¶¶134(b), 134(e), 136-38.  As Audit Committee Chair (Kuzdowicz from 2019-2022), and Audit Committee members (Fea from 2018-2021, Haas from 2019-2021, and Kapteyn from

17

2018-2020), ¶190, their duties required them to monitor internal controls and "any fraud involving management or other employees with a significant role in such internal controls[.]" ¶¶190-91.

Here, Willis had a significant role in internal controls (because he and the CFO at the time—Ence and thereafter Gould and Manion—were responsible for evaluating them, ¶¶132-34, 137), and with others, published press releases and made public statements regarding a "new distribution agreement" with the military, an expanded distribution with the largest grocery retailers across Canada, "a major distribution agreement" with South Korea's "largest food and beverage distributor," and NewAge's "first national distribution" with Walmart. ¶¶94-97, 101-02, 105, 126. Willis and Gould also told the market throughout 2019 that NewAge had tested and developed a CBD-beverage portfolio, and announced massive retail commitments and near-term launches. ¶¶115-22. Numerous analysts and media outlets reported on the public statements about those relationships and CBD portfolio, and questioned Willis, Gould, and others about them during conference calls. ¶¶55, 59, 121, 185-86.

The SEC investigation into the false and misleading statements concerning NewAge's business relationships and CBD portfolio began in February 2019 and was still active while Brennan, who had been on the board since 2017, Fea, Haas, Kapteyn, and Kuzdowicz signed the false and misleading SEC filings. *See* ¶87. Thus, it is inconceivable that these Defendants as Board and/or Audit Committee members, were unaware that the investigation was ongoing, and why NewAge was being investigated.

This is particularly true considering that the dissemination of accurate information is highly relevant to whether a company's internal and Disclosure Controls are effective. *See In re*

*Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *5 (S.D.N.Y. Jan. 27, 2014) (finding scienter where audit committee members failed to further investigate falsity of public statements despite various indications of fraud).  Accordingly, if Fea, Haas, Kapteyn, Kuzdowicz and Brennan checked information they had a duty to monitor prior to making the statements in ¶¶134(b), 134(e), 136-38—*i.e.*, whether the agreements and CBD portfolio existed as described in light of the SEC investigation and Willis's role in it—they would have discovered that NewAge's internal and Disclosure Controls were ineffective because falsehoods about the agreements and CBD Portfolio were able to be disseminated repeatedly.  If they made those statements without checking, they therefore "failed to check information [they] had a duty to monitor" and "thereby knowingly or recklessly allowed dissemination of false" statements.  *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 822 (D. Minn. 2022) (where defendants' position on audit and compliance committees and access to documentation about kickback risks were sufficient to find scienter); *see also Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043-44 (N.D. Cal. 2016) (finding scienter where "responsible members of an Audit Committee should have noticed significant errors [], and that at the very least, a failure to do so was reckless on their part").[9]

Additionally, Defendants Ence, Gould, Aure, and Manion each "evaluated" the Company's internal and Disclosure Controls in their capacities as CFO (and, with respect to Aure, as Chief Accounting Officer) and signed the SEC filings in which these statements appeared.  ¶¶132-33 (Ence); ¶¶134(a)-(h), 136-38 (Gould); ¶¶139 (Aure); ¶¶141-43 (Manion).  If

---

[9]    This is therefore dissimilar from the "[g]eneralized imputations of knowledge" found insufficient in *In re Molson Coors Beverage Co. Securities Litigation*, 2020 WL 13499995, at *9 (D. Colo. Dec. 2, 2020).  MTD 16.

they evaluated the controls as they claimed, they would have discovered that numerous false and misleading press releases had been disseminated about material agreements and a CBD portfolio that NewAge did not actually have.  Indeed, certain Defendants were present when some of these lies were told.  *See* ¶98 (Ence on call where Willis falsely stated that NewAge was selling "21 core SKUs" of its brands in the "military channel" that was "as big as Walmart in total sales throughout"); ¶116 (Gould on call where a NewAge employee claimed it had "overcommitments" of "well over 125,000 new points of distribution" for its CBD beverage portfolio).

