**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-JPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff,

v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,
GREG FEA, and
CRAIG THIBODEAU,

Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
FRED COOPER'S MOTION TO DISMISS THE AMENDED CLASS ACTION
COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 4

    A.    NewAge's Relationships With The Military, Retailers, And Distributors
        And Its CBD Beverage Portfolio ................................................................. 4

    B.    The Ariix Merger And NewAge's Internal And Disclosure Controls .................... 5

    C.    Cooper's Compensation and Stock Awards ........................................................... 6

    D.    The Truth Begins To Emerge ................................................................................. 7

ARGUMENT ........................................................................................................................ 8

I.    THE AC ADEQUATELY PLEADS COOPER'S MATERIALLY FALSE AND
    MISLEADING STATEMENTS ...................................................................................... 8

    A.    Cooper Does Not Dispute That The Statements Were False And Misleading
        When Made .............................................................................................................. 8

    B.    Plaintiffs' Allegations Meet The PSLRA Threshold For Materiality And
        Reliability .............................................................................................................. 11

    C.    Plaintiffs' Allegations From Third Party Complaints Are Properly Included ...... 13

II.    THE AC SUFFICIENTLY PLEADS A STRONG INFERENCE OF SCIENTER ......... 14

    A.    Cooper Knew Or Had Access To The Relevant Facts And Had A Duty
        To Disclose ........................................................................................................... 15

    B.    Cooper's Personal Financial Motives Bolster Strong Inferences of Scienter ....... 17

    C.    Cooper's Knowledge of the Licensing Agreement Supports a Strong
        Inference of Scienter ............................................................................................. 18

III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ...................................... 19

    A.    The Corrective Disclosure And Leakage Theories ............................................... 20

    B.    The Materialization Of The Risk Theory .............................................................. 24

    C.    The AC Adequately Alleges Artificial Inflation ................................................... 25

IV.    THE AMENDED COMPLAINT STATES CONTROL PERSON CLAIMS UNDER
    SECTION 20(a) ............................................................................................................. 27

CONCLUSION ................................................................................................................... 29

i

# TABLE OF AUTHORITIES

**Cases**                                                                                                      **Page(s)**

*Adams v. Kinder-Morgan, Inc.*,
    340 F.3d 1083 (10th Cir. 2003) ....................................................................................8, 14

*Alfandary v. Nikko Asset Mgmt., Co.*,
    2019 WL 4747994 (S.D.N.Y. Sept. 30, 2019).......................................................................19

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
    827 F.3d 1229 (10th Cir. 2016) .............................................................................................15

*Bankers Tr. Co. v. Old Republic Ins. Co.*,
    959 F.2d 677 (7th Cir. 1992) .................................................................................................13

*Basic v. Levinson*,
    485 U.S. 224 (1988).................................................................................................................11

*Better v. YRC Worldwide, Inc.*,
    2012 WL 4433500 (D. Kan. Sept. 25, 2012) ...........................................................................19

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
    556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................................21

*Buttonwood Tree Value Partners, LP v. Sweeney*,
    2013 WL 12125980 (C.D. Cal. Sept. 12, 2013) ....................................................................27

*City of Phila. v. Fleming Cos., Inc.*,
    264 F.3d 1245 (10th Cir. 2001) .............................................................................................18

*Coleman v. B-G Maintenance Mgmt. of Colo., Inc.*,
    108 F.3d 1199 (10th Cir. 1997) ...............................................................................................8

*Cox v. Admin. U.S. Steel & Carnegie*,
    17 F.3d 1386 (11th Cir. 1994) ...............................................................................................23

*Croker v. Carrier Access Corp.*,
    2006 WL 2035366 (D. Colo. July 18, 2006) ..........................................................................15

*In re Daou Sys., Inc.*,
    411 F. 3d 1006 (9th Cir. 2005) ..............................................................................................23

*In re Dentsply Sirona, Inc. Sec. Litig.*,
    665 F. Supp. 3d 255 (E.D.N.Y. 2023) ...................................................................................14

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
    924 F. Supp. 449 (S.D.N.Y. 1996) .............................................................24

*Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*,
    777 F. Supp. 228 (S.D.N.Y. 1991) ............................................................19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).........................................................................4, 19, 20

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
    235 F. Supp. 2d 549 (S.D. Tex. 2002) ......................................................29

*In re Facebook, Inc. Sec. Litig.*,
    87 F.4th 934 (9th Cir. 2023) .....................................................................26

*Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (Loc. 66)*,
    579 F.3d 401 (5th Cir. 2009) ....................................................................20

*In re FirstEnergy Corp. Sec. Litig.*,
    2022 WL 681320 (S.D. Ohio Mar. 7, 2022).............................................11

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
    2022 WL 716653 (D. Utah Mar. 9, 2022) ................................................18

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
    97 F.4th 1171 (9th Cir. 2024) ..............................................................25, 26

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) ..................................................................20

*In re Gold Res. Corp. Sec. Litig.*,
    776 F.3d 1103 (10th Cir. 2015) ................................................................18

*Gruber v. Gilbertson*,
    628 F. Supp. 3d 472 (S.D.N.Y. 2022).......................................................20

*In re Hamilton Bancorp, Inc. Sec. Litig.*,
    194 F. Supp. 2d 1353 (S.D. Fla. 2002) .....................................................29

*IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.*,
    2024 WL 1140947 (D. Kan. Mar. 15, 2024) .............................................13

*IBT Emp. Grp. Welfare Fund v. Compass Mins. Int'l, Inc.*,
    706 F. Supp. 3d 1225 (D. Kan. 2023).......................................................13

*Kessman v. Myriad Genetics, Inc.*,
  2019 WL 1330363 (D. Utah Mar. 25, 2019) ...........................................................................20

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ..................................................................................28

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ..............................................................................................18

*Lola Cars Int'l Ltd. v. Krohn Racing, LLC*,
  2010 WL 3314484 (Del. Ch. Aug. 2, 2010) ...........................................................................19

*Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*,
  363 F. Supp. 3d 476 (D. Del. 2019)........................................................................................12

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) .........................................................................................27, 29

*In re Manulife Financial Corp. Securities Litigation*,
  276 F.R.D. 87 (S.D.N.Y. 2011) ..............................................................................................26

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) .......................................................................................12

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) .........................................................................21

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016).........................................................................................8

*Nakkhumpun v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) ........................................................................14, 16, 19, 24

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008) ..................................................................................11

*Nolte v. Cap. One Fin. Corp.*,
  390 F.3d 311 (4th Cir. 2004) ..................................................................................................14

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)....................................................................................................12

*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 619 (S.D.N.Y. 2014).......................................................................................12

*In re Parmalat Sec. Litig.*,
375 F. Supp. 2d 278 (S.D.N.Y. 2005)......................................................................................23

*Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*,
372 F. Supp. 3d 1139 (D. Colo. 2019).....................................................................................27

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ...................................................................................................13

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ...................................................................................................22

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)..................................................................................9

*RSM Prod. Corp. v. Fridman*,
643 F. Supp. 2d 382 (S.D.N.Y. 2009)......................................................................................14

*Schleicher v. Wendt*,
618 F.3d 679 (7th Cir. 2010) ...................................................................................................27

