**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-TPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff,

                 v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,  and
GREG FEA,

Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
FRED COOPER'S MOTION TO DISMISS THE SECOND AMENDED
CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................ 4

    A.    NewAge's Relationships With The Military, Retailers, And Distributors And
Its CBD Beverage Portfolio ........................................................................... 4

    B.    The Ariix Merger And NewAge's Internal And Disclosure Controls.................... 5

    C.    Cooper's Compensation and Stock Awards ............................................. 6

    D.    The Truth Begins To Emerge ................................................................. 6

ARGUMENT..................................................................................................................... 7

I.    THE SAC ADEQUATELY PLEADS COOPER'S MATERIALLY FALSE AND
MISLEADING STATEMENTS........................................................................ 8

    A.    Cooper Does Not Dispute That The Statements Were False And
Misleading When Made ............................................................................ 8

II.    THE SAC SUFFICIENTLY PLEADS A STRONG INFERENCE OF SCIENTER....... 11

    A.    Cooper Knew Or Had Access To The Relevant Facts And Had A Duty
To Disclose ........................................................................................... 12

    B.    Cooper's Personal Financial Motives Bolster Strong Inferences Of Scienter...... 14

III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ..................................... 15

    A.    The Corrective Disclosure And Leakage Theories............................................. 16

    B.    The Materialization Of The Risk Theory............................................................ 19

IV.    THE SAC ADEQUATELY PLEADS CONTROL PERSON CLAIMS
UNDER SECTION 20(a) ................................................................................ 20

CONCLUSION................................................................................................................ 22

# TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ...............................................................................................8

*Anderson v. U.S. Dep't of Labor*,
422 F.3d 1155 (10th Cir. 2005) .............................................................................................11

*Better v. YRC Worldwide, Inc.*,
2012 WL 4433500 (D. Kan. Sept. 25, 2012)..........................................................................15

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................................17

*City of Phila. v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) .............................................................................................14

*Coleman v. B-G Maintenance Mgmt. of Colo., Inc.*,
108 F.3d 1199 (10th Cir. 1997) ..........................................................................................8, 9

*Croker v. Carrier Access Corp.*,
2006 WL 2035366 (D. Colo. July 18, 2006) .........................................................................11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).............................................................................................................4, 15

*Farlow v. Peat, Marwick, Mitchell & Co.*,
956 F.2d 982 (10th Cir. 1992) .................................................................................................8

*Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (Loc. 66)*,
579 F.3d 401 (5th Cir. 2009) .................................................................................................15

*In re FirstEnergy Corp. Sec. Litig.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022)..........................................................................13

*Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*,
2022 WL 716653 (D. Utah Mar. 9, 2022) .............................................................................15

*In re Gilead Scis. Sec. Litig.*,
536 F.3d 1049 (9th Cir. 2008) ..........................................................................................15, 16

*Gruber v. Gilbertson*,
628 F. Supp. 3d 472 (S.D.N.Y. 2022).....................................................................................16

*In re Hamilton Bankcorp, Inc. Sec. Litig.*,
  194 F. Supp. 2d 1353 (S.D. Fla. 2002) ......................................................................22

*Humana, Inc. v. Shrader & Assocs., LLP*,
  584 B.R. 658 (S.D. Tex. 2018) ..................................................................................20

*Kessman v. Myriad Genetics, Inc.*,
  2019 WL 1330363 (D. Utah Mar. 25, 2019) .............................................................16

*Kyung Cho v. UCBH Holdings, Inc.*,
  890 F. Supp. 2d 1190 (N.D. Cal. 2012) ....................................................................21

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) ............................................................................14, 15

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) ...........................................................................20, 21

*Mauss v. NuVasive, Inc.*,
  2016 WL 3681831 (S.D. Cal. July 12, 2016) ............................................................17

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016)...........................................................................8

*Nakkhumpun*, *v. Taylor*,
  782 F.3d 1142 (10th Cir. 2015) ........................................................................10, 11, 15, 19

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005)........................................................................18

*Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*,
  769 F.3d 313 (5th Cir. 2014) .....................................................................................17

*Roofer's Pension Fund v. Papa*,
  2018 WL 3601229 (D.N.J. July 27, 2018)..................................................................13

*S.E.C. v. Complete Bus. Sols. Grp., Inc.*,
  538 F. Supp. 3d 1309 (S.D. Fla. 2021) ......................................................................20

*S.E.C. v. Curshen*,
  372 F. App'x 872 (10th Cir. 2010) .............................................................................10

*Sears v. Likens*,
  912 F.2d 889 (7th Cir. 1990) ........................................................................................8

*In re SemGroup Energy Partners, L.P., Sec. Litig.*,
   729 F. Supp. 2d 1276 (N.D. Okla. 2010)......................................................................10, 12, 21

*State of N.J. & Its Division of Inv. v. Sprint Corp.*,
   314 F. Supp. 2d 1119 (D. Kan. 2004).................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)...................................................................................................11, 12, 14

*Thomas v. Magnachip Semiconductor Corp.*,
   167 F. Supp. 3d 1029 (N.D. Cal. 2016) ...............................................................................19

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   695 F. Supp. 2d 1165 (D.N.M. 2010) ............................................................................7, 8, 14

