**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-TPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff,

                v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,
and GREG FEA

Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT
BRENT WILLIS'S MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION
COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

ARGUMENT ............................................................................................................... 5

I.     PLAINTIFFS HAVE STANDING.................................................................... 6

II.    PLAINTIFFS ADEQUATELY PLEAD FALSITY .......................................... 7

       A.     Statements About Distributor Relationships Were False And/Or Misleading ....... 7

              1.     Statements About The Military........................................................ 7

              2.     Statements About Loblaws/Sobeys.............................................. 10

              3.     Statements About South Korean Distribution............................. 12

              4.     Statements About Walmart .......................................................... 13

       B.     Statements About The CBD Portfolio And Orders.................................. 14

       C.     Willis's Internal Controls Certifications Were False And Misleading................. 17

       D.     Willis's Statements Are Not Protected By The Safe Harbor............................... 19

       E.     Willis's Statements Are Not Puffery ...................................................... 19

III.   PLAINTIFFS ADEQUATELY PLEAD SCIENTER ........................................ 20

       A.     Willis Knew The Truth About The Purported Agreements.................................. 21

       B.     Inventory Shortages Support Scienter .................................................... 23

       C.     Willis Knew The Truth About The CBD Portfolio ............................................. 26

       D.     Willis Knew The Truth About NewAge's Internal And Disclosure Controls...... 27

       E.     Willis's Resignation Supports Scienter .................................................. 27

       F.     Motive Supports Scienter.......................................................................... 28

IV.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ....................................... 30

       A.     The Corrective Disclosure And Leakage Theories............................................. 31

       B.     The Materialization Of The Risk Theory............................................................ 33

V.      PLAINTIFFS STATE §20(a) CLAIMS ............................................................................ 33

CONCLUSION.................................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page(s)**

*A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*,
   2018 WL 1273343 (S.D.N.Y. Mar. 5, 2018) ............................................................................12

*In re Allergan Generic Drug Pricing Sec. Litig.*,
   2019 WL 3562134 (D.N.J. Aug. 6, 2019) ...............................................................................32

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) ...............................................................................................21

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007).......................................................................................18

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) .....................................................................................................28

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) .....................................................................................................7

*Better v. YRC Worldwide Inc.*,
   2012 WL 4433500 (D. Kan. Sept. 25, 2012).............................................................................19

*Blue Chip Stamps v. Manor Drug Stores*,
   421 U.S. 723 (1975)....................................................................................................................6

*Brody v. Transitional Hosp. Corp.*,
   280 F.3d 997 (9th Cir. 2002) .....................................................................................................7

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ......................................................................................14

*Carlucci v. Han*,
   907 F. Supp. 2d 709 (E.D. Va. 2012) ........................................................................................8

*Chapman v. Mueller Water Prods., Inc.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020).......................................................................................29

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) .................................................................................................7

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)...........................................................................30

*In re Crocs, Inc. Sec. Litig.*,
774 F. Supp. 2d 1122 (D. Colo. 2011).......................................................................................11

*Croker v. Carrier Access Corp.*,
2006 WL 2035366 (D. Colo. July 18, 2006) ............................................................................30

*In re Curaleaf Holdings, Inc. Sec. Litig.*,
519 F. Supp. 3d 99 (E.D.N.Y. 2021) ........................................................................................16

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ...........................................................................18

*Donley v. Live Nation Ent., Inc.*,
2024 WL 794641 (C.D. Cal. Feb. 23, 2024)..............................................................................11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................................4, 30

*Ellis v. Spectranetics Corp.*,
2018 WL 1583837 (D. Colo. Apr. 2, 2018)...............................................................................25

*Emps.' Ret. Sys. of the State of R.I. v. Williams Cos, Inc.*,
889 F.3d 1153 (10th Cir. 2018) ................................................................................................11

*In re Facebook, Inc., IPO Sec. & Deriv. Litig.*,
986 F. Supp. 2d 428 (S.D.N.Y. 2013).......................................................................................20

*Farlow v. Peat, Marwick, Mitchell & Co.*,
956 F.2d 982 (10th Cir. 1992) ....................................................................................................6

*In re Firstenergy Corp. Sec. Litig.*,
2022 WL 681320 (S.D. Ohio Mar. 7, 2022)..............................................................................19

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................................29

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ..................................................................................................9

*Gruber v. Gilbertson*,
628 F. Supp. 3d 472 (S.D.N.Y. 2022)........................................................................................31

*Halperin v. eBanker USDA.com, Inc.*,
295 F.3d 352 (2d Cir. 2002).......................................................................................................7

*In re Hertz Glob. Holdings Inc*,
    905 F.3d 106 (3d Cir. 2018).....................................................................................................29

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021).......................................................................................16

*Higginbotham v. Baxter International Inc.*,
    495 F.3d 753 (7th Cir. 2007) ....................................................................................................19

*Hogan v. Pilgrim's Pride Corp.*,
    2023 WL 8896324 (D. Colo. Dec. 26, 2023)............................................................................30

*IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.*,
    706 F. Supp. 3d 1225 (D. Kan. 2023)........................................................................................21

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
    537 F.3d 527 (5th Cir. 2008) ....................................................................................................23

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) .......................................................................................9, 28, 29

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).......................................................................................................25

*Jacobsen v. Deseret Book Co.*,
    287 F.3d 936 (10th Cir. 2002) ...................................................................................................12

*Kessman v. Myriad Genetics, Inc.*,
    2019 WL 1330363 (D. Utah Mar. 25, 2019) ............................................................................31

*Kowal v. MCI Commc'ns Corp.*,
    16 F.3d 1271 (D.C. Cir. 1994).....................................................................................................7

*Lachman v. Revlon, Inc.*,
    487 F. Supp. 3d 111 (E.D.N.Y. 2020) .......................................................................................24

*Latham v. Matthews*,
    662 F. Supp. 2d 441 (D.S.C. 2009)............................................................................................11

*Lingam v. Dish Network Corp.*,
    2025 WL 872464 (D. Colo. Mar. 20, 2025) ..............................................................................14

*Macquarie Infrastructure Corp. v. Moab Partners, L. P.*,
    601 U.S. 257 (2024).....................................................................................................................7

*Matrixx Initiatives, Inc. v. Siracusano*,
　　563 U.S. 27 (2011)....................................................................................................7

*Mauss v. NuVasive, Inc.*,
　　2016 WL 3681831 (S.D. Cal. July 12, 2016) ........................................................32

*McDonald v. Kinder-Morgan, Inc.*,
　　287 F.3d 992 (10th Cir. 2002) ...............................................................................11

*Medina v. Clovis Oncology, Inc.*,
　　215 F. Supp. 3d 1094 (D. Colo. 2017).....................................................................19

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*,
　　79 F.4th 1209 (10th Cir. 2023) ...............................................................................25

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
　　540 F.3d 1049 (9th Cir. 2008) ................................................................................29

*In re MGP Ingredients, Inc. Sec. Litig.*,
　　2021 WL 3885655 (D. Kan. Aug. 31, 2021) ...........................................................21

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
　　761 F.3d 1109 (10th Cir. 2014) ...............................................................................21

*In re Molycorp, Inc. Sec. Litig.*,
　　157 F. Sup. 3d 987, 1012 (D. Colo. 2016)...............................................................30

*In re Molycorp, Inc. Sec. Litig.*,
　　2015 WL 1540523 (D. Colo. Mar. 31, 2015) ..........................................................28

*In re Myriad Genetics, Inc. Securities Litigation*,
　　2021 WL 977770 (D. Utah Mar. 16, 2021) .............................................................28

*Nakkhumpun v. Taylor*,
　　782 F.3d 1142 (10th Cir. 2015) ....................................................................9, 20, 33

