**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:22-cv-03161-DDD-TPO

DENNIS CLIFTON, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY
SITUATED,

Plaintiff,

v.

BRENT WILLIS,
FRED COOPER,
TIM HAAS,
REGINALD KAPTEYN,
ALICIA SYRETT,
GREGORY GOULD,
CHUCK ENCE,
CARL AURE,
KEVIN MANION,
ED BRENNAN,
AMY KUZDOWICZ,
and GREG FEA,

Defendants.

---

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS
CARL AURE, ED BRENNAN, CHUCK ENCE, GREG FEA, GREG GOULD, TIM
HAAS, REGINALD KAPTEYN, AMY KUZDOWICZ AND KEVIN MANION'S
MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT**

---

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

STATEMENT OF FACTS ...................................................................................................... 3

ARGUMENT ........................................................................................................................... 5

I.     THE D&Os MADE MATERIALLY FALSE AND MISLEADING STATEMENTS ...... 5

       A.     The D&Os Are "Makers" Of Statements ...................................................... 6

       B.     Gould's Statements About Walmart ............................................................. 7

       C.     Gould's Statements About NewAge's CBD Beverage Portfolio ................ 9

       D.     D&Os' Statements About NewAge's Internal and Disclosure Controls ...... 12

II.    THE SAC SUFFICIENTLY PLEADS SCIENTER ......................................................... 17

       A.     Gould's Knowledge Regarding Walmart And CBD ................................... 17

       B.     The D&Os' Scienter Regarding NewAge's Internal And Disclosure Controls ... 19

              1.     Forms 10-Q and 10-K Filed in 2018-2020 ...................................... 19

              2.     Forms 10-Q and 10-K Filed in 2021 ............................................... 23

       C.     Personal Financial Motives Bolsters Strong Inference Of Scienter ........... 25

       D.     Other Circumstantial Evidence Supports Scienter ..................................... 27

III.   PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ...................................... 27

       A.     The Corrective Disclosure And Leakage Theories ..................................... 28

       B.     The Materialization of the Risk Theory ...................................................... 30

       C.     Defendants' Remaining Arguments Are Meritless ..................................... 31

IV.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(a) .......................................... 33

CONCLUSION ...................................................................................................................... 35

i

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ...............................................................................34

*In re Alstom SA Sec. Litig.*,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................34

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
   827 F.3d 1229 (10th Cir. 2016) ...............................................................................23

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007).................................................................15, 23

*In re Apogee Enters., Inc. Sec. Litig.*,
   2020 WL 1445856 (D. Minn. Mar. 25, 2020) ..........................................................25

*Arora v. HDFC Bank Ltd.*,
   671 F. Supp. 3d 305 (E.D.N.Y. May 1, 2023) ..........................................................15

*In re Banco Bradesco S.A. Sec. Litig.*,
   277 F. Supp. 3d 600 (S.D.N.Y. 2017).......................................................................15

*In re Barrick Gold Sec. Litig.*,
   2015 WL 1514597 (S.D.N.Y. Apr. 1, 2015)..............................................................22

*Barrie v. Intervoice-Brite, Inc.*,
   397 F.3d 249 (5th Cir. 2005) ...................................................................................20

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988).................................................................................................6

*In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011)..................................................................12, 32

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ........................................................................8

*In re Century Aluminum Co. Sec. Litig.*,
   749 F. Supp. 2d 964 (N.D. Cal. 2010) .....................................................................32

*City of Phila. v. Fleming Cos.*,
   264 F.3d 1245 (10th Cir. 2001) ...............................................................................27

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)..........................................................................................................3, 28

*Employees' Retirement System of the State of R.I. v. Williams Cos., Inc.*,
    889 F.3d 1153 (10th Cir. 2018) .............................................................................................16

*In re Enron Corp. Sec, Derivative & "ERISA" Litig.*,
    2005 WL 3504860 (S.D. Tex. Dec. 22, 2005)........................................................................29

*Evanston Police Pension Fund v. McKesson Corp.*,
    411 F. Supp. 3d 580 (N.D. Cal. 2019) ....................................................................................26

*In re Flower Foods, Inc. Sec. Litig.*,
    2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)........................................................................27

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)....................................................................................17

*Goines v. Valley Community Services Board*,
    822 F.3d 159 (4th Cir. 2016) ..............................................................................................2, 3

*In re Gold Resource Corp. Securities Litigation*,
    957 F. Supp. 2d 1284 (D. Colo. 2013)...................................................................................12

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ...............................................................................................9

*Gruber v. Gilbertson*,
    628 F. Supp. 3d 472 (S.D.N.Y. 2022)....................................................................................29

*Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*,
    2022 WL 889158 (E.D. Pa. Mar. 25, 2022)..............................................................................2

*In re Hamilton Bancorp, Inc. Sec. Litig.*,
    194 F. Supp. 2d 1353 (S.D. Fla. 2002) ..................................................................................34

*In re Honeywell Int'l Inc. Sec. Litig.*,
    182 F. Supp. 2d 414 (D.N.J. 2002) ........................................................................................10

*In re HP Sec. Litig.*,
    2013 WL 6185529 (N.D. Cal. Nov. 26, 2013) .......................................................................35

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ..............................................................................................10

*In re Int'l Rectifier Corp. Sec. Litig.*,
  2008 WL 9453468 (C.D. Cal. Dec. 31, 2008) ..........................................................................31

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)...................................................................................................................6

*Kessman v. Myriad Genetics, Inc.*,
  2019 WL 1330363 (D. Utah Mar. 25, 2019) ...........................................................................28

*In re Keyspan Sec. Litig.*,
  2003 WL 21981806 (E.D.N.Y. July 30, 2003)..........................................................................11

*Lattanzio v. Deloitte & Touche LLP*,
  476 F.3d 147 (2d Cir. 2007)......................................................................................................31

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) .............................................................................................7, 26

*Maher v. Durango Metals, Inc.*,
  144 F.3d 1302 (10th Cir. 1998) ................................................................................................33

*Mart v. Tactile Sys. Tech., Inc.*,
  595 F. Supp. 3d 788 (D. Minn. 2022).......................................................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).......................................................................................................................5

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystem Holdings, Inc.*,
  79 F.4th 1209 (10th Cir. 2023) .................................................................................................27

*In re Merck & Co., Inc., Sec., Derivative & "ERISA" Litig.*,
  2011 WL 3444199 (D.N.J. Aug. 8, 2011) ........................................................................5, 6, 33

*MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
  761 F.3d 1109 (10th Cir. 2014) ................................................................................................27

*Mishkin v. Zynex Inc.*,
  2011 WL 1158715 (D. Colo. Mar. 30, 2011) ...........................................................................18

*In re Molson Coors Beverage Co. Securities Litigation*,
  2020 WL 13499995 (D. Colo. Dec. 2, 2020)............................................................................22

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016).............................................................................23, 26, 28

iii

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ......................................................................11

*Nakkhumpun v. Taylor*,
782 F.3d 1142 (10th Cir. 2015) .................................................................. *passim*

*Nardy v. Chipotle Mexican Grill, Inc.*,
2019 WL 3297467 (D. Colo. Mar. 29, 2019) .......................................................17

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...................................................................................19

*Nykredit Portefølje Administration A/S v. Propetro Holding Corp.*,
2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)......................................................15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)......................................................................16

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)...............................................................................................16

*In re Parmalat Sec. Litig.*,
375 F. Supp. 2d 278 (S.D.N.Y. 2005).....................................................................31

*In re PetroChina Co. Ltd. Securities Litigation*,
120 F. Supp. 3d 340 (S.D.N.Y. 2015).....................................................................15

*In re PMA Cap. Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005)...........................................................15

*Prisset v. EMCORE Corp.*,
894 F. Supp. 2d 1361 (D.N.M. 2012) .....................................................................19

*Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ..................................................................................32

*In re QuantumScape Sec. Class Action Litig.*,
580 F. Supp. 3d 714 (N.D. Cal. 2022) ......................................................................9

*Ret. Sys. of Miss. v. Amedisys, Inc.*,
769 F.3d 313 (5th Cir. 2014) ..................................................................................32

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)..............................................................16

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009) ...................................................................................18

*S.E.C. v. Curshen*,
372 F. App'x 872 (10th Cir. 2010) .........................................................................................25

*S.E.C. v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ...............................................................................................16

*S.E.C. v. Goldstone*,
233 F. Supp. 3d 1169 (D.N.M. 2017) .......................................................................................7