Defendants' authority, *Andropolis*, 505 F. Supp. 2d at 679, is not to the contrary.  MTD 16.  There, the earnings forecasts miscalculations at issue were not obvious, but the *Andropolis* court noted that "direct evidence of knowledge or strong circumstantial evidence of willful blindness" can support a finding of scienter.  *Id.*  Here, the relevant facts involved blatantly misrepresented agreements and a practically nonexistent CBD product overseen and "carefully controlled" by a whole division of the Company, all of which were represented to the market as material developments and asked about by analysts.  Thus, "the nature of the facts" here were "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016), *as amended* (Jan. 28, 2016) ("[A]n allegation that an individual defendant knew certain information based on that individual's position in a company, combined with other relevant allegations concerning knowledge or motive, can be sufficient to support a strong inference of scienter under the PSLRA."); *see also Yellowdog Partners*, 426 F. Supp. 3d at 875 ("the importance of this

20

business does support an inference that defendants closely monitored the transition and its effects").[10]

### B.    Knowledge Related To Ariix

On November 16, 2020, NewAge closed on a merger with Ariix after "waiv[ing] critical closing conditions."  ¶¶80-81.  Immediately post-merger, NewAge discovered that Ariix had *negative* $18M in working capital and that Japan suspended Ariix due to fraudulent practices that likely violated the FCPA.  ¶¶82-84, 217.  This latter revelation caused NewAge to launch an extremely costly investigation into Ariix's FCPA violations.  ¶¶18, 23, 148.

Given the foregoing, it is clear that NewAge's internal and Disclosure Controls were not effective when Gould, Fea, Brennan, Haas, and Kuzdowicz signed the 2020 Form 10-K and when Aure and Manion signed the May 10, 2021 and August 9, 2021 Form 10-Qs, respectively. ¶¶137-139, 141, 143.  Rather than disclose the truth, however, they prevaricated, blaming the ineffective Disclosure Controls on having "insufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "sizing and timing."  ¶¶137-39, 141, 143.

These Defendants necessarily knew or recklessly disregarded that these statements were false or misleading when made for the same reasons discussed in §II.A, and those related to the FCPA investigation.  *See In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 372 (S.D.N.Y. 2001)

---

[10]    Defendants' authorities are not to the contrary.  *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016)*, as amended* (July 6, 2016) (MTD 16) (finding that some defendants may not have known about underlying data used in projections, but noting that "executives' positions" are relevant to whether they would have certain knowledge); *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 498-99 (10th Cir. 2014) (finding defendant's ambiguous remark 1.5 years before first misleading statements did not add to scienter, but defendant's position was relevant) (MTD 16).

(noting that an audit committee's awareness of a material weakness and failure to take steps to ensure manipulations were not being performed could "constitute recklessness sufficient to support an inference of scienter").

Specifically, Audit Committee members Fea, Haas, and Kuzdowicz were necessarily involved in the investigation because the committee was responsible for "review[ing] and discuss[ing] with management and the Company's independent auditors disclosure relating to the Company's…internal controls…and disclosure controls and procedures" which included retaining outside auditors, counsel and accountants to perform an independent investigation into Ariix's international business practices.  ¶¶190-92.

Additionally, given the importance of the Ariix merger, it is inconceivable that Fea, Haas, Kuzdowicz, Brennan, Aure, and Manion as NewAge officers and/or Board and Audit Committee members, were unaware that NewAge "waived critical closing conditions enabling Ariix to provide, among other things, audited and interim financial statements after closing[.]"  ¶80.  But even if they were unaware of this waiver when it happened, they necessarily knew about it immediately after closing when NewAge received the relevant information.  ¶¶83-84.  Thus, these Defendants had "access to material non-public information" and were "in a position to know" information such as the FCPA issue, "understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors."  *SemGroup*, 729 F. Supp. 2d at 1298.

Accordingly, if Fea, Haas, Kuzdowicz, Brennan, and Aure checked information they had a duty to monitor prior to making the statements in ¶¶136-38, they would have discovered that

22

NewAge's internal and Disclosure Controls were ineffective.  ¶140.  If they made those statements without checking, they were deliberately reckless.  *See* §II.A.

Gould and Aure's knowledge is also supported by their involvement in due diligence for the Ariix merger.  ¶218.

Even assuming, *arguendo*, that these defendants did not have an independent duty to monitor the Company's internal controls, which they did, they "incurred a duty to disclose" the full truth "when [they] chose to explain" why the internal controls were inadequate. *Nakkhumpun II*, 782 F.3d at 1152-53; *see also SEC v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) ("[W]here a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information.").