*SEC v. Curshen*,
372 F. App'x 872 (10th Cir. 2010) ..........................................................................................15

*In re SemGroup Energy Partners, L.P., Sec. Litig.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010)........................................................9, 10, 16, 19, 27

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002).......................................................................................11

*State of N.J. & Its Division of Inv. v. Sprint Corp.*,
314 F. Supp. 2d 1119 (D. Kan. 2004).......................................................................................28

*Swack v. Credit Suisse First Bos.*,
383 F. Supp. 2d 223 (D. Mass. 2004) ......................................................................................26

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................................15, 17

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...................................................................................24

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010) ......................................................................................17

*In re Tronox, Inc. Sec. Litig.*,
    2010 WL 2835545 (S.D.N.Y. June 28, 2010) .........................................................................23

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)...............................................................................................................11

*UA Loc. 13 Pension Fund v. Sealed Air Corp.*,
    2021 WL 2209921 (S.D.N.Y. June 1, 2021) ..........................................................................10

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
    672 F. Supp. 2d 596 (S.D.N.Y. 2009).....................................................................................10

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ..............................................................................................20

*Winslow v. BancorpSouth, Inc.*,
    2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).....................................................................22

*Wolfe v. Aspenbio Pharma, Inc.*,
    587 F. App'x 493 (10th Cir. 2014) ..........................................................................................15

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)......................................................................................28

**Other Authorities**

17 C.F.R. § 240.10b-5..................................................................................................................8

Fed. R. Civ. P. 15(a)(2)................................................................................................................3

Lead Plaintiffs Damian Betebenner and Cigdem Betebenner ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant Fred Cooper's ("Cooper") Motion to Dismiss the Amended Class Action Complaint ("MTD").[1, 2]

## INTRODUCTION

Cooper joined the NewAge board in November 2020 following the Company's merger with Ariix, a multi-level-marketing ("MLM") company that Cooper helmed as CEO. The Ariix merger was made possible by a scheme, orchestrated by CEO Brent Willis ("Willis"), whereby he and others repeatedly disseminated false and misleading information to the market through press releases, conference calls, and interviews about distribution agreements for NewAge's beverages and a CBD beverage portfolio that either did not exist or were grossly exaggerated. These lies made the Company appear more successful than it was, artificially inflating NewAge's share price and enabling it to raise much-needed cash to buy other companies and pivot into the MLM beverage space. Ariix would turn out to be NewAge's final acquisition.

Under the terms of the merger, Cooper would receive, *inter alia*, at least $20 million in cash, substantial NewAge stock, and a seat on NewAge's Board of Directors ("Board"). After it became apparent to NewAge insiders that Ariix was not cooperating with its obligation to provide NewAge with its financial records and other information NewAge needed to conduct the necessary due diligence into Ariix, NewAge secretly abandoned its due diligence duties by

---

[1]      All "¶ --" references are to the Amended Class Action Complaint ("AC"). Doc. 82. Unless otherwise noted, all capitalized terms mean the same as in the AC, all emphasis is added and all citations, internal quotation marks and footnotes are omitted.

[2]      Plaintiffs adopt and incorporate the arguments in their oppositions to the other defendants' motions to dismiss and motion to strike filed herewith, to the extent those arguments also pertain to defendant Cooper.

waiving closing conditions that enabled Ariix to provide certain material information *after* closing.  Immediately post-closing, NewAge learned the devastating failures underpinning Ariix. Not only did it have negative $18 million in working capital (a shortfall of $29 million compared to what it initially represented to NewAge), but it also received an order suspending Ariix from recruiting new brand partners in Japan due to fraudulent practices likely in violation of the FCPA.  Had NewAge and its officers and directors fulfilled their duties to uncover this information, they would have never closed the deal with Ariix.

While Cooper and others would disclose in the 2021 Form 10-K that NewAge's Disclosure Controls were ineffective due to certain material weaknesses in internal controls having to do with the Ariix merger, they misled the market by omitting to disclose the fact that they were ineffective for at least two additional reasons.  First, Cooper knew of but failed to disclose that NewAge was engaged in an extraordinarily costly internal investigation of Ariix for FCPA violations.  Second, Cooper, like other Defendants in this Action, enabled and facilitated Willis's (and other's) massive fraud on investors and was well aware that Willis and others had repeatedly disseminated materially false and misleading information about NewAge's distribution agreements and CBD portfolio.

Cooper's statements in the Form 10-K were also made with scienter.  Although the false statements about distribution agreements and the CBD portfolio were disseminated before Cooper joined the Company, the SEC had been investigating NewAge for over a year by the time he became a director.  As a Board member, he necessarily knew this critical material information that the SEC was investigating and why, particularly because its main target was Willis—with whom Cooper was entering into a business relationship to start a competing

2

venture, *i.e.,* Kwikclick.  As Ariix's CEO, Cooper was necessarily aware of the facts that led

Japan to suspend Ariix, and as a NewAge director, he was necessarily aware of the FCPA

investigation and its costs.

Additionally, Cooper was motivated to conceal the relevant truth because the Ariix

merger was plagued by egregious and unlawful self-dealing which benefitted Cooper and Willis

at NewAge's expense.  For example, Cooper and Willis worked to misappropriate key assets

NewAge purchased in the Ariix merger.  The merger agreement called for NewAge to receive

sole ownership of Ariix's proprietary ICONN software.  However, NewAge never received that

software because it was fraudulently transferred from Ariix to Kwikclick, a company primarily

owned by Cooper and Willis.  NewAge then had no option but to pay Kwikclick for a license to

use the software.

In his MTD,[3] Cooper does not challenge that the statement he made was false and

misleading, and his only challenge to materiality is that certain allegations against him are from

the adversary action filed by NewAge's Liquidation Trust.[4]  However, as thoroughly briefed in

Plaintiffs' opposition to the Motion to Strike, courts routinely allow plaintiffs to rely on

allegations made in other complaints.

Cooper's argument that he did not intentionally deceive investors about NewAge's

agreement with Kwikclick is irrelevant with respect to whether he acted with the requisite

---

[3]     Cooper requests that the AC be dismissed with prejudice. MTD 18.  As detailed herein,
the entire Motion should be denied; however, should the Court determine that the AC should be
dismissed in whole or in part, Plaintiffs respectfully request that the dismissal be without
prejudice and that it be granted leave to amend, which should be given "freely...when justice so
requires."  Fed. R. Civ. P. 15(a)(2).
[4]     "Liquidation Trust" refers to the NAI Liquidation Trust that filed an action against
Defendants captioned *In re: NewAge, Inc. et al.*, No. 22-10819 (LSS) (D. Del. Bankr.).

scienter. Plaintiffs' argument regarding Cooper's scienter is not that he intentionally misled the market about the terms and circumstances of the Kwikclick Agreement, **but** that his self-dealing was just one supporting factor among many others showing that he knew his statements were false and misleading when he signed the Form 10-K.

Strong support also exists for Cooper's liability as a §20(a) control person for NewAge—the primary §10(b) violator—because of the significant influence and control he had and exerted over NewAge from the moment he joined it.