*UA Loc. 13 Pension Fund v. Sealed Air Corp.*,
   2021 WL 2209921 (S.D.N.Y. June 1, 2021) .........................................................................10

*Wallack v. Idexx Lab'ys, Inc.*,
   2013 WL 5206190 (S.D. Cal. Sept. 12, 2013)........................................................................8

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
   28 F. Supp. 3d 93 (D. Mass. 2014) ......................................................................................13

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ............................................................................................16

*Winslow v. BancorpSouth, Inc.*,
   2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011)....................................................................18

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)...................................................................................21

## Other Authorities

17 C.F.R. § 240.10b-5............................................................................................................8

Rule 15(a)(2)........................................................................................................................22

Fed. R. Evid. 801(d)(2) ......................................................................................................4, 11

Lead Plaintiffs Damian Betebenner and Cigdem Betebenner ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendant Fred Cooper's ("Cooper") Motion to Dismiss the Second Amended Class Action Complaint ("MTD"), Dkt. 122.[1, 2]

**INTRODUCTION**

Cooper joined the NewAge board in November 2020 following the Company's merger with Ariix, a multi-level-marketing ("MLM") company that Cooper helmed as CEO. The Ariix merger was made possible by a scheme orchestrated by CEO Brent Willis ("Willis"), whereby he and others repeatedly disseminated false and misleading information to the market through press releases, conference calls, and interviews about distribution agreements for NewAge's beverages and a CBD beverage portfolio that either did not exist or were grossly exaggerated. These lies made the Company appear more successful than it was, artificially inflating NewAge's share price and enabling it to raise much-needed cash to buy other companies and pivot into the MLM beverage space. Ariix would turn out to be NewAge's final acquisition.

Under the terms of NewAge's merger with Ariix, Cooper would receive, *inter alia*, at least $20 million in cash, substantial NewAge stock, and a seat on NewAge's Board of Directors ("Board"). NewAge failed to secure Ariix's audited financial statements prior to the closing. Thereafter, NewAge learned the devastating failures underpinning Ariix. Not only did it have negative $18 million in working capital (a shortfall of $29 million compared to what it initially

---

[1]     All "¶" references are to the Second Amended Class Action Complaint ("SAC"). Dkt. 114. Unless otherwise noted, all capitalized terms mean the same as in the SAC, all emphasis is added and all citations, internal quotation marks and footnotes are omitted.

[2]     Plaintiffs adopt and incorporate the arguments in their oppositions to the other defendants' motions to dismiss and motion to strike filed herewith, to the extent those arguments also pertain to Defendant Cooper.

1

represented to NewAge), but it also received an order suspending Ariix from recruiting new brand partners in Japan due to fraudulent practices likely in violation of the FCPA. Had NewAge and its officers and directors fulfilled their duties to uncover this information, they would have never closed the deal with Ariix.

As relevant with respect to Defendant Cooper, Plaintiffs allege that Cooper and certain other Defendants violated §10(b) by making false and misleading statements in the 2021 Form 10-K that he signed after he became a director of NewAge. That 10-K misleadingly stated that NewAge's Disclosure Controls were ineffective due to certain material weaknesses in internal controls related to the Company's failure to design and implement monitoring activities over the Ariix acquisition, due to the acquisition's "size and timing." This statement misled the market because, by discussing the Ariix merger and NewAge's related internal and Disclosure Control issues, Cooper and the other Defendants who signed this 10-K put these issues in play and therefore had a duty to discuss the full truth about why NewAge's Disclosure Controls were ineffective. Namely, that NewAge was engaged in an extraordinarily costly internal investigation of Ariix's business practices for suspected FCPA violations, caused by NewAge's failure to discover important information before the merger closed. The Company's internal controls were also materially weak because they enabled Willis and others to repeatedly disseminate materially false and misleading information about NewAge's distribution agreements and CBD portfolio.

Cooper's statements in the Form 10-K were made with scienter. Although the false and misleading statements about distribution agreements and the CBD portfolio were disseminated before Cooper joined the Company, the SEC had been investigating NewAge for over a year by

2

the time he became a director.  As a Board member, he necessarily knew what the SEC was investigating and why, particularly because its main target was Willis—with whom Cooper was entering into a business relationship, *i.e.,* Kwikclick.  As Ariix's CEO, Cooper was also necessarily aware of the facts that led Japan to suspend Ariix, and as a NewAge director, he was necessarily aware of the FCPA investigation and its costs.  Cooper was also personally motivated to conceal that Ariix's merger was in fact disastrous for NewAge—and thereby to keep NewAge afloat and its stock price inflated in the meantime—in light of the money he stood to make.  Specifically, he received 18 million shares of NewAge stock as part of the merger, would receive millions when the NewAge promissory notes he was owed came due, and planned to make money off of NewAge through licensing fees and commissions it would pay Kwikclick, his venture with Willis.

In his MTD, Cooper does not challenge that the statements in ¶¶155-57 were false and misleading, but that he did not make direct misrepresentations about Iconn (Ariix's proprietary software), Kwikclick, Ariix's working capital, and FCPA violations.  As explained above, however, Plaintiffs argue that Cooper only made false and misleading statements regarding internal and Disclosure Controls.  Cooper also challenges scienter, which is more than adequately alleged for the reasons set forth above and in further detail below.