*Nicholas v. Poughkeepsie Sav. Bank/FSB*,
　　1990 WL 145154 (S.D.N.Y. Sept. 27, 1990)..............................................................6

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000).......................................................................................7

*In re NPS Pharms., Inc. Sec. Litig.*,
　　2007 WL 1976589 (D. Utah July 3, 2007*)* ............................................................25

*Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019)......................................................................6

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015).....................................................................18

*Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*,
    679 F.3d 952 (7th Cir. 2012) .................................................................................16

*Prissert v. EMCORE Corp.*,
    894 F. Supp. 2d 1361 (D.N.M. 2012) .....................................................................29

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc*.,
    769 F.3d 313 (5th Cir. 2014) .................................................................................32

*Puddu v. 6D Glob. Techs., Inc.*,
    742 F. App'x 553 (2d Cir. 2018) ............................................................................32

*In re QuantumScape Sec. Class Action Litig.*,
    580 F. Supp. 3d 714 (N.D. Cal. 2022) ...................................................................15

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004)....................................................................30

*Rabkin v. Lion Biotechnologies, Inc.*,
    2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ..........................................................32

*Reilly v. U.S. Physical Therapy Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018) ..........................................................29

*Richfield v. PolarityTE, Inc.*,
    2023 WL 3010208 (D. Utah Apr. 19, 2023)............................................................16

*Roberts v. Zuora, Inc.*,
    2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .........................................................25

*Roots P'ship v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) ................................................................................6

*S. Ferry LP #2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)...............................................................24

*In re Salix Pharms., Ltd*.,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..........................................................24

*Sapssov v. Health Management Associates, Inc.*,
608 F. App'x 855 (11th Cir. 2015) ........................................................................................32

*S.E.C. v. Gallagher*,
2023 WL 6276688 (S.D.N.Y. Sept. 26, 2023)........................................................................17

*S.E.C. v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ...............................................................................................19

*S.E.C. v. Willis*,
No. 22-cv-02744-GPG-SKC, Dkt. 42 (D. Colo. Sept. 29, 2023) ...........................................29

*In re SemGroup Energy Partners, L.P. Sec. Litig.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010)..........................................................................18, 21

*Shafer v. Lightning eMotors, Inc.*,
2024 WL 691458 (D. Colo. Feb. 20, 2024)............................................................................25

*Smallen v. W. Union Co.*,
950 F.3d 1297 (10th Cir. 2020) .......................................................................................21, 29

*Sorkin, LLC v. Fischer Imaging Corp.*,
2005 WL 1459735 (D. Colo. Jun. 21, 2005) ....................................................................25, 29

*Spiegel v. Tenfold Corp.*,
192 F. Supp. 2d 1261 (D. Utah 2002)....................................................................................24

*Spitzberg v. Hous. Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .............................................................................................6, 20

*SS Richmond LLC v. Harrison*,
640 F. Supp. 3d 453 (E.D. Va. 2022) ....................................................................................20

*Steamfitters Local 449 Pension Plan v. Molina Healthcare, Inc.*,
2018 WL 6787349 (C.D. Cal. Dec. 13, 2018) .......................................................................19

*Steiner v. Medquist Inc.*,
2006 WL 2827740 (D.N.J. Sept. 29, 2006) ...........................................................................33

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ................................................................................................29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................................20, 28

*Thomas v. Magnachip Semiconductor Corp.*,
  167 F. Supp. 3d 1029 (N.D. Cal. 2016) ....................................................................33

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010) .............................................................5, 8, 28

*In re Triangle Capital Corp. Securities Litigation*,
  988 F.3d 743 (4th Cir. 2021) ......................................................................................9

*Trs. of Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*,
  726 F. Supp. 3d 938 (D. Minn. 2024)........................................................................16

*In re Tyco Int'l, Ltd. MDL Litig.*,
  2004 WL 2348315 (D.N.H. Oct. 14, 2004) ..............................................................22

*UA Loc. 13 Pension Fund v. Sealed Air Corp.*,
  2021 WL 2209921 (S.D.N.Y. June 1, 2021) ............................................................18

*United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake
  Energy Corp.*,
  774 F.3d 1229 (10th Cir. 2014) .................................................................................11

*In re UTStarcom, Inc. Sec. Litig.*,
  617 F. Supp. 2d 964 (N.D. Cal. 2009) ......................................................................27

*In re Vivendi Universal, S.A. Sec. Litig.*,
  242 F.R.D. 76 (S.D.N.Y. 2007) ..................................................................................6

*Voulgaris v. Array Biopharma Inc.*,
  2020 WL 8367829 (D. Colo. Nov. 24, 2020) ................................................. *passim*

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) .................................................................................31

*Winslow v. BancorpSouth, Inc.*,
  2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).......................................................32

*In re Zagg Securities Litigation*,
  2014 WL 505152 (D. Utah Feb. 7, 2014)..................................................................28

**Statutes**

15 U.S.C. §78u-5(c)(1) .....................................................................................................19

vii

**Other Authorities**

17 C.F.R. §229.308(a)(3) ..................................................................................................................17

17 C.F.R. §240.13a–15(e) .................................................................................................................17

17 C.F.R. §240.13a–15(f) .................................................................................................................17

Fed. R. Evid. 801(d)(2) ..................................................................................................................3, 27

Rule 11(b)(4) .......................................................................................................................................8

Rule 15(a)(2) .....................................................................................................................................34

Plaintiffs respectfully submit this memorandum of law in opposition to Brent Willis's ("Willis") Motion to Dismiss ("Motion" or "MTD") (Dkt. 124).[1]

## INTRODUCTION

This securities fraud class action is the result of the numerous lies Defendants issued to investors about NewAge's operations.  The lies also spawned lawsuits by the SEC and even by NewAge against Willis – viewed by many as the chief culprit that drove a potentially profitable company into bankruptcy.

Willis and other Defendants assured the market that the Company was entering into multiple lucrative distribution agreements for its beverages—including a prized contract with the U.S. military.  In reality, the agreements either did not exist, or were greatly exaggerated.  Willis and other Defendants also told the market that NewAge was developing a CBD-infused beverage portfolio, had retail orders for it, and that it was currently available in FamilyMart (a Japanese convenience store chain with 15,000 outlets).  In truth, no such orders existed, the product was not in FamilyMart, and NewAge had no finished product to sell.  These misrepresentations had the intended impact, as NewAge's stock price soared during the Class Period, allowing Willis to sell over $3 million worth of shares and more than double his annual salary to $650,000 per year.  NewAge also used the artificially inflated stock price to raise over $100 million through additional stock offerings, which was used in part to fund acquisitions.  The acquisition of Ariix—part of NewAge's supposed effort to expand into the multi-level-marketing beverage space—was the product of egregious self-dealing by Willis and others.

---

[1]    All "¶" references are to the Second Amended Class Action Complaint ("SAC").  Dkt. 114.  Unless otherwise noted, all capitalized terms mean the same as in the SAC, all emphasis is added and all citations, internal quotation marks, and footnotes are omitted.

The truth came out over time in a series of partial disclosures, including NewAge's bankruptcy, caused in part by the costly internal investigation into Ariix's suspected violations of the Foreign Corrupt Practices Act ("FCPA"), and the SEC's Cease-and-Desist ("C&D") Order against NewAge and its complaint ("SEC Complaint") against Willis that revealed the full truth about the purported agreements and CBD portfolio.  As a result, NewAge's stock price plummeted and investors lost over 90% of their investment's value.