*In re SemGroup Energy Partners, L.P. Sec. Litig.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010)................................................................14, 25, 33

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ................................................................................................27

*Smallen v. Western Union Co.*,
950 F.3d 1297 (10th Cir. 2020) ............................................................................................27

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2022)...............................................................................10, 11

*State of N.J. and Its Division of Inv. v. Sprint Corp.*,
314 F. Supp. 2d 1119 (D. Kan. 2004).....................................................................................33

*Steiner v. Medquist, Inc.*,
2006 WL 2827740 (D.N.J. Sept. 29, 2006) ............................................................................30

*In re Take-Two Interactive Sec. Litig.*,
551 F. Supp. 2d 247 (S.D.N.Y. 2008).....................................................................................32

*Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*,
690 F. Supp. 2d 959 (D. Ariz. 2010) .....................................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...........................................................................................................17, 25

*Thomas v. Magnachip Semiconductor Corp.*,
167 F. Supp. 3d 1029 (N.D. Cal. 2016) .................................................................................21

*In re Thornburg Mortg., Inc. Sec. Litig.*,
695 F. Supp. 2d 1165 (D.N.M. 2010) ....................................................................................26

*In re Thornburg Mortg., Inc. Sec. Litig.*,
 824 F. Supp. 2d 1214 (D.N.M. 2011) ......................................................................33

*In re Tronox, Inc. Sec. Litig.*,
 2010 WL 2835545 (S.D.N.Y. June 28, 2010) .........................................................31

*UA Loc. 13 Pension Fund v. Sealed Air Corp.*,
 2021 WL 2209921 (S.D.N.Y. June 1, 2021) ......................................................14, 21

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
 672 F. Supp. 2d 596 (S.D.N.Y. 2009).....................................................................15

*Voulgaris v. Array Biopharma Inc.*,
 2020 WL 8367829 (D. Colo. Nov. 24, 2020) .........................................................18

*In re Williams Sec. Litig.-WCG Subclass*,
 558 F.3d 1130 (10th Cir. 2009) ........................................................................29, 32

*In re Williams Sec. Litig.*,
 339 F. Supp. 2d 1206 (N.D. Okla. 2003)...................................................12, 25, 33

*Winslow v. BancorpSouth, Inc.*,
 2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).......................................................29

*Wolfe v. Aspenbio Pharma, Inc.*,
 587 F. App'x 493 (10th Cir. 2014) ..........................................................................23

*Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*,
 426 F. Supp. 3d 864 (D. Kan. 2019)...................................................................19, 23

*In re Zagg, Inc. Sec. Litig.*,
 797 F.3d 1194 (10th Cir. 2015) ...............................................................................26

**Statutes**

15 U.S.C. §78u-5(c)(1) ...............................................................................................11

**Other Authorities**

17 C.F.R. §229.308(a)(3)...............................................................................................12

17 C.F.R. §240.13a–15(e)..............................................................................................12

17 C.F.R. §240.13a–15(f) ..............................................................................................12

Fed. R. Civ. P. 15(a)(2)..................................................................................................35

Lead Plaintiffs Damian Betebenner and Cigdem Betebenner ("Plaintiffs") respectfully submit this memorandum of law in opposition to Defendants' Carl Aure, Ed Brennan, Chuck Ence, Greg Fea, Greg Gould, Tim Haas, Reginald Kapteyn, Amy Kuzdowicz and Kevin Manion's ("D&Os") motion to dismiss ("MTD").[1]

## INTRODUCTION

The SAC contains, *inter alia*, ███████████████████████████, the accounts of confidential witnesses ("CWs"), and NewAge's own admissions that detail what was really happening at the Company during the Class Period.  Specifically, the SAC alleges that Willis, Gould, and NewAge fabricated or grossly exaggerated agreements for NewAge's beverages with the military, certain retailers, and distributors and touted a largely fictional CBD beverage portfolio, all while certain Defendants repeatedly reassured the market that the Company had effective internal controls and disclosure controls and procedures ("Disclosure Controls") during their respective tenures at NewAge.  These falsehoods artificially inflated NewAge's stock price, allowing certain D&Os to receive large salary bumps beginning in 2019 (Gould, Brennan, Fea, Kapteyn, and Haas) and larger stock awards (Gould, Brennan, Fea, Kapteyn, and Haas), while Willis and Kapteyn also profited from suspiciously timed insider sales.  NewAge was also able to raise much-needed cash that allowed it to buy other companies and pivot into the multi-level-marketing ("MLM") beverage space, culminating in the disastrous

---

[1]     All "¶" references are to the Second Amended Class Action Complaint ("SAC").  Dkt. 114.  Unless otherwise noted, all capitalized terms mean the same as in the SAC, all emphasis is added and all citations, internal quotation marks, and footnotes are omitted.

1

Ariix merger that NewAge itself claims was the product of egregious self-dealing by Willis and others.

The truth came out in a series of partial disclosures, terminating in the SEC's Cease-and-Desist ("C&D") Order.

The D&Os largely ignore the SAC's new allegations[2] and draw implausible inferences from the few facts they do address, claiming (boldly) that Plaintiffs' case against them rests on their mere "association" with Willis. But the D&Os were not merely associated with Willis, they were officers and directors of a public company who owed their own duties to investors under the federal securities laws to abstain from misleading the market. Nonetheless, contrary to the law, they insist that they are not responsible for the statements they uttered orally (Gould) or the statements made in the documents they signed (all D&Os).

The D&Os further argue that their statements were not false or misleading, or made with scienter. At bottom, they claim that everything was Willis's fault. To be sure, the evidence adduced to date shows that Willis was highly culpable, but that does not negate the claims against the D&Os or absolve the D&Os who made false or misleading statements of liability under the federal securities laws. *See, e.g., Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharms. Indus. Ltd.*, 2022 WL 889158, at *19-20 (E.D. Pa. Mar. 25, 2022) (securities suit survived against certain defendants not charged by government).[3] By misrepresenting the scope

---

[2]    The D&Os misrepresent the Court's prior Order (Dkt. 112) as requiring a purge of any reference to the SEC's complaint or NewAge's Adversary Action (which is different from the action brought by the NAI Liquidation Trust discussed in the prior complaint). They are wrong as explained in the accompanying opposition to the motions to strike ("MTS Opp.").

[3]    *Goines v. Valley Community Services Board*, 822 F.3d 159 (4th Cir. 2016) is not to the contrary. There, the court found that the plaintiff "did not adopt the Incident Report as true

of NewAge's agreement with Walmart (Gould), the status of its CBD portfolio (Gould), and the effectiveness of NewAge's internal and Disclosure Controls (all D&Os at different times), the D&Os acted with, at least, "reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun v. Taylor* ("*Nakkhumpun II*"), 782 F.3d 1142, 1150 (10th Cir. 2015).

Furthermore, Plaintiffs have sufficiently alleged loss causation under the governing standard, Fed. R. Civ. P. ("Rule") 8, by providing "defendants with notice of what the relevant economic loss [or] the causal connection might be[.]" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

Even assuming, *arguendo*, that the D&Os are not themselves found liable under §10(b), they are control persons under §20(a) for NewAge's primary §10(b) violations as explained herein.

## STATEMENT OF FACTS

In 2018, Willis and NewAge announced a "new distribution agreement" with the military, and thereafter claimed NewAge had "begun shipments" of certain brands "in expanded distribution throughout Loblaws and Sobeys, the largest grocery retailers across Canada;" "signed a major distribution agreement" with South Korea's "largest food and beverage distributor" "to expand to all major retail outlets throughout the country immediately;" and the "first national distribution" of its Marley products to Walmart. ¶¶115, 121-23, 126, 146. They also told the market that NewAge had tested and developed a CBD-beverage portfolio, for which

---

simply by relying on the Report for some of the facts alleged in his complaint." *Id.* at 168. The same is true here with respect to the SEC Complaint and Adversary Complaint, as explained in the MTS Opp. That said, even if Plaintiff did adopt them as true, they do not negate any allegations in the SAC.

the Company's Health Sciences Division was "overseeing and carefully controlling production, quality, and its supply chain and sales channel partners[,]" and announced massive retail commitments and near-term launches.  ¶¶130; 135-43.  NewAge's stock rose on these announcements.  ¶¶121, 125, 129, 145, 149.