### C.    Personal Financial Motives Bolsters Strong Inference of Scienter

Although motive is not required to prove scienter, *Williams*, 339 F. Supp. 2d at 1241, "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325.  Here, D&O Defendants and NewAge were motivated by the "prospect of ever-greater compensation" and "desire to raise capital" to avoid the "looming threat of bankruptcy."  *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010) (subsequent history omitted).

In light of NewAge's supposed "better financial footing," Gould's salary skyrocketed in 2019 from $67,000 to $500,000.  ¶211.  This chasm was even larger when considering stock awards.  In 2018, he made $72,013, and in 2019, he made over $3 million, with extremely high compensation continuing in 2020 for $835,337.  ¶¶71, 211, 214.

Kapteyn, Kuzdowicz, Brennan, Fea, and Haas also had a compelling motive for making the false and misleading statements alleged herein as their compensation was largely dependent on NewAge's stock price.  In 2018, Kapteyn, Brennan, Fea, and Haas' stock awards were over 371%, 371%, 152%, and 371% greater than their respective salaries.  ¶214.  In 2019 and 2020, Kapteyn, Kuzdowicz, Brennan, Fea, and Haas' stock awards were over 169%, 129%, 142%, 53%, and 142% more than their salaries, respectively.  *Id.*; *see Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (finding the fact that "executives' compensation from stock and cash awards far outstripped their base salaries" supported scienter).[11]

Kapteyn also sold 40% of his shares during the Class Period at suspicious times—one week after the false Walmart announcement and a couple of weeks after Willis's false announcement that CBD beverages were available at FamilyMart.  ¶¶62-63; 213.  *See Molycorp*, 157 F. Supp. 3d at 1009-10 (sales of 21% or more of stock suspicious).

### D.    Other Circumstantial Evidence Supports Scienter

Gould left NewAge on March 5, 2021, three months after NewAge's FCPA investigation began.  ¶230.  CW-4 stated that Gould was fired by Willis because he told him to "walk away from Ariix," ¶232, which was corroborated by the Liquidation Trust's Complaint, ¶231.  Gould argues that this suggests he acted without intent to deceive, but "[s]cienter is not limited to

---

[11]    D&Os authorities are inapposite.  *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1345 (10th Cir. 2012) (MTD 19) (false statements involved progress estimates that ***might*** have been inconsistent with a few internal reports); *In re Zagg Sec. Litig.*, 797 F.3d 1194, 1206-07 (10th Cir. 2015) (MTD 18) (no scienter where defendant disclosed the margin account he was allegedly motivated to conceal).

24

situations in which a defendant acted with the primary purpose of misleading shareholders"—

recklessness suffices. *Nakkhumpum II*, 782 F.3d at 1150.[12]

The timing and circumstances of Gould's departure suggest that he was aware of and/or

had access to information showing that the internal and Disclosure Control statements made after

the Ariix merger closed were false and/or misleading when made. ¶230. Additionally,

"execution of Sarbanes–Oxley certifications [is] indicative of an individual defendant's

knowledge about a company's business success and financial data," which supports a strong

inference of scienter. *Croker v. Carrier Access Corp.*, 2006 WL 2035366, at *11 (D. Colo. July

18, 2006). Defendants Gould, Ence, Manion, and Aure signed SOX certifications during the

Class Period. ¶¶233-34.

Furthermore, the SEC's decision not to charge the D&Os does not mean they did not

violate the securities laws. *See* Introduction; *cf. Singer v. Reali*, 883 F.3d 425, 441 (4th Cir.

2018) ("[u]nfortunately for the Company, the duty to disclose may extend to uncharged and

unadjudicated illegal conduct."); *In re Flower Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *8

(M.D. Ga. Mar. 23, 2018) ("Even though Defendants argue that no court or government agency

[stated] that Flowers was misclassifying distributors, Plaintiff sufficiently alleges facts that

would allow one to reasonably infer that Flowers was intentionally misclassifying distributors.").

And contrary to the D&Os' claims, Willis did not lie to the Board with respect to everything

---

[12]     *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir. 2001) (MTD 16)
does not say "intent to mislead" is required for weaknesses in internal controls.