With respect to loss causation, Cooper argues that Plaintiffs fail to connect his statement to the losses suffered, and that the stock was not artificially inflated. For the reasons explained herein, he is wrong on both counts. To plead loss causation, Plaintiffs need only meet the requirements of Rule 8, providing "defendants with notice of what the relevant economic loss [or] the causal connection might be…." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs have done so, alleging a series of partial disclosures that revealed the truth concealed by the misstatements alleged.

## STATEMENT OF FACTS

### A. NewAge's Relationships With The Military, Retailers, And Distributors And Its CBD Beverage Portfolio

On the first day of the Class Period, Willis and NewAge announced a "new distribution agreement" with the military, ¶94, claimed NewAge had "begun shipments" of certain brands "in expanded distribution throughout Loblaws and Sobeys, the largest grocery retailers across Canada," and "signed a major distribution agreement" with South Korea's "largest food and beverage distributor" "to expand to all major retail outlets throughout the country immediately." ¶¶101-02, 105.

4

Willis also told the market that NewAge had tested and developed a portfolio of CBD-infused beverages that it planned to unveil in October 2018, overseen by its Health Sciences Division.  ¶110.  He then presented the portfolio's debut as a success, touting massive retail commitments and near-term launches.  ¶¶115-22.  Thereafter, Willis and Gould touted NewAge's "first national distribution" with Walmart, the "world's largest retailer."  ¶126.

With each of the foregoing announcements, NewAge's stock rose accordingly.  ¶¶54-55, 104, 108, 125, 129.

### B.    The Ariix Merger And NewAge's Internal And Disclosure Controls

Made possible by its artificially inflated stock, NewAge commenced a series of strategic acquisitions which culminated in the ill-fated Ariix merger, announced in July 2020.  ¶79.  Prior to closing, Ariix was not cooperating with its obligation to provide NewAge with the information it requested, so NewAge secretly *waived* these material conditions, allowing the merger to close without Ariix's audited financials and other critical information.  ¶80.  In quick succession, this decision would prove disastrous.

First, the financials provided post-closing revealed that Ariix's targeted working capital was *negative $18 million—a $29 million shortfall* from what it previously represented to NewAge.  ¶¶18, 83.  Second, immediately after closing, Japan's Consumer Affairs Agency suspended Ariix from recruiting new brand partners due to fraudulent practices likely in violation of the FCPA.  ¶¶18, 84.  This caused NewAge to conduct a lengthy and ruinously expensive investigation into Ariix's business practices.  ¶¶18, 148.

Despite its failure to ascertain this before the merger closed, and although Willis was able to repeatedly disseminate false and misleading statements concerning NewAge's relationships

5

and CBD portfolio, Cooper and other defendants falsely assured investors regarding NewAge's Disclosure Controls.  ¶¶132-44.  Meanwhile, Willis and Cooper misappropriated key assets NewAge acquired in the merger to fund a competing venture.  ¶¶216-27.

Once the consequences of the events surrounding the merger came to a head, Cooper, alongside other Defendants, conceded the ineffectiveness of NewAge's Disclosure Controls by signing and certifying NewAge's 2020 Form 10-K. ¶137.  NewAge's internal and Disclosure Controls weaknesses, however, were falsely attributed to "[in]sufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix to prevent or detect material misstatements due to "the size and timing of the acquisition of Ariix" in an SEC filing.  ¶138.  The foregoing reasons why NewAge's Disclosure Controls were ineffective were based on Willis's and the CFO's purported "evaluation" of NewAge's Disclosure Controls. However, Cooper knew he could not rely on any evaluation Willis may have performed of NewAge's Disclosure Controls because an ongoing SEC investigation raised concerns that Willis was regularly bypassing them to issue false and misleading statements about NewAge's relationships and CBD portfolio.  ¶¶87-88.  Additionally, Cooper knew that the Company was embroiled in an extremely expensive investigation into Ariix for FCPA violations.

### C.    Cooper's Compensation and Stock Awards

As part of the merger, Cooper (Ariix's founder and CEO), became a Board member on November 13, 2020.  ¶¶38, 77, 81.  Cooper immediately realized the personal benefits of the merger because,  NewAge was required to pay Ariix's members (including Cooper): (i) $20 million in cash; (ii) the issuance of $19 million worth of NewAge common stock; and (iv) a convertible promissory note in the aggregate amount of $141.25 million, maturing 24 months

from the closing date, to certain members of Ariix and other designated employees.  ¶79; AC Ex. C at ¶¶165-67.

As part of his employment with NewAge, Cooper also received $6,250.00 in base salary and $33,048.00 in stock awards for the limited time he spent with NewAge in 2020.  ¶214.

### D.     The Truth Begins To Emerge

The SEC began to investigate NewAge around February 2019 related to its claims regarding the distribution agreements and CBD portfolio.  ¶87.  Two months before Willis received an SEC subpoena, he abruptly resigned on January 10, 2022 without explanation, sending NewAge's stock down 6%.  ¶20.

With the SEC closing in and the Ariix investigation ongoing, NewAge was unable to file its Form 10-Q on time, causing NASDAQ to send it a notice that it was not in compliance with listing rules.  ¶21.  On this news, NewAge's stock dropped 8%.  *Id.*  NewAge again shocked the market on June 8, 2022 by announcing that it was considering "strategic alternatives," leading its stock to plummet 12%, 11%, and 7% over three days.  ¶22.  Two months later, it filed for Chapter 11 bankruptcy, which the Wall Street Journal reported on in an article titled, "New Age Says Cost of Internal Probe Contributed to Bankruptcy," exposing the enormous costs NewAge incurred while investigating Ariix.  ¶23.  On this news, NewAge stock dropped 26%.  *Id.*  The bankruptcy led NASDAQ to delist NewAge, leading to another 9% drop the next trading day. ¶24.

Finally, on October 18, 2022, the SEC sued Willis for violating §10(b), among other statutes, for making many of the statements challenged herein.  ¶89.  The next day, the SEC

issued its C&D Order against NewAge, setting forth the Company's and Willis's misconduct.

¶90.  On this news, NewAge stock dropped over *90%*.  ¶¶25-26.

NewAge's Liquidation Trust ("Liquidation Trust") thereafter sued Defendants, making

many of the same arguments as the SEC and casting additional light on circumstances related to

the Ariix merger.

## ARGUMENT

**I.    THE AC ADEQUATELY PLEADS COOPER'S MATERIALLY FALSE AND
MISLEADING STATEMENTS**

To plead an actionable claim for securities fraud under Rule 10b-5, a plaintiff must plead

that the defendant made an untrue or misleading statement of fact or failed to state a fact

necessary to make a statement not misleading.  *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083,

1099–100 (10th Cir. 2003).  Rule 10b-5 imposes a duty to disclose material facts that are

necessary to make disclosed statements, whether mandatory or volunteered, not misleading.  *See*

17 C.F.R. § 240.10b-5.  If "a reasonable person would find the defendant's statements to be false

or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in

the misleading nature of the defendant's statements."  *In re Molycorp, Inc. Sec. Litig.*, 157 F.

Supp. 3d 987, 1003 (D. Colo. 2016), *as amended* (Jan. 29, 2016).