Cooper's argument that Plaintiffs improperly rely on allegations from the adversary action filed by NewAge ("NewAge Adversary Action") against, *inter alia*, Cooper, Willis, and Kwikclick is also misplaced.  *In re: NewAge, Inc. et al.*, No. 22-50432 (LSS) (Bankr. D. Del.).  The complaint in the NewAge Adversary Action is appropriately referenced herein because its allegations demonstrate how deficient NewAge's internal controls were, and therefore constitute

3

an admission against interest by NewAge under Fed. R. Evid. 801(d)(2).

With respect to loss causation, Cooper argues that Plaintiffs fail to connect his statement to the losses suffered.  He is wrong.  To plead loss causation, Plaintiffs need only meet the requirements of Fed. R. Civ. P. 8, providing "defendants with notice of what the relevant economic loss [or] the causal connection might be[.]"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005).  Plaintiffs have done so, alleging a series of partial disclosures that revealed the truth concealed by the misstatements alleged.

Strong support also exists for Cooper's liability as a §20(a) control person for NewAge— the primary §10(b) violator—during his tenure as a NewAge director because of the significant influence and control he exerted over NewAge from the moment he joined it.

## STATEMENT OF FACTS

### A.    NewAge's Relationships With The Military, Retailers, And Distributors And Its CBD Beverage Portfolio

On the first day of the Class Period, Willis and NewAge announced a "new distribution agreement" with the military, ¶115, claimed NewAge had "begun shipments" of certain brands "in expanded distribution throughout Loblaws and Sobeys, the largest grocery retailers across Canada," and "signed a major distribution agreement" with South Korea's "largest food and beverage distributor" "to expand to all major retail outlets throughout the country immediately." ¶¶122-23, 126.

Willis also told the market that NewAge had tested and developed a portfolio of CBD-infused beverages that it planned to unveil in October 2018, overseen by its Health Sciences Division.  ¶130.  He then presented the portfolio's debut as a success, touting massive retail commitments and near-term launches.  ¶¶135-42.  Thereafter, Willis and Gould touted

4

NewAge's "first national distribution" with Walmart, the "world's largest retailer."  ¶146.

With each of the foregoing announcements, NewAge's stock rose accordingly.  ¶¶64, 125, 129, 145, 149.

### B.    The Ariix Merger And NewAge's Internal And Disclosure Controls

Made possible by its artificially inflated stock, NewAge commenced a series of strategic acquisitions which culminated in the ill-fated Ariix merger, announced in July 2020.  ¶101. Prior to closing, NewAge allowed the merger to close without Ariix's audited financials and other critical information.  ¶103.  In quick succession, this decision would prove disastrous.

First, the financials provided post-closing revealed that Ariix's targeted working capital was *negative $18 million—a $29 million shortfall* from what it previously represented to NewAge.  ¶¶20, 105.  Second, immediately after closing, Japan's Consumer Affairs Agency suspended Ariix from recruiting new brand partners due to fraudulent practices likely in violation of the FCPA.  ¶¶20, 106.  This caused NewAge to conduct a lengthy and ruinously expensive investigation into Ariix's business practices.  ¶¶20, 167.

Despite its failure to ascertain this before the merger closed, Cooper and other defendants falsely assured investors regarding NewAge's internal and Disclosure Controls.  ¶¶151-63.

Once the consequences of the events surrounding the merger came to a head, Cooper, alongside other Defendants, conceded the ineffectiveness of NewAge's Disclosure Controls by signing and certifying NewAge's 2020 Form 10-K.  ¶¶155-56.  However, the ineffectiveness was falsely attributed to "[in]sufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to "the size and timing of the acquisition of Ariix" in an SEC filing.  ¶157.

The foregoing reasons why NewAge's Disclosure Controls were ineffective were based on Willis's and the CFO's purported "evaluation" of NewAge's Disclosure Controls. However, Cooper knew he could not rely on any evaluation Willis may have performed of NewAge's Disclosure Controls because an ongoing SEC investigation raised concerns that Willis was regularly bypassing them to issue false and misleading statements about NewAge's relationships and CBD portfolio. ¶¶109-14. Additionally, Cooper knew that the Company was embroiled in an extremely expensive investigation into Ariix for FCPA violations.

## C. Cooper's Compensation and Stock Awards

As part of the merger, Cooper (Ariix's founder and CEO), became a NewAge Board member on November 13, 2020. ¶¶40, 99, 103. Cooper immediately realized the personal benefits of the merger because NewAge was required to pay Ariix's members (including Cooper): (i) $25 million in cash; (ii) the issuance of 18 million shares of NewAge common stock; (iii) a convertible promissory note in the aggregate amount of $10 million, maturing six months from the closing date, to certain members of Ariix and other designated employees; and (iv) a convertible promissory note in the aggregate amount of $141.25 million, maturing 24 months from the closing date, to certain members of Ariix and other designated employees. ¶101.

As part of his employment with NewAge, Cooper also received $6,250.00 in base salary and $33,048.00 in stock awards for the limited time he spent with NewAge in 2020. ¶267.