In his Motion, Willis boldly claims that Plaintiffs' allegations are based solely on the SEC's "say[] so," but, as discussed in depth in Plaintiffs' opposition to Willis's motion to strike, that claim is plainly false.  As the Court's prior order makes clear, "Plaintiffs may reallege the same or similar facts [as the prior complaint] in a second amended complaint" as long as they are "supported by independent investigation."  Doc. 112 at 4 n.1.  Plaintiffs have done so.  Plaintiffs' claims are supported by a tremendous amount of additional investigation which revealed, *inter alia*: ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████;[2] the accounts of four confidential witnesses ("CWs"); and NewAge's own admissions against interest in ***its own***

---

[2]    As explained in Plaintiffs' accompanying opposition to Willis's motion to strike, these materials were not "purloined[,]" nor do they violate the PSLRA.

Adversary Complaint in the bankruptcy action.[3]  Plaintiffs believe that because of great success with the additional investigation, the SAC fully addresses the concerns the Court had with the first Amended Complaint. Willis's MTD should be denied in all respects.

This is a clear-cut case of securities fraud.  Willis now claims that NewAge was clear that the agreements he discussed, e.g., with the Military, were merely indefinite and immaterial "authorizations" that created no guaranteed sales or long-term obligations, but this *post hoc* claim by his lawyers is ***directly contradicted by the evidence and his contemporary statements to the market***.

Willis argues that his statements about agreements



Willis also blames unforeseen challenges and the fact that the much-hyped agreements and orders for NewAge's supposed CBD beverage portfolio fell short of investors' expectations. This argument is completely baseless.  Plaintiffs do not complain that such ventures were inadequately profitable, but that their very existence was misrepresented.

---

[3]    This is different from the bankruptcy trustee's action addressed in the Court's prior order. *See* SAC at 2, ¶273 (explaining that *In re: NewAge, Inc. et al.*, No. 22-50432 (LSS) (Bankr. D. Del.) was brought by NewAge itself and appropriately considered under Fed. R. Evid. 801(d)(2)).

With respect to scienter, Willis's position—that he was just overly optimistic about NewAge's prospects—is not plausible.  There is a strong inference of scienter, supported by, *inter alia*, the documentary evidence described above.

With respect to loss causation, which is subject to Fed. R. Civ. P. 8's pleading standard, Plaintiffs need only provide "defendants with notice of what the relevant economic loss [or] the causal connection might be[.]"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). Plaintiffs have done so, alleging a series of partial disclosures that culminate in the SEC's disclosures in October 2022 that sent NewAge's stock plunging **93%**.

## STATEMENT OF FACTS

Beginning in January 2018, Willis and NewAge made a series of announcements that misled the market that the Company's fortunes were improving.  ¶6.  They announced a "new distribution agreement" with the military, an expanded distribution with Canadian retailers, and "a major distribution agreement" to expand "to all major retail outlets throughout [South Korea] immediately," and in early 2019, NewAge's "first national distribution" with Walmart.  ¶¶115-18, 122-23, 126, 146.  They also told the market that NewAge had developed a CBD-beverage portfolio, and announced massive retail commitments and near-term launches.  ¶¶135-42. Investors and analysts bought these lies as NewAge's stock price soared on these announcements.  ¶¶64, 125, 130, 149.

On NewAge's buoyed stock price and seemingly improved prospects, Willis's salary doubled in early 2019 and he thereafter pocketed millions selling his shares.  ¶¶93-94, 263.

4

Meanwhile, NewAge capitalized on its artificially inflated share price to raise over $100 million, allowing it to expand its business by acquiring multiple companies.  ¶¶250-59.

NewAge's acquisition spree would culminate in the ill-fated Ariix merger, announced in July 2020, which closed without Ariix's audited financials.  ¶¶101-03.  Post-closing, NewAge discovered Ariix's targeted working capital was ***negative $18 million***, and that it would need to undertake an expensive investigation into Ariix's potential FCPA violations which would prove to be disastrous.  ¶¶105-06, 270.  Meanwhile, Willis and Cooper misappropriated key assets NewAge acquired in the Ariix merger to fund a competing venture.  ¶¶269-82.

Despite the foregoing and because of Willis's ability to repeatedly disseminate falsehoods concerning NewAge's business relationships and CBD portfolio, Defendants falsely assured investors regarding NewAge's internal and Disclosure Controls.  ¶¶151-63.

The truth came out in a series of partial disclosures thereafter, including Willis's resignation and NewAge's bankruptcy, which gradually revealed the truth previously concealed by Defendants, culminating in the SEC's Complaint and C&D Order that detailed Willis's and NewAge's misconduct.  ¶¶164-70.  NewAge stock plummeted on each revelation.  *Id.*

## ARGUMENT

On a Rule 12(b)(6) motion, the "court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1185 (D.N.M. 2010), *on reconsideration in part,* 824 F. Supp. 2d 1214 (D.N.M. 2011).  If inferences weigh equally in favor of both plaintiff and defendants,

5

then the "tie" goes to plaintiff and the motion to dismiss should be denied.  *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014).

## I.   PLAINTIFFS HAVE STANDING

Willis's argument that Plaintiffs lack standing to pursue claims for false statements made after their last NewAge stock purchase on October 4, 2018, lacks merit.  MTD 8-9.  To hold otherwise would imply that "only someone who bought on the last day of [the] Class Period" could bring an action.  *Nicholas v. Poughkeepsie Sav. Bank/FSB*, 1990 WL 145154, at *6 (S.D.N.Y. Sept. 27, 1990).  That is not the law.  Numerous courts "apply a 'common course of conduct analysis' to standing questions," considering whether plaintiffs made a purchase after the defendant made **any statements** in furtherance of their "scheme of fraud."  *Peace Officers' Annuity & Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1150 (D. Colo. 2019) (disagreeing with *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1420 (7th Cir. 1992)).

Plaintiffs have standing because they purchased NewAge securities on October 1 and 4, 2018 (Dkt. 20-2) following certain misstatements in furtherance of this "sustained course of conduct" (*In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 87 (S.D.N.Y. 2007)), and held through the loss causation events.[4]

---

[4]   *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986-87 (10th Cir. 1992) (MTD 8) says nothing about standing and unlike here, lacked sufficient detail to determine what misrepresentations were made when or how they furthered the alleged scheme.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 725, (1975) (MTD 8) provided only that an action cannot be maintained by someone who "neither purchased nor sold any of the offered shares"— which is plainly not the case here.

## II.    PLAINTIFFS ADEQUATELY PLEAD FALSITY

Statements are actionable under Section 10(b) if they are either false or misleading with respect to a material fact. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011); *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024). It is also unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 37 (2011). A statement is misleading if it "affirmatively create[d] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosp. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, when defendants choose to speak about topic material to investors, they put that topic "in play" and assume a duty to speak fully and truthfully on that topic. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008); *see also Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829, at *14 (D. Colo. Nov. 24, 2020).[5]

### A.    Statements About Distributor Relationships Were False And/Or Misleading

#### 1.    Statements About The Military

Willis stated that NewAge had a "new distribution agreement" with the military with products "shipping out now…to all commissary locations worldwide," that the "scope of

---

[5]    Defendants' authorities are distinguishable. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (MTD 9) ("allegations of GAAP violations or accounting irregularities, standing alone, are insufficient"); *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1253-60 (10th Cir. 2001) (MTD 9, 24, 28) (finding failure to disclose specific lawsuit against company not misleading where company disclosed that it was subject to various lawsuits for substantial amounts whose outcomes were unknown, and defendants did not know this lawsuit was particularly material); *Halperin v. eBanker USDA.com, Inc.*, 295 F.3d 352, 360-61 (2d Cir. 2002) (MTD 10) (allegations based on underperformance of brokerage activities were insufficient); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1279 (D.C. Cir. 1994) (MTD 10) (similar).