Although the foregoing was untrue, Gould nonetheless confirmed the development of NewAge's CBD portfolio and its near-term launch by touting the "material impact" its "CBD infused beverage portfolio launches" would have on NewAge's financials in 2019.  ¶140.  Gould also discussed NewAge's first "national distribution" with Walmart on a conference call, the scale of which he said would "grow significantly" and lead to "significantly increased revenue there."  ¶147.

While Willis, Gould, and NewAge were repeatedly disseminating blatantly false and misleading information about the foregoing, they and Ence, Aure, Fea, Brennan, Haas, Kapteyn, and Kuzdowicz were assuring investors that the Company had in place adequate internal and Disclosure Controls.  ¶¶151-54.

Given NewAge's buoyed stock price and seemingly improved prospects, certain D&Os' fortunes vastly increased due to the steady stream of false statements, with stock awards accounting for a great deal of their compensation.  Gould's salary increased from around $67,000 *to $500,000 per year* and he received $1,845,500 in stock awards (up from $0).  ¶267.  Fea, Brennan, Kapteyn, and Kuzdowicz also received substantial salary increases and an additional $100,000 in stock awards (up from $65,000).  *Id.*  Kapteyn sold 40% of his shares.  ¶266.

Meanwhile, NewAge capitalized on its artificially inflated share price to raise over $100 million, allowing it to pivot into the MLM beverage space by acquiring multiple companies.

4

¶¶250-59.  NewAge's acquisition spree would culminate in the ill-fated Ariix merger, which closed in November 2020 without Ariix's audited financials.  ¶¶98-103.  Post-closing, NewAge discovered Ariix's targeted working capital was ***negative $18 million***, and Japan suspended Ariix from recruiting new brand partners due to fraudulent practices that likely violated the FCPA.  ¶¶105-06.

Despite failing to ascertain this information before the merger closed, Willis, Gould, Fea, Brennan, Haas, Kuzdowicz, Aure, and Manion continued to mislead the market by disclosing a material weakness in internal controls unrelated to the real issues facing the Company.  ¶¶155-63.  Meanwhile, NewAge itself claims that Willis and Cooper misappropriated key assets NewAge acquired in the Ariix merger to fund a competing venture.  ¶¶272-83.

The truth came out in a series of partial disclosures thereafter, including Willis's resignation and NewAge's bankruptcy, which gradually revealed the truth previously concealed by Defendants, culminating in the SEC's Complaint and C&D Order that detailed Willis's and NewAge's misconduct.  ¶¶164-70.  NewAge stock plummeted on each revelation.  *Id.*

## ARGUMENT

### I.    THE D&Os MADE MATERIALLY FALSE AND MISLEADING STATEMENTS

It is unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).  By speaking about NewAge's relationships, CBD portfolio, and the effectiveness of its Disclosure Controls, the D&Os put these topics "in play," giving rise to a "duty to speak fully and truthfully" about them.  *In re*

*Merck & Co., Inc., Sec., Derivative & "ERISA" Litig.*, 2011 WL 3444199, at \*9 (D.N.J. Aug. 8, 2011).

An omitted fact is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

### A.    The D&Os Are "Makers" Of Statements

The maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Ordinarily, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made…only by-the party to whom it is attributed." *Id.* at 142-43.  Here, Gould made oral statements (¶¶140, 147) and all D&Os signed SEC filings (¶¶151-63) containing statements Plaintiffs alleged to be false or misleading.  This is sufficient to show that the D&Os were "makers" of those statements. *See, e.g., Janus*, 564 U.S. at 143 ("the content [of a speech] is…within the control of the person who delivers it."); *Merck*, 2011 WL 3444199, at \*25-26 (executive "made" statements in SEC filings he signed).

To be clear, Plaintiffs *only* allege that the D&Os are makers of statements in documents they signed or made orally and are not using "improper group pleading."  The SAC sets forth the statements alleged to be false and misleading in a section titled, "Materially False And Misleading Statements Issued During The Class Period," specifies that only "bold and italicized" statements in that section are challenged, and states which Defendant is responsible for which

statement. *See* SAC at 29-53. For example, the SAC provides who "made" each written statement by stating who signed or certified the documents in which the challenged statements appear. *See, e.g.*, ¶151-53, 155-57, 160-62. The D&Os state that Plaintiffs "evade the 'maker' requirement" by alleging that "the signatures on the Filings are themselves false statements," citing ¶¶151-54. MTD 11 n.7. However, those paragraphs explicitly indicate which statements are false and misleading by bolding and italicizing the challenged language (¶¶151-52), listing the documents that contain "substantially similar if not identical language" to those in ¶152 (¶153), providing who made which statement by listing who signed and certified each statement (¶¶151-53), and why each statement is false and misleading (¶154).[4] Nowhere does the SAC say that the ***signatures themselves*** are false and misleading.

Curiously, the D&Os rely on the SEC's C&D Order (despite claiming it cannot be considered) to place the blame for their own statements solely on Willis. However, the SEC does not allege that Willis is responsible for Gould's oral statements (¶¶140, 147) or for the statements signed by the D&Os (¶¶151-63). Even if it did, however, "nothing in *Janus* precludes a single statement from having multiple makers." *S.E.C. v. Goldstone*, 233 F. Supp. 3d 1169, 1204 (D.N.M. 2017).

### B.    Gould's Statements About Walmart

On May 9, 2019, Gould maintained the narrative about NewAge's Walmart agreement that was first published by Willis and NewAge in April 2019. Gould claims that he "never

---

[4]    Thus, the SAC is not a "puzzle" that leaves the court "the task of teasing out which specific statements are at issue." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1339 n.8 (10th Cir. 2012) (MTD 22-23).

suggested there was a long-term commitment from Walmart," MTD 20, but his oral statements

continued to give investors a misleading impression about the agreement's scope.  For example,

he stated that NewAge had secured a "national distribution" with Walmart that would "grow

significantly" and lead to "significantly increased revenue there."  ¶147.  In reality, ██

████████████████████████████████████████████████████████████████

████████████████████████████████████████.5  ██████

████████████████████████████████████████████

███████████████

Gould argues that his statements "reflected that this was a new and emerging

relationship," but the deal's newness is not in question—its scope is.  ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████  Gould argues that an analyst's

question shows that the market did not interpret his statements to mean that the product was in

every Walmart.  MTD 21.  However, Plaintiffs argue that the statements misrepresented the

agreement's scope by ████████████████████████████████████████

---

5   The Court previously stated that statements about a "national distribution" did not create "the misleading impression that NewAge had begun to and would be shipping them to all, or at least most U.S. WalMart Stores."  Dkt. 112 n.3.  Plaintiffs amended this allegation accordingly in the SAC based on the additional evidence gathered to address the Court's concerns.

███████████████████████████████████████████████████████████████

███████████████████████████████.[6]

Gould also argues that "national distribution" pertained to both Walmart *and* 7-Eleven, *i.e.*, that they were only collectively "national." MTD 20. This makes no sense considering that the press release issued a month prior announced NewAge's "first national distribution" with Walmart. ¶146.

## C.    Gould's Statements About NewAge's CBD Beverage Portfolio

On January 16, 2019, Gould stated: "[w]hen I look at this opportunity [CBD]…will the Marley and the other ***CBD infused beverage portfolio launches have a material impact on our financials*** in 2019? The answer to this is, yes." ¶140. By touting the material financial impact NewAge's CBD beverages would bring in ***that year***, Gould gave investors the impression that the portfolio was sufficiently developed such that it would soon be made available by retailers in the commercial market. Gould's statement was false and misleading because, unbeknownst to investors, ████████████████████████████████████████████████████████

████████████████████████████████████████. Thus, the non-existent portfolio could have no "material impact." *Id.*; *see In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 733-34 (N.D. Cal. 2022) (sustaining complaint where statements gave false impression that product was past conceptual stage and would soon be ready for commercialization).

---

[6]    *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124-25 (10th Cir. 1997) is inapposite. The court found that a statement that a merger would not dilute "future earnings" implicated no duty to disclose an earnings forecast before it was known. Here, Gould necessarily ███████ ████████████████████████████. *See* §II.