Plaintiffs allege he lied to investors about. *See* ¶¶180-82 (noting lies to Board about negotiations with military and certain CBD orders only).[13]

## III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

To plead loss causation, a plaintiff need only "allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is ***in some way*** connected with a drop in stock price." *Molycorp*, 157 F. Sup. 3d at 1012.  Fed. R. Civ. P. 8 applies to loss causation allegations, which is "not meant to impose a great burden upon a plaintiff," and in the context of loss causation, it requires only that plaintiffs "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be." *Dura*, 544 U.S. at 347.

Loss causation can be alleged through (1) "a corrective disclosure" theory which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth . . . leak[s] out" over time; or (3) "a theory of materialization of a concealed risk[,]" in which "a plaintiff shows that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019).

---

[13]    The D&O cite *Smallen v. Western Union Co.*, 950 F.3d 1297, 1310 (10th Cir. 2020) (MTD 20), *MHC Mututal Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014) (MTD 17), and *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystem Holdings, Inc.*, 79 F.4th 1209, 1217 (10th Cir. 2023) (MTD 17), for the propositions that stock sales, meetings, and mere access to information on their own, respectively, are insufficient to allege scienter.  Plaintiffs here allege more than that.

### A.        The Corrective Disclosure And Leakage Theories

The D&Os and Syrett[14] misled investors by speaking about distribution agreements (Gould), NewAge's CBD portfolio (Gould), and the effectiveness of NewAge's internal and Disclosure Controls (D&Os and Syrett) while concealing that the agreements were non-existent or grossly exaggerated, the CBD portfolio was not as represented, and the Ariix FCPA investigation and its implications. Plaintiffs allege that the truth was gradually revealed in a series of partial disclosures, ¶¶235-46, all of which have a causal nexus to the D&Os' and Syrett's statements.

Willis's resignation on January 10, 2022 caused NewAge's stock to plummet 6%. ¶145. The D&Os argue that nothing in the press release announcing his resignation reference "Walmart, the CBD portfolio or the Company's internal controls." MTD 24. A disclosure, however, "need not precisely mirror the earlier misrepresentation[s]." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009). Rather, the truth can come out "through events constructively disclosing the fraud[.]" *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 (S.D.N.Y. 2022). Willis resigned during the SEC investigation (¶229), two months before receiving an SEC subpoena and three months after the FCPA investigation that he was accused of frustrating began (¶¶231-32), and denied severance (¶¶177-79). Thus, Willis's resignation strongly suggests that his departure—and the accompanying stock drop—was causally related to the challenged statements and omissions tied to the D&Os. *See, e.g., In re Enron Corp. Sec, Derivative & ERISA Litig.*, 2005 WL 3504860, at \*19 (S.D. Tex. Dec. 22, 2005) (officer's

---

14        Syrett adopts the D&Os' loss causation arguments (Doc. 96 at 5 n.4), so Plaintiffs address this element with respect to Syrett here.

resignation, which only subsequent events suggested was linked to the alleged fraud, supported loss causation).

The same is true for the remaining disclosures. On May 17, 2022, NewAge received a NASDAQ notice that it was not in compliance with listing rules because its Form 10-Q was late, leading to an 8% drop. ¶146. Then, on June 8, 2022, NewAge announced that it was undertaking a review of "strategic alternatives," including "available financial alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction," leading to a 12% drop, followed by further drops the next two days. ¶147. Events like these are appropriately considered part of the loss causation analysis, even if they are then-unexplained. *See Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*12 (M.D. Tenn. Apr. 26, 2011).

The reasons behind the late filing and review of strategic alternatives became clear following NewAge's bankruptcy announcement and the SEC's revelations. On August 30, 2022, NewAge announced that it was filing for bankruptcy, and the following day the Wall Street Journal reported it was due largely to the costs related to the Ariix investigation. ¶148. NewAge's stock dropped another 39% and 26% over the next two trading days. *Id.* Shortly thereafter, NASDAQ announced that it would be delisting the stock due to NewAge's bankruptcy, leading to a 9% drop. ¶149; *Steiner v. Medquist, Inc.*, 2006 WL 2827740, at \*20 (D.N.J. Sept. 26, 2006) (delisting linked to the fraud where delisting decision caused by an investigation into company's billing practices). These disclosures revealed part of the truth about NewAge's underlying condition and the previously undisclosed costs of the FCPA investigation that had been concealed by the challenged statements.