**A.    Cooper Does Not Dispute That The Statements Were False And Misleading
When Made**

Cooper's motion does not (nor could it) challenge Plaintiffs' allegations of falsity as to

any statements attributed to him in the AC.  *See* MTD.  Therefore, this element of Plaintiffs'

claims against him is conceded and any challenges he could have made are waived.  *See, e.g.,*

*Coleman v. B-G Maintenance Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997),

*abrogated in part on other grounds by United States ex rel. Heron v. Nationstar Mortg., LLC*,

8

2024 WL 3770843, at *8 (10th Cir. Aug. 13, 2024) (issues not raised in opening brief are deemed waived).

Cooper and others misled the market by attesting to the accuracy and truthfulness of NewAge's 2020 Form 10-K (filed on Mar. 18, 2021) while stating that NewAge's Disclosure Controls were ineffective as of December 31, 2020 due to a material weakness in internal controls. Specifically, the 10-K attributed these issues to having "insufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "size and timing…." ¶¶137-39, 141, 143. By attributing the Disclosure Controls' ineffectiveness *exclusively* to these factors, Cooper misled investors about the true issues facing the Company. *Id.  See In re SemGroup Energy Partners, L.P., Sec. Litig.*, 729 F. Supp. 2d 1276, 1289-90, 1307 (N.D. Okla. 2010), *on reconsideration in part* (July 30, 2010) (misleading statements about effectiveness of internal controls actionable). Once Cooper chose to speak about NewAge's internal and Disclosure Controls, he put them in play and had a duty to provide truthful information and include *all* material information necessary to avoid misleading investors. *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) ("once Defendants[] chose to speak…they could not omit material facts related to that issue so as to make the disclosure misleading.").

In other words, these statements were rendered misleading for omitting the real reasons why NewAge's Disclosure Controls were ineffective. ¶¶137-39.

First, they were ineffective because Willis and others were able to issue written and oral public statements *on multiple occasions* about fake/exaggerated agreements and a CBD portfolio

9

that they implied or outright stated were "expected to have a material impact on [NewAge's] financial results."  ¶94; *see also* ¶¶95-129.  Either NewAge had Disclosure Controls in place to prevent the unilateral publication of blatant falsehoods regarding NewAge's finances and prospects that were continuously bypassed, or no such Disclosure Controls existed. Alternatively, NewAge had material weaknesses in its internal controls that rendered its Disclosure Controls ineffective.  *See UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021) (sustaining claim that the Disclosure Controls were ineffective and/or inadequately designed where company was able to file reports that misstated and/or omitted material facts).

Second, the Disclosure Controls were also ineffective because unbeknownst to investors, NewAge was engaging in an extremely expensive investigation into Ariix's FCPA violations. ¶¶18, 140, 217.  The investigation and its costs are evidence of the controls' ineffectiveness because NewAge only had to undertake them because it waived critical closing requirements (¶80) before the Ariix merger closed, meaning that that NewAge's internal controls were materially weak and therefore its Disclosure Controls were ineffective too.  *See SemGroup,* 729 F. Supp. 2d at 1289 (failure to disclose ineffective internal controls actionable).

Each of the foregoing occurrences, which Cooper knew about but failed to disclose, constituted material facts necessary to make his statements about *why* NewAge's Disclosure Controls were ineffective not misleading to a reasonable investor.[5]  *See Varghese v. China*

---

[5]     As set forth in greater detail in §II, Cooper was aware of the facts about why NewAge's controls were ineffective when he signed conflicting SEC filings because, when he joined NewAge, they were being investigated by the SEC in relation to the misstatements Willis made during the Class Period.  ¶¶87-91.

*Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606–07 (S.D.N.Y. 2009) (statements concerning company's internal controls actionable where the complaint specified misstatements and explained why statements were fraudulent).

## B.    Plaintiffs' Allegations Meet The PSLRA Threshold For Materiality And Reliability

An "omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in" making an investment decision, *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), and would have viewed it as "alter[ing] the 'total mix' of information made available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988). The materiality of a misrepresentation or omission is a fact-specific determination that should be and ordinarily is resolved during or after summary judgment. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1215 (D. Kan. 2002). Cooper's false and misleading statements about NewAge's Disclosure Controls are patently material—another point which Cooper does not dispute. *In re New Century*, 588 F. Supp. 2d 1206, 1226 (C.D. Cal. 2008) ("Officer Defendants made material false and misleading statements regarding the adequacy of internal controls during the Class Period.").

Cooper only challenges Plaintiffs' allegations to the extent they refer to his conduct surrounding the Kwikclick Software Licensing and Exclusivity Agreement ("Kwikclick Agreement"). This attack is nothing but a red herring because Plaintiffs are not pleading any misstatements in connection with this scheme. If anything, Plaintiffs' allegations relating to the Kwikclick Agreement against the backdrop of their Disclosure Control allegations lends further support to the fact that NewAge's Disclosure Controls were ineffective for allowing such a brazen scheme to occur in the first place. *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320,

11

at *10 (S.D. Ohio Mar. 7, 2022) (finding statements related to efficacy of internal controls actionable where the complaint had well-pled allegations of a fraudulent scheme).

Contrary to Cooper's assertions, Plaintiffs' allegations relating to the Kwikclick Agreement scheme pass muster, even for those based on "second-hand allegations" or "information and belief."  MTD 8-10.  As an initial matter, courts have made clear that plaintiffs need not identify the source of every single allegation.  *See Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir. 2000) ("the applicable provision of [the PSLRA] as ultimately enacted requires plaintiffs to plead only facts and makes no mention of the sources of these facts").  Rather, the Court merely requires the allegations of fraud, if made on information and belief, to give sufficient detail to place the defendants on notice of the claims asserted against them.  *See Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1308 (C.D. Cal. 1996).

Even so, Plaintiffs' use of "information and belief" amply pleads the facts upon which their information and belief is based by including their review and analysis of the plethora of publicly available SEC filings, press releases, conference calls, analyst reports, news articles, the SEC's action against Willis captioned *SEC v. Willis*, No. 1:22-cv-02744-SKC (D. Colo.), the SEC's Order Instituting Cease-and-Desist Proceeding ("C&D Order"), filings in the Liquidation Trust's action against Defendants, and NewAge's bankruptcy docket.  AC 1-2.

Similarly, Plaintiffs' use of "specific factual allegations in the government complaint [and the Liquidation Trust's Complaint], which ***must*** [be and are] under Fed. R. Civ. P. 11...***based on a reasonable inquiry***" are used "to corroborate similar factual allegations in [Plaintiffs'] own complaint."  *Lord Abbett Affiliated Fund, Inc. v. Navient Corp.*, 363 F. Supp. 3d 476, 493-94 (D. Del. 2019); *see also In re OSG Sec. Litig.*, 12 F. Supp. 3d 619, 620-21

12

(S.D.N.Y. 2014) (permitting plaintiffs to rely on factual allegations in a motion filed in

bankruptcy court for a separate proceeding).  Like in Plaintiffs' AC, the SEC and Liquidation

Trust's allegations were drawn from a myriad of sources such as news articles, court filings,

confidential witnesses, SEC filings, their own in-depth investigation and other reliable sources.