## D. The Truth Begins To Emerge

The SEC began to investigate NewAge in or around 2019 related to its claims regarding the distribution agreements and CBD portfolio. ¶¶109, 113. Willis abruptly resigned on January

10, 2022 without explanation, sending NewAge's stock down 6%. ¶22.

With the SEC closing in and the Ariix investigation ongoing, NewAge was unable to file its Form 10-Q on time, causing NASDAQ to send it a notice that it was not in compliance with listing rules. ¶23. On this news, NewAge's stock dropped 8%. *Id.* NewAge again shocked the market on June 8, 2022 by announcing that it was considering "strategic alternatives," leading its stock to plummet 12%, 11%, and 7% over three days. ¶24. Two months later, it filed for Chapter 11 bankruptcy, which *The Wall Street Journal* reported on in an article titled, "New Age Says Cost of Internal Probe Contributed to Bankruptcy," exposing the enormous costs NewAge incurred while investigating Ariix. ¶25. On this news, NewAge stock dropped 26%. *Id.* The bankruptcy led NASDAQ to delist NewAge, leading to another 9% drop the next trading day. ¶26.

Finally, on October 19, 2022, the SEC issued its C&D Order against NewAge, setting forth the Company's and Willis's misconduct. ¶¶111-13. On this news, NewAge stock dropped ***93%***. ¶¶27-28.

NewAge thereafter sued Willis, Cooper, and others, casting additional light on circumstances related to the Ariix merger that also revealed the inadequacy of NewAge's internal and Disclosure Controls.

## ARGUMENT

On a Fed. R. Civ. P. ("Rule") 12(b)(6) motion, the "court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor." *In re*

7

*Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1185 (D.N.M. 2010), *on reconsideration in part*, 824 F. Supp. 2d 1214 (D.N.M. 2011).

I.    **THE SAC ADEQUATELY PLEADS COOPER'S MATERIALLY FALSE AND MISLEADING STATEMENTS**

To plead an actionable claim for securities fraud under Rule 10b-5, a plaintiff must plead that the defendant made an untrue or misleading statement of fact or failed to state a fact necessary to make a statement not misleading. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1099–100 (10th Cir. 2003).  Rule 10b-5 imposes a duty to disclose material facts that are necessary to make disclosed statements, whether mandatory or volunteered, not misleading. *See* 17 C.F.R. § 240.10b-5.  If "a reasonable person would find the defendant's statements to be false or misleading, the plaintiff has sufficiently pled with particularity facts supporting his belief in the misleading nature of the defendant's statements." *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1003 (D. Colo. 2016), *as amended* (Jan. 29, 2016).[3]

A.    **Cooper Does Not Dispute That The Statements Were False And Misleading When Made**

Cooper's motion does not (nor could it) challenge Plaintiffs' allegations of falsity as to any statements attributed to him in the SAC.  Therefore, this element of Plaintiffs' claims against him is conceded and any challenges he could have made are waived. *See, e.g., Coleman v. B-G*

---

[3]    Cooper's cases are in inapposite.  For example, *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986-87 (10th Cir. 1992) and *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (MTD 2) involved instances where the pleadings lacked sufficient detail specifying defendants' misrepresentations and how they furthered the alleged fraudulent "scheme."  Similarly, in *Wallack v. Idexx Lab'ys, Inc.*, the court declined to find a defendant's vague and standalone statements about a company "[n]ot really [being] that profitable" actionable because it expressed the defendant's subjective opinion at the time and was only contradicted by hard information that was revealed several months later.  2013 WL 5206190, at *8-11 (S.D. Cal. Sept. 12, 2013) (MTD 2-3).

8

*Maintenance Mgmt. of Colo., Inc.*, 108 F.3d 1199, 1205 (10th Cir. 1997), *abrogated in part on other grounds by United States ex rel. Heron v. Nationstar Mortg., LLC*, 2024 WL 3770843, at *8 (10th Cir. Aug. 13, 2024) (issues not raised in opening brief are deemed waived).

Rather, Cooper argues that Plaintiffs failed to allege an "actionable misrepresentation or omission *by Mr. Cooper to the NewAge investing public*" regarding: (1) Ariix's working capital (MTD 4-6); (2) his involvement with Iconn/Kwikclick (*id.* at 6-10); and (3) Ariix's suspected FCPA violations and NewAge's internal investigation *(id*. at 10-13). This is a red herring, as none of the paragraphs he cites to are the paragraphs containing the false and misleading statements he is alleged to have made. The SAC sets forth, in a singular section, the statements alleged to be false and misleading (titled, "Materially False And Misleading Statements Issued During The Class Period") and notes that only the statements "bold and italicized" in that section (which spans ¶¶115-63) are being challenged (SAC at 29 n.5), and sets forth specifically which Defendant is responsible for which statement. *See* ¶¶115-63. Plaintiffs allege that Cooper made false and misleading statements in only one document, the 2020 Form 10-K, by signing it, as clearly set forth at ¶¶155-57.