Military Commissaries (240) and Exchanges (3,100) spans over 3,300 outlets in more than 30 countries around the world," and "the new distribution agreement is expected to have a material impact on the financial results of NewAge," ¶115; NewAge "picked up the military business worldwide," ¶117, "in a very significant way," ¶118; and NewAge was selling "21 core" products "in the military channel" that was "as big as Walmart in total sales throughput[,]" ¶119. These statements thereby gave the false and misleading impression that NewAge had a "new distribution agreement" with the military and was shipping products to all commissaries. ¶120.

Plaintiffs' investigation revealed that each of these statements were completely fictious. *See* ¶¶62, 65, 206, 224.

Willis audaciously claims that "Plaintiffs are dealing in conjecture" because "they are assuming, without support, that NewAge's agreement with the military was written" and with "the federal government." MTD 12. Willis suggests (but is careful to not outright state) that the agreement involved subcontractors, *id.*, but he has never come up with any evidence at all of this supposed agreement. ¶62.[6] At this stage of the litigation, the Court is required to take all well-pleaded facts as true and draw all reasonable inferences in Plaintiffs' favor. *Thornburg*, 719 F.3d at 1190. The only reasonable inference that can be drawn is that the agreement with the military described by Willis did not exist and he knew it. *See Carlucci v. Han*, 907 F. Supp. 2d 709, 732 (E.D. Va. 2012).

Willis also argues that the foregoing statements cannot be false or misleading because he never said that NewAge's agreement was "written," and that some (unspecified) risk warnings somehow neutralized it. MTD 12. This makes no sense, especially given the market's reaction

---

[6]    *See* Rule 11(b)(4).

to this news.  The stock price went up 21% on the announcement of the claimed agreement

(¶¶64, 121), and an analyst discussed the new agreement. ¶66; *see also Ind. Pub. Ret. Sys. v.*

*Pluralsight, Inc.*, 45 F.4th 1236, 1244, 1251, 1264 (10th Cir. 2022) (finding analysts'

understanding of defendants' statements relevant to whether they misled investors).

Additionally, Willis argues that Plaintiffs failed to sufficiently explain how NewAge

lacked "plans" and "sufficient inventory" to distribute the relevant beverages to commissaries

worldwide.  However, the allegation has sufficient support and is a reasonable inference

considering there was no evidence of any agreement and insufficient inventory to fill such an

agreement according to ██ CW-2 and ████████████████████████████

████████████████████████ ¶¶206, 210; §III.B, *infra*.

Willis argues that CW-2 lacked the personal knowledge to opine on inventory for a

distribution agreement, but he does not dispute CW-2's role of being in charge of storing and

shipping products.  ¶115, 206, 224.  Willis also suggests that CW-2 is conflating a "sales

authorization from the U.S. military"— which does not require inventory—with purchase orders,

which do require inventory.  MTD 12.  But perhaps the most glaring deficiency in his *post hoc*

position is that Willis' contemporary statements at the time say nothing to investors about a mere

"authorization."  *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1150 (10th Cir. 2015) ("*Nakkhumpun*

*II*").[7]

---

[7]    *In re Triangle Capital Corp. Securities Litigation*, 988 F.3d 743, 756 (4th Cir. 2021)
(MTD 11) and *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (MTD 12) are
distinguishable, because there no contemporaneous facts showed the statements were misleading
**when made**.

### 2.    Statements About Loblaws/Sobeys

Willis and NewAge told the market in two February 2018 press releases that: NewAge had "begun shipments of its Coco-Libre and Búcha Live Kombucha brands in expanded distribution throughout Loblaws and Sobeys, the largest grocery retailers across Canada," "is now expanding to all banners within Loblaws and expanding throughout Sobeys and Safeway," and "are now expanding to all banners and our brands are gaining real critical mass," ¶122; and Búcha "has recently expanded to all major retailers throughout Canada," ¶123.  As Thibodeau testified and internal documents show, these statements were false and misleading when made. ¶124.

The truth was that

Thus, unlike the facts in Willis's authorities, disclosing the truth in this case

would have "alter[ed] the meaning" of his statements.  *See Emps.' Ret. Sys. of the State of R.I. v. Williams Cos, Inc.*, 889 F.3d 1153, 1163-64 (10th Cir. 2018) (MTD 8); *United Food & Com. Workers Union Loc. 880 Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1236-39 (10th Cir. 2014) (MTD 10); *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 996-98 (10th Cir. 2002) (MTD 14-15); *cf. In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122, 1151-52 (D. Colo. 2011) (MTD 15).

Willis claims that Plaintiffs are misreading the press release, because it was NewAge's portfolio that was expanding to "all banners" while Búcha was only expanding to "all major" banners.  MTD 14.  It is not true that the press release excludes Búcha from "all banners" when read in its entirety, but even if it were true, these statements were false and misleading as

██████████████████████████████████████████████████████████

█████████████████████████.  Thus, the challenged statements created an "impression of a state of affairs that differs in a material way from the one that actually exists."  *Donley v. Live Nation Ent., Inc.*, 2024 WL 794641, at *8 (C.D. Cal. Feb. 23, 2024); *see Latham v. Matthews*, 662 F. Supp. 2d 441, 457-58 (D.S.C. 2009).

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████



### 3.   Statements About South Korean Distribution

Willis told the market in a press release that NewAge "signed a major distribution agreement for expansion of its Búcha Live Kombucha brand with the largest food and beverage distributor in South Korea to expand to all major retail outlets throughout the country immediately." ¶126. The press release listed the specific stores and the schedule. *Id.* Tellingly, Willis does not argue that NewAge had an agreement to sell in those stores or on that schedule.

---

[8] ███████████████████████████████████████████ Thus, Willis's authorities are inapplicable. *See A.V.E.L.A., Inc. v. Est. of Marilyn Monroe, LLC*, 2018 WL 1273343, at *4, *8 n.4 (S.D.N.Y. Mar. 5, 2018) (MTD 13) (plaintiffs' MTD documents contradict pleadings); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 942 (10th Cir. 2002) (addressing legal effect of original and copyrighted works).

12

Instead, he argues that Plaintiffs "misinterpret the statement" and that he was merely laying "the groundwork for expansion."  MTD 15.  Nothing in the press release suggests that mere "groundwork" is being laid.   ¶76.  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████

### 4.     Statements About Walmart

In April 2019, Willis and NewAge announced: the "first national distribution" of its Marley line with Walmart; that it had "now begun shipments to Walmart distribution centers across the [U.S.]"; that each of NewAge's three Marley flavors "will be available at Walmart stores in the beginning of April" 2019; and "we expect to make the full portfolio of New Age's better-for-you products available as we expand the relationship."  ¶¶146-47.  These statements gave investors a materially misleading impression regarding the actual scope of the Walmart agreement.  █████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████[9]

---

[9]     The Court previously stated that statements about a "national distribution" did not create "the misleading impression that NewAge had begun to and would be shipping them to all, or at

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████

Willis now argues that the statements were intended to be read as merely "an opportunity for NewAge to expand in **_at least some_** Walmart stores nationwide."  MTD 15.  However, by "volunteering relevant, material information regarding the lucrative nature of [NewAge's] impending agreements, [Willis] assumed an obligation…[and failed] to convey 'the whole truth.'"  *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006).

Unlike in Willis's authority, *Lingam v. Dish Network Corp.*, 2025 WL 872464, at *4 (D. Colo. Mar. 20, 2025) (MTD 16), ███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██

## B.    Statements About The CBD Portfolio And Orders

Willis and NewAge told the market that NewAge had tested and developed a CBD-beverage portfolio, and announced massive retail commitments and near-term launches.  ¶¶130, 132, 134-43.