9

Gould's subsequent statement that NewAge is not going to make any specific forecasts or predictions about the CBD beverages, and that "the regulatory landscape" would likely present obstacles changes nothing, as he goes on to reaffirm his prior misleading statements:

> That's why, as Brent and Jay said, we are being measured and methodical. We are being first, but still very direct and diligent in our approach. ***But all indications from customers is this is a very big opportunity and we are perfectly positioned to take advantage of it in 2019***. At around $40 a case in wholesale revenue, which translates to great margins for retailers and a suggested retail price of $5 to $6, margin-wise, the product is very accretive to the overall New Age portfolio.
>
> The Marley CBD-infused portfolio will be one of our highest margin products in our portfolio and therefore, will positively impact the overall gross margin mix of the firm. So strategically, it should be material and it should be margin enhancing to our mix. ***It will be an upside to our 2019 plan and we will gain more information <u>and begin shipments later in this quarter.</u>*** And as the markets begin to open, we will release more news and have more insight on how this will affect the company's financials going forward.

Dkt. 95-1 at 7-8. "By voluntarily choosing to speak about [NewAge's CBD portfolio, Gould was] under a duty to be honest and forthright" about it. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1220 (D. Kan. 2022) ("*Sprint I*"); *see In re Honeywell Int'l Inc. Sec. Litig.*, 182 F. Supp. 2d 414, 419, 425-26 (D.N.J. 2002) (statements actionable where "[t]here were other undisclosed problems…that perpetrate[d] the illusion that new Honeywell was thriving"). Gould's statements were also reinforced by "Jay" (referenced above) who stated that NewAge produced its CBD portfolio "in time for Christmas" 2018, and that "every single grocery retailer that we met with at the [Winter fancy Food Show] placed an order, every single one, 100%. This is unprecedented." ¶140.

Gould argues that his CBD statements were puffery: "loosely optimistic statements that are so vague, so lacking in specificity…no reasonable investor could find them important." *Ind.*

*Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1249 (10th Cir. 2022).  Context is key.  What may seem to "be innocuous 'puffery' or [a] mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation."  *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).

Gould's statements about "the material impact" that "Marley and the other CBD infused beverage portfolio *launches* [will] have…on [NewAge's] financials *in 2019*" (¶140) were not "vague statements of optimism" in context but specific statements about their impending launch and their likely impact on NewAge's bottom line.  *In re Keyspan Sec. Litig.*, 2003 WL 21981806, at *17 (E.D.N.Y. July 30, 2003) (optimistic statements that defendants knew misrepresented existing facts found actionable).

Neither the PSLRA safe harbor nor the bespeaks caution doctrine protects Gould's material misstatements.  The safe harbor provides that a forward-looking statement is not actionable if it is issued with "meaningful cautionary statements," or was not knowingly false or misleading when made.  15 U.S.C. §78u-5(c)(1).  The bespeaks caution doctrine provides that "[f]orward-looking representations are…considered immaterial when…sufficiently specific risk disclosures or other cautionary statements concerning the subject matter of the statements at issue to nullify any potentially misleading effect."  *Sprint I*, 232 F. Supp. 2d at 1222.  The "safe harbor" disclosure Gould cites identifies which statements are "forward-looking" (MTD 18) but contains no cautionary statements that are "substantive and tailored to the specific" statements that are required by the safe harbor and the bespeaks caution doctrine.  *Sprint I*, 232 F. Supp. 2d at 1221.  Indeed, Gould points to nothing warning investors of the risks that already materialized

11

with respect to NewAge's CBD portfolio—



[7] The statements were also made with actual knowledge of their falsity.

*See* §II.

### D.    D&Os' Statements About NewAge's Internal and Disclosure Controls

Internal controls "provide reasonable assurance regarding the reliability of financial

reporting and the preparation of financial statements for external purposes in accordance with

generally accepted accounting principles…." 17 C.F.R. §240.13a–15(f).  Management cannot

"conclude that the registrant's internal control over financial reporting is effective if there

are…material weaknesses[.]"  17 C.F.R. §229.308(a)(3).  Disclosure Controls "ensure that

information required to be disclosed by the issuer" under the Exchange Act "is recorded,

processed, summarized and reported, within the" relevant "time periods[,]" and "accumulated

and communicated to the issuer's management,…as appropriate to allow timely decisions

regarding required disclosure."  17 C.F.R. §240.13a–15(e).  Disclosure Controls can be rendered

ineffective by material weaknesses in internal controls.  *See* ¶156.  Internal and Disclosure

Controls are material to investors.  *See In re Bear Stearns Cos. Sec., Derivative, & ERISA Litig.*,

763 F. Supp. 2d 423, 470-71 (S.D.N.Y. 2011).

---

[7]     *In re Gold Resource Corp. Securities Litigation*, 957 F. Supp. 2d 1284, 1298 (D. Colo. 2013) is inapposite because there, plaintiffs failed to plead that defendants' growth projections were unattainable, meaning the risk had not materialized.

On May 15 and August 14, 2018, Willis and Ence certified and signed SEC filings that stated (1) "[t]here have been no changes in our internal controls over financial reporting" that have "or are reasonably likely to materially affect," those controls, and (2) that they "evaluated the effectiveness of our [Disclosure Controls]" and concluded "that our [Disclosure Controls] are effective[.]" ¶¶151-52. Similar statements appeared throughout NewAge's 2019 and 2020 Forms 10-Q and 10-K, based on Willis and CFO Gould's evaluation, and signed by Willis and Gould (¶¶153(a)-(h)); and Fea, Brennan, Haas, Kapteyn, and Kuzdowicz (¶¶153(b), (e)).

These statements were false and/or misleading when made. The Disclosure Controls were not "effective" in ¶¶151-53 because Willis, Gould, and others were able to issue written and oral public statements *on multiple occasions* about fake/exaggerated agreements and a CBD portfolio that implied or outright stated were "expected to have a material impact on [NewAge's] financial results." ¶115; *see also* ¶¶116-49. For example, the May 15, 2018 statement regarding NewAge's internal and Disclosure Controls (covering Q1 2018, ¶151) was made by NewAge, Willis, and Ence after Willis and others made numerous false and misleading statements about the military agreement (Jan. 2018, ¶115), Loblaws and Sobeys (Feb. 2018, ¶¶122-23), and South Korean distribution (Feb. 2018, ¶¶126-27). This pattern continues with different speakers through November 9, 2020. *See* ¶153.

Plaintiffs are not alleging that the internal and Disclosure Controls "must have been deficient" because they may have failed to detect "some weaknesses" "in some instances." MTD 6. Rather, Plaintiffs allege that the repeated publication of material falsehoods (like a fabricated agreement with the military for all commissaries worldwide) over the course of several years necessarily implicates these controls. Either NewAge had Disclosure Controls in place to

13

prevent the unilateral publication of such statements regarding NewAge's finances and prospects that was continuously bypassed, or no such Disclosure Controls existed.  Alternatively, NewAge had material weaknesses in its internal controls that rendered its Disclosure Controls ineffective. *See UA Loc. 13 Pension Fund v. Sealed Air Corp.*, 2021 WL 2209921, at *3 (S.D.N.Y. June 1, 2021) (sustaining claim that the disclosure controls were ineffective and/or inadequately designed where company was able to file reports that misstated and/or omitted material facts).

Certain Defendants also misled the market in the March 18, 2021 Form 10-K by attesting to the accuracy and truthfulness of the statements made therein (Willis and Gould, ¶155) while stating (Fea, Brennan, Haas, Kuzdowicz, ¶¶156-58) that NewAge's Disclosure Controls were ineffective as of December 31, 2020 due to insufficient "resources to adequately monitor the consolidation of the financial information and purchase allocation of Ariix in order to prevent or detect material misstatements" due to the acquisition's "sizing and timing."  ¶157.  These statements were misleading for omitting the real reasons why NewAge's Disclosure Controls were ineffective as discussed above.  ¶159.  Substantially similar statements appeared in the August 9 and November 9, 2021 Form 10-Qs, signed by Willis and Manion, and were misleading for the same reasons.  ¶¶160, 162-63.

With respect to the statements at ¶¶156-58, the Disclosure Controls were also ineffective for the additional reason that NewAge only discovered the FCPA issues *after* the Ariix merger closed.  ¶¶20, 270.  NewAge's failure to timely ascertain this (and other information)— necessitating a ruinously expensive internal investigation—demonstrates that its internal controls were materially weak and therefore its Disclosure Controls were ineffective too.  *See In re SemGroup Energy Partners, L.P. Sec. Litig.*, 729 F. Supp. 2d 1276, 1289-90 (N.D. Okla. 2010);

14

*In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *10 n.8 (E.D. Pa. July 27, 2005) (similar); *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 607 (S.D.N.Y. 2009) (representations actionable where facts concerning internal controls were "much more serious than the picture conveyed[]").