The D&Os argue that the FCPA investigation costs were already known to the market prior to the bankruptcy. However, the document they cite merely states that NewAge "cannot reasonably estimate the amount of any potential loss on its financial statements at this time." The "potential loss" referred to is not the incredible costs of the FCPA investigation itself, which was revealed for the first time on August 31, 2022. ¶148.

The final disclosures on October 18 and 19, 2022, the SEC Complaint and C&D Order revealed that Willis and NewAge repeatedly disseminated blatant falsehoods about NewAge's agreements and CBD portfolio. These disclosures are factually related to the D&O's and Syrett's statements because they reveal the truth previously concealed by it—that the agreements and CBD portfolio were fictional/grossly exaggerated and NewAge's internal and Disclosure Controls were ineffective for these reasons as well.

### B.      The Materialization of the Risk Theory

A plaintiff can also "allege[] loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpum II*, 782 F.3d at 1154. Plaintiffs allege that (1) the risk that materialized was within the zone of risk concealed by Defendants' false and misleading statements regarding the distribution agreements, CBD portfolio, and internal and Disclosure Controls (foreseeability), and that (2) the materialization of the risk negatively impacted NewAge stock's value (causal link). *Id.*

Specifically, the undisclosed risks of the invented/exaggerated distribution agreements, invented/exaggerated CBD portfolio, and ineffective internal and Disclosure Controls included regulatory scrutiny, costly internal investigations, and their foreseeable consequences, such as

the CEO's ouster due to his role in this misconduct, violations of NASDAQ listing rules, bankruptcy, delisting, and SEC charges for such lies.  ¶¶235-46.  Thus, the decline in NewAge's stock price in response to these disclosures was a materialization of the risk concealed by the D&Os and Syrett's misrepresentations and omissions.  *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at *13 (S.D.N.Y. June 28, 2010); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005).[15]

### C.   Defendants' Remaining Arguments Are Meritless

Citing no caselaw, the D&Os suggest that the length of time between certain statements and the disclosures meant that the disclosures could not have been corrective.  However, no rule requires a disclosure to occur within a particular timespan to be considered corrective.  *See In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 9453468, at *8-9 (C.D. Cal. Dec. 31, 2008) (2008 disclosure corrected statements from 2003); *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 317-18, 326 (5th Cir. 2014) (statements made in 2005 first corrected in 2008).

The D&Os argue that the stock prices do not reflect a loss after the SEC announcements based on the ***opening*** prices of NewAge stock on October 18th to October 20th.  MTD 27.  However, NewAge stock decreased approximately 93% from an opening price on October 20th of $0.0175[16] to a closing price that day of $0.0013 per share.  ¶245.  The drop is still steep when measured from closing prices: a 94% drop from a closing price of $0.0200 on October 18, 2022

---

[15]   *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (MTD 25) is distinguishable because in *Lattanzio* the plaintiffs argued that the risk that was concealed by the misstatements "was not the risk of Warnaco's bankruptcy, but the risk that Deloitte's audits were not conducted in accordance with generally accepted accounting practices."

[16]   The AC mistakenly writes this value as $0.175.  ¶¶151, 245.

to $0.0012 on October 19, 2022. Either way, these drops "plausibly establish loss causation." *See, e.g., In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 975 (N.D. Cal. 2010) (finding loss causation sufficiently pled where plaintiffs alleged a drop based on the closing prices, over defendants' insistence on using different prices). Even if the D&Os are correct that the price did not decrease following those announcements, however, that is no bar to loss causation. *See, e.g., In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008) (plaintiffs alleged loss causation despite no stock drop upon the corrective disclosure because "the market already had taken account of such information").

Furthermore, "[a]t the motion to dismiss stage, it is not necessary to 'disentangle' or apportion losses resulting from the defendants' misstatements as opposed to losses resulting from" other causes. *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig*., 763 F. Supp. 2d 423, 521 (S.D.N.Y. 2011).[17]

## IV.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(A)

To properly plead a control person claim under §20(a), a plaintiff need only allege "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304-05 (10th Cir. 1998). As a "complex factual question," assessing control person liability is not "ordinarily subject to resolution on a motion to dismiss…." *SemGroup*, 729 F. Supp. 2d at 1303-04.

Although the bankrupt NewAge is not a defendant, it was also a maker of each challenged statement and was expressly identified as such. *See* ¶¶94-144, 153; *see Merck*, 2011

---

[17]    *Williams Sec. Litig.-WCG Subclass*, 558 F.3d at 1143, is not to the contrary, as that court addressed what was necessary to prove loss causation at **summary judgment**, not plead it.