*See* ¶¶160-63, 174-75, Exs. A & C.[6]

### C. Plaintiffs' Allegations From Third Party Complaints Are Properly Included

Cooper asks that the Court not consider Plaintiffs' allegations taken from relevant third-

party complaints.  However, as thoroughly briefed in Plaintiffs' Opposition to Willis and D&Os'

Motion to Strike ("MTS Opp."), Cooper's basis to exclude allegations from third-party

complaints is not sound.  Courts, including recently in this circuit, routinely permit plaintiffs to

rely on allegations from unadjudicated third-party complaints, like those referred to in Plaintiffs'

AC, in order to meet the Rule 9(b) and PSLRA thresholds.  *See IBT Emp. Grp. Welfare Fund v.*

*Compass Minerals Int'l, Inc.*, 2024 WL 1140947, at *4 (D. Kan. Mar. 15, 2024) (stating, "[s]o

long as [p]laintiffs' overall investigation comports with Rule 11(b), [p]laintiffs are free to rely on

third-party sources in alleging their claims[,]" and finding that the "clear weight of authority"

holds that a plaintiff may rely on facts and investigatory findings in complaints filed by other

private litigants and in orders from governmental entities); *see also IBT Emp. Grp. Welfare Fund*

---

[6] Even if Cooper's argument to exclude was sound, which it is not, his authorities are distinguishable.  Here, Plaintiffs' allegations are backed up by additional sources and include far more detail with respect to the documents referred to and the inquiry undertaken by counsel than the limited support Cooper's cases provide for their borrowed allegations.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011) (MTD 9) (plaintiff's "complaint skips the phrase 'information and belief'" and bases its allegations on qui tam made out exclusively by a whistleblower lacking direct access to the fraud at issue); *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 684 (7th Cir. 1992) (MTD 9) (plaintiffs failed to provide any details as to what their "information and belief" was based on).

*v. Compass Mins. Int'l, Inc.*, 706 F. Supp. 3d 1225, 1245 (D. Kan. 2023) ("Furthermore,

[p]laintiffs may allege facts contained with the SEC Order.  Mere inclusion of the facts

underlying [p]laintiffs' [c]omplaint within the SEC Order is not a sufficient reason to strike those

allegations.  Thus, the Court denies [d]efendants' [m]otion on this ground"); *Adams*, 340 F.3d at

1103 (finding allegations based on information and belief may satisfy PSLRA pleading

requirements); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 276 (E.D.N.Y. 2023)

("Indeed, since *Lipsky [v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976)], the

Second Circuit has both explicitly and implicitly sanctioned the inclusion of allegations taken

from SEC Orders, in pleadings, where a plaintiff also allege[s] [additional] non-conclusory facts

that render unproblematic any implied reliance on the SEC findings.") (citing *Loreley Fin.

(Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 180 (2d Cir. 2015)).

Such facts related to the Kwikclick Agreement, drawn in part from the Liquidation

Trust's Complaint, are properly included and can be used to bolster Plaintiffs' claims, as

explained more fully in Plaintiffs' MTS Opposition.[7]

## II.    THE AC SUFFICIENTLY PLEADS A STRONG INFERENCE OF SCIENTER

A plaintiff may satisfy the scienter standard by showing either an intent to deceive or that

"defendant acted with a reckless disregard of a substantial likelihood of misleading investors."

*Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015).  When considering scienter

---

[7]    Cooper's authorities are inapposite and further addressed in the MTS Opp.  *See Nolte v. Cap. One Fin. Corp.*, 390 F.3d 311, 317 n.* (4th Cir. 2004) (MTD 10) (court did not take judicial notice of "mere [unsubstantiated] allegations"); *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009) (MTD 10) (court struck allegations based solely on complaints in actions that were either dismissed or discontinued).

allegations, a court must "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues &*

*Rights, Ltd.*, 551 U.S. 308, 328 (2007).

Here, "plaintiff's allegations in their entirety, without regard to whether those allegations

fall into defined, formalistic categories" and "taken as a whole, give rise to a strong inference of

scient[e]r," *Croker v. Carrier Access Corp.*, 2006 WL 2035366, at *9 (D. Colo. July 18, 2006)

(quoting *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1263 (10th Cir. 2001)), that is "at

least as compelling as any opposing inference[.]" *Tellabs*, 551 U.S. at 324 ("The inference that

the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre or even

the most plausible of competing inferences[.]").

> **A.    Cooper Knew Or Had Access To The Relevant Facts And Had A Duty To Disclose**

Contrary to Cooper's claims, the AC sufficiently pleads particular factual allegations as

to Cooper, which taken as a whole, support a strong inference of scienter. *See* ¶¶77, 79-81, 86,

136, 219-20, 223-24, 226-27.  Plaintiffs allege that Cooper, who was the founder and CEO of

Ariix (¶77) at the time of the merger, had intimate knowledge of both Ariix's financial and legal

condition and the merger itself. *See* ¶¶80, 82.[8]

"[W]here a party without a duty elects to disclose material facts, he must speak fully and

truthfully, and provide complete and non-misleading information…." *SEC v. Curshen*, 372 F.

---

[8]    Cooper's authorities are inapposite.  In *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x
493, 498 (10th Cir. 2014) (MTD 12), while the Court found defendant lacked scienter *solely*
because of his position—less supporting facts than what is present here—his status as company's
"CEO [wa]s nonetheless a fact relevant in…weighing of the totality of the allegations." (quoting
*Adams*, 340 F.3d at 1106); *see also Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d
1229, 1245 (10th Cir. 2016) (MTD 12) (there was no corroborating evidence to support that
defendant "knew that his statements….were false and misleading.").

App'x 872, 880 (10th Cir. 2010).  Defendant Cooper signed the 2020 10-K (¶136) claiming there were material weaknesses because NewAge had "[in]sufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "size and timing" (¶¶137-38).  Even if the statements were partially true, in that those were some of the issues related to the Ariix merger, the statements were misleading for omitting other reasons why NewAge's internal controls had material weaknesses— specifically, that NewAge was conducting an investigation into Ariix for FCPA violations (¶140) which threatened to bankrupt NewAge (¶148).

Cooper "incurred a duty to disclose when he chose to explain" why the internal controls were inadequate.  *Nakkhumpun*, 782 F.3d at 1152-53.  As Ariix's CEO, Cooper necessarily knew that NewAge waived certain critical closing conditions after it became clear that Ariix was not cooperating with its obligation to provide NewAge with the financial records and information it requested as a condition precedent to closing.  ¶¶77, 80.  He also knew, as Ariix's CEO and a NewAge Board member as of November 13, 2020, that Ariix had been suspended in Japan from recruiting brand partners due to potential FCPA violations.  ¶¶18, 217.  Thus, he had "access to material non-public information" and was "in a position to know this information, understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors."  *SemGroup*, 729 F. Supp. 2d at 1298.

Furthermore, the SEC investigation into the false and misleading statements concerning NewAge's business relationships and CBD portfolio had been ongoing for over two years by the time Cooper signed the false and misleading SEC filing.  *See* ¶87.  Given his role and duties as a director and the fact that he was entering into a business relationship, *i.e.*, Kwikclick, with

16

Willis, the SEC's investigation's main target, it would be absurd to suggest that Cooper had no knowledge of what the SEC was investigating and why when he made the challenged statements in ¶¶136-38.