The 2020 10-K contained false and misleading representations about NewAge's internal and Disclosure Controls. Namely, it stated that its Disclosure Controls were ineffective as of December 31, 2020 due to material weaknesses in its internal controls because NewAge had "[in]sufficient resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "size and timing." ¶¶156-57. Even if the statements were partially true, in that those were some of the issues related to the Ariix merger, the statements were misleading for

9

omitting other reasons why NewAge's internal controls had material weaknesses—specifically, that NewAge's failure to ascertain necessary information before the merger closed resulted in it needing to conduct an investigation into Ariix for FCPA violations (¶159) which threatened to bankrupt NewAge (¶167). "[W]here a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information…." *S.E.C. v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010). Cooper therefore "incurred a duty to disclose when he chose to explain" why the internal controls were inadequate. *Nakkhumpun*, *v. Taylor*, 782 F.3d 1142, 1152-53 (10th Cir. 2015) ("*Nakkhumpun II*").

These statements were misleading for the additional reason that they failed to disclose the fact that NewAge's Disclosure Controls were also ineffective because Willis and others had been able to issue written and oral public statements *on multiple occasions* about fake/exaggerated agreements and a CBD portfolio that they implied or outright stated were "expected to have a material impact on [NewAge's] financial results…." ¶115; *see also* ¶¶116-49. Either NewAge had Disclosure Controls in place to prevent the unilateral publication of blatant falsehoods regarding NewAge's finances and prospects that were continuously bypassed, or no such Disclosure Controls existed. Alternatively, NewAge had material weaknesses in its internal controls that rendered its Disclosure Controls ineffective. *See UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021) (sustaining claim that the disclosure controls were ineffective and/or inadequately designed where company was able to file reports that misstated and/or omitted material facts); *see In re SemGroup Energy Partners, L.P., Sec. Litig.*, 729 F. Supp. 2d 1276, 1289-90 (N.D. Okla. 2010).

10

In other words, Cooper's statements were rendered misleading for omitting the real reasons why NewAge's Disclosure Controls were ineffective.  ¶¶156-57.

Cooper argues that Plaintiffs' allegations against him are based on NewAge's own allegations in the Adversary Action it filed against him, Willis, Kwikclick, and others, which he argues is improper.  Plaintiffs were clear in the SAC that NewAge's Adversary Action is appropriately considered as an admission against interest under Fed. R. Evid. 801(d)(2), as its allegations about the Ariix merger and Kwikclick demonstrate how deficient NewAge's internal controls were.  *See* ¶¶272-73 (citing relevant rule and caselaw).  Tellingly, Cooper makes no attempt to explain why NewAge's Adversary Action is not appropriately considered under Fed. R. Evid. 801, and therefore waives this issue.  *See Anderson v. U.S. Dep't of Labor*, 422 F.3d 1155, 1174 (10th Cir. 2005) ("The failure to raise an issue in an opening brief waives that issue").

## II.    THE SAC SUFFICIENTLY PLEADS A STRONG INFERENCE OF SCIENTER

A plaintiff may satisfy the scienter standard by showing either an intent to deceive or that "defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun II*, 782 F.3d at 1150.  When considering scienter allegations, a court must "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

Here, "plaintiff's allegations in their entirety, without regard to whether those allegations fall into defined, formalistic categories" and "taken as a whole, give rise to a strong inference of scient[e]r," *Croker v. Carrier Access Corp.*, 2006 WL 2035366, at *9 (D. Colo. July 18, 2006) (quoting *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1263 (10th Cir. 2001)), that is "at

11

least as compelling as any opposing inference[.]" *Tellabs*, 551 U.S. at 324 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre or even the most plausible of competing inferences[.]").

### A.    Cooper Knew Or Had Access To The Relevant Facts And Had A Duty To Disclose

Contrary to Cooper's claims, the SAC sufficiently pleads particular factual allegations as to Cooper, which taken as a whole, support a strong inference of scienter. *See* ¶¶99, 101-03, 155, 272, 278-83. Indeed, Plaintiffs allege that Cooper, who was the founder and CEO of Ariix (¶99) at the time of the merger, had intimate knowledge of both Ariix's financial and legal condition and its merger with NewAge. *See* ¶¶102, 104.

As Ariix's CEO, Cooper necessarily knew that Ariix had not provided NewAge with crucial financial records and information prior to closing. ¶99. He also knew, at the time he made the challenged statements (¶¶155-57), that Ariix had been suspended in Japan from recruiting brand partners due to potential FCPA violations, and NewAge's investigation into the same began in December 2020. ¶¶20, 161, 270. Thus, he had "access to material non-public information" and was "in a position to know this information, understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors." *SemGroup*, 729 F. Supp. 2d at 1298.

Furthermore, the SEC's investigation into the false and misleading statements concerning NewAge's business relationships and CBD portfolio had been ongoing for over two years by the time Cooper signed the false and misleading SEC filing. *See* ¶¶109, 155. Given his role and duties as a director and the fact that he was entering into a business relationship, *i.e.*, Kwikclick, with Willis, the SEC's investigation's main target, it would be absurd to suggest that Cooper had

12

no knowledge of what the SEC was investigating and why when he made the challenged statements in ¶¶156-57; *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) ("[G]overnment investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter.").