These statements were blatantly false when made because, among other things, NewAge (i) had **not** completed the development of a **single** CBD beverage; (ii) ████████████████

████████████████████████████████████████████████████████

least most U.S. WalMart stores."  Dkt. 112 at n. 3.  Plaintiffs amended this allegation in the SAC based on the additional evidence gathered to address the Court's concerns regarding the Walmart statements.

14



. ¶144.[10]

*; see In re*

*QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 733-34 (N.D. Cal. 2022) (finding

statements gave false impression that product was past conceptual stage and would soon be ready

for commercialization).

Instead, Willis claims that no misleading impression could be given in light of the

warnings in an SEC filing about there being "no long-term obligations with any of the third

parties." MTD 17 (citing MTD Ex. 3). However, that filing covers the year ended 2017, while

the subject statements were made in late 2018 and into 2019. ¶¶134-43. In any event, the issue

is not that the retail orders and "points of distribution" were not "long-term obligations," but that

***they did not exist at all.*** Furthermore, Willis's argument that cautions about regulatory hurdles

neutralized these statements misses the point: the CBD statements challenged herein gave

---

[10]    The Court previously stated that NewAge's statements about it having "developed" a
"portfolio" of CBD beverages did not create a misleading impression that was contradicted by
the fact that NewAge added "[an]other company's CBD drops to NewAge's existing non-CBD
drinks." Dkt. 112 at 5 n.3. Plaintiffs amended this allegation accordingly in the SAC to address
the Court's concerns regarding the CBD statements.

investors reason to invest in NewAge based off the false hope that whenever those regulatory hurdles were lifted, NewAge would have a competitive advantage. *See* ¶140. Indeed, on the news of the CBD portfolio's debut, NewAge stock soared a whopping nearly 178%. ¶145. Willis's authorities are inapposite because Plaintiffs' allegations have nothing to do with regulatory approval. *See* ¶141; *see also Trs. of Welfare & Pension Funds of Loc. 464A - Pension Fund v. Medtronic PLC*, 726 F. Supp. 3d 938, 982 (D. Minn. 2024) (MTD 10); *In re Curaleaf Holdings, Inc. Sec. Litig.*, 519 F. Supp. 3d 99, 107 (E.D.N.Y. 2021) (MTD 17); *Richfield v. PolarityTE, Inc.*, 2023 WL 3010208, at *10 (D. Utah Apr. 19, 2023) (MTD 18); *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 310 (S.D.N.Y. 2021) (MTD 19).

He also went on national television and falsely stated that NewAge's CBD beverages were currently available at FamilyMart. ¶142 ("If you want to go to Japan, you can pick it up at FamilyMart there now."). This was 100% false. With no defense, Willis only addresses this in a footnote: that investors do not rely on oral statements because they "are invariably 'less precise than written ones.'" MTD at 18 n.8.[11] Willis's assertion that reasonable investors should not depend on oral statements from company CEOs is ridiculous and trivializes the purpose of the

---

[11]    *Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings, Inc.*, 679 F.3d 952, 955 (7th Cir. 2012) is distinguishable because it involved a truthful answer to the compound question "[d]o you currently have any issues with the FDA, any warning letters, that usually takes a few months for those to be posted, that they may have been issued or 483'ed?" *Id.* After the defendant in *Plumbers* truthfully answered that he did not receive any warning letters, the analyst did not follow up with the second part of the question about 483 observations. *Id.* Here, by contrast, Willis's answer responded to the non-compound question "Can I buy it?" (at 2:18 in the video linked at ¶142).

securities laws (MTD 18); by his reasoning, all securities law claims based on fraudulent *oral*

statements should be dismissed.[12]

### C.    Willis's Internal Controls Certifications Were False And Misleading

Internal controls are intended "to provide reasonable assurance regarding the reliability of

financial reporting and the preparation of financial statements for external purposes in

accordance with generally accepted accounting principles…." 17 C.F.R. §240.13a–15(f); see

also 17 C.F.R. §229.308(a)(3).  Disclosure Controls "ensure that information required to be

disclosed by the issuer in the reports [filed] under the [Exchange] Act…is recorded, processed,

summarized and reported, within the [relevant] time periods[,]"and "accumulated and

communicated to the issuer's management,…as appropriate to allow timely decisions regarding

required disclosure."  17 C.F.R. §240.13a–15(e).  Disclosure Controls can be rendered

ineffective by material weaknesses in internal controls.  ¶156.

Willis certified that "[t]here have been no changes in our internal controls over financial

reporting" that have "or are reasonably likely to materially affect, our internal controls over

financial reporting."  ¶151.  He also certified that he "evaluated the effectiveness of our

[Disclosure Controls]" and "[b]ased on that evaluation[,]" concluded that "our [Disclosure

Controls] are effective[.]"  ¶152.  These statements were false and/or misleading when made.

The Disclosure Controls were not "effective" in ¶¶151-52 because Willis was able to

issue written and oral public statements *on multiple occasions* about fake/exaggerated

---

[12]     Contrary to Willis's contention that the FamilyMart statements did not impact stock prices, MTD 18 n.8, "'the deceit of investors occurs, and is complete, upon the dissemination of the false or misleading touts,' without regard to whether those touts later cause a rise in share price or sales volume." *S.E.C. v. Gallagher*, 2023 WL 6276688, at *9 (S.D.N.Y. Sept. 26, 2023).

agreements and a CBD portfolio that he implied or outright stated were "expected to have a

material impact on [NewAge's] financial results…."  ¶115; *see also* ¶¶116-48; *UA Loc. 13*

*Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021); *see also In*

*re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 377, 380-81 (S.D.N.Y. 2015)

Willis and others also misled the market in later filings by attesting to the filings'

accuracy and truthfulness while stating that NewAge's Disclosure Controls were ineffective as of

December 31, 2020 due to material weaknesses in internal controls unrelated to what was really

plaguing the Company.  Specifically, they stated that NewAge had "[in]sufficient resources to

adequately monitor the consolidation of the financial information and purchase allocation of

Ariix in order to prevent or detect material misstatements" due to the acquisition's "sizing and

timing."  ¶¶156-58, 160, 162.  These statements were misleading for omitting the real reasons

why NewAge's Disclosure Controls were ineffective discussed above.  *Id*.  And with respect to

the statement at ¶¶156-58, the Disclosure Controls were also ineffective because NewAge only

discovered the FCPA issues *after* the Ariix merger closed, necessitating a ruinously costly

internal investigation.  ¶¶20, 161, 270.  *See In re SemGroup Energy Partners, L.P. Sec.*

*Litig.*, 729 F. Supp. 2d 1276, 1290, 1311 (N.D. Okla. 2010).[13]

These statements would still be actionable as opinions.  By making repeated false and

misleading statements about NewAge a "fundamental aspect of [its] business model[,]" Willis's

positive assessments of internal and Disclosure Controls "either were not honestly held or were

---

[13]    Willis's authorities are inapposite because there, plaintiffs insufficiently identified how defendants knew the statements were misleading.  *See Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 683-84 (D. Colo. 2007) (MTD 18); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *12 (S.D.N.Y. Mar. 30, 2021) (MTD 18).

not based on the diligence a reasonable investor would expect [hi]m to convey." *In re Firstenergy Corp. Sec. Litig.*, 2022 WL 681320, at *10 (S.D. Ohio Mar. 7, 2022).[14]

### D.    Willis's Statements Are Not Protected By The Safe Harbor

The PSLRA's safe harbor does not protect Willis's forward-looking statements because they are not accompanied by meaningful cautionary language and were made with actual knowledge of their falsity.  15 U.S.C. §78u-5(c)(1).  Meaningful cautionary language must be "substantive and tailored to the specific future projections, estimates or opinions…which the plaintiffs challenge." *S.E.C. v. GenAudio Inc.*, 32 F.4th 902, 929 (10th Cir. 2022).  The statements Willis claims are forward-looking (¶¶115, 146, 130, 132, 134, 138-39) were not accompanied by meaningful cautionary language and were made with actual knowledge, as described in §III. 146-47.[15]

### E.    Willis's Statements Are Not Puffery

Whether statements are puffery depends on the context in which they were made.  *See Better v. YRC Worldwide Inc.*, 2012 WL 4433500, at *6, *9 (D. Kan. Sept. 25, 2012).  Willis identifies a handful of statements as puffery (¶¶116, 118, 130, 135, 138), but many were "capable of objective verification" and therefore not puffery.  *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1123 (D. Colo. 2017).  For example, the December 2018 statement that

---

[14]    In *Higginbotham v. Baxter International Inc.*, 495 F.3d 753, 760-61 (7th Cir. 2007) (MTD 18), defendant was unaware of a business partners' potentially unlawful conduct while here, ***Willis*** was engaging in it.