The D&Os' authorities are distinguishable. *In re PetroChina Co. Ltd. Securities Litigation*, 120 F. Supp. 3d 340, 356 (S.D.N.Y. 2015) involved alleged fraud that **post-dated** the internal controls statements, and there were no allegations as to how or why the internal controls were inadequate. Here, no such timing issue exists and the "how" and "why" are clearly explained. *See, e.g.,* ¶¶154, 159, 163; *Arora v. HDFC Bank Ltd.*, 671 F. Supp. 3d 305, 315 (E.D.N.Y. May 1, 2023) (no explanation of how or why internal controls were ineffective); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) (same); *Andropolis v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 685 (D. Colo. 2007) (same).

Defendants argue that the deficiencies identified do not pertain to NewAge's "accounting," but its ineffective controls necessarily implicated the accuracy of the Company's financial reporting. *See Nykredit Portefølje Administration A/S v. Propetro Holding Corp.*, 2021 WL 9037758, at *6, *15-17 (W.D. Tex. Sept. 13, 2021) (internal controls not effective where "senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company[,]" which "had a pervasive impact, and as such, resulted in a risk that **could have** impacted virtually all financial statement account balances and disclosures").

Assuming, *arguendo*, that the foregoing statements were opinions, they are still actionable. A statement of opinion is false if the speaker does not hold the stated belief, or

15

misleading even if believed by the speaker if it "omits material facts about the [speaker's] inquiry into or knowledge concerning [the opinion], and if those facts conflict with what a reasonable investor…would take from the statement itself…." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 176 (2015).

The D&Os' statements were false because they did not believe their stated opinions considering their respective knowledge (*see* §II) about the repeated dissemination of false information about NewAge's agreements and CBD portfolio, and about the disastrous Ariix merger.  Alternatively, these statements were misleading for omitting that NewAge repeatedly failed to verify and prevent the spread of false and misleading information, and failed to timely discover and disclose Ariix's FCPA issues, causing the Company to be embroiled in a costly investigation.  *S.E.C. v. GenAudio Inc.*, 32 F.4th 902, 925 (10th Cir. 2022) (finding opinion misleading because it "omitted certain information that resulted in the statement being misleading to a reasonable investor").  Thus, the D&Os' statements about *why* their Disclosure Controls were ineffective were "misleading to a reasonable person" when read fairly and in context.  *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 32 (S.D.N.Y. 2019).  Thus, unlike in *Employees' Retirement System of the State of R.I. v. Williams Cos., Inc.*, disclosing the truth in this case would have "alter[ed] the meaning" of their statements.  889 F.3d 1153, 1163-64 (10th Cir. 2018).

The D&Os' arguments about what is required to be disclosed in SOX certifications misses the point.  MTD 14-15.  Once they spoke about NewAge's internal and Disclosure Controls, they put those controls "in play" and "cannot omit material facts related to that issue so as to make the disclosure misleading."  *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at

*13 (D.N.J. July 27, 2018).  Thus, this is not a case of mere mismanagement, but the failure "to disclose a specific material fact resulting from that mismanagement."  *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010).[8]

## II.    THE SAC SUFFICIENTLY PLEADS SCIENTER

A plaintiff may satisfy the scienter standard by showing either an intent to deceive or that "defendant acted with a reckless disregard of a substantial likelihood of misleading investors." *Nakkhumpun II*, 782 F.3d at 1150.  A court must "assess all the allegations holistically."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007).  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the smoking-gun genre or even the most plausible of competing inferences[.]"  *Id.* at 324.

### A.    Gould's Knowledge Regarding Walmart And CBD

Gould knew or recklessly disregarded that his oral statements about the Walmart agreement on May 9, 2019 were materially misleading.  ¶147.  ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[8]    *Nardy v. Chipotle Mexican Grill, Inc.*, 2019 WL 3297467, at *12 (D. Colo. Mar. 29, 2019) did not involve allegations regarding internal and Disclosure Controls.

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Gould also knew that the CBD portfolio could not have a "material impact on [NewAge's] financials" in 2019 when he spoke on January 16, 2019.  ¶140. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ It is unbelievable that a CFO who decided to talk to the market about the Company's CBD beverages and their impact on NewAge's financials would not have access to the portfolio's development status.  *See Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829, at *21 (D. Colo. Nov. 24, 2020) ("It is unclear what further facts [P]laintiffs would need to plead to create a stronger inference that [Defendants] had access to information [they] discussed publicly."); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (defendants' statements "demonstrate[d] that [he] knew about [company's] systems capacities").  His knowledge is also supported by CW-1's allegations, which unlike in the D&Os' authorities, are entitled to significant weight because the SAC "describes the bases of [their] knowledge, the positions they held, their exposure to the relevant conduct, and the relevant time frame." *Mishkin v. Zynex Inc.*, 2011 WL 1158715, at *7 (D. Colo. Mar. 30, 2011).  CW-1, who served as NewAge's Senior General Manager of Sales Operations & Customer Success – North America from December 2018 to July 2020, stated that NewAge did not have an ingestible CBD product.  ¶223.

18

Thus, Gould either knew before speaking that the portfolio could not materially impact NewAge's financials in 2019, or did not bother to check the status before speaking. Either way, he "should have realized the obvious risk that existing and potential shareholders would…be misled and that they might rely on the mischaracterization to their detriment." *Nakkhumpun II*, 782 F.3d at 1150.[9]

### B.    The D&Os' Scienter Regarding NewAge's Internal And Disclosure Controls

#### 1.    Forms 10-Q and 10-K Filed in 2018-2020

The D&Os signed annual and quarterly filings that stated NewAge's Internal and Disclosure Controls were adequate while knowingly and/or recklessly disregarding that they were not. *See Yellowdog Partners, LP v. CURO Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 875-76 (D. Kan. 2019) (finding defendants' failure to disclose information that they would have been closely monitoring to support inference of scienter); *see also Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (scienter can be alleged where "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.").

Specifically, on May 15, 2018 and August 14, 2018 then-CFO Ence certified and signed quarterly filings covering the first and second quarters of 2018 that contained false and misleading statements about internal and Disclosure Controls. ¶¶151-52. At that time, however, numerous false and misleading statements about the fictious military agreement (¶¶115-18), the

---

[9]    *Prisset v. EMCORE Corp.*, is inapposite because there, plaintiffs failed to plead who, within the defendant-company had contrary information and "what specific [contradictory] information [the witness] provided, or how and when he provided it." 894 F. Supp. 2d 1361, 1371 (D.N.M. 2012).

19

supposed Sobeys and Loblaws expansion (¶¶122-23),[10] and supposed commitments from "all major retail outlets" throughout South Korea (¶¶126-27) had been disseminated to the market through press releases, conference calls, and YouTube. *Id.*

Gould, Fea, Brennan, Haas, and Kudzowicz signed the Form 10-K filed April 1, 2019 (¶153(b)) which covered 2018, during which the foregoing false and misleading statements were able to be disseminated, along with statements about the CBD portfolio (¶¶115-39). They and Kapteyn also signed the Form 10-K filed March 16, 2020 (¶155) which covered 2019, and Gould certified and/or signed the quarterly filings for 2019 and 2020 (¶153(c)-(h)), during which additional false and misleading statements about the CBD portfolio and Walmart were made and not corrected (¶¶140-48).

These misrepresentations (¶¶115-48) were widely disseminated, and several were commented on by analysts and/or sent the stock soaring (¶¶121, 125, 129, 145, 149), meaning that they could not have gone unnoticed by the signing D&Os. Indeed, certain Defendants were present when some of these lies were told, and therefore necessarily knew that false information was being disseminated to the market. *See* ¶119 (Ence on call where Willis falsely stated that NewAge was selling "21 core SKUs" of its brands in the "military channel" that was "as big as Walmart in total sales throughout"); ¶136 (Gould on call where employee claimed NewAge had "overcommitments" of "well over 125,000 new points of distribution" for its CBD beverage portfolio). *Cf. Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 262 (5th Cir. 2005) ("[A] high

---

[10] ████████████████████████████████████████████████████

5.

ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements.").