31

WL 3444199, at *25 ("*Janus* does not alter the well-established rule that a corporation can act only through its employees and agents.").  Thus, NewAge likewise committed a primary violation of §10(b).  *See In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1279 (D.N.M. 2011) ("Because 'the liability of the primary violator is simply an element of proof of a §20(a) claim, ... liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong.'"); *see also Briggs v. Sterner*, 529 F. Supp. 1155, 1170-71 (S.D. Iowa 1981) ("the Court will not permit officers and directors of a bankrupt corporation whose actions are alleged to have contributed to that condition to avoid the possible imposition of liability...by asserting the lack of prior adjudication against the controlled person as a basis for dismissal.").

The D&Os argue that the AC inadequately pleads their control over NewAge.  But §20(a) is to be "construed liberally" and requires only "some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable."  *Williams*, 339 F. Supp. 2d at 1237.  Here, each D&O certified and signed their name to at least one SEC filing that either attested to the adequacy of NewAge's inadequate internal and Disclosure Controls or failed to accurately convey the reasons why they were inadequate.  ¶¶132-43; *Jacobs v. Coopers & Lybrand*, *L.L.P.*, 1999 WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999) ("It does comport with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report."); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 524 (W.D. Pa. 2002) ().

Moreover, as explained in §II.A-B, Kuzdowicz, Haas, Fea, and Kapteyn each held positions as members of NewAge's Audit Committee.  ¶¶186-88, 191; *Teamsters Loc. 617*

32

*Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 976 (D. Ariz. 2010) (sustaining §20(a) claim where complaint alleged audit committee duties and that audit committee member "caused or allowed the dissemination of improper public statements…."); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 488 (S.D.N.Y. 2005) (audit committee member who signs an SEC filing has the power to control those who write the report, within the meaning of §20(a)); *see also Jacobs*, 1999 WL 101772, at *18 (finding that defendant who served on the audit committee and signed SEC filings was a control person for purposes of §20(a)).

Kuzdowicz, Haas, Fea and Brennan were also members of the Board during the Class Period and attended no "fewer than 75%" of the meetings held from during their tenures where matters ranging from employee compensation to NewAge's agreements and product portfolio were discussed. ¶¶186-89, 194, 210. These D&O's positions as members of an involved Board, alone, are sufficient to allege control. *See, e.g., In re Hamilton Bancorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359-1360 (S.D. Fla. 2002) ("[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs...are sufficient to state a cause of action for controlling person liability."). The additional allegations that the Board signed NewAge's false and misleading SEC filings reinforces their liability under §20(a). *State of N.J. and Its Division of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1144-45 (D. Kan. 2004) (holding that allegation that board members signed SEC filings containing misleading or fraudulent statement raised sufficient inference of control).[18]

---

[18]     Thus, unlike in *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) (MTD 28), Plaintiffs have explained why the D&Os exerted control over the company.

Furthermore, Gould, Ence, Aure and Manion's primary and secondary liability is established for the false and misleading statements they knowingly issued that were specifically attributed to them in the AC as signers, speakers and/or conference call participants. ¶¶98, 120, 124, 127-28, 234; *In re HP Sec. Litig.*, 2013 WL 6185529, at *2 (N.D. Cal. Nov. 26, 2013) (finding officer was a control person when she "signed [] regulatory reports, and participated in investor conference calls and interviews….").

## CONCLUSION

For the foregoing reasons, D&Os' motion should be denied in its entirety.

Dated:  September 30, 2024

Respectfully submitted,

By: s/ James M. Wilson, Jr.

James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: jwilson@faruqilaw.com

Robert W. Killorin
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
E-mail: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Damian Betebenner and
Cigdem Betebenner and Lead Counsel for the Class*

34

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Lead Plaintiffs' Memorandum in Opposition to Defendants Carl Aure, Ed Brennan, Chuck Ence, Greg Fea, Gregory Gould, Tim Haas, Reginald Kapteyn, Amy Kuzdowicz and Kevin Manion's Motion to Dismiss the Amended Class Action Complaint complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1), and modified by the Court's July 30, 2024 order, Doc. 91.


s/ James M. Wilson, Jr.
James M. Wilson, Jr.


**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on September 30, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

1