### B.    Cooper's Personal Financial Motives Bolster Strong Inferences of Scienter

Although motive is not required to prove scienter, "personal financial gain may weigh heavily in favor of a scienter inference[.]" *Tellabs*, 551 U.S. at 325.  Here, Cooper was motivated by the "prospect of ever-greater compensation" and "desire to raise capital" for Defendant's other companies.  *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010), *on reconsideration in part,* 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013); *see* ¶214 (Defendant Cooper received stock awards in 2020).

First, even before the merger, Cooper was motivated to prevent the truth about Ariix's financial condition and legal troubles from reaching the public (and NewAge) because he stood to receive $25 million in cash in addition to other substantial amounts in NewAge stock and promissory notes, and would become a NewAge director.  ¶¶79, 81.[9]  Once the merger was consummated, Cooper remained motivated to conceal this information so that he could misappropriate key assets for funding of his and Willis's competing venture Kwikclick.  *See* ¶¶219-20, 225-26.  The idea was to clone Ariix's proprietary software, ICONN, to illegally gain access to its partnership data, transfer it to Kwikclick, and compel NewAge to pay for a license to obtain the software.  ¶¶219-27.  Thus, Cooper was personally motivated to keep the fact that

---

[9]    The subsequent amendments to the merger reduced his cash payment to $20 million.  AC Ex. C at ¶¶165-67.

the Ariix merger was in fact disastrous for NewAge—and thereby keep NewAge afloat in the meantime—so that NewAge could pay Kwikclick.[10]  Additionally, Cooper would receive a salary of $6,250 with an additional $33,048 in stock awards for just over one and a half months of work in 2020.  ¶214.

As Cooper concedes, "the absence of a motive from inside-stock sales 'is not dispositive[.]'"  MTD 11.  Here, Plaintiffs have "adequately ple[]d scienter by identifying circumstances that indicate conscious behavior on the part of the defendant[.]"  *Level 3*, 667 F.3d at 1347.  Like in *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *9 (D. Utah Mar. 9, 2022), where defendant did not sell stocks but co-defendants sold significant amounts of stock while avoiding a validity testing which would reveal their misleading statements, here, Willis and Kapetyn sold significant amounts of stock (¶¶207-10, 213), and Cooper avoided disclosing Ariix's financial condition and FCPA violations after closing (¶¶77, 80, 82).

**C.      Cooper's Knowledge of the Licensing Agreement Supports a Strong Inference of Scienter**

Cooper mischaracterizes the issue as a failure to disclose a licensing and exclusivity agreement or a contract dispute.  These are red herrings to distract from the real issues in the case with respect to Cooper, which is that he knowingly or recklessly misrepresented the status of NewAge's internal and Disclosure Controls.  In addition to the motive allegations set forth

---

[10]      Defendant's authorities are inapposite.  *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012) (MTD 11) (finding bonuses did not show motive where they were based on real progress, not representations of progress); *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1117 n.8 (10th Cir. 2015) (MTD 11) ("absence of *any allegation* of a financial benefit from the alleged fraud cuts the other way"); *Fleming*, 264 F.3d 1245, 1270 (10th Cir. 2001) (MTD 11) (absence of allegations that defendants "in *any other way* benefitted in some concrete and personal manner").

above, Cooper's "creat[ion of] a complicated dependent business relationship" at NewAge's

expense contributes to the inference of scienter. *SemGroup*, 729 F. Supp. 2d at 1298. Disclosure

of the exclusivity agreement did not remedy the fact that Cooper duplicated an asset that

NewAge used its resources to acquire and then entered into an agreement for NewAge to expend

more resources to Kwikclick for use of that asset.[11]  ¶¶86, 219-20, 223, 226-27. Cooper's

authorities are inapposite. *See Alfandary v. Nikko Asset Mgmt., Co.*, 2019 WL 4747994, at \*2

(S.D.N.Y. Sept. 30, 2019) (MTD 6-7) (where the issue was the interpretation of contract terms);

*Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs.*, 777 F. Supp. 228, 235

(S.D.N.Y. 1991) (MTD 7) (where the issue was fulfillment of the contract).

## III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

Whether loss causation is adequately pled is determined under the notice pleading

requirements of Rule 8. *Better v. YRC Worldwide, Inc.*, 2012 WL 4433500, at \*9-10 (D. Kan.

Sept. 25, 2012). In the Tenth Circuit, to adequately plead loss causation, a plaintiff need only

"provide a defendant with some indication of the loss and the causal connection that the plaintiff

has in mind." *Dura*, 544 U.S. at 347; *Nakkhumpun*, 782 F.3d at 1154 ("To plead loss causation,

a plaintiff must allege facts showing a causal connection between the revelation of truth to the

marketplace and losses sustained by the plaintiff."). Here, Plaintiffs gave Defendants adequate

---

[11]    "Cooper even admitted that [misuse of Kwikclick's access to NewAge brand partner data
to unfairly compete with NewAge] was the intention when [NewAge's Chief Information Officer
Blake] Heringer confronted [Cooper] about it." ¶224. Also, contrary to Cooper's assertion that
it was the Board's decision (MTD 7-8), the Board has asserted that they were denied the
"opportunity to review the sham Licensing Agreement, in turn impeding disinterested directors
from having an opportunity [to] review and vote on it," (¶223) which would be a "grossly
uninformed decision" (MTD 8). *Cf. Lola Cars Int'l Ltd. v. Krohn Racing, LLC*, 2010 WL
3314484, at \*13 (Del. Ch. Aug. 2, 2010) (cited by Cooper, where the issue was whether one
defendant or the other should have been responsible for a certain expense).

notice of their theory and that is enough at the pleading stage. *Dura*, 544 U.S. at 347. "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "[T]he testimony of an expert—along with some kind of analytical research or event study—is required to show loss causation." *Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (Loc. 66)*, 579 F.3d 401, 409 (5th Cir. 2009). "[L]oss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Gilead*, 536 F.3d at 1057.

Loss causation can be alleged through: (1) "a corrective disclosure" theory which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth . . . leak[s] out" over time; or (3) "a theory of materialization of a concealed risk[,]" where "defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized[.]" *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019). A "disclosure need not precisely mirror the earlier misrepresentation[s.]" *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009). Rather, the truth can come out "through events constructively disclosing the fraud[.]" *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 (S.D.N.Y. 2022).

### A.    The Corrective Disclosure And Leakage Theories

Cooper misled investors by speaking about the effectiveness of the Company's internal and Disclosure Controls while concealing that they were actually ineffective because numerous lies were able to be repeatedly published about NewAge's agreements and CBD portfolio, and NewAge was embroiled in a ruinously expensive investigation into Ariix's FCPA violations.