Cooper argues that no facts outside of NewAge's Adversary Action support scienter, which is largely based on his misconception that he is alleged to have made false and misleading statements about the Kwikclick agreement. As explained in §I, that is not Plaintiffs' case. Rather, Plaintiffs' allegations relating to the Kwikclick Agreement lend further support to the fact that NewAge's Disclosure Controls were ineffective for allowing—by NewAge's own description—such a brazen scheme to occur in the first place. *In re FirstEnergy Corp. Sec. Litig.*, 2022 WL 681320, at *10 (S.D. Ohio Mar. 7, 2022) (finding statements related to efficacy of internal controls actionable where the complaint had well-pled allegations of a fraudulent scheme). Once Cooper chose to speak about NewAge's internal and Disclosure Controls, he put them in play and had a duty to provide truthful information and include ***all*** material information necessary to avoid misleading investors about it. *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *12 (D.N.J. July 27, 2018) ("once Defendants[] chose to speak…they could not omit material facts related to that issue so as to make the disclosure misleading.").

Cooper's argument that he had no duty to disclose information about the FCPA violations because he did not have "knowledge of any actual, definitive FCPA violations" also misses the point. MTD 11. Whether or not Ariix actually violated the FCPA is irrelevant to the fact that he necessarily knew NewAge was involved in an internal investigation into whether Ariix had violated the FCPA that was so costly it posed a substantial risk to the Company's ability to

13

continue as a going concern.  ¶161.  The investigation and its costs are evidence of NewAge's internal and Disclosure Controls' ineffectiveness because NewAge only had to undertake it because they failed to obtain critical information before the merger closed.  By making the challenged statements about NewAge's internal and Disclosure Controls in ¶¶155-57, Cooper therefore had a duty to disclose the investigation.  *See* §I, *supra*.

**B.**      **Cooper's Personal Financial Motives Bolster Strong Inferences Of Scienter**

Although motive is not required to prove scienter, "personal financial gain may weigh heavily in favor of a scienter inference[.]"  *Tellabs*, 551 U.S. at 325.  Here, Cooper was motivated by the "prospect of ever-greater compensation."  *Thornburg*, 695 F. Supp. 2d at 1202.

Once the merger went through and he became a director, Cooper was motivated to prevent the truth about Ariix's financial condition and legal troubles from reaching the public (and NewAge) and keep NewAge's stock inflated because he received 18 million NewAge shares in the deal.  ¶¶101, 103.  Cooper was also personally motivated to keep the fact that the Ariix merger was in fact disastrous for NewAge—and thereby keep NewAge afloat and its stock price high in the meantime—so that NewAge could pay Kwikclick (his and Willis's venture) a $50,000 monthly licensing fee, and he could receive millions in promissory notes.[4]  *See* ¶¶274-75, 281-82.  Additionally, as a director, Cooper would receive a salary of $6,250 with an additional $33,048 in stock awards for just over one and a half months of work in 2020.  ¶267.

---

[4]      Defendant's authorities are inapposite.  *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012) (MTD 3) (finding bonuses did not show motive where they were based on real progress, not representations of progress); *Fleming*, 264 F.3d at 1270 (MTD 3) (absence of allegations that defendants "in ***any other way*** benefitted in some concrete and personal manner").

14

Here, Plaintiffs have "adequately ple[]d scienter by identifying circumstances that indicate conscious behavior on the part of the defendant[.]" *Level 3*, 667 F.3d at 1347. Like in *Gelt Trading, Ltd. v. Co-Diagnostics, Inc.*, 2022 WL 716653, at *9 (D. Utah Mar. 9, 2022), where defendant did not sell stocks but co-defendants sold significant amounts of stock while avoiding validity testing that would reveal the misleading nature of their statements, here, Willis and Kapetyn sold significant amounts of stock (¶¶260-63, 266), and Cooper signed the Form 10-K containing the aforementioned false and misleading statements while omitting to disclose Ariix's financial condition and FCPA violations after closing (¶¶99, 103-04, 155).

## III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

Whether loss causation is adequately pled is determined under the notice pleading requirements of Rule 8. *Better v. YRC Worldwide, Inc.*, 2012 WL 4433500, at *9-10 (D. Kan. Sept. 25, 2012). In the Tenth Circuit, to adequately plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347; *Nakkhumpun II*, 782 F.3d at 1154 ("To plead loss causation, a plaintiff must allege facts showing a causal connection between the revelation of truth to the marketplace and losses sustained by the plaintiff."). Here, Plaintiffs gave Defendants adequate notice of their theory and that is enough at the pleading stage. *Dura*, 544 U.S. at 347. "[A] district court ruling on a motion to dismiss is not sitting as a trier of fact." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "[T]he testimony of an expert—along with some kind of analytical research or event study—is required to show loss causation." *Fener v. Operating Eng'rs Const. Indus. & Misc. Pension Fund (Loc. 66)*, 579 F.3d 401, 409 (5th Cir.

15

2009).  "[L]oss causation is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss."  *Gilead*, 536 F.3d at 1057.

Loss causation can be alleged through: (1) "a corrective disclosure" theory which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth…leak[s] out" over time; or (3) "a theory of materialization of a concealed risk[,]" where "defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized[.]"  *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019).  A "disclosure need not precisely mirror the earlier misrepresentation[s.]"  *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).  Rather, the truth can come out "through events constructively disclosing the fraud[.]"  *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 (S.D.N.Y. 2022).