[15]    A few sentences about generic contractual arrangements are not "address[ing] in extensive detail the challenges posed by the [third parties] and the Company's related growth," *Steamfitters Local 449 Pension Plan v. Molina Healthcare, Inc.*, 2018 WL 6787349, at *2 (C.D. Cal. Dec. 13, 2018) (MTD 19); thus, Willis's authority is inapposite.

NewAge wants its CBD "beverages portfolio launched in market before Christmas so we're in production now" and "we're on track to be able to execute that," ¶138, were verifiable: either NewAge had completed the necessary steps such that it could get its portfolio on store shelves by Christmas, or it had not. *Cf. In re Facebook, Inc., IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 428, 465 (S.D.N.Y. 2013) (statements about "on-time, on-target, and ready-to-launch technology" represented existing facts concerning NASDAQ's capability and reliability to execute orders and "were readily capable of verification.").[16]

The same is true of the statement that the military agreement was "worldwide in a very significant way," ¶118, which was made in the context of discussing that channel's profitability and conveyed the verifiable fact that NewAge had a relationship with the military of meaningful scope. *See SS Richmond LLC v. Harrison*, 640 F. Supp. 3d 453, 475-76 (E.D. Va. 2022).

### III.    PLAINTIFFS ADEQUATELY PLEAD SCIENTER

A plaintiff may plead scienter by showing either an intent to deceive or that "defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun II*, 782 F.3d at 1150. When considering scienter allegations, a court must "assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).

When the parties present competing inferences, "a tie favors the plaintiff[.]" *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014). Willis argues that the most compelling inference is that he innocently attempted to improve NewAge through new endeavors but "misse[d] the mark." MTD 30. But Willis was not merely optimistic about how NewAge's

---

[16]    The SAC does not challenge as false or misleading the "unique consumer insights," ¶130, or "confident" statements. ¶¶116, 135. None of Willis's authorities regarding puffery (MTD 20) involved a situation where the touted products did not exist.

budding business relationships and the CBD portfolio would shake out—he knowingly or recklessly misrepresented their then-current status and profited handsomely from the results.[17] These allegations are supported by facts properly taken from ███████████████ █████████████, four CWs, a FOIA request, and NewAge's own admissions against interest in its Adversary Action.  Viewed holistically, Plaintiffs' allegations are more than sufficient to plead scienter.

### A.    Willis Knew The Truth About The Purported Agreements

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate."  *SemGroup*, 729 F. Supp. 2d at 1297; *see also IBT Emp. Grp. Welfare Fund v. Compass Minerals Int'l, Inc.*, 706 F. Supp. 3d 1225, 1260 (D. Kan. 2023). That is the case here.

Willis necessarily knew that his statements about the military made from January to August 2018 (¶¶115-19) were false because the agreement was a fiction of his own invention. *See* §II.A.1.

Willis also knew, or recklessly disregarded, that the statements he made about the other agreements were false or substantially likely to mislead investors ████████████████████

---

[17]    Defendant's authorities are therefore inapposite.  *See, e.g., Smallen v. W. Union Co.*, 950 F.3d 1297, 1310 (10th Cir. 2020) (MTD 18, 21) (defendants may not have known about others' wrongdoing); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1246 (10th Cir. 2016) (MTD 21, 23, 28, 30) (certain defendants may not have known about underlying data used so could not know projections were unrealistic); *MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1118 (10th Cir. 2014) (MTD 30) (defendants' opinion about future prospects supported by independent experts); *In re MGP Ingredients, Inc. Sec. Litig.*, 2021 WL 3885655, at *3, *16 (D. Kan. Aug. 31, 2021) (MTD 30) (involved a whiskey product that existed but was not selling).

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████ also shows that he was *at*

*least* deliberately reckless to a substantial likelihood of misleading investors. *See In re Tyco*

*Int'l, Ltd. MDL Litig.*, 2004 WL 2348315, at *13 (D.N.H. Oct. 14, 2004).

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████,

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████,

22



Thus, unlike in Willis's authority, Plaintiffs here ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### B.    Inventory Shortages Support Scienter

Willis also knew or recklessly disregarded inventory issues that would have prevented

NewAge from fulfilling the agreements that he described.  Willis's knowledge of or access to

NewAge's inventory status at the time of his statements is confirmed by his own statements and

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Voulgaris v.*

*Array Biopharma Inc.*, 2020 WL 8367829, at *21 (D. Colo. Nov. 24, 2020); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009).[18]



CW-2, in charge of shipping products to NewAge customers, who claimed that a distribution agreement as large as the one described would have "100%" affected CW-2 because CW-2 would have had to communicate it to product managers to begin the four-to-six-month process of producing the product necessary to satisfy the agreement's inventory requirements.  ¶206; §II.A.1.  However, no such communications took place.  *See*

---

[18]    Willis's authorities *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 121, 132 (E.D.N.Y. 2020) (MTD 20) and *Spiegel v. Tenfold Corp.*, 192 F. Supp. 2d 1261, 1264-65 (D. Utah 2002) (MTD 24) are distinguishable because performance of software programming may not be predicted until performance is due, whereas here, ███████████████████████████ ████████████████████████████████████████████████.

*Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 264 (3d Cir. 2009) (scienter found through "anecdotal" CW statements which were corroborated by internal reports.).

CW-3, who handled "everything related to the supply chain for…NewAge" claimed that at no time during CW-3's tenure would there have been sufficient inventory to satisfy major retail orders from the U.S. military, Korean retailers or Canadian retailers. ¶211. CW-3 provided that it could take "upwards of three to four months" for NewAge to obtain the bottles necessary to distribute its Kombucha (*i.e.*, Búcha) drinks and "upwards of six to nine months" to ship in volume orders as large as the purported agreements called for. ¶212. However, CW-3 never recalled receiving such large purchase commitments necessary to fulfill large retailer orders. *Id.* CW-3 also communicated with Willis about supply chain matters by email and claimed that Willis was in a position to know whether NewAge had sufficient inventory to fulfill the agreements he touted. ¶213;[19] *see In re NPS Pharms., Inc. Sec. Litig.*, 2007 WL 1976589, at *6 (D. Utah July 3, 2007); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *11 (N.D. Cal. Apr. 28, 2020) (CW allegations support inference of scienter because they establish that defendants "***had access to*** minutes, documents, and ***emails***" contradicting their statements).[20]