Additionally, the SEC investigation into NewAge's business relationships and CBD portfolio began in 2019 and was still active when Gould, Brennan, Fea, Haas, Kapteyn, and Kuzdowicz signed the false and misleading SEC filings.  ¶¶109, 111.  Thus, it is inconceivable that these Defendants were unaware that the investigation was ongoing, and why NewAge was being investigated.  The dissemination of accurate information is highly relevant to whether a company's internal and Disclosure Controls are effective.  *See UA*, 2021 WL 2209921, at *3. Accordingly, if Fea, Haas, Kapteyn, Kuzdowicz, and Brennan checked information they had a duty to monitor prior to making the statements in ¶¶153(b), 153(e), 155-57—*i.e.*, whether the agreements and CBD portfolio existed as described in light of the SEC investigation, Willis's role in it, and ███████████████████████████████████████ they would have discovered that NewAge's internal and Disclosure Controls were ineffective because falsehoods about the agreements and CBD Portfolio were able to be disseminated repeatedly.  If they made those statements without checking, they therefore "failed to check information they had a duty to monitor" and "thereby knowingly or recklessly allowed dissemination of false" statements.  *Mart v. Tactile Sys. Tech., Inc.*, 595 F. Supp. 3d 788, 822 (D. Minn. 2022).

The Audit Committee members—Kuzdowicz (Chair from 2019-2022), Fea (2018-2021), Haas (2019-2021), and Kapteyn (2018-2020)—would have been especially reckless in light of their duty to monitor internal controls and "any fraud involving management or other employees with a significant role in such internal controls."  ¶¶244-45; *Thomas v. Magnachip Semiconductor Corp.*, 167 F. Supp. 3d 1029, 1043-44 (N.D. Cal. 2016) (finding scienter where

21

"responsible members of an Audit Committee should have noticed significant errors [], and that at the very least, a failure to do so was reckless on their part").[11]

Additionally, Ence, Gould, Aure, and Manion each "evaluated" the Company's internal and Disclosure Controls in their capacities as CFO and Chief Accounting Officer (Aure only) and signed the SEC filings in which these statements appeared. ¶¶151-52 (Ence); ¶¶153(a)-(h), 155-57 (Gould); ¶158 (Aure); ¶¶160-62 (Manion). If Ence, Gould, and Aure had evaluated the controls as they claimed, they would have discovered that numerous false and misleading press releases had been disseminated about material agreements and a CBD portfolio that NewAge did not actually have, and Aure and Manion would also have discovered the internal control issues related to the Ariix merger (*see* §II.B.2).

Additionally, ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████. *See, e.g., In re Barrick Gold Sec. Litig.*, 2015 WL 1514597, at *14 (S.D.N.Y.

---

[11] This is therefore dissimilar from the "[g]eneralized imputations of knowledge" found insufficient in *In re Molson Coors Beverage Co. Securities Litigation*, 2020 WL 13499995, at *9 (D. Colo. Dec. 2, 2020).

[12] Plaintiffs did not rely on a misleading heading by titling ¶¶244-46 "Audit Committee Scienter." MTD 5. This section explains the committee's membership, duties, and other knowledge regarding the Ariix merger, all of which are part of Plaintiffs' scienter allegations.

Apr. 1, 2015) (finding scienter regarding statements about internal controls where defendants were at the very least reckless in failing to confirm "before certifying a lack of material weakness in internal controls").

Defendants' authorities are not to the contrary.[13] In *Andropolis*, 505 F. Supp. 2d at 679, the forecast miscalculations at issue were not obvious, but the court noted that "direct evidence of knowledge or strong circumstantial evidence of willful blindness" can support a finding of scienter. *Id.* Here, the relevant facts regarding the misrepresented agreements and CBD portfolio were represented to the market as material developments and asked about by analysts. Thus, "the nature of the…facts" here were "of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter." *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016), *as amended* (Jan. 29, 2016); *see also Yellowdog Partners*, 426 F. Supp. 3d at 875 (business's importance "support[s] an inference that defendants closely monitored the transition and its effects").

### 2.    Forms 10-Q and 10-K Filed in 2021

For context, in November 2020, the Ariix merger closed ***without*** Ariix's audited financials. ¶103. Post-closing NewAge discovered that Ariix had negative $18 million in working capital, and Japan suspended Ariix due to fraudulent practices likely in violation of the FCPA, causing NewAge to launch an extremely costly investigation. ¶¶106-07.

---

[13]    *See Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1245 (10th Cir. 2016)*, as amended* (July 6, 2016) (finding that some defendants may not have known about underlying data used in projections, but noting that "executives' positions" are relevant to whether they would have certain knowledge); *Wolfe v. Aspenbio Pharma, Inc.*, 587 F. App'x 493, 498-99 (10th Cir. 2014) (finding defendant's ambiguous remark 1.5 years before first misleading statements did not add to scienter, but defendant's position was relevant).

23

On March 18, 2021, Gould, Fea, Brennan, Haas, and Kuzdowicz signed the Form 2020 10-K, wherein Gould certified the accuracy and truthfulness of the information contained therein, and wherein they disclosed a material weakness in internal controls "due to the size and timing of the acquisition of Ariix," but not the full truth regarding the repeated misrepresentations about NewAge's agreements, the CBD portfolio, and the internal investigation into Ariix.  ¶¶156-59. Aure certified a 10-Q with substantially similar language on May 10, 2021.  ¶158.  Manion did the same on August 9, 2021 and November 9, 2021, which omitted the same issues except for the Ariix investigation, which it disclosed while downplaying the toll it was taking on the Company. ¶¶160-63.

These Defendants necessarily knew or recklessly disregarded that these statements were false or misleading when made as discussed in §II.A-B.1, and those related to the FCPA investigation.

Audit Committee members Fea, Haas, and Kuzdowicz were necessarily involved in the investigation because the committee was responsible for "review[ing] and discuss[ing] with management and the Company's independent auditors disclosure relating to the Company's…internal controls…and disclosure controls and procedures" which included retaining outside auditors, counsel and accountants to perform an independent investigation into Ariix's international business practices.  ¶¶244-46.

Additionally, given the importance of the Ariix merger, it is inconceivable that Fea, Haas, Kuzdowicz, Brennan, Aure, and Manion as NewAge officers and/or Board and Audit Committee members, were unaware that NewAge did not have Ariix's audited financial statements before closing.  ¶103.  But even if they were unaware before closing, they necessarily knew

24

immediately thereafter when NewAge received the relevant information.  ¶¶105-06.  Thus, these Defendants had "access to material non-public information" and were "in a position to know" information such as the FCPA issue, "understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors."  *SemGroup*, 729 F. Supp. 2d at 1298.

Accordingly, if Fea, Haas, Kuzdowicz, Brennan, Aure, and Manion checked information they had a duty to monitor prior to making the statements in ¶¶155-57, they would have discovered that NewAge's internal and Disclosure Controls were ineffective.  ¶159.  If they made those statements without checking, they were deliberately reckless.  *See* §II.B.1.

Gould and Aure's knowledge is also supported by their admitted involvement in due diligence for the Ariix merger.  ¶271.  *See, e.g.*, *In re Apogee Enters., Inc. Sec. Litig.*, 2020 WL 1445856, at *12 (D. Minn. Mar. 25, 2020) ("[S]trong inference of scienter" shown by statement that "[d]efendants…participated in…due diligence process prior to acqui[sition.]")

Furthermore, Gould, Fea, Brennan, Haas, Kuzdowicz, Manion, and Aure "incurred a duty to disclose" the full truth "when [they] chose to explain" why the internal controls were inadequate (¶¶155-62).  *Nakkhumpun II*, 782 F.3d at 1152-53; *see also S.E.C. v. Curshen*, 372 F. App'x 872, 880 (10th Cir. 2010) ("[W]here a party without a duty elects to disclose material facts, he must speak fully and truthfully, and provide complete and non-misleading information.").

## C.    Personal Financial Motives Bolsters Strong Inference Of Scienter

Although motive is not required, *Williams*, 339 F. Supp. 2d at 1241, "personal financial gain may weigh heavily in favor of a scienter inference…." *Tellabs*, 551 U.S. at 325.  Here,

25

certain D&Os and NewAge were motivated by the "prospect of ever-greater compensation" and "desire to raise capital" to avoid the "looming threat of bankruptcy[.]" *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1202 (D.N.M. 2010) (subsequent history omitted).

Gould's salary skyrocketed in 2019 from $67,000 to $500,000. ¶264. This chasm was even larger when considering stock awards. In 2018, he made $72,013, and in 2019, he made over $3 million, with extremely high compensation continuing in 2020 for $835,337. ¶¶93, 264, 267.