Plaintiffs allege that the truth was gradually revealed in a series of partial disclosures: (1) Willis's resignation; (2) the NASDAQ notice regarding the late Form 10-Q; (3) NewAge's announcement of "strategic alternatives"; (4) NewAge's bankruptcy filing, to which the costs of the Ariix investigation contributed; (5) the resulting delisting from the NASDAQ; and (6) the SEC's C&D Order and Complaint.  ¶¶235-46.  NewAge's stock plummeted in response to each of these disclosures.  *Id.*

Cooper's argument that Plaintiffs allege no causal nexus between his statements and the loss is incorrect.

Willis's resignation on January 10, 2022 caused NewAge's stock to plummet 6%.  ¶145. Although the resignation was not then attributed to the fraud alleged herein, an officer's "resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to" the allegedly fraudulent conduct.  *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016).  Willis resigned during the SEC investigation (¶229), two months before receiving an SEC subpoena and three months after the FCPA investigation that he was accused of frustrating began (¶¶229, 231-32).  He was also denied severance.  ¶¶177-79.  Thus, the timing of Willis's resignation and his direct involvement in the wrongdoing alleged strongly suggests that his departure—and the accompanying stock drop—was causally related to Cooper's statement concealing that wrongdoing.  *See, e.g., Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 136, 140 (D. Conn. 2021) (finding resignations publicly "attributed to non-fraudulent motivations" served as loss causation events where resignees were directly involved in the alleged fraud and resigned shortly after investigation launched).  Even if Willis's resignation could not serve as a corrective disclosure on its own, however, it is properly

considered "a portion of the totality" of the loss causation inquiry. *See Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc*., 769 F.3d 313, 322-23 (5th Cir. 2014).

The same is true for the remaining disclosures. On May 17, 2022, NewAge received a NASDAQ notice that it was not in compliance with listing rules because its Form 10-Q was late, leading to an 8% drop. ¶146. Then, NewAge announced that it was undertaking a review of "strategic alternatives," including "available financial alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction" on June 8, 2022, leading to a 12% drop the next day, followed by further drops the following three days. ¶147. Events like these are also appropriately considered part of the loss causation analysis, even if they are then-unexplained. *See Winslow v. BancorpSouth, Inc*., 2011 WL 7090820, at \*12 (M.D. Tenn. Apr. 26, 2011) (finding press release announcing that a Form 10-K would be filed late need not "specifically detail[] the exact basis of the fraud….to establish loss causation").

The reasons behind the late filing and review of strategic alternatives became clear following NewAge's bankruptcy announcement and the SEC's revelations. On August 30, 2022, NewAge announced that it was filing for bankruptcy, which the Wall Street Journal reported on the following day in an article titled "NewAge Says Cost of Internal Probe Contributed to Bankruptcy." ¶148. NewAge's stock dropped another 39% and 26% over the next two trading days. *Id*. Shortly thereafter, NASDAQ announced that it would be delisting the stock due to NewAge's bankruptcy filing, leading to a 9% drop. ¶149.

The bankruptcy filing revealed part of the truth about NewAge's underlying condition and the previously undisclosed costs of the FCPA investigation that had been concealed by, *inter alia*, Cooper's statements. Furthermore, NewAge *itself* attributes the bankruptcy to the Ariix

22

investigation.  *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at \*13 (S.D.N.Y. June 28, 2010) (finding corporate bankruptcy was materialization of previously undisclosed risks); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (loss causation adequately pleaded where "[t]he concealed risk materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as they came due").

The final disclosures on October 18 and 19, 2022, the SEC Complaint and C&D Order revealed that Willis and NewAge repeatedly disseminated blatant falsehoods about NewAge's agreements and CBD portfolio.  These disclosures are factually related to Cooper's statements because they reveal the truth previously concealed by it—that NewAge's internal and Disclosure Controls were ineffective for these reasons as well.

Cooper argues that Plaintiffs fail "to account sufficiently for the possibility that Plaintiffs' losses were caused by the actions of the other Defendants, market, industry, or company-specific factors."  MTD 15-16.  But it is well established that "[a] plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation."  *In re Daou Sys., Inc.*, 411 F. 3d 1006, 1025 (9th Cir. 2005), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011).  "[A]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement[.]"  *Id*.  So long as Cooper's conduct was a contributing cause of Plaintiffs' losses, therefore, it is irrelevant for loss causation purposes that prevailing industry conditions also may have contributed.  *Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994), *cert. denied sub nom. USX Corp. v. Cox*, 513 U.S. 1110 (1995).  Causation is established even though "[m]acroeconomic troubles undoubtedly

had some negative effect on [the company's] survival." *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 463 (S.D.N.Y. 1996).

As explained above, Plaintiffs allege sufficient facts to show that Cooper's misrepresentations and omissions proximately caused Plaintiffs' losses.

**B.      The Materialization Of The Risk Theory**

A plaintiff can also "allege[] loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpum*, 782 F.3d at 1154.  Plaintiffs allege that (1) the risk that materialized was within the zone of risk concealed by Defendants' false and misleading statements regarding the distribution agreements, CBD portfolio, and internal and Disclosure Controls (foreseeability), and that (2) the materialization of the risk negatively impacted NewAge stock's value (causal link).  *Id*.

Specifically, the undisclosed risks of the invented/exaggerated distribution agreements, invented/exaggerated CBD portfolio, and ineffective internal and Disclosure Controls included regulatory scrutiny, costly internal investigations, and their foreseeable consequences, such as the CEO's ouster due to his role in this misconduct, violations of NASDAQ listing rules, bankruptcy, delisting, and SEC charges for such lies.  ¶¶235-46.  Thus, the decline in NewAge's stock price in response to these disclosures was a materialization of the risk concealed by Defendants' (including Cooper's) misrepresentations.  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045-46 (N.D. Cal. 2016) (finding materialization of the risk theory adequately pled where disclosures included a resignation, a retirement, and eventual restatement).

24

### C.     The AC Adequately Alleges Artificial Inflation

Cooper argues that because the price of NewAge stock decreased between the SEC filings on November 16, 2020 (announcing closing of the Ariix merger), March 18, 2021 (Form 10-K signed by Cooper, *et al.*), November 9, 2021 (Form 10-Q announcing Kwikclick agreement) and the first corrective disclosure on January 10, 2022, Plaintiffs "have failed to plausibly allege the artificial inflation necessary to establish loss causation."  MTD 14.[12]

Not so.  First, the dates Cooper lists above before the first corrective disclosure are not all dates of alleged misstatements.  Thus, it is not clear why Cooper thinks the stock price should have gone up on November 16, 2020.  Second, to the extent Cooper's argument is that loss causation requires a positive price reaction on the dates of the alleged misstatements to allege artificial inflation, he is wrong.

"It bears emphasis that initial price *inflation* and initial price *increase* are not one and the same[.]"  *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1185 (9th Cir. 2024) (emphasis in original).  In *Genius Brands*, the Ninth Circuit reversed the dismissal of the loss causation claim "on the grounds that the shareholders failed to plead an initial price increase":

> [A] price increase is one way of demonstrating that "the price was higher than it would have been," but it is not the only way….[A] plaintiff could plausibly allege that a misstatement inflated the value of a security where the price dropped, but that the drop would have been even more significant if the misstatement had not been made. [Thus], the plaintiff would plausibly allege that the stock's price was higher "than it would have been had the false statements not been made," even though the misstatements did not increase the stock's price.