### A.    The Corrective Disclosure And Leakage Theories

Cooper misled investors by speaking about the effectiveness of the Company's internal and Disclosure Controls while concealing that they were actually ineffective because numerous lies were able to be repeatedly published about NewAge's agreements and CBD portfolio, and NewAge was embroiled in a ruinously expensive investigation into Ariix's FCPA violations.

Plaintiffs allege that the truth was gradually revealed in a series of partial disclosures: (1) Willis's resignation; (2) the NASDAQ notice regarding the late Form 10-Q; (3) NewAge's announcement of "strategic alternatives"; (4) NewAge's bankruptcy filing, to which the costs of the Ariix investigation contributed; (5) the resulting delisting from the NASDAQ; and (6) the SEC's C&D Order and Complaint.  ¶¶289-300.  NewAge's stock plummeted in response to each of these disclosures.  *Id.*

16

Cooper's argument that Plaintiffs allege no causal nexus between his statements and the loss is incorrect.

Willis's resignation on January 10, 2022 caused NewAge's stock to plummet 6%.  ¶164. Although the resignation was not then attributed to the fraud alleged herein, an officer's "resignation can qualify as a partial disclosure, even if the announcement did not connect his resignation to" the allegedly fraudulent conduct.  *Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at *11 (S.D. Cal. July 12, 2016).  Willis resigned suddenly and without a replacement planned. ¶284.  Thus, the timing of Willis's resignation and his direct involvement in the wrongdoing alleged strongly suggests that his departure—and the accompanying stock drop—was causally related to statements like Cooper's that concealed that wrongdoing.  *See, e.g., Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 136, 140 (D. Conn. 2021) (finding resignations publicly "attributed to non-fraudulent motivations" served as loss causation events where resignees were directly involved in the alleged fraud and resigned shortly after investigation launched).  Even if Willis's resignation could not serve as a corrective disclosure on its own, however, it is properly considered "a portion of the totality" of the loss causation inquiry.  *See Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322-23 (5th Cir. 2014).

The same is true for the remaining disclosures.  On May 17, 2022, NewAge received a NASDAQ notice that it was not in compliance with listing rules because its Form 10-Q was late, leading to an 8% drop.  ¶165.  Then, NewAge announced that it was undertaking a review of "strategic alternatives," including "available financial alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction" on June 8, 2022, leading to a 12% drop the next day, followed by further drops the following three days.  ¶166.

Events like these are also appropriately considered part of the loss causation analysis, even if they are then-unexplained. *See Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *6, *12 (M.D. Tenn. Apr. 26, 2011) (finding press release announcing that a Form 10-K would be filed late need not "specifically detail[] the exact basis of the fraud…to establish loss causation").

The reasons behind the late filing and review of strategic alternatives became clear following NewAge's bankruptcy announcement and the SEC's revelations. On August 30, 2022, NewAge announced that it was filing for bankruptcy, which *The Wall Street Journal* reported on the following day in an article titled "NewAge Says Cost of Internal Probe Contributed to Bankruptcy." ¶167. NewAge's stock dropped another 39% and 26% over the next two trading days. *Id*. Shortly thereafter, NASDAQ announced that it would be delisting the stock due to NewAge's bankruptcy filing, leading to a 9% drop. ¶168.

The bankruptcy filing revealed part of the truth about NewAge's underlying condition and the previously undisclosed costs of the FCPA investigation that had been concealed by, *inter alia*, Cooper's statements. Furthermore, NewAge *itself* attributes its bankruptcy to the Ariix investigation. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (loss causation adequately pleaded where "[t]he concealed risk materialized when Parmalat suffered a liquidity crisis on December 8, 2003 and was unable to pay bonds as they came due").

The final disclosures on October 18 and 19, 2022, the SEC Complaint and C&D Order revealed that Willis and NewAge repeatedly disseminated blatant falsehoods about NewAge's agreements and CBD portfolio. These disclosures are factually related to Cooper's statements because they reveal the truth previously concealed by it—that NewAge's internal and Disclosure Controls were ineffective for these reasons as well.

As explained above, Plaintiffs allege sufficient facts to show that Cooper's misrepresentations and omissions proximately caused Plaintiffs' losses.

**B.      The Materialization Of The Risk Theory**

A plaintiff can also "allege[] loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpum II*, 782 F.3d at 1154.  Plaintiffs allege that: (1) the risk that materialized was within the zone of risk concealed by Defendants' false and misleading statements regarding the distribution agreements, CBD portfolio, and internal and Disclosure Controls (foreseeability); and that (2) the materialization of the risk negatively impacted NewAge stock's value (causal link).  *Id*.

Specifically, the undisclosed risks of the invented/exaggerated distribution agreements, invented/exaggerated CBD portfolio, and ineffective internal and Disclosure Controls included regulatory scrutiny, costly internal investigations, and their foreseeable consequences, such as the CEO's ouster due to his role in this misconduct, violations of NASDAQ listing rules, bankruptcy, delisting, and SEC charges for such lies.  ¶¶289-300.  Thus, the decline in NewAge's stock price in response to these disclosures was a materialization of the risk concealed by Defendants' (including Cooper's) misrepresentations.  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045-46 (N.D. Cal. 2016) (finding materialization of the risk theory adequately pled where disclosures included a resignation, a retirement, and eventual restatement).