---

[19]    Willis asks this Court to draw improper inferences in his favor by suggesting that CW-3 could have communicated to Willis ███████████████████████████████████████ ███████████████████████████████████ This argument also conflicts with his effort to discredit CW-3 knowledge of events, when CW-3 was responsible for supply chain. (¶211; MTD 24-25).  Thus, *Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*, 79 F.4th 1209, 1219-20 (10th Cir. 2023) (MTD 21-22, 25); *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *7 (D. Colo. Jun. 21, 2005) (MTD 24-25); *Shafer v. Lightning eMotors, Inc.*, 2024 WL 691458, at *11-12 (D. Colo. Feb. 20, 2024) (MTD 25); and *Ellis v. Spectranetics Corp.*, 2018 WL 1583837, at *8 (D. Colo. Apr. 2, 2018) (MTD 25) are inapposite because here, Plaintiffs sufficiently identifies CW-3, why they have the requisite personal knowledge, and why it would reach Willis

## C.    Willis Knew The Truth About The CBD Portfolio

Willis knew when he made the CBD statements in late 2018 and early 2019 that the Company's CBD beverage was not yet complete, ███████████████████████ ███████████████████ ¶¶130, 132, 134-43, 218-28; *see Voulgaris*, 2020 WL 8367829, at *21. ████████████████████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████████ ██████████████████

Willis states that the statements were not misleading because Plaintiffs are confusing "developed" products with "saleable" products, and based on nothing but his say-so, claims that the definition of saleable products means products that were legally allowed to be sold.  This is a red herring—everything Willis and others said suggested that they had a product ready to be sold such that "we'll be in a position to act on these first" as regulatory barriers come down.  ¶140 (employee quote).

---

20  ████████████████████████████████████████████
████████████████████████████████

26

**D.        Willis Knew The Truth About NewAge's Internal And Disclosure Controls**

As explained in §IV.A-B, Willis necessarily knew that NewAge's internal and Disclosure Controls were ineffective because he was able to repeatedly and unilaterally make false and misleading statements about the agreements and the CBD portfolio.  *See also* §III.C.  He also knew that they were ineffective because of his knowledge of what was happening behind the scenes with the Ariix merger, including the closing without Ariix's audited financials and the investigation into the FCPA violations.  ¶¶269-83.

Willis argues that in ¶269 of the SAC, Plaintiffs plead that because the 2020 Ariix merger would prove disastrous, Willis's 2018 and 2019 statements were false and misleading.  MTD 27.  That is not Plaintiffs' allegation, as explained above.  Willis also sets up the strawman argument that Plaintiffs' allegations about the Ariix merger come from "an unproven allegation by NewAge's bankruptcy trustee" that Plaintiffs are not allowed to rely on.  MTD 27.  However, Plaintiffs were clear that those allegations in the SAC come from NewAge's own complaint against Willis, Cooper, and others, ***not*** the bankruptcy's trustees.  *See* SAC at 2; ¶¶272-83 (discussing NewAge's Adversary Complaint specifically and citing to paragraphs in that complaint as opposed to the bankruptcy trustee's).  This does not violate the Court's prior order.  NewAge's own complaint, as opposed to the trustee's complaint, contains admissions against interest that are exempted from the hearsay rule under FRE 801(d)(2).  ¶272-74.

**E.        Willis's Resignation Supports Scienter**

Resignations under suspicious circumstances, like Willis's, support scienter.  Willis resigned suddenly while the SEC investigation was ongoing.  ¶284.  *See*, *e.g.*, *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 975-76 (N.D. Cal. 2009) (resignations contemporaneous

with investigations support scienter).  Willis's resignation was also unusual because "it was effective immediately with no successor identified[,]" *In re Myriad Genetics, Inc. Securities Litigation*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021), ¶284, unlike in *In re Zagg Securities Litigation*, 2014 WL 505152, at *6 (D. Utah Feb. 7, 2014) (MTD 28).

### F.    Motive Supports Scienter

Though not required, allegations of "personal financial gain may weigh heavily in favor of a scienter inference…." *Tellabs*, 551 U.S. at 325.  Willis and NewAge were motivated by the "prospect of ever-greater compensation" and "desire to raise capital" to avoid the "looming threat of bankruptcy[.]" *Thornburg*, 695 F. Supp. 2d at 1202.

Specifically, Willis was motivated to artificially inflate NewAge's share price and make its prospects appear stronger to get a raise.  ¶61.  This worked: in early 2019, his salary more than doubled, and with stock awards and other compensation, he went from making $384,949 in 2018 to $2.1-$1.7 million in 2019 and 2020, respectively.  ¶¶263, 267.

He also made suspicious stock sales.  Willis, who never sold shares before, sold 1,220,541 shares (54% of his holdings) during the Class Period for over $3.2 million (¶¶260-62), dwarfing the 130,000 shares he bought.  *Pluralsight*, 45 F.4th at 1267 (sales of 5% and 12% of holdings supported scienter).  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, is inapposite.  28 F.4th 343, 355-56 (2d Cir. 2022) (defendants bought more shares than sold). 150,000 shares were sold the day after the fictional Walmart agreement was announced, and 750,000 were sold a month after the Ariix merger was announced.  ¶¶261-62.[21]

---

[21]    Defendant's authorities are distinct.  *See In re Molycorp, Inc. Sec. Litig.*, 2015 WL 1540523, at *23 (D. Colo. Mar. 31, 2015) (MTD 19, 29) (defendants unable to sell before class

Although he did not buy at the Class Period high, he sold his shares for 207,000% more than their worth post-Class Period.[22]  *See Pluralsight*, 45 F.4th at 1267 (defendants' sales at prices roughly 75% higher than post-class period price suspicious, without reference to class period high).  His supposed 10b5-1 plan does not save him either.  *See id.* at 1266–67 (rejecting 10b5-1 defense at this stage because such "plans can be manipulated easily"); *see S.E.C. v. Willis*, No. 22-cv-02744-GPG-SKC, Dkt. 42 at 21 n.10 (D. Colo. Sept. 29, 2023).  (finding Willis's trading suspicious and noting the 10b5-1 plan was adopted ***after*** many of the challenged statements were made).  Unlike in Willis's authority, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008) (MTD 29) where the bulk of shares sold were pursuant to a 10b5-1 plan, here, only less than 12% of the shares sold were reported, and each of those amounts—25,000 or less—was a small fraction of the next highest amount, 150,000.  MTD Ex. 14; ¶262.

---

period due to lock out period); *Prissert v. EMCORE Corp.*, 894 F. Supp. 2d 1361, 1374 (D.N.M. 2012) (MTD 28) (no meaningful trading history alleged); *Sorkin*, 2005 WL 1459735, at *11 (MTD 24-25, 29) (similar); *Smallen*, 950 F.3d at 1310 (MTD 21, 24, 27, 29) (exercising options before expiration and selling only 9,000 shares); *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020) (MTD 29) (similar); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 592 (S.D.N.Y. 2011) (MTD 29) (only one defendant alleged to have sold stocks and that defendant's holdings increased during the class period); *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 120 (3d Cir. 2018) (MTD 29) (lacked allegations to plausibly suggest defendants "timed their trades to improperly benefit from any particular disclosure"); *Reilly v. U.S. Physical Therapy Inc.*, 2018 WL 3559089, at *13-14 (S.D.N.Y. July 23, 2018) (MTD 29) (no defendants alleged to have sold any shares on suspicious dates); *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) (MTD 30) (low retained holdings were offset by the defendants' vested stock options).

[22]    Willis sold the shares for $3,297,854.56, which were worth $1,586.70 at the post-Class Period price of $0.0013.  ¶¶262, 299.

And even assuming that he sold to cover tax obligations, his trades would still "satisfy the 'motive' prong[.]"  *See City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *16 (S.D.N.Y. Mar. 25, 2013).[23]  Willis and NewAge were also motivated to use the artificially inflated stock to raise over $105 million and acquire multiple companies.  ¶¶250-59; *see Croker v. Carrier Access Corp.*, 2006 WL 2035366, at *3, *9-10 (D. Colo. July 18, 2006) (finding motive to acquire company with artificially inflated stock supports scienter).  Willis was also motivated to use the Ariix acquisition to misappropriate key assets to fund his and Cooper's competing venture.  ¶¶272, 275, 277-78, 281-82.