Kapteyn, Kuzdowicz, Brennan, Fea, and Haas also had motive to make the challenged statements because their compensation was largely dependent on NewAge's stock price. In 2018, Kapteyn, Brennan, Fea, and Haas' stock awards were over 371%, 371%, 152%, and 371% greater than their respective salaries. ¶267. In 2019 and 2020, Kapteyn, Kuzdowicz, Brennan, Fea, and Haas' stock awards were over 169%, 129%, 142%, 53%, and 142% more than their salaries, respectively. *Id.*; *see Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 603 (N.D. Cal. 2019) (finding the fact that "executives' compensation from stock and cash awards far outstripped their base salaries" supported scienter).[14]

Kapteyn also sold 40% of his shares during the Class Period at suspicious times—one week after the false Walmart announcement and a few weeks after Willis's false announcement that CBD beverages were available at FamilyMart. ¶¶80-81, 266. *See Molycorp*, 157 F. Supp. 3d at 1009-10 (sales of 21% or more of stock suspicious).

---

[14]    The D&Os' authorities are inapposite. *See Level 3*, 667 F.3d at 1345 (false statements involved progress estimates that ***might*** have been inconsistent with a few internal reports); *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1206-07 (10th Cir. 2015) (no scienter where defendant disclosed the margin account he was allegedly motivated to conceal).

26

### D.    Other Circumstantial Evidence Supports Scienter

Gould left NewAge on March 5, 2021, three months after NewAge's FCPA investigation began.  ¶285.  CW-4 stated that Gould was fired by Willis because he told him to "walk away from Ariix."  ¶286.  Gould argues that this suggests he acted without intent to deceive, but "[s]cienter is not limited to situations in which a defendant acted with the primary purpose of misleading shareholders"—recklessness suffices.  *Nakkhumpum II*, 782 F.3d at 1150.[15]

The timing and circumstances of Gould's departure suggest that he was aware of and/or had access to information showing that the internal and Disclosure Control statements made after the Ariix merger closed were false and/or misleading when made.  ¶285.

Furthermore, the SEC's decision not to charge the D&Os does not mean they did not violate the securities laws.  *See* Introduction; *cf. Singer v. Reali*, 883 F.3d 425, 441 (4th Cir. 2018) ("[u]nfortunately for the Company, the duty to disclose may extend to uncharged and unadjudicated illegal conduct."); *In re Flower Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *8 (M.D. Ga. Mar. 23, 2018) (similar).[16]

## III.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

To plead loss causation, a plaintiff need only "allege a disclosure or revelation of truth about a defendant's prior misstatement or omission that is ***in some way*** connected with a drop in

---

[15]    *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1261 (10th Cir. 2001) does not say "intent to mislead" is required for weaknesses in internal controls.

[16]    The D&Os cite *Smallen v. Western Union Co.*, 950 F.3d 1297, 1310 (10th Cir. 2020), *MHC Mutual Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1122 (10th Cir. 2014), and *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystem Holdings, Inc.*, 79 F.4th 1209, 1217 (10th Cir. 2023), for the propositions that stock sales, meetings, and mere access to information on their own, respectively, are insufficient to allege scienter.  Plaintiffs allege more than that.

stock price." *Molycorp*, 157 F. Sup. 3d at 1012.  Rule 8 applies to loss causation allegations, which is "not meant to impose a great burden upon a plaintiff," and in the context of loss causation, requires only that plaintiffs "provide[] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be…." *Dura*, 544 U.S. at 347.

Loss causation can be alleged through: (1) "a corrective disclosure" theory which "reveals the fraud to the public"; (2) a "leakage theory" in which "the relevant truth … leak[s] out" over time; or (3) "a theory of materialization of a concealed risk[,]" in which "a plaintiff shows that the defendant's misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized." *Kessman v. Myriad Genetics, Inc*., 2019 WL 1330363, at *9 (D. Utah Mar. 25, 2019).

### A.    The Corrective Disclosure And Leakage Theories

The D&Os and Alicia Syrett ("Syrett")[17] misled investors by speaking about distribution agreements (Gould), NewAge's CBD portfolio (Gould), and the effectiveness of NewAge's internal and Disclosure Controls (D&Os and Syrett) while concealing that the agreements were non-existent or grossly exaggerated, the CBD portfolio was not as represented, and the Ariix FCPA investigation and its implications.  Plaintiffs allege that the truth was gradually revealed in a series of partial disclosures, ¶¶164-70, 289-300, all of which have a causal nexus to the D&Os' and Syrett's statements.

Willis's sudden resignation on January 10, 2022 caused NewAge's stock to plummet 6%. ¶164.  The D&Os argue that nothing in the press release announcing his resignation references

---

[17]    Syrett adopts the D&Os' loss causation arguments (Dkt. 129 at 6 n.7), so Plaintiffs address this element with respect to Syrett here.

"Walmart, the CBD portfolio or the Company's internal controls."  MTD 33.  A disclosure,

however, "need not precisely mirror the earlier misrepresentation[s]."  *In re Williams Sec. Litig.-*

*WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009).  Rather, the truth can come out "through

events constructively disclosing the fraud[.]"  *Gruber v. Gilbertson*, 628 F. Supp. 3d 472, 481

(S.D.N.Y. 2022).  Willis resigned during the SEC investigation with the "terms of his departure"

then undecided.  ¶284.  Thus, Willis's resignation strongly suggests that his departure—and the

accompanying stock drop—was causally related to the challenged statements and omissions tied

to the D&Os.  *See, e.g., In re Enron Corp. Sec, Derivative & "ERISA" Litig.*, 2005 WL

3504860, at *19 (S.D. Tex. Dec. 22, 2005) (officer's resignation, which only subsequent events

suggested was linked to the alleged fraud, supported loss causation).

The same is true for the remaining disclosures.  On May 17, 2022, NewAge announced

that it was not in compliance with NASDAQ listing rules because its Form 10-Q was late,

leading to an 8% drop.  ¶165.  Then, on June 8, 2022, NewAge announced that it was

undertaking a review of "strategic alternatives, including available financing alternatives, a

potential financial restructuring or a reorganization, merger, sale or other strategic transaction,"

leading to a 12% drop.  ¶166.  Events like these are appropriately considered part of the loss

causation analysis, even if they are then-unexplained.  *See Winslow v. BancorpSouth, Inc.*, 2011

WL 7090820, at *6, *12 (M.D. Tenn. Apr. 26, 2011).

The reasons behind the late filing and review of strategic alternatives became clear

following NewAge's bankruptcy announcement and the SEC's revelations.  On August 30, 2022,

NewAge announced its bankruptcy filing, and the following day *The Wall Street Journal*

reported it was due largely to the costs related to the Ariix investigation.  ¶167.  NewAge's stock

29

dropped another 39% and 26% over the next two trading days.  *Id*.  Then, NewAge announced

that NASDAQ would delist it due to NewAge's bankruptcy, leading to a 9% drop.  ¶168; *Steiner*

*v. Medquist, Inc.*, 2006 WL 2827740, at *20 (D.N.J. Sept. 29, 2006) (delisting linked to the fraud

where delisting decision caused by an investigation into company's billing practices).  These

disclosures revealed part of the truth about NewAge's underlying condition and the previously

undisclosed costs of the FCPA investigation that had been concealed by the challenged

statements.

The D&Os argue that the FCPA investigation costs were already known to the market

before the bankruptcy.  MTD 35.  However, the document they cite merely states that NewAge

"cannot reasonably estimate the amount of any potential loss on its financial statements at this

time."  2021 Form 10-Q at 25.  The "potential loss" referred to is not the incredible costs of the

FCPA investigation itself, which was revealed for the first time on August 31, 2022.  ¶167.

The final disclosures on October 18 and 19, 2022, the SEC Complaint and C&D Order,

revealed that Willis and NewAge repeatedly disseminated blatant falsehoods about NewAge's

agreements and CBD portfolio.  These disclosures are factually related to the D&Os' and

Syrett's statements because they reveal the truth previously concealed by it—that the agreements

and CBD portfolio were fictional/grossly exaggerated and NewAge's internal and Disclosure

Controls were ineffective for these reasons as well.

## B.    The Materialization of the Risk Theory

A plaintiff can also "allege[] loss causation by showing that the defendant's

misrepresentation concealed a risk that caused a loss for the plaintiff when the risk materialized."