*Id.* at 1185, 1190.

---

[12]     Contrary to Cooper's stock price analysis in the chart on p. 13 of the MTD, the price of NewAge's stock on November 16, 2020 was $2.75, not $3.15, and the decrease of NewAge's stock price between November 16, 2020 and the first corrective disclosure was -63.27%, not -67.6%.  Moreover, the price of NewAge's stock on January 7, 2022 was $1.02, not $1.01.

Referring to its recent *In re Facebook* decision, the Ninth Circuit continued: "Although the plaintiffs did not plead that Facebook's misleading statement that users controlled their own data increased the value of Facebook's shares, we nevertheless found that their allegations were sufficient to plead loss causation." *Id.* at 1186 (citing *In re Facebook, Inc. Sec. Litig.*, 87 F.4th 934, 954-55 (9th Cir. 2023)).

Numerous other courts have reached similar conclusions. For example, in *Swack*, the plaintiff pled that the market price of the stock was artificially inflated when purchased and attributed this artificial inflation to Credit Suisse's analyst's misrepresentations. *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 239 (D. Mass. 2004). The defendants argued that the analyst's ratings "had little or no discernible effect on the stock price," because the stock price declined after the analyst's "buy" and "strong buy" ratings that allegedly misled the market. *Id.* at 240. Denying the defendants' motion to dismiss, the court explained that "[s]tock prices rise and fall for combinations of many different reasons. Defendants' conduct could have tempered a drop in price that would otherwise have occurred . . . absent the deceptive analyst reports." *Id.* The court "emphasized the fact-intensive nature of the comparison between alleged misstatements and stock price movements" and stated that "[t]here must be actual factfinding, including perhaps expert testimony about general market trends" at summary judgment. *Id.* at 241-42. Thus, to the extent the stock price movement on the dates Cooper identified matter at all (they do not), it would not be appropriately decided at this stage of the litigation.

*In re Manulife Financial Corp. Securities Litigation*, 276 F.R.D. 87 (S.D.N.Y. 2011), cited by Cooper (MTD 14), is inapposite because the court's reasoning was based on "on a flawed premise - that a stock's value can only be artificially inflated by a news event if its price goes up

26

on the day of the news event." *Buttonwood Tree Value Partners, LP v. Sweeney*, 2013 WL

12125980, at \*16 (C.D. Cal. Sept. 12, 2013); *see also Schleicher v. Wendt*, 618 F.3d 679, 682,

683–84 (7th Cir. 2010) (stating that the "stock was falling during the class period is irrelevant"

and concluding that misrepresentations or omissions "designed to slow the rate of fall" of a stock

price are actionable even if the stock "price [i]s declining throughout the class period" and

"eventually reach[es] zero when the bankruptcy court cancel[s] the shares"); *cf*. ¶148 (stating that

after NewAge filed for bankruptcy, the price of NewAge stock was $0.1482).

## IV.    THE AMENDED COMPLAINT STATES CONTROL PERSON CLAIMS UNDER SECTION 20(A)

Cooper challenges Plaintiffs' §20(a) control person allegations on the basis that he did

not commit a primary violation of §10(b).  MTD 17-18.  Since Plaintiffs have clearly pled viable

§10(b) claims against Cooper, their §20(a) claims against him survive.  *Peace Officers' Annuity*

*& Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1156 (D. Colo. 2019).

But even if Cooper was found not to have violated §10(b), he is liable under §20(a) as a

controlling person of NewAge — a primary violator of §10(b). *Maher v. Durango Metals,*

*Inc.*, 144 F.3d 1302, 1304-05 (10th Cir. 1998) (Under §20(a), a plaintiff need only allege "(1) a

primary violation of the securities laws and (2) control over the primary violator by the alleged

controlling person.").  As a "complex factual question," the Tenth Circuit has found that control

person liability is not ordinarily resolved on a motion to dismiss and when it is, plaintiffs' claims

will be defeated only if they fail to plead *any facts* from which it can be inferred the defendant

was a control person of the primary violator.  *SemGroup*, 729 F. Supp. 2d at 1304-06.

NewAge unquestionably committed a primary violation of §10(b) by knowingly co-

authoring, issuing and signing various false and misleading press releases and SEC filings during

27

the Class Period — yet another point which Cooper does not dispute.  ¶¶94, 99, 101, 110-15, 119, 126; *State of N.J. & Its Division of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1144-45 (D. Kan. 2004) (primary violation of 10(b) found where SEC filings contained false and misleading statements).

Plaintiffs also allege sufficient facts to establish Cooper's status as a control person of NewAge.  First, Cooper was a member of the "NewAge[] Board [of Directors as of] November 13, 2020," ¶38, who signed relevant SEC filings containing false and misleading statements about NewAge's business, operations, prospects and internal and disclosure controls.  ¶136; *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) ("[A]llegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status.").  Cooper joined the NewAge Board when Ariix—the company of which he was the founder and CEO— merged with NewAge.  ¶81.  As a Board member, executive and key figure in the Ariix merger, Cooper was "charge[d] with power over the documents and represent[ed] to the corporation, its shareholders, and the public that … [he] performed h[is] role with sufficient diligence [and] that []he [wa]s willing and able to stand behind the information contained in th[e SEC filings]" when the information turned out to be false and misleading.  *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003).

Indeed, Cooper regularly exerted his "influence" over NewAge, ¶220, so much so that he caused them to enter into a sham licensing agreement with a competing venture Kwikclick—an entity he and Willis jointly owned— and lied about the impact the transaction had on NewAge. ¶¶223-25.  Cooper's active participation in the fraudulent conduct at issue far surpasses the

28

Tenth Circuit threshold for establishing control person liability under §20(a). *Maher*, 144 F. 3d at 1305 (finding a standard less than "actual[] or culpabl[e] participat[ion] in the primary violation" sufficient to plead control person liability); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 584 (S.D. Tex. 2002) ("[T]he Tenth Circuit does not require attribution of the alleged misrepresentation to the secondary actor at the time of the statement's dissemination to the public.").

Significantly, the Board did not remain passive and regularly presided over the micro and macro aspects of NewAge's operations (*i.e.*: holding frequent meetings, ¶¶186-89; controlling employee compensation, ¶¶17, 51, and keeping abreast of NewAge's products and agreements, ¶¶180-82, 189). Such involvement lends itself to a presumption of control. *See, e.g., In re Hamilton Bancorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359-60 (S.D. Fla. 2002) ("[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs...are sufficient to state a cause of action for controlling person liability.").

## CONCLUSION

For the foregoing reasons, Cooper's motion should be denied in its entirety.

Dated: September 30, 2024

Respectfully submitted,

By: s/ James M. Wilson, Jr.

James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331

29

E-mail: jwilson@faruqilaw.com

Robert W. Killorin
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
E-mail: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Damian Betebenner and
Cigdem Betebenner and Lead Counsel for the Class*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Lead Plaintiffs' Memorandum in Opposition to

Defendant Fred Cooper's Motion to Dismiss the Amended Class Action Complaint complies

with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1), and

modified by the Court's July 30, 2024 order, Doc. 91.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on September 30, 2024, I electronically filed

the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of

such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

1