Additionally, Plaintiffs' SAC does not amount to a "conclusory shotgun pleading" as Cooper suggests.  MTD 14-15.  A "shotgun pleading" refers to a complaint that "fails to

19

articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading," or

that "is virtually impossible to know which allegations of fact are intended to support which

claims(s) for relief." *Humana, Inc. v. Shrader & Assocs., LLP*, 584 B.R. 658, 671-72 (S.D. Tex.

2018). Unlike a shotgun pleading, the SAC identifies each false and misleading statement by

category, who made the statement, and what specific disclosure(s) revealed the truth behind each

statement and caused NewAge's share price to decline. ¶¶115-70; *see also S.E.C. v. Complete

Bus. Sols. Grp., Inc*., 538 F. Supp. 3d 1309, 1341 (S.D. Fla. 2021) (rejecting argument that

complaint was a shotgun pleading where it separately described each alleged misrepresentation

that forms the basis for its claims and indicated which defendant made each misrepresentation).

## IV.    THE SAC ADEQUATELY PLEADS CONTROL PERSON CLAIMS UNDER SECTION 20(a)

To plead a §20(a) claim, a plaintiff need only allege "(1) a primary violation of the

securities laws and (2) control over the primary violator by the alleged controlling person."

*Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304-05 (10th Cir. 1998). Cooper argues that

the §20(a) allegation against him fails because Plaintiffs have failed to adequately plead that he

committed a primary violation of §10(b). MTD 17. Plaintiffs have sufficiently pled Cooper's

§10(b) violation for the reasons explained above, but even if they had not, Cooper would still be

liable under §20(a) as a controlling person of NewAge—a primary violator of §10(b).

NewAge unquestionably committed a primary violation of §10(b) by making false and

misleading statements in the March 18, 2021, August 9, 2021, and November 9, 2021 annual and

quarterly SEC filings—yet another point which Cooper does not dispute. ¶¶155-63; *State of N.J.

& Its Division of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1144-47 (D. Kan. 2004) (primary

violation of 10(b) found where SEC filings contained false and misleading statements).

To show that a defendant is a control person, "plaintiff must allege facts which indicate the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *SemGroup*, 729 F. Supp. 2d at 1301-03.  The Tenth Circuit "has expressly rejected those decision that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation." *Maher*, 144 F. 3d at 1305.  As a "complex factual question," control person liability is not ordinarily resolved on a motion to dismiss and when it is, plaintiffs' claims will be defeated only if they fail to "plead ***any facts*** from which it can be reasonably inferred the defendant was a control person" of the primary violator.  *SemGroup*, 729 F. Supp. 2d at 1304-06.

Plaintiffs have sufficiently pled Cooper's control over NewAge during his tenure there. First, Cooper was a member of the "NewAge[] Board [of Directors as of] November 13, 2020," ¶40, who signed an SEC filing that contained false and misleading statements about NewAge's internal and Disclosure Controls.  ¶155; *Kyung Cho v. UCBH Holdings, Inc.*, 890 F. Supp. 2d 1190, 1208 (N.D. Cal. 2012) ("[A]llegations that directors signed the statements which contain the material misrepresentations are sufficient to state Section 20(a) control status.").  Cooper joined the NewAge Board when Ariix—the company of which he was the founder and CEO— merged with NewAge.  ¶¶99, 103.  As a Board member, executive and key figure in the Ariix merger, Cooper was "charge[d] with power over the documents and represent[ed] to the corporation, its shareholders, and the public that…[he] performed h[is] role with sufficient diligence [and] that []he [wa]s willing and able to stand behind the information contained in th[e SEC filings]." *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 420 (S.D.N.Y. 2003).

21

Significantly, the Board that Cooper joined did not remain passive and regularly presided over the micro and macro aspects of NewAge's operations (*i.e.*: holding frequent meetings, ¶¶240-43; controlling employee compensation, ¶¶19, 240-42, and keeping abreast of NewAge's products and agreements, ¶243). Such involvement lends itself to a presumption of control for Board members. *See, e.g., In re Hamilton Bankcorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359-60 (S.D. Fla. 2002) ("[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs...are sufficient to state a cause of action for controlling person liability.").

## CONCLUSION

For the foregoing reasons, Cooper's motion should be denied in its entirety. However, should the Court determine that the SAC should be dismissed in whole or in part, Plaintiffs respectfully request that the dismissal be without prejudice and that they be granted leave to amend, which should be given "freely . . . when justice so requires." Rule 15(a)(2).

Dated: July 10, 2025

Respectfully submitted,


By: s/ James M. Wilson, Jr.

James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: jwilson@faruqilaw.com

Robert W. Killorin
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380

22

Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
E-mail: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Damian Betebenner and
Cigdem Betebenner and Lead Counsel for the Class*

23

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Lead Plaintiffs' Memorandum in Opposition to Defendant Fred Cooper's Motion to Dismiss the Second Amended Class Action Complaint complies with the type-volume limitation set forth in Judge Domenico's Practice Standards III(A)(1), and modified by the Court's April 29, 2025 order, Dkt. 121.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on July 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

1