## IV.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

Fed. R. Civ. P. 8 applies to loss causation allegations.  *Hogan v. Pilgrim's Pride Corp.*, 2023 WL 8896324, at *6-7 (D. Colo. Dec. 26, 2023).  To plead loss causation, a plaintiff need only "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be…." *Dura*, 544 U.S. at 346-47; *In re Molycorp, Inc. Sec. Litig.*, 157 F. Sup. 3d 987, 1012 (D. Colo. 2016).

Loss causation can be alleged through: (1) "a corrective disclosure" theory which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth…leak[s] out" over time; or (3) "a theory of materialization of a concealed risk[,]" where "defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk

---

[23]    Willis's complaint that Plaintiffs have only pled his proceeds, not profits, does not negate scienter.  *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1195–96 (D. Colo. 2004) (stating that while "proceeds are not equal to profits," "the proceeds generated were substantial," and stating that "it is apparent that the stock sales of the individual defendants likely were, at minimum, significantly profitable for them").

materialized…." *Kessman v. Myriad Genetics, Inc.*, 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019).

Willis's claim that Plaintiffs have not pled the requisite "nexus" between the disclosures and drops in NewAge's stock price is merely an insistence that a disclosure "mirror" the earlier representations, which the law does not require. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (a "disclosure need not precisely mirror the earlier misrepresentation"). Rather, the truth can come out "through events constructively disclosing the fraud[.]" *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481 (S.D.N.Y. 2022). Plaintiffs more than adequately plead loss causation here.

### A.      The Corrective Disclosure And Leakage Theories

Willis misled investors by speaking about distribution agreements, NewAge's CBD portfolio, and the effectiveness of NewAge's internal and Disclosure Controls while concealing the truth about them and the Ariix FCPA investigation. The truth was gradually revealed in a series of partial disclosures: (1) Willis's resignation; (2) the NASDAQ notice regarding the late Form 10-Q; (3) NewAge's announcement of "strategic alternatives"; (4) NewAge's bankruptcy filing, to which the costs of the Ariix investigation contributed; (5) the resulting delisting from the NASDAQ; and (6) the SEC's C&D Order and Complaint. ¶¶164-70, 289-300. NewAge's stock plummeted in response to each of these disclosures. *Id.*

Willis concedes that the final disclosures—the SEC Complaint and C&D Order—are factually related to the challenged misstatements but argues that they do not qualify as corrective disclosures because they are "unproven allegations." MTD 31. It is well-established, however, that the announcement of government charges – *e.g.*, the SEC Complaint and C&D Order –

adequately supports loss causation. *See e.g., In re Allergan Generic Drug Pricing Sec. Litig.*, 2019 WL 3562134, at \*13-14 (D.N.J. Aug. 6, 2019); *Puddu v. 6D Glob. Techs., Inc.*, 742 F. App'x 553, 557 (2d Cir. 2018); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at \*15 (N.D. Cal. Feb. 15, 2018) (C&D order).[24]

The earlier disclosures are also adequately connected to the challenged statements.

First, Willis's resignation on January 10, 2022 caused NewAge's stock to plummet 6%. ¶164. There is a nexus between this event and the stock drop, as subsequent events can confirm an earlier event revealed the truth about a fraud or a part thereof. *See Mauss v. NuVasive, Inc.*, 2016 WL 3681831, at \*11 (S.D. Cal. July 12, 2016); *see also Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 322-23 (5th Cir. 2014) (resignation considered a part of totality of inquiry); *see* discussion at §III.E.

The same is true for the remaining disclosures. On May 17, 2022, NewAge received a NASDAQ notice that it was not in compliance with listing rules because its Form 10-Q was late, leading to an 8% drop. ¶165. Then, NewAge announced that it was undertaking a review of "strategic alternatives, including available financing alternatives, a potential financial restructuring or a reorganization, merger, sale or other strategic transaction" on June 8, 2022, leading to a 12% drop the next day, followed by further drops the following three days. ¶166. Events like these are appropriately considered part of the loss causation analysis, even if they are then-unexplained. *See Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*6, \*12 (M.D. Tenn. Apr. 26, 2011).

---

[24] Willis's authority, *Sapssov v. Health Management Associates, Inc.*, 608 F. App'x 855, 866 (11th Cir. 2015) (MTD 31), involved the announcement of a government investigation, not the charges announced here.

The reasons behind the late filing and review of strategic alternatives became clear following NewAge's bankruptcy announcementj, the SEC's revelations and the NASDAQ delisting, each of which was followed by significant stock price drops.  ¶167, ¶168.  *See Steiner v. Medquist Inc.*, 2006 WL 2827740, at \*20 (D.N.J. Sept. 29, 2006) (delisting linked to the fraud where delisting decision caused by an investigation into company's billing practices).

### B.     The Materialization Of The Risk Theory

A plaintiff can also "allege[] loss causation by showing that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Nakkhumpum II*, 782 F.3d at 1154.  Plaintiffs allege that the undisclosed risks of the invented/exaggerated agreements, invented/exaggerated CBD portfolio orders, and ineffective internal and Disclosure Controls included regulatory scrutiny, costly internal investigations, and their foreseeable consequences, such as the CEO's ouster due to his role in this misconduct, violations of NASDAQ listing rules, bankruptcy, delisting, and SEC charges for such lies. ¶¶289-300.  Thus, the decline in NewAge's stock price in response to these disclosures was a materialization of the risk concealed by Defendants' misrepresentations.  *See Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1045-46 (N.D. Cal. 2016) (finding materialization of the risk theory adequately pled where disclosures included a resignation, a retirement, and eventual restatement).

### V.     PLAINTIFFS STATE §20(a) CLAIMS

Willis only challenges Plaintiffs' §20(a) claim on the basis that Plaintiff failed to establish a §10(b) violation against him and NewAge.  Plaintiffs have pled a §10(b) violation, so the §20(a) claims survive.

**CONCLUSION**

For the foregoing reasons, Willis's motion should be denied in its entirety.  However,

should the Court determine that the SAC should be dismissed in whole or in part, Plaintiffs

respectfully request that the dismissal be without prejudice and that they be granted leave to

amend, which should be given "freely . . . when justice so requires."  Rule 15(a)(2).

Date: July 10, 2025                                        Respectfully submitted,

                                        By: *s/ James M. Wilson, Jr.*

                                        James M. Wilson, Jr.
                                        **FARUQI & FARUQI, LLP**
                                        685 Third Avenue, 26th Floor
                                        New York, NY 10017
                                        Telephone: 212-983-9330
                                        Facsimile: 212-983-9331
                                        E-mail: jwilson@faruqilaw.com

                                        Robert W. Killorin
                                        **FARUQI & FARUQI, LLP**
                                        3565 Piedmont Road NE Building Four
                                        Suite 380
                                        Atlanta, GA 30305
                                        Telephone: 404-847-0617
                                        Facsimile: 404-506-9534
                                        E-mail: rkillorin@faruqilaw.com

                                        *Attorneys for Lead Plaintiffs Damian*
                                        *Betebenner and Cigdem Betebenner and*
                                        *Lead Counsel for the Class*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Lead Plaintiffs' Memorandum in Opposition to Defendant Brent Willis's Motion to Dismiss the Second Amended Class Action Complaint complies with the type-volume limitation set forth in Judge Domenico's Practice Standards III(A)(1), and modified by the Court's April 29, 2025 order, Dkt. 121.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on July 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

1