*Nakkhumpum II*, 782 F.3d at 1154.  Plaintiffs allege that: (1) the risk that materialized was within

the zone of risk concealed by Defendants' false and misleading statements regarding the

distribution agreements, CBD portfolio, and internal and Disclosure Controls (foreseeability);

and (2) the materialization of the risk negatively impacted NewAge stock's value (causal link).

*Id*.

Specifically, the undisclosed risks of the invented/exaggerated distribution agreements,

invented/exaggerated CBD portfolio, and ineffective internal and Disclosure Controls included

regulatory scrutiny, costly internal investigations, and their foreseeable consequences, such as

the CEO's ouster due to his role in the misconduct, violations of NASDAQ listing rules,

bankruptcy, delisting, and SEC charges for such lies.  ¶¶289-300.  Thus, the decline in

NewAge's stock price in response to these disclosures was a materialization of the risk concealed

by the D&Os and Syrett's misrepresentations and omissions.  *In re Tronox, Inc. Sec. Litig.*, 2010

WL 2835545, at \*13 (S.D.N.Y. June 28, 2010); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278,

307 (S.D.N.Y. 2005).[18]

### C.    Defendants' Remaining Arguments Are Meritless

Citing no caselaw, the D&Os suggest that the length of time between certain statements

and the disclosures meant that the disclosures could not have been corrective.  However, no rule

requires a disclosure to occur within a particular timespan to be considered corrective.  *See In re*

*Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 9453468, at \*8-9 (C.D. Cal. Dec. 31, 2008) (2008

---

[18]    *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) is distinguishable because the risk concealed by the misstatements "was not the risk of Warnaco's bankruptcy, but the risk that Deloitte's audits were not conducted in accordance with generally accepted accounting practices."

31

disclosure corrected statements from 2003); *Pub. Emps.' Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 317-18, 326 (5th Cir. 2014) (statements made in 2005 first corrected in 2008).

The D&Os argue that the stock prices do not reflect a loss after the SEC announcements based on the ***opening*** prices of NewAge stock on October 18th to October 20th.  MTD 36. However, NewAge stock decreased approximately 93% from an opening price on October 20th of $0.0175[19] to a closing price that day of $0.0013 per share.  ¶299.  The drop is still steep when measured from closing prices: a 94% drop from a closing price of $0.0200 on October 18, 2022 to $0.0012 on October 19, 2022.  Either way, these drops "plausibly establish loss causation." *See, e.g., In re Century Aluminum Co. Sec. Litig.*, 749 F. Supp. 2d 964, 975 (N.D. Cal. 2010) (finding loss causation sufficiently pled where plaintiffs alleged a drop based on the closing prices, over defendants' insistence on using different prices).  Even if the D&Os are correct that the price did not decrease following those announcements, however, that is no bar to loss causation.  *See, e.g., In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 289 (S.D.N.Y. 2008) (plaintiffs alleged loss causation despite no stock drop upon the corrective disclosure because "the market already had taken account of such information").

Furthermore, "[a]t the motion to dismiss stage, it is not necessary to 'disentangle' or apportion losses resulting from the defendants' misstatements as opposed to losses resulting from" other causes.  *Bear Stearns*, 763 F. Supp. 2d at 521.[20]

---

[19]    The SAC mistakenly writes this value as $0.175.  ¶¶170, 299.
[20]    *Williams Securities Litigation-WCG Subclass*, 558 F.3d at 1143, is not to the contrary, as that court addressed what was necessary to prove loss causation at ***summary judgment***, not pleading stage.

**IV.    PLAINTIFFS STATE A CLAIM UNDER SECTION 20(a)**

To properly plead a control person claim under §20(a), a plaintiff need only allege "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304-05 (10th Cir. 1998). As a "complex factual question," assessing control person liability is not "ordinarily subject to resolution on a motion to dismiss…." *SemGroup*, 729 F. Supp. 2d at 1303-04.

Although the bankrupt NewAge is not a defendant, it was a maker of each challenged statement and was expressly identified as such. *See* ¶¶115-63, 174; *see Merck*, 2011 WL 3444199, at *25 ("*Janus* does not alter the well-established rule that a corporation can act only through its employees and agents."). Thus, NewAge likewise committed a primary violation of §10(b). *See In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1279 (D.N.M. 2011) ("Because the liability of the primary violator is simply an element of proof of a §20(a) claim, ... liability need not be actually visited upon the primary violator before a controlling person may be held liable for the primary violator's wrong.").

The D&Os argue that the SAC inadequately pleads their control over NewAge. But §20(a) is to be "construed liberally" and requires only "some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Williams*, 339 F. Supp. 2d at 1237. Here, each D&O certified and/or signed their name to at least one SEC filing that either attested to the adequacy of NewAge's inadequate internal and Disclosure Controls or failed to accurately convey the reasons why they were inadequate. ¶¶151-63; *see State of N.J. and Its Division of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1144-45 (D. Kan. 2004) (holding

33

that allegation that board members signed SEC filings containing misleading or fraudulent statement raised sufficient inference of control).[21]

Moreover, as explained in §II.B.1-2, Kuzdowicz, Haas, Fea, and Kapteyn each held positions as members of NewAge's Audit Committee.  ¶244; *Teamsters Loc. 617 Pension & Welfare Funds v. Apollo Grp., Inc.*, 690 F. Supp. 2d 959, 976, 982 (D. Ariz. 2010) (sustaining §20(a) claim where complaint alleged audit committee duties and that audit committee member "caused or allowed the dissemination of improper public statements…."); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 488 (S.D.N.Y. 2005) (audit committee member who signs an SEC filing has the power to control those who write the report, within the meaning of §20(a)).

Kuzdowicz, Haas, Fea and Brennan were also Board members who attended no "fewer than 75%" of the meetings held where matters ranging from employee compensation to NewAge's agreements and product portfolio were likely discussed.  ¶¶240-43, 263.  These D&Os' positions as members of an involved Board, alone, are sufficient to allege control.  *See, e.g., In re Hamilton Bancorp, Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359-60 (S.D. Fla. 2002) ("[A]llegations that individuals, because of their management and/or director positions, could control a company's general affairs...are sufficient to state a cause of action for controlling person liability.").

Furthermore, Gould, Ence, Aure and Manion's primary and secondary liability is established for the false and misleading statements they knowingly issued that were specifically attributed to them in the SAC as signers, speakers and/or conference call participants.  ¶¶119,

---

[21]    Thus, unlike in *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003), Plaintiffs have explained why the D&Os exerted control over the company.

140, 144, 147-48, 288; *In re HP Sec. Litig.*, 2013 WL 6185529, at \*2, \*12 (N.D. Cal. Nov. 26, 2013) (finding officer was a control person when she "signed [] regulatory reports, and participated in investor conference calls and interviews…").

The D&Os argue that Plaintiffs have not matched each Defendants' period of control to a specific primary violation by NewAge, but Plaintiffs alleged that each served as a control person "by reason of their status as senior executive officers and/or directors of NewAge," and are thus only responsible as a control person for NewAge's §10(b) violations while they were in those roles. *See* ¶¶35-39, 41-44, 336.

## CONCLUSION

For the foregoing reasons, D&Os' motion should be denied in its entirety. If the Court disagrees, Plaintiffs respectfully request that the dismissal be without prejudice and that they be granted leave to amend, which should be given "freely … when justice so requires." Rule 15(a)(2).

Dated: July 10, 2025

Respectfully submitted,

By: <u>s/ James M. Wilson, Jr.</u>

James M. Wilson, Jr.
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
E-mail: jwilson@faruqilaw.com

Robert W. Killorin
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380

Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
E-mail: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiffs Damian Betebenner and*
*Cigdem Betebenner and Lead Counsel for the Class*

36

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that the foregoing Lead Plaintiffs' Memorandum in Opposition to Defendants Carl Aure, Ed Brennan, Chuck Ence, Greg Fea, Gregory Gould, Tim Haas, Reginald Kapteyn, Amy Kuzdowicz and Kevin Manion's Motion to Dismiss the Amended Class Action Complaint complies with the type-volume limitation set forth in Judge Domenico's Practice Standards III(A)(1), and modified by the Court's April 29, 2025 order, Dkt. 121.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.

**CERTIFICATE OF SERVICE**

I, James M. Wilson, Jr., hereby certify that on July 10, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

s/ James M. Wilson, Jr.
James M. Wilson, Jr.